| **Fill in this information to identify the case:** |
| United States Bankruptcy Court for the: |
| Southern District of New York |
| Case number (*If known*): _____ Chapter 15 |

☐ Check if this is an amended filing

Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding   12/15

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).**

**1. Debtor's name**

Grupo Antolin-Autotrim, S.A.U.

**2. Debtor's unique identifier**

**For non-individual debtors:**

☐ Federal Employer Identification Number (EIN)  ___ ___ – ___ ___ ___ ___ ___ ___ ___

☑ Other A09097080 . Describe identifier Spanish Tax ID Number .

**For individual debtors:**

☐ Social Security number:  xxx – xx– ____ ____ ____ ____

☐ Individual Taxpayer Identification number (ITIN): **9** xx – xx – ____ ____ ____ ____

☐ Other _____. Describe identifier _____.

**3. Name of foreign representative(s)**

Cristina Blanco Santo Tomás

**4. Foreign proceeding in which appointment of the foreign representative(s) occurred**

Proceeding under Spanish Insolvency Law

**5. Nature of the foreign proceeding**

*Check one:*

☑ Foreign main proceeding
☐ Foreign nonmain proceeding
☐ Foreign main proceeding, or in the alternative foreign nonmain proceeding

**6. Evidence of the foreign proceeding**

☐ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

☑ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.
Resolutions; homologation request documents; documents appointing
Lexaudit as Restructuring Expert; translations of all foreign documents

**7. Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)
☑ Yes

Debtor   Grupo Antolin-Autotrim, S.A.U.                Case number (*if known*)_____
         Name

**8. Others entitled to notice**   Attach a list containing the names and addresses of:

(i)   all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)   all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii)   all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

**Country where the debtor has the center of its main interests:**

Spain

**Debtor's registered office:**

C/Vitoria número 307
Number     Street

_____
P.O. Box

Burgos                           09007
City     State/Province/Region     ZIP/Postal Code

Spain
Country

**Individual debtor's habitual residence:**

_____
Number     Street

_____
P.O. Box

_____
City     State/Province/Region     ZIP/Postal Code

_____
Country

**Address of foreign representative(s):**

C/Vitoria número 307
Number     Street

_____
P.O. Box

Burgos                           09007
City     State/Province/Region     ZIP/Postal Code

Spain
Country

**10. Debtor's website** (URL)   https://www.antolin.com/

**11. Type of debtor**   *Check one:*

☑ Non-individual (*check one*):

   ☑ Corporation.  Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

   ❑ Partnership

   ❑ Other.  Specify: _____

❑ Individual

Debtor    Grupo Antolin-Autotrim, S.A.U.                          Case number (*if known*)_____
          Name

**12. Why is venue proper in *this district*?**

Check one:

☐ Debtor's principal place of business or principal assets in the United States are in this district.

☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:
_____.

☑ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:
Chapter 15 cases of affiliates are pending in this district.

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✗ /s/ Cristina Blanco Santo Tomás                    Cristina Blanco Santo Tomás
   Signature of foreign representative               Printed name

Executed on    07/20/2026
               MM  / DD / YYYY

✗ _____            _____
   Signature of foreign representative               Printed name

Executed on    _____
               MM  / DD / YYYY

**14. Signature of attorney**

✗ /s/ Chad J. Husnick                        Date    07/20/2026
   Signature of Attorney for foreign representative       MM  / DD / YYYY

Chad J. Husnick
Printed name

Kirkland & Ellis LLP and Kirkland & Ellis International LLP
Firm name

333 West Wolf Point Plaza
Number        Street

Chicago                                    Illinois      60654
City                                       State        ZIP Code

(312) 862-2000                             chad.husnick@kirkland.com
Contact phone                              Email address

4855995                                    NY
Bar number                                 State

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 15 |
| GRUPO ANTOLIN-IRAUSA, S.A.U.,[1] | ) |
| | ) Case No. 26-[●] ([●]) |
| Debtors in a Foreign Proceeding. | ) |
| | ) (Joint Administration Requested) |
| | ) |

**STATEMENTS REQUIRED BY**
**(I) SECTION 1515(c) OF THE BANKRUPTCY**
**CODE AND (II) FED. R. BANKR. P. 1007(a)(4)(A)**
**AND 7007.1, AND CONSOLIDATED VERIFIED**
**LIST PURSUANT TO FED. R. BANKR. P. 1007(a)(4)(B)**

I, Cristina Blanco Santo Tomás, in my capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors, each of which is a party to a foreign proceeding in Spain (the "Spanish Proceedings") before the *Sección de lo Mercantil del Tribunal de Instancia de Burgos, Plaza número 1*, submit (a) a statement as required by section 1515(c) of title 11 of the United States Code (the "Bankruptcy Code"); (b) a corporate ownership statement as required by rules 1007(a)(4)(A) and 7007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (c) the list attached hereto as **Exhibit A**, which contemplates each of the following pursuant to rule 1007(a)(4)(B) of the Bankruptcy Rules:

(i)      all persons or bodies authorized to administer the debtor's foreign proceedings;

(ii)     all entities against whom provisional relief is sought under § 1519; and

---

[1]   A complete list of each of the Debtors in these chapter 15 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Antolin.   The location of Debtor Grupo Antolin-Irausa, S.A.U.'s corporate headquarters and the Debtors' service address in these chapter 15 cases is C/Vitoria número 307 / Burgos / 09007 / Spain.

(iii)    all parties to litigation pending in the United States in which the debtor was a party when the petition was filed.

**A.  <u>Statement Required by Section 1515(c) of the Bankruptcy Code</u>**

The Foreign Representative submits that, besides the Spanish Proceedings, the Debtors are not subject to any other foreign proceedings (as that term is defined in section 101(23) of the Bankruptcy Code).

**B.  <u>Corporate Ownership Statement Pursuant to Rules 1007(a)(4)(A) and 7007.1 of the Bankruptcy Rules</u>**

The Foreign Representative submits that the Debtors are privately held and wholly owned by non-Debtor Grupo Antolin Holdco S.A.

I declare under penalty of perjury under the laws of the United States of America that the information in the attached list is true and correct.

Burgos, Spain
Dated:  July 20, 2026

/s/ Cristina Blanco Santo Tomás

Cristina Blanco Santo Tomás
Chief Executive Officer
Grupo Antolin-Irausa, S.A.U.

**Exhibit A**

List of Entities Entitled to Notice Pursuant to Bankruptcy Rule 1007(a)(4)

**All persons or bodies authorized to administer the debtor's foreign proceedings:**

Cristina Blanco Santo Tomás
Calle Vitoria 307
Burgos, Spain 09007

**All entities against whom provisional relief is sought under § 1519:**

The Debtors will be seeking provisional stay relief under section 1519 of the Bankruptcy Code against the entities listed in **Exhibit 1** attached hereto, and any other entity that may otherwise take any action proscribed by section 362 of the Bankruptcy Code against the Debtors within the territorial jurisdiction of the United States.

**All parties to litigation pending in the United States in which the debtor was a party when the petition was filed:**

Rodney S. Scott, as Commissioner of U.S. Customs and Border Protection
-and-
U.S. Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington, D.C. 20229

NowAccount Network Corporation
Patrick J. Kilburn, Counsel for NowAccount North America LLC
Lloyd & McDaniel, PLC
P.O. Box 23200, Louisville, KY 40223-0200

Daehan Solution Georgia, LLC
791 Progress Parkway
West Point, GA 31833 (USA)

Office of the U.S. Trade Representative
600 17th Street NW
Washington, D.C. 20508

Quanta Burse
1704 Walnut Street
Hopkinsville, KY 42240

Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC 20530

**Exhibit 1**

| Name | Address |
|---|---|
| Deutsche Trustee Company Limited | Attention: Debt & Agency Services – Managing Director<br>21 Moorfields<br>London EC2Y 9DB<br>United Kingdom |
| Deutsche Trustee Company Limited | Attention: Debt & Agency Services – Managing Director<br>21 Moorfields<br>London EC2Y 9DB<br>United Kingdom |
| Deutsche Bank AG, London Branch | Attention: Debt & Agency Services – Managing Director<br>21 Moorfields<br>London EC2Y 9DB<br>United Kingdom |
| Banco Bilbao Vizcaya Argentaria, S.A. | Pablo Arsuaga Arana<br>Ciudad BBVA. Edificio Oceanía, 2ª planta. C/ Sauceda 28, 28050, Madrid |
| European Investment Bank | Attention: OPS/IBERIN4<br>100 boulevard Konrad Adenauer<br>L-2950 Luxembourg |
| Banco Bilbao Vizcaya Argentaria, S.A. | ALVARO SANTOS ANGARITA<br>Ciudad BBVA, Calle Azul 4 - Oceania Planta 2ª 28050 Madrid |
| Banco Bilbao Vizcaya Argentaria, S.A., New York Branch | ALVARO SANTOS ANGARITA<br>Ciudad BBVA, Calle Azul 4 - Oceania Planta 2ª 28050 Madrid |
| Atradius Crédito y Caución, S.A. de Seguros y Reaseguros | Francisco Javier NEIRA MENENDEZ<br>Paseo de la Castellana, 4 28046 |
| Deutsche Bank Aktiengesellschaft | Javier Rapallo<br>Paseo de la Castellana, 18, 28046 Madrid |
| HSBC Bank, plc | Juan Amoraga<br>Torre Picasso, Pza Pablo Ruiz Picasso 1, Planta 32. 28020 Madrid |
| Grupo Antolin-Irausa, S.A.U. | Concha Ortuño<br>Igor Renedo<br>Calle Vitoria 307, Burgos, Spain 09007 |
| Banco Santander, S.A. | Allen Overy Shearman Sterling US LLP<br>Attn: Fredric Sosnick and Mira J. Soldon<br>599 Lexington Avenue<br>New York, New York 10022 |
| Banco de Sabadell, S.A. | Allen Overy Shearman Sterling US LLP<br>Attn: Fredric Sosnick and Mira J. Soldon<br>599 Lexington Avenue<br>New York, New York 10022 |
| CaixaBank, S.A. | Allen Overy Shearman Sterling US LLP<br>Attn: Fredric Sosnick and Mira J. Soldon<br>599 Lexington Avenue<br>New York, New York 10022 |

| | |
|---|---|
| Banco Bilbao Vizcaya Argentaria, S.A. | Allen Overy Shearman Sterling US LLP<br>Attn: Fredric Sosnick and Mira J. Soldon<br>599 Lexington Avenue<br>New York, New York 10022 |
| Bankinter, S.A. | Allen Overy Shearman Sterling US LLP<br>Attn: Fredric Sosnick and Mira J. Soldon<br>599 Lexington Avenue<br>New York, New York 10022 |

**Resolutions**

**ACTA DEL CONSEJO DE ADMINISTRACIÓN DE GRUPO ANTOLÍN – AUTOTRIM, S.A.U.**

Este acta recoge los acuerdos adoptados en el domicilio social, por el consejo de administración de Grupo Antolín – Autotrim, S.A.U. (la "**Sociedad**"), por el procedimiento escrito y sin sesión, con fecha 17 de junio de 2026, siendo esta la fecha de recepción del último de los votos recibidos, de conformidad con lo previsto en el artículo 100 del Reglamento del Registro Mercantil, aprobado por el Real Decreto 1784/1996, de 19 de julio (el "**RRM**").

En escritos aparte, que se adjuntan al presente acta, todas las personas integrantes del consejo de administración de la Sociedad, esto es:

- Cristina Blanco Santo Tomás (en su condición de presidenta, consejera delegado y consejera),

- Ignacio Martínez Contreras (en su condición de vicepresidente y consejero),

- Igor Carlos Renedo Rafols (en su condición de consejero),

han manifestado su conformidad a la adopción de acuerdos por el consejo de administración de la Sociedad por el procedimiento escrito y sin sesión, así como su voto escrito respecto de los acuerdos sometidos a su consideración.

Por consiguiente, quedan formalmente adoptados por unanimidad de todos los votantes miembros del consejo de administración los siguientes

**ACUERDOS**

**PRIMERO.- Aprobación de la Reestructuración y de los Documentos de la Reestructuración.**

Los miembros del consejo de administración de la Sociedad aprueban, por unanimidad, la reestructuración del endeudamiento financiero listado en el **Anexo I** (el "**Endeudamiento Financiero Afectado**") respecto de los cuales la Sociedad tiene, de todos o de parte, la consideración de deudor, garante, obligado o cualquier otra condición (según proceda) en los términos y condiciones previstos en el borrador de hoja de términos que se adjunta como **Anexo II** (el "**Term Sheet**") con el fin de proceder a una reordenación del Endeudamiento Financiero Afectado que refuerce la viabilidad de la Sociedad y del Grupo y que fortalezca adecuadamente su estructura de capital, adaptándola a la situación actual del mercado (la "**Reestructuración**"), todo ello sin perjuicio de las modificaciones que aun sea necesario o conveniente realizar durante el proceso de negociación de la correspondiente documentación, incluyendo

1

cualesquiera cambios requeridos por las entidades participantes del Endeudamiento Financiero Afectado.

Los términos y expresiones que comienzan con letra mayúscula tendrán el significado que se les atribuye en el Term Sheet, salvo que se indique expresamente otra cosa o del contexto se deduzca otro significado.

Se hace constar que el deber de los miembros del consejo de administración de la Sociedad es en todo momento actuar en el mejor interés de la Sociedad y que, en circunstancias en las que una sociedad se enfrenta a dificultades financieras (y, en particular, cuando existe probabilidad de insolvencia), los consejeros deberán tener debidamente en cuenta, como mínimo, (i) los intereses de los acreedores, los socios, los empleados de la Sociedad y otras partes interesadas, (ii) la necesidad de adoptar medidas para evitar la insolvencia; y (iii) la necesidad de evitar conductas deliberadas o gravemente negligentes que pongan en peligro la viabilidad del negocio. En consecuencia, los miembros del consejo de administración señalan que, en caso de ser necesario, seguirán: (a) recabando asesoramiento profesional con respecto a sus obligaciones y considerando cuidadosamente dicho asesoramiento; (b) reuniéndose periódicamente para revisar la situación financiera y de flujo de caja de la Sociedad; y (iii) manteniendo registros exhaustivos de su toma de decisiones.

En el marco de la Reestructuración, los miembros del consejo de administración de la Sociedad han analizado la conveniencia y el interés propio de la Sociedad en relación con la Reestructuración, concluyendo que la Reestructuración contribuye a beneficiar y reforzar la situación financiera de la Sociedad y de cada una de las sociedades del Grupo.

Asimismo, en el contexto de la Reestructuración, VEST Partners Estrada, S.L., como experto en valoración en la Reestructuración, ha elaborado los siguientes informes: (a) el informe de valoración de los activos denominados "Activos Designados" en el Term Sheet Comercial; (b) el informe del valor de reestructuración del Grupo; (c) el informe relativo a la prueba del interés superior de los acreedores (*BIC test*); (d) el informe sobre el principio de equidad y la regla de prioridad absoluta en el contexto de la Reestructuración; y (e) el plan de viabilidad del Grupo.

Los miembros del consejo de administración de la Sociedad han analizado la conveniencia y el interés propio de la Sociedad en relación con la Reestructuración, concluyendo que la Reestructuración contribuye a beneficiar y reforzar la situación financiera de la Sociedad y de cada una de las sociedades del Grupo.

Los miembros del consejo de administración de la Sociedad consideran que, tras haber analizado todos los hechos y circunstancias relevantes, incluida la situación de liquidez actual de la Sociedad, la suscripción del contrato de compromiso de apoyo a la recapitalización (en inglés "*Recapitalisation Support Agreement*", tal y como este término se define más adelante) y del Plan de Reestructuración (tal y como este término se define más adelante) redunda en el

2

mejor interés de las partes interesadas de la Sociedad (incluidos sus acreedores en su conjunto), ya que proporcionaría a la Sociedad y a las demás empresas del Grupo la liquidez necesaria para su viabilidad en el corto y medio plazo, ampliaría el vencimiento del Endeudamiento Financiero Afectado y reforzaría la estructura de capital del Grupo.

Por lo tanto, a raíz de lo anteriormente expuesto y en vista de que la Reestructuración es en interés y beneficio de la Sociedad y de las restantes sociedades del Grupo, los miembros del consejo de administración de la Sociedad aprueban la Reestructuración, así como la formalización por parte de la Sociedad como deudor, garante, obligado, promitente o en cualquier otra condición (según proceda), de cuantos documentos públicos o privados resultaren necesarios o convenientes en el contexto de la Reestructuración y, en particular, pero sin limitación, la suscripción y otorgamiento de todos o parte de los siguientes documentos (los "**Documentos de la Reestructuración**"):

(i)     Un contrato de compromiso de apoyo a la recapitalización denominado en inglés "*Recapitalisation Support Agreement*" sujeto a derecho inglés en virtud del cual, entre otras cosas: (a)  la Sociedad se comprometerá a realizar o no realizar (según sea el caso) determinadas actuaciones con el objeto de facilitar la implementación y ejecución de la Reestructuración, y  (b) los acreedores financieros firmantes asumirán ciertas obligaciones hasta la fecha en la que la Reestructuración sea efectiva como, por ejemplo, abstenerse de exigir el pago de cantidades vencidas y no pagadas en concepto de principal e intereses en relación con la Deuda Afectada, de iniciar procedimientos de reclamación o ejecución de cualquier naturaleza, de solicitar el concurso de la Sociedad o de ceder su participación en la Deuda Afectada salvo que el cesionario se subrogue en el contrato (el "**RSA**").

(ii)    Un plan de reestructuración al amparo de lo previsto en el Libro II de la Ley Concursal (el "**Plan de Reestructuración**") para su homologación con el objetivo, entre otras finalidades, de (i) extender la vinculación al contenido completo e íntegro del Plan de Reestructuración y del resto de Documentos de la Reestructuración que correspondan a todos los acreedores del Endeudamiento Financiero Afectado respecto de los créditos de su titularidad; y (ii) proteger todos los actos y negocios jurídicos que se lleven a cabo para implementar la Reestructuración (incluyendo, sin limitación, la nueva financiación de circulante otorgada al amparo de la Reestructuración) (sin perjuicio de las modificaciones que aun sea necesario o conveniente realizar durante el proceso de negociación de la correspondiente documentación, incluyendo cualesquiera cambios requeridos por las entidades participantes del Endeudamiento Financiero Afectado).

(iii)   La presentación de una solicitud voluntaria de reconocimiento  para iniciar un procedimiento al amparo del Capítulo 15 (*Chapter 15*) del Título 11 del Código de Código de los Estados Unidos, 11 U.S.C. § 101 y ss. (*U.S. Bankruptcy Code*) (la "**Solicitud del Capítulo 15**"), ante el Tribunal de Insolvencias de los Estados Unidos

3

(*U.S. Bankruptcy Court*) para el Distrito Sur de Nueva York (el "**Tribunal de Insolvencias**"), solicitando el reconocimiento del procedimiento español al amparo del Real Decreto Legislativo 1/2020 (el "**Procedimiento Español**") como procedimiento principal extranjero y la aplicación de las protecciones derivadas de la suspensión automática tras dicho reconocimiento, incluyendo cualesquiera solicitudes de medidas provisionales y posteriores al reconocimiento.

(iv)    Un documento que describe los pasos clave de la Reestructuración (el "**Agreed Form Step Plan**").

(v)    Una moción de medidas cautelares en el marco del Capítulo 15 (*Chapter 15*) al amparo del artículo 1519 del Código de Insolvencia de los Estados Unidos (*U.S. Bankruptcy Code*), por la que se solicite una suspensión provisional de todas las acciones de los acreedores respecto a la Sociedad y sus activos ubicados en los Estados Unidos o relacionados con este país, en espera de la resolución de reconocimiento.

(vi)    Cualquier solicitud de medidas cautelares adicionales posteriores al reconocimiento en el marco del Capítulo 15 (*Chapter 15*) ante el Tribunal de Insolvencias de los Estados Unidos, incluyendo (sin limitación) órdenes que hagan cumplir las disposiciones de exoneración, liberación y medida cautelar del Plan de Reestructuración contra todas las personas sujetas a la jurisdicción del Tribunal de Insolvencias de los Estados Unidos.

(vii)    Una solicitud para cerrar el procedimiento del Capítulo 15 (*Chapter 15*) (si fuera necesario).

(viii)    El Nuevo Contrato de Financiación Circulante.

(ix)    Los contratos que correspondan relativos a la reestructuración de la Deuda Bancaria Existente, los Bonos Existentes, las Líneas de Avales Existentes, los Préstamos Intragrupo y cualesquiera otros documentos, públicos o privados, que resultaren necesarios o convenientes en el contexto de la Reestructuración a efectos de regular los nuevos términos del pasivo reestructurado.

(x)    La novación modificativa y no extintiva del Contrato entre Acreedores Existente a los efectos de regular, entre otras cuestiones, determinada prioridad de cobro en relación con determinados activos y/o garantías, así como las reglas de ejecución de las nuevas garantías, reales o personales, que se otorguen en el contexto de la Reestructuración.

(xi)    Cualesquiera cartas de comisiones (incluyendo, a modo ejemplificativo, cartas de comisión de compromiso de apoyo (*lock-up fee*), comisión de adhesión temprana (*early bird fee*), comisión de coordinación, comisión de agencia, comisión de disponibilidad y/o comisión de estructuración) en relación con los Documentos de la Reestructuración.

4

(xii) Contratos o documentos, ya sea en documento público o privado, en los términos y condiciones que sean convenientes o apropiados, para la constitución, modificación, novación, ratificación, rectificación, extensión, cesión, extinción, renuncia y/o cancelación de cualquier garantía personal o derecho real de garantía (incluyendo, a título enunciativo, hipotecas, mobiliarias o inmobiliarias, prendas con o sin desplazamiento sobre cualquier tipo de activo o derecho o promesas de constitución de garantías) cuyo otorgamiento, novación y/o cancelación esté previsto para garantizar el puntual cumplimiento de las obligaciones asumidas por la Sociedad y cualquier sociedad del Grupo bajo los Documentos de la Reestructuración, y/o cualquier otro documento otorgado al amparo o en relación con la Reestructuración, incluyendo, pero sin limitación, la suscripción de cualesquiera documentos de garantía (ya sean de primer rango, segundo rango, rango simultáneo o cualquier otro rango) sobre los bienes y derechos que en cada momento sean propiedad de la Sociedad, así como las notificaciones que sean precisas para comunicar a las entidades, públicas o privadas, la constitución de dicha garantías (los "**Documentos de Garantía**").

(xiii) Cualesquiera poderes irrevocables en relación con los Documentos de Garantía que pudieran otorgarse para garantizar el puntual cumplimiento de las obligaciones asumidas por cada pignorante y/o promitente.

(xiv) Cualquier documento de cartas de pago y cancelación de cualquier documento de financiación que sea necesario o conveniente otorgar en el contexto de la Reestructuración.

(xv) Cualquier documento necesario o conveniente a los efectos de solicitar la homologación judicial del Plan de Reestructuración con extensión de efectos de los Documentos de la Reestructuración a los acreedores disidentes o no participantes, así como a los efectos de proteger los Documentos de la Reestructuración de cualquier potencial riesgo de rescisión, todo ellos de conformidad con la normativa concursal vigente en cada momento.

(xvi) Cualesquiera escrituras de elevación a público y ratificación de los Documentos de la Reestructuración que sean necesarias o convenientes.

(xvii) Cualquier otro contrato, carta, aplicación, formulario, solicitud de disposición, de emisión, de relevación anticipada o de dispensa, poder o documento complementario, público o privado, necesario o conveniente en relación con los documentos anteriores y, en general, cualquier contrato (público o privado) o documento cuyo otorgamiento esté previsto en cualquiera de los Documentos de la Reestructuración.

(xviii) Cualesquiera documentos de adhesión, ratificación, suplemento, modificación, novación, ampliación, extensión, canje, aclaración, subsanación, cesión y/o cancelación que deban otorgarse respecto de los anteriores.

(xix) En general, cuantos documentos públicos o privados sean necesarios o convenientes en relación con los Documentos de la Reestructuración.

Los miembros del consejo de administración de la Sociedad toman razón de que estos documentos están siendo objeto de negociación y, por tanto, los términos actualmente previstos pueden variar en el transcurso de la negociación con las entidades participantes del Endeudamiento Financiero Afectado. Dichas variaciones no afectarán a los términos de los acuerdos, autorizaciones y poderes aquí previstos.

Los miembros del consejo de administración de la Sociedad consideran asimismo que redunda en el mejor interés de la Sociedad, de sus acreedores y de las demás partes interesadas que la Sociedad presente, o procure que se presente, la Solicitud de Capítulo 15 ante el Tribunal de Insolvencias de los Estados Unidos de conformidad con la normativa aplicable.

Asimismo, los miembros del consejo de administración de la Sociedad (i) consideran que los Documentos de la Reestructuración serán beneficiosos para la Sociedad; y (ii) aprueban la suscripción y ejecución de los Documentos de la Reestructuración y el cumplimiento por parte de la Sociedad de cualesquiera obligaciones que le correspondan en virtud de los mismos.

Los miembros del consejo de administración de la Sociedad aprueban y autorizan la contratación por la Sociedad de Kirkland & Ellis LLP y Kirkland & Ellis International LLP (conjuntamente, "**Kirkland**") y de Gómez-Acebo & Pombo Abogados, S.L.P. como asesores legales para representar y asistir a la Sociedad en el cumplimiento de sus obligaciones en relación con el Procedimiento Español y la Solicitud del Capítulo 15, así como la suscripción de los correspondientes contratos de prestación de servicios, el pago de las provisiones de fondos y honorarios que correspondan y, en su caso, la promoción de las solicitudes necesarias para autorizar dicha contratación.

Los miembros del consejo de administración de la Sociedad aprueban y autorizan la contratación por la Sociedad de un agente de notificaciones y reclamaciones (*notice and claims agent*) para representar y asistir a la Sociedad en el cumplimiento de sus obligaciones bajo el Código de Insolvencia de los Estados Unidos (*U.S. Bankruptcy Code*), así como la suscripción de los correspondientes contratos de prestación de servicios, el pago de las provisiones de fondos y honorarios que correspondan y la promoción de las solicitudes necesarias para autorizar dicha contratación. A estos efectos, se autoriza y ordena a Dña. María Cristina Blanco Santo Tomás, con facultad de delegación, a formalizar los acuerdos de contratación que correspondan, abonar las provisiones de fondos oportunas y promover la presentación de las solicitudes necesarias para autorizar la contratación de dicho agente.

**SEGUNDO.- Otorgamiento de poder especial para la Reestructuración a favor de Dña. María Cristina Blanco Santo Tomás**

Los miembros del consejo de administración de la Sociedad acuerdan, por unanimidad, conferir poder especial tan amplio y bastante como en derecho sea necesario, salvando si fuera menester cualquier impedimento legal relativo a la autocontratación, a la múltiple representación o al conflicto de interés en favor de Dña. María Cristina Blanco Santo Tomás con DNI número 13158416-R para que, individualmente, actuando en nombre y representación de la Sociedad, pueda:

(i)    Negociar, suscribir, firmar, otorgar, perfeccionar, ejecutar, cumplir, modificar, novar, ratificar, aclarar, rectificar, extender, subsanar, ceder o cancelar (como deudor, garante, obligado o en cualquier otra condición) los Documentos de la Reestructuración, así como cualesquiera otros documentos que puedan resultar necesarios o convenientes en relación con el otorgamiento, perfección y cumplimiento de los anteriores y, a tal efecto, comparecer ante cualquier fedatario público y otorgar cuantos documentos públicos o privados sean necesarios o convenientes para suscribir los Documentos de la Reestructuración, en las condiciones acordadas por los miembros del consejo de administración de la Sociedad en el acuerdo anterior, así como en los términos que la apoderada estime conveniente como resultado de las negociaciones entre las partes.

(ii)   Negociar, suscribir, firmar, otorgar, perfeccionar, ejecutar, cumplir, modificar, novar, ratificar, aclarar, rectificar, extender, subsanar, ceder, liberar o cancelar cualesquiera garantías personales o reales en relación con los Documentos de la Reestructuración y cualquier otro documento otorgado al amparo o en relación con la Reestructuración, entre otros, hipotecas mobiliarias o inmobiliarias, prendas con o sin desplazamiento (incluida la suscripción de la prenda sobre las propias acciones o participaciones sociales, según corresponda, de la Sociedad a efectos de darse por notificada y asumir determinadas obligaciones), promesas de constitución de garantías personales o reales sobre cualquier activo de la Sociedad, así como contratos equivalentes bajo cualquier jurisdicción extranjera y, a tal efecto, comparecer ante cualquier fedatario público y otorgar cuantos documentos públicos o privados sean necesarios o convenientes a tal efecto y, en particular, los Documentos de Garantía y cualesquiera otras garantías reales o personales que deban otorgarse y/o cancelarse en relación con cualesquiera Documentos de la Reestructuración, firmar cualesquiera notificaciones que sean precisas para comunicar a entidades públicas o privadas la constitución y/o cancelación de dichas garantías así como emitir y firmar cualquier documento necesario para el cumplimiento de cualquier requisito exigido por las autoridades fiscales, cualquier organismo administrativo o cualquier otro órgano que pueda intervenir en la Reestructuración.

(iii)  Comparecer y formalizar las oportunas declaraciones, comunicaciones y actuaciones ante los Registros Públicos (incluido cualquier Registro Mercantil, Registro de la Propiedad o

7

Registro de Bienes Muebles), jueces, tribunales u otros órganos judiciales, organismos de la administración, en particular, el Banco de España o la Comisión Nacional del Mercado de Valores, Órganos Rectores de Mercados Regulados españoles o de la Unión Europea o Órganos Rectores o Empresas de Servicios de Inversión que gestionen Sistemas Multilaterales de Negociación españoles o de la Unión Europea, autoridades fiscales y otras autoridades u organismos públicos en relación con los documentos aquí descritos y con el ejercicio de las facultades aquí referidas.

(iv)    Suscribir y otorgar cuantos documentos públicos o privados sean necesarios o convenientes incluyendo, si fuese necesario, la publicación de cualesquiera anuncios que sean legalmente exigibles ante cualesquiera organismo o instancias públicas o privadas, la inscripción en cualesquiera registros resulten oportunos y la realización de cuantos actos y trámites sean necesarios o convenientes al efecto, así como, entre otras cosas, las facultades de subsanar, aclarar, interpretar, completar, precisar o concretar, en su caso, los acuerdos adoptados, otorgar cuantos documentos públicos de ratificación, rectificación, subsanación y aclaración sean precisos, y, en particular, subsanar los defectos, omisiones o errores que fuesen apreciados, incluso los advertidos en la calificación verbal o escrita del Registro Mercantil, del Registro de la Propiedad o de cualquier otro registro y que pudieran obstaculizar la efectividad de los Documentos de la Reestructuración, con la facultad incluso para solicitar la inscripción parcial.

(v)    Realizar cualesquiera actuaciones y gestiones en relación con cualesquiera aspectos procesales relativos a la homologación judicial del Plan de Reestructuración o, en su caso, impugnación de la homologación judicial de dicho Plan de Reestructuración, todo ello de conformidad con la normativa concursal vigente en cada momento.

(vi)    Redactar y suscribir cuantos documentos públicos o privados sean necesarios o convenientes y realizar cuantos trámites estimen pertinentes ante la Comisión Nacional del Mercado de Valores, la Sociedad de Gestión de los Sistemas de Registro, Compensación y Liquidación de Valores, S.A. (Iberclear), la Sociedad de Bolsas, las Sociedades Rectoras de las Bolsas de Valores, el mercado Euro MTF, la Bolsa de Luxemburgo (*Luxembourg Stock Exchange*), la Comisión luxemburguesa de Supervisión del Sector Financiero (*Commission de Surveillance du Secteur Financier*), Euroclear Bank SA/NV, Clearstream Banking S.A. y cualesquiera otros organismos competentes nacionales e internacionales a fin de ejecutar y llevar a buen término los acuerdos aprobados y para la tramitación de los expedientes y documentación de todo tipo que fueran necesarios o convenientes ante organismos públicos y privados, y en general cuantas actuaciones relativas a los acuerdos anteriores sean precisas y necesarias para su ejecución.

(vii)    Firmar, enviar o certificar en nombre de la Sociedad todos los documentos y comunicaciones que se requieran bajo los Documentos de la Reestructuración incluyendo,

8

pero sin limitación, cualesquiera solicitudes de disposición y certificados de cumplimiento de condiciones o certificados de cumplimiento de ratios financieros.

(viii) Suscribir, otorgar o firmar cualquier contrato, instrumento, poder (incluyendo, sin limitación, poderes irrevocables), en documento público o privado, en relación con los Documentos de la Reestructuración.

(ix) Representar a la Sociedad, en su caso, como socio o accionista de cualquiera de los Obligados.

(x) Firmar cualquier documento público o privado de subsanación, rectificación, novación, extensión, modificación, cesión, cancelación o ratificación de los Documentos de la Reestructuración (incluyendo, pero sin limitación, los que fueran necesarios para la inscripción de cualquier documento público privado relacionado con los Documentos de la Reestructuración en el Registro de la Propiedad, el Registro de Bienes Muebles o cualquier otor registro público que corresponda) y realizar cualquier acto o cosa que los apoderados consideren necesario o conveniente para cumplimentar las finalidades descritas en este acuerdo.

(xi) Presentar y liquidar los impuestos, tributos, gastos y aranceles que se deriven del otorgamiento de los documentos y de la realización de las operaciones y negocios aquí descritos.

(xii) Realizar cuantos actos accesorios, conexos o complementarios sean necesarios o convenientes para la más completa ejecución del mandato recibido, incluyendo, entre otros y sin limitación, efectuar y contestar requerimientos y notificaciones.

(xiii) Suscribir cuantos documentos sean necesarios con el fin de dar cumplimiento a la normativa de prevención del blanqueo de capitales y procedimientos de "know your customer" de los acreedores de los Documentos de la Reestructuración.

(xiv) Suscribir cuantos documentos públicos o privados resulten necesarios o convenientes al objeto de ejecutar y ejercer las facultades aquí conferidas, incluyendo, sin limitación, documentos públicos de modificación, novación modificativa, subsanación, complementarias o de ratificación de escrituras y pólizas.

(xv) Ratificar cualquier documento o acto llevado a cabo como un mandatario verbal de la Sociedad relativo a las facultades contempladas en los apartados anteriores.

(xvi) Efectuar delegaciones o subdelegaciones de las facultades contempladas en los apartados anteriores en las personas que la apoderada considere convenientes.

Asimismo, los miembros del consejo de administración de la Sociedad acuerdan nombrar a Dña. María Cristina Blanco Santo Tomás, o a la persona en quien esta delegue, como representante extranjero (*foreign representative*) de la Sociedad en la Solicitud de Capítulo 15 y sus documentos y procedimientos asociados, por considerarlo en el mejor interés de la Sociedad, de sus acreedores y de las demás partes interesadas, y la facultan expresamente, con facultad de delegación a quién considere conveniente, para realizar cuantas declaraciones, certificaciones, solicitudes, comparecencias o actuaciones sean necesarias o convenientes a tal efecto.

Sin perjuicio de la extensión de las facultades otorgadas en virtud del presente poder, los miembros consejo de administración de la Sociedad hacen constar que Dña. María Cristina Blanco Santo Tomás ostenta la condición de consejera delegada de Grupo Antolín-Irausa, S.A.U. En consecuencia, Dña. María Cristina Blanco Santo Tomás, en su condición de apoderada especial de la Sociedad en virtud del presente acuerdo, no procederá a la formalización de los Documentos de la Reestructuración en nombre de la Sociedad hasta que éstos no sean a su vez suscritos por ella misma en nombre de Grupo Antolín-Irausa, S.A.U. o por cualquier otro representante debidamente autorizado de dicha sociedad.

Dña. María Cristina Blanco Santo Tomás no responderá frente a la Sociedad de ningún daño o pérdida que ésta pueda sufrir a causa o como consecuencia del uso que Dña. María Cristina Blanco Santo Tomás haga de las facultades contenidas en este poder salvo supuestos de dolo o negligencia grave, con renuncia expresa por parte de la Sociedad al ejercicio de cualesquiera acciones que en este sentido pudieran corresponderle frente a Dña. María Cristina Blanco Santo Tomás.

**TERCERO.- Otorgamiento de poderes especiales a favor de Grupo Antolín-Irausa, S.A.U.**

Los miembros del consejo de administración de la Sociedad acuerdan otorgar poderes especiales a favor de Grupo Antolín-Irausa, S.A.U. para que, actuando en su calidad de representante de la Sociedad, realice, a título ejemplificativo, pero no limitativo, cualesquiera de las siguientes facultades:

**(i)** emitir y recibir cuantas notificaciones y comunicaciones se deriven de los Documentos de la Reestructuración y entregar a la entidad que actúe como agente bajo los mismos y, en su caso, a los restantes acreedores cuanta documentación e información deba suministrarse conforme a lo que previsto en los Documentos de la Reestructuración;

**(ii)** emitir instrucciones, adoptar decisiones y prestar su consentimiento a las actuaciones que sean precisas para el desarrollo y cumplimiento de los Documentos de la Reestructuración, tanto si están previstas en ellos como si no lo están;

**(iii)** suscribir y formalizar cuantos documentos conexos, complementarios o relacionados con los Documentos de la Reestructuración sean necesarios, estando expresamente facultado para ratificar, aclarar y acordar modificaciones de los mismos;

**(iv)** efectuar por cuenta de la Sociedad cuantos pagos deban realizarse conforme a los restantes Documentos de la Reestructuración; y

**(v)** en general, otorgar cualquier documento, público o privado, y llevar a cabo cualquier actuación que sea necesaria o conveniente en relación con el desarrollo y cumplimiento de los Documentos de la Reestructuración.

## CUARTO.- Documentación de acuerdos

Facultar a cada uno de los miembros del consejo de administración de la Sociedad y al secretario no consejero para que cualquiera de ellos, por sí sólo, pueda comparecer ante notario, con las más amplias facultades para otorgar y firmar las escrituras precisas, a fin de que puedan formalizarse los anteriores acuerdos y los negocios jurídicos que de ellos traigan causa, elevándolos a escritura pública, para que puedan surtir todos sus efectos legales, incluso los de su inscripción en el Registro Mercantil, facultándoles especial y expresamente para que, si al ser presentada dicha escritura para su inscripción en el Registro Mercantil, dicho Registro apreciase errores, defectos u omisiones que impidiesen tal inscripción, puedan suscribir y/u otorgar los documentos privados o públicos precisos para la aclaración, corrección, subsanación o rectificación necesarias para la definitiva inscripción en dicho Registro Mercantil.

Por medio de las cartas de voto emitidas por las personas integrantes del consejo de administración de la Sociedad, los acuerdos anteriores fueron adoptados y la presente acta del consejo de administración relativa a dichos acuerdos aprobada en el domicilio social, con fecha 17 de junio de 2026.

Y para que conste, a los efectos de lo dispuesto en el artículo 100.1 del RRM, el secretario no consejero redacta la presente acta con el visto bueno del presidente, en Burgos, en el domicilio social, a 17 de junio de 2026.

**V.º B.º Presidente**                    **Secretario no consejero**

_____                    _____
Doña Cristina Blanco Santo Tomás            Doña María Concepción Ortuño Sierra

[Annexes Omitted Due to Volume but Available on Request of Counsel to the
Foreign Representative]

**<u>Resolutions</u>**
**<u>Certified Translation</u>**

  

American Translators Association
ATA MEMBER # M - 186788

**TRADUX USA Corp**
**Certified & Professional Translation Services**
405 Lexington Avenue, Floor 9
(Chrysler Building) NEW YORK, NY 10174
+ 1 650 546-5512
www.traduxusa.com
info@traduxusa.com

# Certification of Translation Accuracy

Translation of
**Minutes of the Board of Directors of Grupo Antolín – Autotrim, S.A.U.**
from **Spanish** to **English**

As an authorized representative of TRADUX USA Corp, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified, and certified professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text accurately and faithfully reflects the content, meaning, and style of the original document and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, TRADUX USA Corp assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.







Mariagiovanna Oricchio - CEO of TRADUX USA Corp
Order date: July 12, 2026

TRADUX USA Corp
405 Lexington Avenue, Floor 9
New York City 10174
United States
 + 1 650 546-5512

**TRADUX USA Corp**
**108 West 13th Street,**
**Wilmington, DE 19801**

## MINUTES OF THE BOARD OF DIRECTORS OF
## GRUPO ANTOLÍN – AUTOTRIM, S.A.U.

These Minutes record the resolutions adopted at the registered office by the Board of Directors of Grupo Antolín – Autotrim, S.A.U. (the "**Company**"), by means of written resolutions without a meeting, on June 17, 2026, such date being the date of receipt of the last vote received, in accordance with Article 100 of the Commercial Registry Regulations (Reglamento del Registro Mercantil), approved by Royal Decree 1784/1996 of July 19 (the "**RRM**").

In separate written instruments attached to these Minutes, all members of the Company's Board of Directors, namely:

- Cristina Blanco Santo Tomás (in her capacity as Chairwoman, Chief Executive Officer, and Director);
- Ignacio Martínez Contreras (in his capacity as Vice Chairman and Director);
- Igor Carlos Renedo Rafols (in his capacity as Director);

have expressed their agreement to the adoption of resolutions by the Company's Board of Directors by means of written resolutions without a meeting, as well as their written vote with respect to the resolutions submitted for their consideration.

Accordingly, the following resolutions are hereby formally adopted unanimously by all voting members of the Board of Directors:

### RESOLUTIONS

**FIRST. Approval of the Restructuring and the Restructuring Documents.**

The members of the Company's Board of Directors unanimously approve the restructuring of the financial indebtedness listed in **Annex I** (the "A**ffected Financial Indebtedness**"), with respect to which the Company acts, in whole or in part, as debtor, guarantor, obligor, or in any other applicable capacity, under the terms and conditions set forth in the draft term sheet attached hereto as **Annex II** (the "**Term Sheet**"), for the purpose of reorganizing the Affected Financial Indebtedness in a manner that strengthens the viability of the Company and the Group and appropriately reinforces its capital structure by adapting it to current market conditions (the "**Restructuring**"), without prejudice to any amendments that may still be necessary or advisable during the negotiation of the relevant documentation,

 CERTIFIED TRANSLATION

1



including any changes required by the institutions participating in the Affected Financial Indebtedness.

Capitalized terms and expressions shall have the meanings ascribed to them in the Term Sheet, unless expressly stated otherwise or unless a different meaning is inferred from the context.

It is hereby acknowledged that the members of the Company's Board of Directors are at all times under a duty to act in the best interests of the Company and that, in circumstances where a company is experiencing financial difficulties (and, in particular, where there is a likelihood of insolvency), the directors shall duly take into account, at a minimum: (i) the interests of the Company's creditors, shareholders, employees, and other stakeholders; (ii) the need to take measures to avoid insolvency; and (iii) the need to avoid intentional or grossly negligent conduct that may jeopardize the viability of the business. Accordingly, the members of the Board of Directors state that, if necessary, they will continue to: (a) obtain professional advice regarding their duties and carefully consider such advice; (b) meet periodically to review the Company's financial position and cash flow; and (c) maintain comprehensive records of their decision-making process.

Within the framework of the Restructuring, the members of the Company's Board of Directors have analyzed the advisability of, and the Company's own interest in, the Restructuring, concluding that the Restructuring contributes to improving and strengthening the financial position of the Company and each of the companies comprising the Group.

Likewise, in connection with the Restructuring, VEST Partners Estrada, S.L., acting as valuation expert for the Restructuring, has prepared the following reports: (a) the valuation report relating to the assets referred to as the "Designated Assets" in the Commercial Term Sheet; (b) the Group restructuring value report; (c) the report regarding the Best Interest of Creditors Test (BIC Test); (d) the report concerning the fairness principle and the absolute priority rule in the context of the Restructuring; and (e) the Group's business viability plan.

The members of the Company's Board of Directors have analyzed the advisability of, and the Company's own interest in, the Restructuring, concluding that the Restructuring contributes to improving and strengthening the financial position of the Company and each of the companies comprising the Group.

The members of the Company's Board of Directors consider that, having analyzed all relevant facts and circumstances, including the Company's current liquidity position, the execution of the recapitalization support agreement (the "Recapitalisation Support Agreement," as defined below) and the Restructuring Plan (as defined below) is in the


CERTIFIED TRANSLATION

2



best interests of the Company's stakeholders (including its creditors as a whole), since it would provide the Company and the other companies of the Group with the liquidity necessary to ensure their short and medium-term viability, extend the maturity of the Affected Financial Indebtedness, and strengthen the Group's capital structure.

Accordingly, in light of the foregoing, and considering that the Restructuring is in the interests and for the benefit of the Company and the other companies of the Group, the members of the Company's Board of Directors approve the Restructuring, as well as the execution by the Company, in its capacity as debtor, guarantor, obligor, promisor, or in any other applicable capacity, of any public or private documents that may be necessary or appropriate in connection with the Restructuring and, in particular, but without limitation, the execution and delivery of all or any of the following documents (the "**Restructuring Documents**"):

(i) A recapitalization support agreement (Recapitalisation Support Agreement), governed by the laws of England and Wales, pursuant to which, among other things: (a) the Company shall undertake to perform or refrain from performing (as applicable) certain actions for the purpose of facilitating the implementation and completion of the Restructuring; and (b) the signatory financial creditors shall undertake certain obligations until the Restructuring becomes effective, including, for example, refraining from demanding payment of due and unpaid principal and interest relating to the Affected Debt, initiating any enforcement or collection proceedings of any nature, filing insolvency proceedings against the Company, or assigning their participation in the Affected Debt unless the assignee assumes the transferor's rights and obligations under the agreement (the "**RSA**").

(ii) A restructuring plan pursuant to Book II of the Spanish Insolvency Act (the "**Restructuring Plan**"), to be submitted for judicial confirmation for the purposes of, among others: (i) extending the binding effect of the entire Restructuring Plan and the other applicable Restructuring Documents to all creditors holding claims constituting the Affected Financial Indebtedness; and (ii) protecting all legal acts and transactions carried out to implement the Restructuring (including, without limitation, the new working capital financing granted in connection with the Restructuring), without prejudice to any amendments that may still be necessary or advisable during the negotiation of the relevant documentation, including any changes required by the institutions participating in the Affected Financial Indebtedness.

(iii) The filing of a voluntary petition for recognition commencing a proceeding under Chapter 15 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the U.S. Bankruptcy Code) (the "**Chapter 15 Petition**"), before the United States Bankruptcy Court





3

for the Southern District of New York (the "**Bankruptcy Court**"), seeking recognition of the Spanish proceeding under Royal Legislative Decree 1/2020 (the "**Spanish Proceeding**") as a foreign main proceeding and the application of the protections arising from the automatic stay upon such recognition, including any requests for provisional relief and post-recognition relief.

(iv) A document describing the key steps of the Restructuring (the "**Agreed Form Step Plan**").

(v) A motion for provisional relief under Chapter 15 of the U.S. Bankruptcy Code pursuant to Section 1519 thereof, requesting a provisional stay of all actions by creditors against the Company and its assets located in, or otherwise connected with, the United States, pending the determination of the petition for recognition.

(vi) Any additional post-recognition requests for provisional or other relief under Chapter 15 before the United States Bankruptcy Court, including, without limitation, orders enforcing the discharge, release, and injunction provisions of the Restructuring Plan against all persons subject to the jurisdiction of the United States Bankruptcy Court.

(vii) A motion to close the Chapter 15 proceeding, if necessary.

(viii) The New Working Capital Financing Agreement.

(ix) Any agreements relating to the restructuring of the Existing Bank Debt, the Existing Notes, the Existing Guarantee Facilities, the Intercompany Loans, and any other public or private documents that may be necessary or appropriate in connection with the Restructuring for the purpose of governing the new terms of the restructured indebtedness.

(x) An amendment and restatement (without extinguishment) of the Existing Intercreditor Agreement for the purpose of regulating, among other matters, the priority of payment with respect to certain assets and/or collateral, as well as the enforcement rules applicable to the new security interests, whether personal or in rem, granted in connection with the Restructuring.

(xi) Any fee letters (including, by way of example, lock-up fee letters, early bird fee letters, coordination fee letters, agency fee letters, commitment fee letters, and/or structuring fee letters) relating to the Restructuring Documents.



4



(xii) Any agreements or documents, whether executed as public or private instruments, upon such terms and conditions as may be appropriate or advisable, for the creation, amendment, novation, ratification, correction, extension, assignment, termination, waiver, and/or cancellation of any personal guarantee or security interest (including, by way of illustration, chattel mortgages, real property mortgages, pledges with or without transfer of possession over any type of asset or right, or agreements to grant security interests), the execution, novation, and/or cancellation of which is contemplated to secure the due performance of the obligations assumed by the Company and any Group company under the Restructuring Documents and/or any other document executed pursuant to or in connection with the Restructuring, including, without limitation, the execution of any security documents (whether first-ranking, second-ranking, pari passu, or of any other ranking) over the assets and rights owned by the Company from time to time, as well as any notices required to inform public or private entities of the creation of such security interests (the "**Security Documents**").

(xiii) Any irrevocable powers of attorney relating to the Security Documents that may be granted to secure the due performance of the obligations assumed by each pledgor and/or promisor.

(xiv) Any payoff letter, release letter, or other document relating to the discharge and cancellation of any financing document that may be necessary or appropriate in connection with the Restructuring.

(xv) Any document necessary or appropriate for the purpose of obtaining judicial confirmation of the Restructuring Plan, including the extension of the effects of the Restructuring Documents to dissenting or non-participating creditors, as well as for the purpose of protecting the Restructuring Documents against any potential avoidance or clawback risk, all in accordance with the insolvency laws in force from time to time.

(xvi) Any notarial deeds required or appropriate to formalize and ratify the Restructuring Documents.

(xvii) Any other agreement, letter, application, form, request for utilization, issuance, early release, or waiver, power of attorney, or ancillary public or private document that may be necessary or appropriate in connection with the foregoing documents and, generally, any public or private agreement or document whose execution is contemplated under any of the Restructuring Documents.

 CERTIFIED TRANSLATION



(xviii) Any joinder, ratification, supplement, amendment, novation, expansion, extension, exchange, clarification, corrective, assignment, and/or termination documents that may be required in connection with any of the foregoing.

(xix) In general, any public or private documents that may be necessary or appropriate in connection with the Restructuring Documents.

The members of the Company's Board of Directors acknowledge that these documents are currently under negotiation and, accordingly, that their presently contemplated terms may change during the course of negotiations with the institutions participating in the Affected Financial Indebtedness. Any such changes shall not affect the terms of the resolutions, authorizations, and powers granted herein.

The members of the Company's Board of Directors further consider that it is in the best interests of the Company, its creditors, and its other stakeholders for the Company to file, or cause to be filed, the Chapter 15 Petition before the United States Bankruptcy Court in accordance with applicable law.

Furthermore, the members of the Company's Board of Directors (i) consider that the Restructuring Documents will be beneficial to the Company; and (ii) approve the execution and performance of the Restructuring Documents and the performance by the Company of any obligations arising thereunder.

The members of the Company's Board of Directors approve and authorize the engagement by the Company of Kirkland & Ellis LLP and Kirkland & Ellis International LLP (together, "**Kirkland**"), and Gómez-Acebo & Pombo Abogados, S.L.P., as legal counsel to represent and assist the Company in fulfilling its obligations in connection with the Spanish Proceeding and the Chapter 15 Petition, as well as the execution of the corresponding engagement agreements, the payment of the applicable retainers and fees, and, where appropriate, the filing of any applications necessary to authorize such engagement.

The members of the Company's Board of Directors further approve and authorize the engagement by the Company of a notice and claims agent to represent and assist the Company in fulfilling its obligations under the U.S. Bankruptcy Code, as well as the execution of the corresponding engagement agreements, the payment of the applicable retainers and fees, and the filing of any applications necessary to authorize such engagement. For these purposes, Ms. María Cristina Blanco Santo Tomás, with the power to delegate, is authorized and instructed to execute the relevant engagement agreements, pay the appropriate retainers, and arrange for the filing of any applications necessary to authorize the engagement of such notice and claims agent.


CERTIFIED TRANSLATION



**SECOND. Grant of Special Power of Attorney for the Restructuring in Favor of Ms. María Cristina Blanco Santo Tomás**

The members of the Company's Board of Directors unanimously resolve to grant a special power of attorney, as broad and comprehensive as may be necessary under applicable law, waiving, to the extent necessary, any legal restrictions relating to self-dealing, multiple representation, or conflicts of interest, in favor of Ms. María Cristina Blanco Santo Tomás, holder of Spanish National Identity Document (DNI) No. 13158416-R, so that, acting individually in the name and on behalf of the Company, she is authorized to:

(i) Negotiate, enter into, sign, execute, deliver, perform, amend, novate, ratify, clarify, correct, extend, remedy, assign, or terminate (in the capacity of debtor, guarantor, obligor, or in any other applicable capacity) the Restructuring Documents, as well as any other documents that may be necessary or appropriate in connection with the execution, completion, and performance thereof, and, for such purpose, appear before any notary public or other public official vested with authority to authenticate legal instruments, and execute any public or private documents that may be necessary or appropriate for the execution of the Restructuring Documents, on the terms approved by the members of the Company's Board of Directors pursuant to the preceding resolution, as well as on such terms as the attorney-in-fact may deem appropriate as a result of the negotiations between the parties.

(ii) Negotiate, enter into, sign, execute, deliver, perform, amend, novate, ratify, clarify, correct, extend, remedy, assign, release, or terminate any personal guarantees or security interests relating to the Restructuring Documents or any other document executed pursuant to or in connection with the Restructuring, including, without limitation, chattel mortgages, real property mortgages, pledges with or without transfer of possession (including the execution of a pledge over the Company's own shares or equity interests, as applicable, for the purpose of acknowledging notice thereof and assuming certain obligations), undertakings to grant personal guarantees or security interests over any of the Company's assets, as well as equivalent agreements under any foreign jurisdiction; and, for such purpose, appear before any notary public or other public official vested with authority to authenticate legal instruments, and execute any public or private documents that may be necessary or appropriate, including, in particular, the Security Documents and any other personal guarantees or security interests required to be granted and/or released in connection with any of the Restructuring Documents, execute any notices required to notify public or private entities of the creation and/or release of such security interests, and issue and execute any document necessary to satisfy any requirement imposed by the tax authorities, any administrative authority, or any other body involved in the Restructuring.

(iii) Appear before and complete the appropriate declarations, notices, and formalities before the Public Registries (including any Commercial Registry, Land Registry, or

 CERTIFIED TRANSLATION



Registry of Movable Property), judges, courts, or other judicial bodies, governmental authorities, including the Bank of Spain, the Spanish National Securities Market Commission (Comisión Nacional del Mercado de Valores), the governing bodies of regulated markets in Spain or the European Union, or the governing bodies or investment firms operating multilateral trading facilities in Spain or the European Union, tax authorities, and other public authorities or agencies, in connection with the documents described herein and the exercise of the powers granted herein.

(iv) Execute and deliver any public or private documents that may be necessary or appropriate, including, where required, the publication of any notices legally required before any public or private authority or body, the filing of any appropriate registrations, and the performance of any acts or formalities necessary or appropriate for such purpose, including, among other things, the authority to remedy, clarify, interpret, supplement, specify, or otherwise give effect, as appropriate, to the resolutions adopted, execute any public instruments of ratification, correction, rectification, or clarification that may be required, and, in particular, remedy any defects, omissions, or errors that may be identified, including those noted in any oral or written determination issued by the Commercial Registry, the Land Registry, or any other registry, which might prevent the effectiveness of the Restructuring Documents, including the authority to request partial registration.

(v) Carry out any acts or proceedings relating to any procedural matters concerning the judicial confirmation of the Restructuring Plan or, as applicable, any challenge to the judicial confirmation of the Restructuring Plan, all in accordance with the insolvency laws in force from time to time.

(vi) Prepare and execute any public or private documents that may be necessary or appropriate, and carry out any formalities deemed appropriate before the Spanish National Securities Market Commission (Comisión Nacional del Mercado de Valores), Sociedad de Gestión de los Sistemas de Registro, Compensación y Liquidación de Valores, S.A. (Iberclear), Sociedad de Bolsas, the governing bodies of the Spanish Stock Exchanges, the Euro MTF market, the Luxembourg Stock Exchange, the Luxembourg Financial Sector Supervisory Commission (Commission de Surveillance du Secteur Financier), Euroclear Bank SA/NV, Clearstream Banking S.A., and any other competent national or international authorities or bodies, for the purpose of implementing and carrying through the approved resolutions, processing any proceedings and documentation of any kind that may be necessary or appropriate before public or private authorities, and, in general, carrying out any acts relating to the foregoing resolutions that may be necessary or appropriate for their implementation.

(vii) Execute, deliver, submit, or certify, on behalf of the Company, any documents and communications required under the Restructuring Documents, including,





8

without limitation, any utilization requests, conditions precedent certificates, or financial covenant compliance certificates.

(viii) Execute, deliver, or sign any agreement, instrument, or power of attorney (including, without limitation, irrevocable powers of attorney), whether in the form of a public or private instrument, in connection with the Restructuring Documents.

(ix) Represent the Company, where applicable, in its capacity as partner or shareholder of any of the Obligors.

(x) Execute any public or private document relating to the correction, rectification, novation, extension, amendment, assignment, termination, or ratification of the Restructuring Documents (including, without limitation, any documents required for the registration of any public or private instrument relating to the Restructuring Documents with the Land Registry, the Registry of Movable Property, or any other relevant public registry), and perform any act or thing that the attorney-in-fact may consider necessary or appropriate to carry out the purposes described in this resolution.

(xi) File and pay any taxes, duties, fees, charges, and tariffs arising from the execution of the documents and the consummation of the transactions and legal acts described herein.

(xii) Perform any ancillary, related, or complementary acts that may be necessary or appropriate for the full implementation of the authority granted herein, including, among others and without limitation, issuing and responding to any requests and notices.

(xiii) Execute any documents necessary to comply with applicable anti-money laundering laws and the "know your customer" procedures required by the creditors under the Restructuring Documents.

(xiv) Execute any public or private documents that may be necessary or appropriate to implement and exercise the powers granted herein, including, without limitation, public instruments of amendment, amendatory novation, correction, supplementation, or ratification of deeds and notarial policies.

(xv) Ratify any document executed or act performed by an agent acting pursuant to an oral mandate of the Company in connection with the powers described in the foregoing paragraphs.

(xvi) Delegate or subdelegate any of the powers described in the foregoing paragraphs to such persons as the attorney-in-fact may deem appropriate.



CERTIFIED TRANSLATION

9



Furthermore, the members of the Company's Board of Directors resolve to appoint Ms. María Cristina Blanco Santo Tomás, or any person to whom she may delegate such authority, as the Company's foreign representative in connection with the Chapter 15 Petition and all related documents and proceedings, having determined that such appointment is in the best interests of the Company, its creditors, and its other stakeholders, and expressly authorize her, with full power to delegate to any person she deems appropriate, to make any declarations, certifications, applications, appearances, or take any actions that may be necessary or appropriate for such purpose.

Without prejudice to the scope of the powers granted under this power of attorney, the members of the Company's Board of Directors acknowledge that Ms. María Cristina Blanco Santo Tomás serves as Chief Executive Officer (Consejera Delegada) of Grupo Antolín-Irausa, S.A.U. Accordingly, Ms. María Cristina Blanco Santo Tomás, in her capacity as the Company's attorney-in-fact pursuant to this resolution, shall not execute the Restructuring Documents on behalf of the Company until such documents have first been executed by her on behalf of Grupo Antolín-Irausa, S.A.U., or by any other duly authorized representative of such company.

Ms. María Cristina Blanco Santo Tomás shall not be liable to the Company for any damage or loss that the Company may suffer as a result of, or in connection with, the exercise of the powers granted under this power of attorney, except in cases of willful misconduct or gross negligence. The Company expressly waives any right to bring any claim against Ms. María Cristina Blanco Santo Tomás in this respect.

**THIRD. Grant of Special Powers of Attorney in Favor of Grupo Antolín-Irausa, S.A.U.**

The members of the Company's Board of Directors resolve to grant special powers of attorney in favor of Grupo Antolín-Irausa, S.A.U., so that, acting in its capacity as the Company's representative, it may, by way of illustration and without limitation, exercise any of the following powers:

(i) issue and receive any notices and communications arising under the Restructuring Documents and deliver to the entity acting as agent thereunder and, where applicable, to the other creditors, any documentation and information required to be provided pursuant to the Restructuring Documents;

(ii) issue instructions, make decisions, and provide its consent to any actions required for the implementation and performance of the Restructuring Documents, whether or not expressly contemplated therein;


CERTIFIED TRANSLATION



(iii) execute and formalize any ancillary, supplemental, or related documents that may be necessary in connection with the Restructuring Documents, being expressly authorized to ratify, clarify, and agree to any amendments thereto;

(iv) make, on behalf of the Company, any payments required under the remaining Restructuring Documents; and

(v) in general, execute any public or private document and carry out any action that may be necessary or appropriate in connection with the implementation and performance of the Restructuring Documents.

**FOURTH. Documentation of Resolutions**

Authorize each of the members of the Company's Board of Directors and the non-director secretary, acting individually, to appear before a notary public, with the broadest powers necessary to execute and sign any notarial deeds required to formalize the foregoing resolutions and the legal transactions arising therefrom, elevating them to the status of public instruments so that they may produce their full legal effects, including their registration with the Commercial Registry. They are further expressly authorized, should the Commercial Registry identify any errors, defects, or omissions preventing such registration upon submission of any such notarial deed, to execute and/or grant any public or private documents necessary for the clarification, correction, remediation, or rectification required to obtain the final registration thereof with the Commercial Registry.

By means of the voting letters issued by the members of the Company's Board of Directors, the foregoing resolutions were adopted and these Minutes of the Board of Directors relating to such resolutions were approved at the Company's registered office on June 17, 2026.

In witness whereof, for the purposes of Article 100.1 of the Commercial Registry Regulations (RRM), the non-director secretary has prepared these Minutes with the approval of the Chair, in Burgos, at the Company's registered office, on June 17, 2026.





11

**V.º B.º Chair**                                            **Non-Director Secretary**

[Signature]                                                  [Signature]

Ms. Cristina Blanco Santo Tomás                             Ms. María Concepción Ortuño Sierra


CERTIFIED TRANSLATION

12



**<u>Homologation Request Documents</u>**

| | |
|---|---|
| **Solicitantes:** | **Grupo Antolín Irausa S.A.U. y otras** |
| **Procurador:** | **D. Miguel Ángel Esteban Ruiz** |

| | |
|---|---|
| **Tribunal:** | **Sección de lo Mercantil del Tribunal de Instancia de Burgos. Plaza nº 1** |
| **Antecedentes:** | **Cuestión Incidental Especial Pronunciamiento (Nombramiento de experto en la reestructuración) 310/2026** |

| | |
|---|---|
| **Escrito:** | **Solicitud de homologación judicial de plan de reestructuración sin contradicción previa** |

## A LA SECCIÓN DE LO MERCANTIL DEL
## TRIBUNAL DE INSTANCIA DE BURGOS, PLAZA Nº 1

**D. Miguel Ángel Esteban Ruiz**, Procurador de los Tribunales y de Grupo Antolin-Irausa, S.A.U. ("**Antolín Irausa**"), Grupo Antolin-Aragusa, S.A.U. ("**Antolín Aragusa**"), Grupo Antolin-Autotrim, S.A.U. ("**Antolín Autotrim**"), Grupo Antolin-Eurotrim, S.A.U. ("**Antolín Eurotrim**"), Grupo Antolin-Glass, S.A.U. ("**Antolín Glass**"), Grupo Antolin-Ingeniería, S.A.U. ("**Antolín Ingeniería**"), Grupo Antolin-Plasbur, S.A.U. ("**Antolín Plasbur**"), Grupo Antolin-RyA, S.A.U. ("**Antolín RyA**"), Antolin Interiors UK Limited ("**Antolín Interiors UK**"), Grupo Antolin Leamington Limited ("**Antolín Leamington**"), Grupo Antolin UK Limited ("**Antolín UK**"), Grupo Antolin North America, Inc. ("**Antolín North America**"), Antolin Alabama, LLC ("**Antolín Alabama**"), Antolin Interiors USA, Inc. ("**Antolín Interiors USA**"), Antolin Shelby, Inc. ("**Antolín Shelby**"), Grupo Antolin Missouri, LLC ("**Antolín Missouri**"), Grupo Antolin Kentucky, Inc. ("**Antolín Kentucky**"), Grupo Antolin Michigan, Inc. ("**Antolín Michigan**"), Grupo Antolin Sibiu SRL ("**Antolín Sibiu**"), Antolin Silesia Sp. z.o.o. ("**Antolín Silesia**"), Grupo Antolin South Africa (PTY) Ltd. ("**Antolín South África**"), Grupo Antolin Bohemia, a.s. ("**Antolín Bohemia**"), Grupo Antolin Ostrava, s.r.o. ("**Antolín Ostrava**"), Grupo Antolin Turnov, s.r.o. ("**Antolín Turnov**"), Antolin Liban, s.r.o. ("**Antolín Liban**"), Antolin Deutschland GmbH ("**Antolin Deutschland**"), Grupo Antolin Bamberg GmbH & Co. KG ("**Antolín Bamberg**"), Grupo Antolin Logistik Deutschland GmbH ("**Antolín Logistik Deutschland**"), Antolin Straubing GmbH ("**Antolín Straubing**"), Antolin Interiors México, S.A. de C.V. ("**Antolín Interiors Mexico**"), Grupo Antolin Silao, S.A. de C.V. ("**Antolín Silao**"), Grupo Antolin Saltillo, S.R.L. de C.V. ("**Antolín Saltillo**"), Grupo Antolin Tlaxcala, S.R.L. de C.V. ("**Antolín Tlaxcala**"), Grupo Antolin Cuautitlán, S.R.L. de C.V. ("**Antolín Cuautitlán**"), Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. ("**Antolín Lusitania**") y Grupo Antolin Bratislava, s.r.o. ("**Antolín Bratislava**"), (todas ellas a excepción de Antolín Irausa, las "**Filiales**"; y, conjuntamente Antolín Irausa y las Filiales, las "**Sociedades Solicitantes**" o las "**Sociedades Reestructuradas**"), según se acredita mediante poderes que se acompañan como **Conjunto Documental nº 1** comparezco ante este Iltre. Tribunal y, como mejor proceda en Derecho, **DIGO**:

1

**I.** Que el 28 de abril de 2026, las Sociedades Solicitantes instaron ante este mismo Iltre. Tribunal el nombramiento de **LEXAUDIT CONCURSAL, S.L.P.** como experto en la reestructuración ("**LEXAUDIT**", el "**Experto en la Reestructuración**" o el "**Experto**"), designación que fue acordada por Auto de 14 de mayo de 2026 en la pieza de designación de experto 310/2026[1].

**II.** Que, fruto de las negociaciones mantenidas, las Sociedades Solicitantes elaboraron un plan de reestructuración conjunto que *(i)* fue suscrito por algunos de los principales acreedores financieros, *(ii)* permitiría garantizar la viabilidad del Grupo Antolín en el corto, medio e, incluso, largo plazo, y *(iii)* fue elevado a público con fecha 24 de junio de 2026, en virtud de escritura pública ante el Notario de Madrid, D. Andrés Domínguez Nafría, con el número 3847 de su protocolo (el "**Plan de Reestructuración Original**").

**III.** Que las partes firmantes del Plan de Reestructuración Original detectaron una omisión formal e involuntaria y decidieron subsanarla e incluir unos ajustes no sustanciales mediante la formalización de un plan de reestructuración refundido (el "**Plan de Reestructuración Refundido**", el "**Plan de Reestructuración**" o el "**Plan**"). Así, las Sociedades Solicitantes e, igualmente, algunos de los principales acreedores financieros han suscrito y elevado a público, el 10 de julio de 2026, el Plan de Reestructuración en virtud de escritura pública autorizada por el Notario de Madrid, D. Francisco Miras Ortiz, en sustitución y para el protocolo de D. Andrés Domínguez Nafría, con el número 4.281 de su protocolo, que se acompaña como **Documento nº 2**[2].

**IV.** Que, a través del presente escrito, y de conformidad con lo establecido en los artículos 635 y siguientes del Real Decreto Legislativo 1/2020, de 5 de mayo, por el que se aprueba el Texto Refundido de la Ley Concursal ("**TRLC**") se solicita la **HOMOLOGACIÓN JUDICIAL DEL PLAN DE REESTRUCTURACIÓN CONJUNTO SIN FASE DE CONTRADICCIÓN PREVIA** (la "**Solicitud de Homologación**"), junto con los efectos legales inherentes a tal declaración, con base en los siguientes,

---

[1] El Auto de 14 de mayo de 2026 fue rectificado, a instancia de las Sociedades Solicitantes, mediante Auto de 1 de junio, a los efectos de incluir expresamente en el fallo que el nombramiento de LEXAUDIT como Experto en la Reestructuración se efectuaba para todas las Sociedades Solicitantes.

[2] Salvo indicación en contrario, los términos en mayúsculas no expresamente definidos en este escrito tienen el significado que se les atribuye en el Plan de Reestructuración.

2

**HECHOS**

**PREVIO. -    Objeto de la Solicitud de Homologación**

1. Según lo previsto en el artículo 614 TRLC, las Sociedades Solicitantes han firmado con algunos de sus principales acreedores financieros el Plan de Reestructuración, que establece las bases de la reestructuración de su deuda financiera (la "**Reestructuración**"), y el modo en que dicha Reestructuración se implementará.

2. En la medida en la que las Sociedades Solicitantes pretenden *(i)* la extensión de los efectos del Plan de Reestructuración a los acreedores cuyos créditos se ven afectados que no hayan participado en él, ni se hayan adherido al mismo con posterioridad, *(ii)* la protección de la financiación interina, de la nueva financiación, de los actos, operaciones y negocios realizados en el contexto del Plan frente a acciones rescisorias -así como los privilegios en el eventual concurso posterior cuando proceda- y *(iii)* la extensión de la protección a garantías prestadas por terceros en virtud del artículo 652.2 TRLC, mediante el presente escrito se solicita la homologación judicial del Plan de Reestructuración, en los términos previstos en el artículo 635 y siguientes TRLC.

**PRIMERO. -    Identificación de las partes del Plan de Reestructuración**

**1.1 Las Sociedades Solicitantes**

3. Las Sociedades Solicitantes forman parte de un grupo de sociedades denominado "Antolín" (el "**Grupo Antolín**" o simplemente, el "**Grupo**"), dedicado al desarrollo, diseño y fabricación de componentes de interior para la industria del automóvil; y, en concreto, son las compañías del Grupo que adeudan los pasivos financieros objeto de reestructuración en el Plan. Para una mejor comprensión de las Sociedades Solicitantes se aporta como **Conjunto Documental nº 3** un organigrama del Grupo y un organigrama exclusivamente acotado a las Sociedades Solicitantes.

4. Como se ha avanzado, y se puede apreciar en el organigrama reducido, las Sociedades Solicitantes comparten como matriz operativa a Antolín Irausa.

5. Antolín Irausa es una sociedad mercantil de nacionalidad española, con número de identificación fiscal A09092305 y domicilio social en Calle Vitoria 307, 09007, de Burgos. Antolín Irausa es la sociedad cabecera de las Filiales, que ejerce control sobre el resto de las Sociedades Solicitantes, es decir, sobre las Filiales; y desde la cual se adoptan todas las

3

decisiones relevantes de las Filiales (por tanto, como veremos, el centro principal de intereses de las mismas se sitúa igualmente en Burgos).

6.   Las Filiales, españolas o extranjeras (si bien, todas con el centro principal de intereses en España), cuya deuda financiera se reestructura en el Plan son las siguientes:

| | Filial | Nacionalidad | NIF | Domicilio |
|---|---|---|---|---|
| 1. | Antolín Aragusa | España | A09019191 | Calle Monte de la Abadesa, 0, Parque Empresarial, Burgos |
| 2. | Antolín Autotrim | España | A09097080 | Calle Vitoria 307, 09007 Burgos |
| 3. | Antolín Eurotrim | España | A09021759 | Calle Vitoria 309, 09007 Burgos |
| 4. | Antolín Glass | España | A09063611 | Calle Vitoria 309, 09007 Burgos |
| 5. | Antolín Ingeniería | España | A09276528 | Calle Vitoria 307, 09007 Burgos |
| 6. | Antolín Plasbur | España | A09256975 | Calle Condado de Treviño, 21, Polígono Industrial de Villalonquéjar, Burgos, 09001 Burgos |
| 7. | Antolín RyA | España | A09075680 | Calle Vitoria 307, 09007 Burgos |
| 8. | Antolín Interiors UK | Reino Unido | N0407133H | Merse Road, North Moons Moat, Redditch, Inglaterra B98 9HL |
| 9. | Antolín Leamington | Reino Unido | N0404953B | Tachbrook Park Drive, Leamington Spa, Warwick, Warwickshire CV34 6RH |
| 10. | Antolin UK | Reino Unido | N0404945H | Merse Road, North Moons Moat, Redditch, Inglaterra B98 9HL |
| 11. | Antolín North America | Estados Unidos | N0405409D | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 12. | Antolín Alabama | Estados Unidos | N0404938C | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 13. | Antolín Interiors USA | Estados Unidos | N0404942E | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 14. | Antolín Shelby | Estados Unidos | N0404939A | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 15. | Antolín Missouri | Estados Unidos | N0404941G | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 16. | Antolín Kentucky | Estados Unidos | N0405410B | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 17. | Antolín Michigan | Estados Unidos | N0405411J | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 18. | Antolín Sibiu | Rumania | N0329720GN040 | Calle Europa Unità, n.º 7, Condado de Sibiu |
| 19. | Antolín Silesia | Polonia | N0405304G | Wrocławska 82, 57-100 Strzelin, Polonia |
| 20. | Antolin South Africa | Sudáfrica | N0405412H | Nelson Mandela Bay Logistics Park, Algoa Road, Jagvlakte, Uitenhage Industries, Eastern Cape 2196 |

| | | | | |
|---|---|---|---|---|
| 21. | Antolín Bohemia | República Checa | N0407143G | Svárovská 696, 463 03 Stráž nad Nisou República Checa |
| 22. | Antolín Ostrava | República Checa | N0407142I | Na Rovince 912, Hrabová, 720 00 Ostrava |
| 23. | Antolín Turnov | República Checa | N0611285H | Průmyslová 3000, 511 01 Turnov |
| 24. | Antolín Liban | República Checa | N0405441G | Komenského 30, 507 23 Libán |
| 25. | Antolin Deutschland | Alemania | N0407141A | Am Ziegelwerk 1, 85391 Allershausen |
| 26. | Antolín Bamberg | Alemania | N0405434B | Kronacherstraße 70-80, 96052 Bamberg |
| 27. | Antolín Logistik Deutschland | Alemania | N0407139E | Am Coloneum 4, 50829 Colonia |
| 28. | Antolín Straubing | Alemania | N0407137I | Stettiner Str. 7, 94315 Straubing |
| 29. | Antolín Interiors Mexico | México | N0405467B | Blvd. Jesús Valdez Sánchez 728, Zona Centro, 25350 Arteaga, Coah., México |
| 30. | Antolín Silao | México | N0405430J | Av. Ingenieros 411, Parque Industrial FIPASI, 36100 Silao de la Victoria, Gto., México |
| 31. | Antolín Saltillo | México | N0405496A | Doctor, Blvd. Jesús Valdez Sánchez s/n, Parque Industrial, 25350 Arteaga, Coah., México |
| 32. | Antolín Tlaxcala | México | N0405486B | Virgen de la Caridad 19 Vesta Park Tlaxcala I Parque Industrial Xicontecatl II, 90500 Huamantla, Tlax., México |
| 33. | Antolín Cuautitlán | México | N0405389H | Av. Tlaloc Manzana 003, Axotlan, 54719 Cuautitlán Izcalli, Méx., México |
| 34. | Antolín Lusitânia | Portugal | N0405449J | Zona industrial cerca de Vila Nova de Cerveira, Viana do Castelo, Portugal, 4920-247 Lusitania, Portugal |
| 35. | Antolin Bratislava | Eslovaquia | N0407135C | Opletalova 73, 841 07 Devínska Nová Ves, Eslovaquia |

7.  Se aporta como **Conjunto Documental nº 4** los certificados registrales de cada una de las Sociedades Solicitantes y como **Conjunto Documental nº 4 bis**, traducción simple de aquellos certificados que están en idiomas distintos al español.

8.  Las Filiales Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Ingeniería, Antolín Plasbur y Antolín RyA (en adelante, las "**Filiales Españolas**") tienen el domicilio en Burgos, coincidiendo con su centro de intereses principal ("**COMI**"). Entre las Filiales Españolas, Antolín Ingeniería lidera el desarrollo de los proyectos de I+D+i de todo el Grupo Antolín, transmitiendo su know-how al resto de sociedades presentes en las diferentes regiones del mundo. Por su parte, el resto de Filiales Españolas se corresponden con plantas de producción y servicios asociados y tienen suscritos contratos con Antolín Irausa que recogen

esa centralización de su actividad en el domicilio social de la matriz operativa (como veremos en el apartado siguiente al explicar el modelo de negocio de Grupo Antolín).

9. En cuanto al resto de Filiales (las "**Filiales Extranjeras**"), aunque su domicilio social se encuentre fuera de España, todas ellas mantienen su COMI en Burgos, tal y como se desarrolla al explicar el modelo de negocio y esquema decisor del Grupo Antolín en el Hecho Segundo.

**1.2 Los Acreedores Afectados, Participantes y No Participantes**

10. Por otro lado, todos aquellos acreedores cuyos créditos quedan afectados por el Plan de Reestructuración serán denominados los "**Acreedores Afectados**". Los Acreedores Afectados se dividen, a su vez, en dos categorías: (i) los "**Acreedores Participantes**", que son aquellos que han votado a favor y se han adherido al Plan; y (ii) los "**Acreedores No Participantes**", que son aquellos Acreedores Afectados que no han suscrito el Plan o que han votado en contra.

11. Para entender las distintas subcategorías que integran los Acreedores Participantes resulta necesario exponer cronológicamente el proceso de formalización y adhesión al Plan:

- Las Sociedades Solicitantes, Grupo Antolín Holdco S.A. y ciertos acreedores participantes originales, entre otros, suscribieron el 23 de junio de 2026 un contrato de apoyo a la Reestructuración denominado "*Recapitalisation Support Agreement*" (en adelante, el "**RSA**"), en virtud del cual asumieron, entre otras obligaciones, el compromiso de votar favorablemente respecto del Plan de Reestructuración Original (o tal y como el mismo fuera modificado de conformidad con los propios términos del RSA) y adoptar las medidas que resultasen necesarias para la Reestructuración. Los acreedores participantes originales que firmaron el RSA el 23 de junio de 2026 son:

| | Acreedores que firmaron el RSA inicialmente |
|---|---|
| **1.** | Banco Bilbao Vizcaya Argentaria, S.A. ("**BBVA**") |
| **2.** | Banco Bilbao Vizcaya Argentaria, S.A. New York Branch ("**BBVA USA**") |
| **3.** | Banco de Sabadell, S.A. ("**Banco Sabadell**") |
| **4.** | Banco Santander, S.A. ("**Banco Santander**") |
| **5.** | Bankinter, S.A. ("**Bankinter**") |
| **6.** | CaixaBank, S.A. ("**CaixaBank**") |

- Con posterioridad a la mencionada firma del RSA se envió una invitación a los Acreedores Afectados, por la cual se habilitaba un periodo de adhesión, hasta el 22 de julio de 2026, para que pudieran: (i) adherirse al RSA (con el consecuente compromiso

6

de adhesión al Plan de Reestructuración Original); y/o (ii) votar a favor o en contra y adherirse al Plan de Reestructuración Original.

- El 24 de junio de 2026 varios de los Acreedores Afectados se adhirieron al RSA con carácter previo a la firma del Plan de Reestructuración Original; en concreto fueron:

| | Acreedores adheridos al RSA de manera previa a la firma del Plan |
|---|---|
| 7. | HSBC Continental Europe |
| 8. | HSBC Continental Europe, Sucursal en España |

- El mismo 24 de junio de 2026, las Sociedades Reestructuradas, los acreedores que suscribieron el RSA el 23 de junio de 2026, así como los que se habían adherido al mismo (conjuntamente los "**Acreedores Participantes Originales**"), suscribieron el Plan de Reestructuración Original.

- Tras la mencionada firma, las Sociedades Reestructuradas y los Acreedores Participantes Originales decidieron novar el Plan de Reestructuración Original al Plan de Reestructuración Refundido con el fin de rectificar una omisión sin impacto en el tratamiento de los Acreedores Afectados y realizar unos ajustes no sustanciales.

- Tras la propuesta de novación del Plan de Reestructuración Original al Plan de Reestructuración Refundido y de manera previa a su suscripción se remitió una nueva invitación a los Acreedores Afectados[3] (la "**Invitación**"[4]), por la cual, de nuevo, se habilita un periodo de adhesión, hasta el 22 de julio de 2026[5], para que pudieran: (i) adherirse al RSA (con el consecuente compromiso de adhesión al Plan de Reestructuración Refundido y a los Documentos de la Reestructuración[6]); y/o (ii) votar a favor o en contra y adherirse libremente al Plan (el "**Periodo de Adhesión**").

---

[3] Pese a que, como se ha mencionado, los términos del Plan eran prácticamente iguales, habiéndose corregido únicamente una omisión y habiéndose realizado unos ajustes no sustanciales.

[4] Los términos concretos de la Invitación constan en el Anexo VIII del Plan.

[5] Plazo que podrá ser prorrogado a instancia de Antolín Irausa mediante notificación al efecto al agente de la reestructuración (al que se hará referencia en el apartado siguiente).

[6] El término Documentos de la Reestructuración se define en el Anexo I del Plan e incluye: (i) el propio Plan de Reestructuración; (ii) los documentos de canje de los Bonos Existentes por los Nuevos Bonos; (iii) los documentos de novación modificativa y no extintiva de la Deuda Bancaria; (iv) los documentos de novación modificativa y no extintiva de las Líneas de Avales Existentes (esto es, las Nuevas Líneas de Avales); (v) el contrato de novación modificativa no extintiva del Contrato entre Acreedores; (vi) el Contrato de Financiación de Circulante; (vii) cualesquiera documentos sean necesarios para articular el mecanismo de prórroga automática mensual del Factoring Sindicado Existente; (viii) las Nuevas Garantías Reales ICA y las Nuevas Garantías Personales ICA; (ix) las Prendas sobre Cuentas; (x) un contrato (*deed of release*) de liberación mutua de responsabilidad, pacto de no reclamación y renuncia de acciones en virtud del cual todas las Partes (incluyendo los Acreedores No Participantes) se liberen recíprocamente de cualesquiera reclamaciones, acciones o pretensiones vinculadas al

7

- El 10 de julio de 2026, durante el Periodo de Adhesión, tal y como estaba previsto, las Sociedades Reestructuradas, los Acreedores Participantes Originales y el agente de la reestructuración (que será definido en el subapartado siguiente), suscribieron el Plan de Reestructuración.

- Sin perjuicio de la formalización del Plan, los restantes Acreedores Afectados pueden igualmente adherirse mientras dure el Periodo de Adhesión, siendo que aquellos que se adhieran serán denominados los "**Acreedores Adheridos**". A fecha de presentación de la Solicitud de Homologación, de hecho, constan ya las siguientes adhesiones:

| | **Acreedores Adheridos** |
|---|---|
| **9.** | Instituto de Crédito Oficial E.P.E. ("**ICO**") |
| **10.** | Banco Santander S.A., en lo que respecta a la parte de su Crédito Afectado cubierto por el Aval ICO Aranceles. |
| **11.** | HSBC Continental Europe, Sucursal en España, en lo que respecta a la parte de su Crédito Afectado cubierto por el Aval ICO Aranceles. |
| **12.** | CaixaBank, S.A., en lo que respecta a la parte de su Crédito Afectado cubierto por el Aval ICO Aranceles. |
| **13.** | Banco de Sabadell, S.A., en lo que respecta a la parte de su Crédito Afectado cubierto por el Aval ICO Aranceles. |

Se aportan como **Conjunto Documental nº 5** las escrituras con la adhesión de los Acreedores Adheridos.

12. Finalmente, el Plan de Reestructuración se considerará suscrito por los Acreedores Participantes Originales y los Acreedores Adheridos[7], es decir, por los Acreedores Participantes.

### 1.3 El Agente de la Reestructuración

13. La entidad GLAS SPECIALIST SERVICES LIMITED ha sido designada por las Sociedades Solicitantes para que actúe como agente de la Reestructuración, del Plan y de los restantes Documentos de la Reestructuración ("**Glas**" o el "**Agente de la Reestructuración**"),

---

proceso de Reestructuración que hubieran surgido con anterioridad a la Fecha de Cierre; y (xi) cualquier otro documento al que Antolín Irausa y el Experto en la Reestructuración acuerden darle la condición de Documento de la Reestructuración.

[7] Que, como hemos indicado, podrían ser más de los indicados en la Solicitud de Homologación ya que el Periodo de Adhesión no ha finalizado.

designación que fue aceptada por Glas a efectos de representación de todos los Acreedores Afectados y de asunción de las funciones que se describen en el propio Plan *(vid.* su Cláusula 14.2).

14. Sobre las funciones del Agente de la Reestructuración se volverá en el Hecho Decimotercero (Sección 13.5).

### 1.4 Terceras sociedades del Grupo Antolín que no son Sociedades Reestructuradas del Plan de Reestructuración

15. Aparte de las Sociedades Solicitantes, que interesan la homologación del Plan en su condición de deudoras reestructuradas, tiene interés que nos refiramos aquí a terceras sociedades del Grupo Antolín que juegan un papel relevante en el despliegue de los efectos del Plan.

### 1.4.1 HoldCo

16. En primer lugar, debemos mencionar a Grupo Antolín Holdco, S.A. ("**Antolín HoldCo**" o "**HoldCo**"), una sociedad anónima constituida conforme a las leyes de España, con domicilio social en calle Vitoria, 307, Burgos (09007), inscrita en el Registro Mercantil de Burgos (tomo 676, libro 467, folio 33, hoja BU/15343) y con NIF A-09553702. Se aporta nota simple de HoldCo como **Documento nº 6.** Antolín HoldCo ostenta la totalidad del capital social de Antolín Irausa y, en última instancia, está controlada por varios miembros de la familia Antolín.

17. La intervención de HoldCo en relación con la Reestructuración se circunscribe a:

   (a) Tomar razón y consentir la extensión de los efectos del Plan, por aplicación del artículo 652.2 TRLC, a los derechos reales de prenda otorgados por ella sobre las acciones representativas del 100% del capital de Antolín Irausa (las "**Prendas sobre Antolín Irausa**"). Sobre esta cuestión se volverá en detalle en el Hecho Decimotercero (Sección 13.4).

   (b) En segundo lugar, al otorgamiento de una garantía personal a primer requerimiento[8].

### 1.4.2. Otras sociedades del Grupo Antolín

18. Igualmente, en virtud del Plan, Grupo Antolin Italia S.R.L., Grupo Antolin Besançon SAS, Antolin Tanger SARL, Trimtec Ltda. e Intertrim Ltda. otorgarán garantías personales a primer

---

[8] *Vid*. Cláusula 5.4 del Plan, donde se prevé el otorgamiento de nuevas garantías en virtud del Plan, y Hecho Noveno.

requerimiento que, junto con la nueva garantía personal a primer requerimiento de HoldCo, forman las denominadas bajo el Plan como "**Nuevas Garantías Personales ICA**" y las sociedades que las otorguen reciben la denominación de "**Nuevas Garantes ICA**", cuestión sobre la que se volverá en el Hecho Noveno. Se aportan los certificados registrales de estas otras sociedades como **Conjunto Documental nº 7**, y sus traducciones simples al español como **Conjunto Documental nº 7 bis**.

**SEGUNDO. – Sobre el Grupo Antolín, las Sociedades Solicitantes y su modelo de negocio**

**2.1 Sobre el Grupo Antolín y su importancia para el tejido industrial español**

19.   Como es sabido, el Grupo Antolín constituye un referente de primer orden en el sector automovilístico español. A pesar de su marcada proyección internacional, el Grupo ha mantenido siempre su esencia de empresa familiar, lo cual se refleja en un modelo de negocio centralizado en el que todas las decisiones estratégicas y operativas emanan de su sede originaria en Burgos. A continuación, analizamos estos aspectos con mayor detalle.

### A) El Grupo Antolín como multinacional de referencia en la industria española de automoción

20.   El Grupo Antolín es una multinacional española, líder mundial en el desarrollo, diseño y fabricación de componentes de interior para la industria del automóvil, lo que incluye la fabricación de techos, puertas, iluminación, paneles de instrumentos y sistemas electrónicos. Desde su fundación en 1950, a partir de un taller mecánico en Burgos regentado por la familia Antolín, el Grupo ha evolucionado hasta convertirse en uno de los principales fabricantes de interiores de vehículos a nivel mundial. Con todo, el Grupo mantiene hoy en día su sede central en Burgos y su carácter de empresa familiar, bajo el liderazgo de la familia Antolín.

21.   Consecuentemente, el Grupo Antolín ocupa una posición de referencia en la industria automovilística internacional, con presencia en los componentes de interior de los coches más vendidos a nivel mundial, equipando más de 500 modelos diferentes y suministrando a 9 de los 10 vehículos más vendidos mundialmente. Así, el Grupo trabaja como proveedor de primer nivel para prácticamente la totalidad de los principales fabricantes de automóviles del mundo. A modo de ejemplo, en Estados Unidos uno de cada tres coches incorpora componentes del Grupo Antolín[9].

---

[9] Comunicación del Ministerio de Asuntos Exteriores, Unión Europea y Cooperación "El Embajador asiste a la inauguración del 10 centro del Grupo Antolín en Kansas City (Missouri), en el 20 Aniversario de la compañía en EEUU" publicada el 23 de mayo de 2014. Disponible en:

22. En la actualidad, el Grupo cuenta con una sólida implantación internacional, operando hasta en 23 países, donde dispone de 111 plantas productivas y centros "*just in time*"[10], así como de 25 oficinas técnico-comerciales. Grupo Antolín emplea a aproximadamente 20.000 personas y alcanzó en 2025 un volumen de negocio de 3.725 millones de euros[11]. A efectos acreditativos, se acompañan las Cuentas Anuales consolidadas del Grupo Antolín de 2025 como **Documento nº 8**, que constan en todo caso publicadas en la página web del Grupo[12].

23. El Grupo es, asimismo, líder mundial por volumen de producción y desarrollo tecnológico en guarnecidos de techos para automóviles. Además, se sitúa entre las primeras compañías del ranking mundial de los mayores proveedores de automoción[13].

24. La importancia del Grupo Antolín debe entenderse, como decimos, en el marco del sector de automoción español, que constituye uno de los pilares fundamentales del sector industrial y, por ende, de la economía nacional. Debemos aquí tener en cuenta que España es el segundo mayor productor de vehículos de Europa —solo superada por Alemania— y el noveno a nivel mundial[14]. El sector de automoción representa aproximadamente el 10% del PIB español y genera empleo para más de 567.000 trabajadores. En 2024, el sector alcanzó una facturación de 76.855 millones de euros, con una inversión de 2.434 millones de euros, y el vehículo se mantuvo como el producto que mayor saldo positivo aporta a la balanza comercial española, con 15.991 millones de euros[15]. Dato a tener también en cuenta es que por cada euro generado

---

https://www.exteriores.gob.es/Embajadas/washington/es/Comunicacion/Noticias/Paginas/Articulos/20140527_NOT1.aspx#:~:text=Adem%C3%A1s%2C%20uno%20de%20cada%20tres%20coches%20en%20Estados%20Unidos%20tiene%20componentes%20del%20fabricante%20espa%C3%B1ol%2C%20lo%20que%20le%20otorga%20una%20significativa%20cuota%20de%20mercado%20y%20supone%20una%20ayuda%20muy%20importante%20para%20liderar%20el%20mercado%20mundial.

[10] Centros en los que se realiza producción al momento.

[11] Para consultar toda la información sobre el Grupo Antolín, puede visitarse su página web: https://www.antolin.com/es/compania-home

[12] https://www.antolin.com/es/informacion-financiera-informes

[13] Informe integrado de Antolín de 2025. Disponible en: https://www.antolin.com/sites/default/files/informe_integrado_antolin_2025.pdf.

[14] Comunicación del Ministerio de Economía, Comercio y Empresa "España es el 2º mayor fabricante de vehículos europeo y se situó 9º a nivel mundial en 2024". Disponible en: https://www.investinspain.org/es/sectores/automocion-movilidad#:~:text=Espa%C3%B1a%20es%20el%202%C2%BA%20mayor%20fabricante%20de%20veh%C3%ADculos%20europeo%20y%20se%20situ%C3%B3%209%C2%BA%20a%20nivel%20mundial%20en%202024 y Comunicación del Observatorio Sectorial de CaixaBank "El sector de automoción en España: el reto de mantener la competitividad en el nuevo ecosistema global" publicada el 29 de noviembre de 2024. Disponible en: https://www.caixabankresearch.com/es/analisis-sectorial/observatorio-sectorial/sector-automocion-espana-reto-mantener-competitividad#:~:text=En%202023%2C%20Espa%C3%B1a%20fabric%C3%B3%20m%C3%A1s%20de%202%2C45%20millones%20de%20veh%C3%ADculos%20y%20se%20coloc%C3%B3%20como%20el%20segundo%20productor%20de%20Europa%2C%20solo%20superada%20por%20Alemania.

[15] Comunicación de la Asociación Española de Fabricantes de Automóviles y Camiones "El sector de la automoción alcanzó los 76.855 millones de euros de facturación en 2024" publicada el 10 de julio de 2025. Disponible en: https://anfac.com/el-sector-de-la-automocion-alcanzo-los-76-855-millones-de-euros-de-facturacion-en-

directamente por la automoción se generan aproximadamente 0,8 euros adicionales en el conjunto de la economía, lo que evidencia el elevado efecto dinamizador del sector en el conjunto de la economía.

25. Dentro de este ecosistema, el Grupo Antolín desempeña un papel vertebrador como una de las escasas multinacionales españolas de primer nivel en el sector de componentes de automoción, con una capacidad única de diseño, ingeniería y producción para los principales mercados automovilísticos del mundo. El Grupo es, asimismo, uno de los mayores inversores en I+D+i del sector en España, habiendo apostado por la innovación como uno de los pilares de su estrategia desde 1993, con la creación de Antolín Ingeniería. Con este espíritu innovador, el Grupo ha venido explorando nuevas vías de crecimiento vinculadas a la transición del sector, incluyendo la electrónica avanzada, los sistemas inteligentes y alianzas estratégicas con plataformas de ingeniería basada en inteligencia artificial[16].

26. La preservación de la actividad del Grupo Antolín resulta de interés, por tanto, no solo para sus acreedores y trabajadores, sino también para el conjunto del tejido industrial español, y, singularmente, para el de las comarcas de Burgos y Castilla y León, habida cuenta de su condición de empresa tractora que genera empleo cualificado, inversión y actividad económica en toda su cadena de valor.

27. La importancia en nuestra economía del Grupo Antolín viene igualmente ilustrada por la abultada plantilla que permite desarrollar su exitoso modelo de negocio. En la siguiente tabla indicamos el número de empleados por cada una de las Sociedades Solicitantes:

---

2024/#:~:text=Las%20empresas%20y%20fabricantes%20de%20autom%C3%B3viles%20que%20operan%20en%20Espa%C3%B1a%2C%20asociadas%20en%20ANFAC%2C%20alcanzaron%20en%202024%20una%20facturaci%C3%B3n%20de%2076.855%20millones%20de%20euros

[16] Página web del Grupo Antolín. Disponible en: https://www.antolin.com/innovacion-retos-de-futuro

| N° | Sociedad | Valor | N° | Sociedad | Valor |
|---|---|---|---|---|---|
| 0 | Antolín Irausa | 267 | 18 | Antolín Sibiu | 876 |
| 1 | Antolín Aragusa | 366 | 19 | Antolín Silesia | 209 |
| 2 | Antolín Autotrim | 86 | 20 | Antolin South Africa | 349 |
| 3 | Antolín Eurotrim | 173 | 21 | Antolín Bohemia | 258 |
| 4 | Antolín Glass | 2 | 22 | Antolín Ostrava | 213 |
| 5 | Antolín Ingeniería | 326 | 23 | Antolín Turnov | 653 |
| 6 | Antolín Plasbur | 125 | 24 | Antolín Liban | 308 |
| 7 | Antolín RyA | 348 | 25 | Antolin Deutschland | 233 |
| 8 | Antolín Interiors UK | 459 | 26 | Antolín Bamberg | 204 |
| 9 | Antolín Leamington | 85 | 27 | Antolín Logistik Deutschland | 95 |
| 10 | Antolin UK | 60 | 28 | Antolín Straubing | 431 |
| 11 | Antolín North America | 113 | 29 | Antolín Interiors México | 1.886 |
| 12 | Antolín Alabama | 116 | 30 | Antolín Silao | 604 |
| 13 | Antolín Interiors USA | 347 | 31 | Antolín Saltillo | 361 |
| 14 | Antolín Shelby | 359 | 32 | Antolín Tlaxcala | 617 |
| 15 | Antolín Missouri | 231 | 33 | Antolín Cuautitlán | 94 |
| 16 | Antolín Kentucky | 407 | 34 | Antolín Lusitânia | 203 |
| 17 | Antolín Michigan | 118 | 35 | Antolin Bratislava | 287 |

| TOTAL EMPLEADOS SOCIEDADES SOLICITANTES | 11.869 |
|---|---|

28. En consecuencia, de los anteriores datos se extrae sin dificultad la gran dimensión e importancia económica, empresarial y laboral del Grupo Antolín para España.

## B) La familia Antolín como fundadora, gestora y pilar estratégico del Grupo

29. El Grupo Antolín tiene su origen en un modesto taller mecánico de Burgos, fundado en la década de 1950 por D. Avelino Antolín López junto a sus hijos Avelino y José, dedicado inicialmente a la reparación de vehículos y maquinaria agrícola. Desde ese taller familiar, los hermanos Antolín demostraron una vocación innovadora que marcó la identidad de la compañía para siempre: en 1950, inventaron la rótula de dirección de caucho-metal, una innovación que resolvió importantes problemas de seguridad en la dirección de los vehículos y que fue objeto de patente y comercialización[17]. Ese origen familiar e industrial no se reduce a un mero antecedente, sino que se trata de uno de los factores que explican la continuidad, especialización y capacidad de adaptación del Grupo durante más de siete décadas.

---

[17] Página web del Grupo Antolín. Disponible en: https://www.antolin.com/es/compania-historia

13

30. En 1959, la familia fundó la empresa ANSA, dedicada a la fabricación de rótulas de dirección y suspensión, y en 1967 constituyeron Talleres ARA, S.L., para la fabricación de guarnecidos y accesorios para el automóvil. La estrategia de diversificación se consolidó en 1968 mediante un acuerdo con la empresa alemana Lemförder para instalar en Burgos una empresa, de la que los hermanos Antolín eran socios mayoritarios, que permitió la adquisición de licencias de fabricación para piezas de interior del vehículo[18]. En 1985, dado el crecimiento del negocio, la familia constituyó el holding Grupo Antolín con el objetivo de gestionar, coordinar y consolidar todas las actividades de las distintas empresas de la corporación y, a partir de 1989, se inició un ambicioso proceso de internacionalización. De este modo, el crecimiento del Grupo se ha consolidado sobre una combinación de liderazgo familiar estable, visión industrial a largo plazo, reinversión, innovación e internacionalización, todos ellos elementos estrechamente vinculados a la permanencia de la familia fundadora en la dirección estratégica y en el gobierno del proyecto empresarial durante sus más de 75 años de historia.

31. Refiriéndonos a las personas, en 2015, el histórico presidente y fundador, D. José Antolín Toledano, dejó las funciones ejecutivas tras 50 años dedicados a la compañía para ser nombrado presidente de honor, asumiendo D. Ernesto Antolín Arribas la presidencia ejecutiva y Dña. María Helena Antolín Raybaud la vicepresidencia. En febrero de 2026, Dña. Emma Antolín Granet fue nombrada presidenta ejecutiva por unanimidad del Consejo de Administración[19]. Más recientemente, en abril de 2026, D. Ernesto Antolín Arribas asumió la Presidencia de Avot Inversiones, S.L., el holding a través del cual la familia articula su participación y su control en el Grupo, permaneciendo plenamente vinculado al proyecto empresarial[20]. Acompañamos, como **Documento nº 9**, la comunicación interna por medio de la cual se hacía partícipe a los empleados sobre este nombramiento.

32. Estos relevos suponen la continuidad ordenada del liderazgo familiar dentro de una estructura de gobierno profesionalizada y orientada a la ejecución del plan estratégico y financiero del Grupo.

33. Es también significativo que en 2013 la familia Antolín adquirió el 22,8% del accionariado que estaba en manos de un grupo de entidades financieras, reflejando así su compromiso

---

[18] Artículo "Antolín, un imperio que nació en un taller mecánico" publicado en el Diario de Castilla y León el 23 de noviembre de 2025. Disponible en: https://www.diariodecastillayleon.es/burgos/251123/103264/antolin-imperio-nacio-taller-mecanico.html

[19] Artículo "Antolín nombra presidenta a Emma Antolín y sustituye a Ernesto Antolín, que deja el cargo tras 10 años" publicado en Europa Press el 25 de febrero de 2026. Disponible en: https://www.europapress.es/motor/sector-00644/noticia-antolin-nombra-presidenta-emma-antolin-sustituye-ernesto-antolin-deja-cargo-10-anos-20260225131207.html

[20] Artículo "Ernesto Antolín, presidente de Avot Inversiones para reforzar el papel de la empresa familiar: 111 fábricas en 23 países" publicado en El Español el 10 de abril de 2026. Disponible en: https://www.elespanol.com/castilla-y-leon/economia/empresas/20260410/ernesto-antolin-presidente-avot-inversiones-reforzar-papel-empresa-familiar-fabricas-paises/1003744201898_0.html

inquebrantable con el futuro del Grupo. En palabras de la propia compañía, este paso reforzó el objetivo de "*garantizar un crecimiento sostenible y rentable durante los próximos años*"[21]. Esta operación reviste especial importancia a los efectos del presente Plan, pues evidencia que la familia Antolín ha actuado históricamente como socio de referencia estable, aportando continuidad al proyecto en momentos relevantes de evolución financiera y societaria, y evitando precisamente la fragmentación o alteración del control que podría comprometer la estrategia industrial del Grupo.

34. El reconocimiento institucional a la labor de la familia Antolín ha sido constante. En 2010, D. José Antolín recibió la Medalla de Oro al Mérito en el Trabajo, la mayor distinción a un trabajador en España. En 2016, el Rey Felipe VI entregó a D. José Antolín el Premio Reino de España a la Trayectoria Empresarial. Con ocasión de la celebración del 75 aniversario del Grupo en 2025, Su Majestad el Rey visitó su sede central en Burgos y dedicó las siguientes palabras a la familia: "*Sois abanderados de la empresa familiar, del arraigo en la tierra en la que nacisteis, de la excelencia y de la Marca España*"[22]. Esta mención sintetiza sin duda el valor que la familia Antolín aporta no solo al Grupo, sino al conjunto de la economía española, a través de un grupo industrial cuya identidad, reputación, relaciones institucionales y posicionamiento ante clientes, proveedores, empleados y financiadores están íntimamente asociados a la continuidad de la familia fundadora.

35. Más recientemente, en mayo de 2026, D. Ernesto Antolín ha sido galardonado con la Medalla de Oro de la Cámara de Comercio de Burgos por su trayectoria profesional ejemplar y por haber contribuido al progreso económico, empresarial y social de la provincia de Burgos. En la comunicación interna de este acontecimiento, que se acompaña como **Documento nº 10**, se destacaba la importante labor realizada por D. Ernesto, que siempre ha defendido los valores del Grupo sin descuidar su indisoluble vínculo con Burgos.

36. En definitiva, el compromiso de la familia Antolín en el gobierno del Grupo y su permanencia en la estructura de capital es inquebrantable y resulta esencial para garantizar su estabilidad a largo plazo, y ello por varias razones interrelacionadas:

    (a) En primer lugar, la marca comercial del Grupo es el apellido de la familia fundadora. La denominación "*Antolín*" constituye la identidad corporativa con la que la compañía opera en los 23 países en los que tiene presencia, y bajo la que suministra a los principales fabricantes de automóviles del mundo. La propia compañía estrenó en 2023

---

[21] Página web del Grupo Antolín. Disponible en: https://www.antolin.com/es/compania-historia
[22] Ídem nota al pie 22.

15

una nueva marca e identidad corporativa, manteniendo siempre el nombre "*Antolín*" como eje central de su imagen e identidad[23].

(b)   En segundo lugar, la confianza que los principales fabricantes de automóviles (OEM) depositan en el Grupo Antolín como proveedor global se sustenta en gran medida en la estabilidad y confianza que la gestión familiar ha proporcionado al Grupo históricamente. El informe integrado 2024 del Grupo que consta en la página web corporativa lo expresa con claridad: "*el espíritu de esa empresa familiar sigue permaneciendo tras más de 70 años de actividad y lo hace en la cercana relación que mantiene con clientes, empleados y todos los demás grupos de interés. Con todos ellos mantiene sólidas alianzas que perduran en el tiempo por su calidad, rigor y compromiso*"[24]. En un sector caracterizado por relaciones de suministro de largo plazo, homologaciones exigentes, procesos de adjudicación plurianuales y una elevada dependencia de la confianza del cliente, la alteración del control accionarial podría generar un efecto desestabilizador.

(c)   En tercer lugar, la experiencia y el capital relacional de la familia Antolín son activos intangibles de valor incalculable para la continuidad del negocio. Con ocasión del nombramiento de D. Ernesto Antolín como presidente de Avot Inversiones, la compañía destacó expresamente que "*su experiencia, su capital relacional y su profundo conocimiento del negocio seguirán siendo un activo fundamental para el proyecto*" y que "*la familia permanece unida en torno a la compañía, y ello constituye una fortaleza que toda la organización debe reconocer como propia*"[25].

Coherentemente con lo anterior, son múltiples los acreedores o clientes que exigen la permanencia de la familia en el gobierno del Grupo; exigencia a la que responden, por ejemplo, las cláusulas de amortización anticipada, vencimiento anticipado o resolución en caso de cambio de control que se incluyen en muchos de los contratos del Grupo. A efectos ilustrativos, se aportan las cláusulas de amortización anticipada, vencimiento anticipado/resolución por cambio de control de algunos de los principales clientes *(cfr.* **Documento nº 11** – su traducción, **Documento nº 11 bis**). Cláusula de cambio de control que también están presentes en la mayoría de los instrumentos financieros

---

[23] Página web del Grupo Antolín. Disponible en: https://www.antolin.com/es/antolin-estrena-nueva-marca-como-reflejo-de-su-proceso-de-transformacion

[24] Informe integrado de Antolín de 2024. Disponible en: https://www.antolin.com/sites/default/files/2024_informe_integrado_antolin_0.pdf#:~:text=Antolin%20es%20la%20compa%C3%B1%C3%ADa%20l%C3%ADder%20en%20todo%20el%20mundo%20en%0A%0Afabricaci%C3%B3n%20de%20guarnecidos%20de%20techos%20para%20autom%C3%B3viles.

[25] Artículo "Ernesto Antolín, presidente de Avot Inversiones para reforzar el papel de la empresa familiar: 111 fábricas en 23 países" publicado en El Español el 10 de abril de 2026. Disponible en: https://www.elespanol.com/castilla-y-leon/economia/empresas/20260410/ernesto-antolin-presidente-avot-inversiones-reforzar-papel-empresa-familiar-fabricas-paises/1003744201898_0.html

16

afectados por la Reestructuración[26] y que ha sido igualmente requerida para su inclusión en el propio Plan de Reestructuración, dada la necesidad de mantener la actual estructura de capital presidida por la familia Antolín para garantizar la viabilidad del Grupo *(vid.* Cláusula 5.3.8 del Plan).

(d)    En cuarto lugar, la gestión familiar y su conocimiento del mercado en el que opera ha dotado al Grupo de una estabilidad y una orientación a largo plazo que resultan particularmente valiosas en un sector tan competitivo y cíclico como el de la automoción. Frente a los vaivenes del mercado, la familia ha mantenido una estrategia coherente de inversión en I+D+i, internacionalización y diversificación de productos que ha permitido al Grupo superar con éxito crisis como la financiera de 2008, la pandemia de Covid-19 y las recientes tensiones en las cadenas de suministro globales.

37.    En definitiva, la familia Antolín es un activo esencial para el Grupo, siendo el elemento vertebrador de su identidad, su estrategia y su posición en el mercado global. El mantenimiento de la actual estructura de capital, con la familia Antolín al frente de la gestión, constituye, por tanto, un presupuesto esencial del Plan de Reestructuración y de la viabilidad futura del Grupo.

**2.2. Sobre el modelo de negocio y esquema decisor de Grupo Antolín**

**A)  Modelo de organización contractual**

38.    Como se ha adelantado, el Grupo Antolín opera a nivel internacional a través de un modelo de negocio integrado y centralizado en Burgos. Las Filiales del Grupo –tanto las Filiales Españolas como las Filiales Extranjeras– se organizan en tres categorías funcionales diferenciadas: (i) Antolín Ingeniería, sociedad con domicilio social en Burgos, que tiene suscrito un contrato marco con Antolín Irausa para el desarrollo de I+D+i para el Grupo Antolín; (ii) las plantas productivas (las "**Plantas**")[27], dedicadas a la fabricación de componentes y a las operaciones logísticas asociadas; y (iii) las oficinas técnico-comerciales (en adelante, "**OTCs**") [28], que prestan servicios de soporte comercial, técnico, de innovación y corporativo.

---

[26] De hecho, en instrumentos financieros que se definirán con posterioridad como son los Bonos Existentes, el Contrato de Financiación Sindicada Existente, los Contratos de Financiación BEI Existentes o el Contrato de Financiación ICO Existente se establecen cláusulas de cambio de control directamente vinculadas a miembros concretos de la Familia Antolín, especificando que el control debe permanecer en los miembros identificados en particular o en partes relacionadas con ellos.

[27] Se corresponden con: Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Plasbur, Antolín RyA, Antolín Interiors UK, Antolín Leamington, Antolín Alabama, Antolín Interiors USA, Antolín Shelby, Antolín Missouri, Antolín Kentucky, Antolín Michigan, Antolín Sibiu, Antolín Silesia, Antolin South Africa, Antolín Bohemia, Antolín Ostrava, Antolín Turnov, Antolín Liban, Antolín Bamberg, Antolín Logistik Deutschland, Antolín Straubing, Antolín Interiors Mexico, Antolín Saltillo, Antolín Tlaxcala, Antolín Cuautitlán, Antolín Silao, Antolin Lusitania y Antolín Bratislava.

[28] Se corresponden con: Antolín UK, Antolín Deutschland y Antolín North America.

39. Tanto las Plantas como las OTCs operan bajo la dirección y supervisión de Antolín Irausa y, en lo que a I+D+i se refiere, de Antolín Ingeniería, siendo que las decisiones se adoptan por sus órganos sociales desde Burgos o por directivos cuyo centro de trabajo se encuentra en Burgos. Así, las Filiales se limitan a la ejecución de instrucciones y directrices que se les transmiten desde dicha ciudad.

40. Las relaciones entre Antolín Irausa y las Plantas se regulan a través de contratos denominados "*Principal Master Agreements*" (los "**PMAs**"), suscritos entre Antolín Irausa –en calidad de "Principal"– y cada una de las Plantas. En virtud de estos contratos, Antolín Irausa asume la condición de empresario ("*entrepreneur*"), definiendo la estrategia negocial a nivel mundial, desarrollando y manteniendo los activos intangibles del Grupo y asumiendo las consecuencias económicas últimas de los riesgos significativos del negocio. Las Plantas, por su parte, quedan relegadas a funciones puramente productivas –gestión de pedidos, fabricación, control de calidad y entrega de productos– bajo la dirección y supervisión de Antolín Irausa, sin autonomía decisoria propia. En este sentido, las decisiones de estas entidades se adoptan, insistimos, desde Burgos.

41. Por su parte, las relaciones entre Antolín Irausa y Antolín Ingeniería con las Filiales que ostentan la condición de OTCs –en concreto, Antolin Deutschland, Antolin UK y Antolín North America– se regulan a través de un conjunto de contratos de prestación de servicios ("**Contratos OTC**") que comprenden, entre otros, servicios de apoyo comercial, servicios de soporte corporativo, servicios de desarrollo y mantenimiento, servicios de actividad industrial, servicios de innovación y servicios de actividad técnico-comercial.

42. El matiz relevante de todos estos Contratos OTC es que son las OTCs las que prestan servicios de colaboración a Antolín Irausa y, en el caso de los contratos de innovación, a Antolín Ingeniería, que son las sociedades que verdaderamente desarrollan las funciones estratégicas, limitándose las OTCs a implementar los modelos de actividad empresarial diseñados desde Burgos.

43. A mayor abundamiento, Antolín Irausa mantiene con todas sus Filiales un sistema de gestión centralizada de tesorería (bajo el modelo habitual de *unidad de caja*), instrumentado a través de acuerdos de *cash pooling*; y Antolín Irausa realiza contrataciones para todas sus Filiales, como es el caso, por ejemplo, de los contratos de seguro.

44. No aportamos aquí todos estos contratos –los PMAs, los Contratos OTC, los acuerdos de *cash pooling* y otros contratos– por contener información empresarial sensible sobre el Grupo y su

18

modelo de negocio, sin perjuicio de que por supuesto ofrezcamos su aportación en la medida en que fuera necesario si Su Señoría así lo decidiese.

### B) Organización del Grupo Antolín en Unidades de Negocio dirigidas desde Burgos

45. A todo lo anterior se suma que Grupo Antolín divide su actividad productiva en las tres unidades de negocio ("**Business Units**") que a continuación describimos, a las que están adscritas las distintas Plantas, y cuya dirección se ejecuta desde Burgos[29]:

   (i) Puertas, Productos Integrados, Consolas centrales y Revestimientos[30]: se trata de la unidad de negocio especializada en la fabricación de estos componentes del vehículo, que se encuentra dirigida por D. Ignacio Salazar empleado de Antolín Irausa con domicilio en Burgos.

   En esta Business Unit, se integran las siguientes Sociedades Solicitantes: Antolín Aragusa, Antolín Glass, Antolín Plasbur, Antolín RyA, Antolín Interiors UK, Antolín Interiors USA, Antolín Shelby, Antolín Silesia, Antolín Turnov, Antolín Liban, Antolín Straubing, Antolín Interiors Mexico, Antolín Tlaxcala, Antolín Cuautitlán y Antolín Lusitania.

   (ii) Techos: de nuevo, se trata de la unidad de negocio que se centra en la fabricación de los componentes para el techo de los vehículos, que es dirigida por D. Fernando Torija, empleado de Antolín Irausa con domicilio en Burgos.

   Las Sociedades Solicitantes que se integran en esta unidad son: Antolín Autotrim, Antolín Eurotrim, Antolín Leamington, Antolín Alabama, Antolín Missouri, Antolín Kentucky, Antolín Michigan, Antolín South Africa, Antolín Bohemia, Antolín Ostrava, Antolín Logistik Deutschland, Antolín Silao y Antolín Bratislava.

   (iii) Sistemas electrónicos: unidad de negocio enfocada en el desarrollo de las soluciones para las funcionalidades asociadas al interior del automóvil. Se encuentra dirigida por D. Enrico Marzinot empleado de Antolín Irausa con domicilio en Burgos.

   Entre las Sociedades Solicitantes, las siguientes se integran en esta unidad de negocio: Antolín Bamberg, Antolín Sibiu y Antolín Saltillo.

---

[29] Se aporta como **Documento nº 12** comunicado interno del Grupo en el que se hacen constar los cambios en la organización de Business Units, que pasan de ser cinco a tres.
[30] Por sus siglas en inglés, empleadas por el Grupo, "*Doors & IP & CCs & HT*".

19

46. Además, los directores de las Business Units mencionadas dependen del Chief Officer & Business Officer, D. Miguel Marañón, también empleado de Antolín Irausa y también residente en Burgos.

47. Por su parte, las OTCs, aunque no se integran en una Business Unit como tal, sí se agrupan bajo la dirección de la Directora Comercial de Grupo Antolín, Dña. Sonia Aguilar, empleada de Antolín Irausa, cuyo centro de trabajo también se encuentra en Burgos.

## C) Administración desde Burgos

48. Asimismo, los órganos de administración de Antolín Irausa y de las Filiales están integrados, con carácter general, por personas de nacionalidad española y cuyo centro de trabajo se encuentra en Burgos. En aquellos casos en los que, por razones legales[31] u operativas de la jurisdicción en la que se opera, ha sido preciso incluir en el órgano de administración a profesionales locales del país donde se ubica la Planta o la OTC, las decisiones continúan tomándose desde España.

49. Además, Dña. Cristina Blanco Santo Tomás, Consejera Delegada de Antolín Irausa, ostenta por lo general el cargo de administrador, o tiene otorgados a su favor poderes solidarios, en las distintas Filiales Extranjeras en las que existe representación local en sus órganos de administración, de modo que, con independencia de ese componente local, el control efectivo de la dirección se sigue localizando en Burgos.

50. Aportamos como **Documento nº 13** cuadro de elaboración propia que resume las personas que forman parte del órgano de administración de las Filiales; como **Documento nº 14** el equipo directivo de Grupo Antolín tal y como aparece en su página web[32]; como **Documento nº 15** organigrama que refleja la dirección del Grupo Antolín y como **Documento nº 16** el certificado de Recursos Humanos de Antolín Irausa que acredita que todas las personas que forman parte del equipo directivo están vinculadas con Antolín Irausa y tienen su domicilio en Burgos.

## D) Modelo de gestión

51. Así, con este esquema organizativo Antolín Irausa remite, desde Burgos, a todas las Filiales protocolos y modelos de actuación estandarizados que deben ser seguidos por la totalidad de los empleados del Grupo a nivel mundial, desde manuales operativos y guías de procedimientos hasta modelos de negocio, calendarios de producción y directrices corporativas. Esta estandarización global de procesos, decidida e implementada desde su sede central, constituye

---

[31] Entre las que figuran razones legales, fiscales, de eficiencia y operativas.
[32] https://www.antolin.com/es/compania-equipo-directivo

20

prueba adicional de que el centro neurálgico de la gestión y dirección del Grupo se encuentra inequívocamente en Burgos.

52. De nuevo, por contener información susceptible de ser calificada como secreto empresarial, no se aportan los referidos documentos, sin perjuicio de que se ponen a disposición de Su Señoría en caso de que estimase necesaria o conveniente su aportación.

### E) Modelo reconocido por autoridades, empleados y acreedores

53. Es especialmente relevante destacar que este modelo operativo ha sido analizado y validado por la Administración Tributaria española. Así, con fecha 21 de marzo de 2024, la Agencia Estatal de la Administración Tributaria aprobó un Acuerdo Previo de Valoración de carácter unilateral (el "APA") suscrito con Antolín Irausa, con efectos para los ejercicios 2024 a 2027, que tiene por objeto la valoración de las operaciones vinculadas acometidas entre las entidades del Grupo. En su análisis funcional, el APA confirma que el Grupo Antolín opera bajo un modelo de gestión industrial y comercial integrado que supone una homogeneización y estandarización de los procesos productivos y comerciales, así como una concentración y centralización en la toma de decisiones en Burgos. Asimismo, el APA reconoce que los principales activos intangibles del Grupo –incluyendo la cartera de clientes, patentes, marcas, know-how de fabricación y sistemas de gestión logística– son propiedad de Antolín Irausa, en quien se concentran las funciones de desarrollo, mejora, mantenimiento, protección y explotación de dichos activos.

54. Lógicamente, los empleados de las distintas Filiales del Grupo Antolín conocen, por su experiencia cotidiana, que las decisiones estratégicas, organizativas y operativas del Grupo se adoptan en la sede central de Burgos. Prueba de ello son las comunicaciones internas de la dirección central, que se dirigen de manera periódica a la totalidad de la plantilla a nivel global a través de listas de distribución globales, se redactan de forma sistemática en español e inglés y se emiten siempre desde el dominio corporativo único (antolin.com), sin diferenciación alguna por razón de filial o región. Se adjunta una muestra de estas comunicaciones como **Conjunto Documental nº 17**.

55. Del mismo modo, acreedores, clientes y proveedores son conocedores de esta centralización dado que las relaciones contractuales entabladas con ellos se negocian desde Burgos. A título ejemplificativo, por lo que aquí interesa, en la práctica totalidad de las operaciones de financiación, quienes actúan como firmantes en nombre de todas las sociedades del Grupo – incluidas las Filiales Extranjeras– son siempre personas residentes en Burgos.

56. El propio Grupo Antolín ha reconocido y expresado esa centralización ante sus acreedores, como se aprecia en la Memoria Justificativa Consolidada para la obtención de financiación

ICO, en la que se describe que el modelo industrial está centralizado en la toma de decisiones y gestión, y que las actividades de dirección industrial, comercial, finanzas, compras y recursos humanos tienen sus órganos de decisión y control en su sede de Burgos. Se acompaña la referida Memoria, excluidos sus anexos, como **Documento nº 18**.

57. Toda la documentación mencionada contiene información de carácter sensible y confidencial sobre el funcionamiento del Grupo Antolín, motivo por el que, de nuevo, no se aporta a este escrito, sin perjuicio de poner nuevamente a disposición de Su Señoría dicha prueba si se estimase necesario o conveniente.

**TERCERO. - Sobre la situación de probabilidad de insolvencia de las Sociedades Solicitantes y las negociaciones llevadas a cabo para la suscripción del Plan de Reestructuración**

58. A continuación, se describe, de un lado, la situación de probabilidad de insolvencia en la que se encuentran las Sociedades Solicitantes que justifica el inicio de este procedimiento (Sección 3.1) y, de otro, el proceso de negociación mantenido con sus acreedores financieros, en el marco de la designación del Experto en la Reestructuración, del que ha resultado el Plan de Reestructuración cuya homologación es objeto de la Solicitud (Sección 3.2).

**3.1 Las Sociedades Solicitantes se encuentran en un estado de probabilidad de insolvencia**

59. De conformidad con el artículo 584.2 TRLC, "*Se considera que existe probabilidad de insolvencia cuando sea objetivamente previsible que, de no alcanzarse un plan de reestructuración, el deudor no podrá cumplir regularmente sus obligaciones que venzan en los próximos dos años*". Este es, precisamente, el escenario en el que se hallan las Sociedades Solicitantes y el que justifica que acudan, de manera proactiva cumpliendo con las recomendaciones de "*alerta temprana*", a los mecanismos de reestructuración preventiva que ofrece el TRLC.

60. Si bien las Sociedades Solicitantes vienen atendiendo hasta la fecha todas sus obligaciones financieras frente a sus acreedores –incluyendo todos los vencimientos de intereses y comisiones[33]–, su estructura de pasivo y los vencimientos próximos, examinados a la luz del actual contexto sectorial y macroeconómico, evidencian que, sin la aprobación e implementación del Plan de Reestructuración cuya homologación se solicita, se exponen al

---

[33] Intereses ordinarios y comisiones que, teniendo en cuenta la situación de mera probabilidad de insolvencia, se seguirán atendiendo en los términos del Plan de Reestructuración hasta la Fecha de Efectividad, a fin de generar el menor perjuicio posible a los Acreedores Afectados.

riesgo más que probable de no poder cumplir regularmente las obligaciones que se devengarán en los próximos dos años. Tres son los factores que, conjuntamente considerados, determinan la concurrencia del presupuesto objetivo de probabilidad de insolvencia.

### A) El contexto macroeconómico y geopolítico actual y su incidencia sobre el sector de la automoción

61. El sector de la automoción atraviesa un período de incertidumbre sin precedentes en las últimas décadas. La política arancelaria impulsada por la Administración estadounidense —mediante la imposición progresiva de aranceles a la importación de vehículos y componentes de automoción no fabricados en territorio norteamericano— ha alterado sustancialmente las condiciones competitivas en el principal mercado mundial del sector y ha incidido de forma particularmente acusada sobre los proveedores europeos de componentes con presencia industrial en los Estados Unidos, entre los que se encuentra el Grupo Antolín, con plantas y centros productivos.

62. Las propias cuentas anuales consolidadas correspondientes al ejercicio 2024 (**Documento nº 19**) ya advertían en su Informe de Gestión Consolidado del impacto adverso que esta coyuntura podía desplegar sobre la actividad del Grupo.

63. Del mismo modo existen referencias a esta situación en las Cuentas Anuales consolidadas correspondientes al ejercicio 2025 que se han acompañado como Documento nº 8, en las que se afirma que (*vid.* pág. 31, apartado (2) h) de la memoria consolidada): "*Además, la incertidumbre derivada de la situación geopolítica asociada al reciente conflicto armado en Irán junto al proceso de transformación en el que se encuentra el sector de la automoción, podría dificultar el cumplimiento de dichos ratios financieros también en el último trimestre del ejercicio 2026 y los dos primeros trimestres de 2027. Dicho incumplimiento podría facultar a las entidades financieras a exigir en 2027 el vencimiento anticipado de una parte significativa de la deuda financiera consolidada del Grupo, lo que afectaría de manera relevante a su posición de liquidez*".

### B) El elevado endeudamiento heredado de la adquisición de Magna Interiors, agravado por crisis exógenas sobrevenidas

64. A los factores sectoriales y geopolíticos anteriores se suma el elevado endeudamiento –superior al habitual en el sector– que el Grupo Antolín arrastra desde la adquisición del negocio de interiores de la multinacional canadiense Magna International (la denominada operación

"**Magna Interiors**")[34]. Aunque esta operación estratégica permitió al Grupo Antolín consolidarse como uno de los principales proveedores mundiales de componentes de interiores, duplicando su tamaño hasta superar los 4.000 millones de euros de facturación y cerca de 20.000 empleados a nivel global; requirió una inversión significativa de recursos, principalmente financieros –en forma de emisión de bonos y suscripción de otros instrumentos financieros adicionales-, que incrementó significativamente el nivel de apalancamiento del Grupo.

65.    La capacidad del Grupo para atender las exigencias financieras derivadas de la citada operación de expansión se vio gravemente comprometida por dos crisis exógenas y consecutivas: en primer lugar, la pandemia de Covid-19, declarada en 2020, que paralizó temporalmente la producción automovilística mundial; y, a continuación, la guerra de Ucrania, iniciada en febrero de 2022 y todavía en curso, que provocó importantes tensiones en las cadenas de suministro y un encarecimiento generalizado de las materias primas y de la energía. Estos factores externos impidieron que el Grupo Antolín pudiera reducir su endeudamiento al ritmo inicialmente previsto.

66.    Si bien el Grupo ha logrado en los últimos ejercicios recomponer sus márgenes operativos y presenta en la actualidad una situación de negocio sólida, con una cartera de clientes diversificada y una posición competitiva reforzada, esta recuperación se ha producido cuando su estructura financiera ya se hallaba comprometida por el apalancamiento resultante de la adquisición de Magna Interiors —agravado por las crisis sobrevenidas—, lo que determina que la carga financiera resulte difícilmente sostenible a medio y largo plazo en ausencia de una reestructuración ordenada.

### C)    La concentración de vencimientos en el horizonte de los próximos dos años y la necesidad de asegurar la financiación de circulante

67.    La estructura de vencimientos de la deuda financiera de las Sociedades Solicitantes, expuesta con detalle en el Hecho Cuarto, presenta una concentración crítica que confirma de manera objetiva la concurrencia del presupuesto del artículo 584.2 TRLC. En particular, el Grupo afronta vencimientos y supuestos de posible vencimiento relevantes en 2027 y 2028 –momento en el que tendrá que hacer frente a pagos por importe total de 494,3 millones de euros.

---

[34] Grupo Antolín publicó esta operación en su web corporativa: https://www.antolin.com/es/grupo-antolin-cierrala-adquisicion-de-magna-interiors-para-ofrecer-el-interior-completo-del                y https://www.antolin.com/es/grupoantolin-acuerda-la-adquisicion-de-la-mayor-parte-del-negocio-de-interiores-de-magna.

68. A ello se añade que la mayor parte de los instrumentos financieros incorporan un mecanismo de anticipación de su vencimiento final al 29 de octubre de 2027 si no se refinancia buena parte de la deuda con anterioridad, circunstancia que, dadas las actuales condiciones de mercado y el contexto sectorial descrito, resulta poco probable –en términos sostenibles, sin una reordenación previa del pasivo financiero del Grupo.

69. Asimismo, el Factoring Sindicado Existente[35], instrumento de circulante fundamental para la operativa del Grupo, vencería el próximo 23 de enero de 2027, por lo que la necesidad de asegurar una línea bancaria de financiación de circulante a largo plazo se convierte en una cuestión esencial y crítica para la viabilidad del Grupo. Asegurarse la financiación de circulante que precisa el Grupo para seguir operando ha sido precisamente uno de los puntos más relevantes de las negociaciones mantenidas con los acreedores para la suscripción del Plan.

70. La probabilidad de insolvencia queda objetivamente acreditada a través del plan de viabilidad elaborado por el Grupo Antolín (el "**Plan de Viabilidad**") con la revisión y validación de la prestigiosa firma VEST Partners Estrada, S.L. (en adelante "**Vest Partners**") que se acompaña como **Documento nº 20** y será objeto de detallada mención en el Hecho Decimocuarto.

71. Adelantamos en todo caso ya que, por lo que se refiere a la situación de probabilidad de insolvencia de las Sociedades Solicitantes, el Plan de Viabilidad aprecia su existencia en los siguientes términos:

> "- *Si bien la principal concentración de vencimientos financieros no se producirá hasta el ejercicio 2028 -aunque podría adelantarse a octubre de 2027 si no se hubieran refinanciado los Bonos con vencimiento en 2028 a dicha fecha-, el volumen y la complejidad de la estructura financiera del Grupo, unidos al contexto macroeconómico y sectorial en el que opera, han llevado al Grupo Antolin a promover un Plan de Reestructuración orientado a reforzar su liquidez, adecuar su estructura financiera a su capacidad de generación de caja y asegurar su viabilidad futura.*
>
> *-En ausencia de dichas medidas, el Grupo difícilmente dispondría del tiempo y de la flexibilidad financiera necesarios para ejecutar las mejoras operativas previstas y generar los recursos que permitan afrontar de forma ordenada sus compromisos financieros futuros. Por ello, se considera que el Grupo Antolin se encuentra en una situación de probabilidad de insolvencia, al resultar razonablemente previsible que, de no alcanzarse el Plan de Reestructuración, no pueda cumplir regularmente las obligaciones que venzan en los próximos dos años*" (*vid*. página 41 del Plan de Viabilidad).

---

[35] El "**Factoring Sindicado Existente**" hace referencia al contrato de factoring sindicado (*Receivables Purchase and Servicing Agreement*) suscrito el 23 de enero de 2025 entre Antolín Irausa, como vendedor y agente de cobros; BBVA, CaixaBank y HSBC Factoring (France), como compradores; y BBVA como banco agente.

72. En idéntico sentido, el Experto en la Reestructuración también aprecia la concurrencia de las dificultades que determinan la existencia de una situación de probabilidad de insolvencia del Grupo Antolín en su informe sobre la razonabilidad del Plan de Viabilidad (el "**Informe sobre la Razonabilidad del Plan de Viabilidad**"), que se acompaña como **Documento nº 21**, concluyendo al tiempo que es posible superar dicha situación con las medidas que recoge el Plan para asegurar su viabilidad:

> "*En la actualidad, debido al volumen de deuda y estructura financiera que mantiene, con concentración de vencimientos en el ejercicio 2028 (494,3M€ aprox), - que podrían anticiparse en buena parte al ejercicio anterior de no conseguir el Grupo refinanciar antes de octubre de 2027 los Bonos que vencen en 2028-, Grupo Antolín no podrá atender la mencionada deuda a sus vencimientos contractualmente previstos. Además, el Grupo tampoco considera factible la posibilidad de refinanciar los vencimientos de la deuda debido al ratio de apalancamiento existente actualmente, y en esas circunstancias, no tiene asegurada la permanencia de las líneas de circulante, fundamentales para la operativa del negocio.*
>
> *Como consecuencia, el Grupo Antolín, propone un Plan de Reestructuración que permita adaptar y optimizar dicha estructura financiera y así asegurar la viabilidad del Grupo*" (*vid*. páginas 11 y 12 del Informe sobre la Razonabilidad del Plan de Viabilidad).

73. En definitiva, concurren todos los elementos exigidos por el artículo 584.2 TRLC para apreciar la probabilidad de insolvencia de las Sociedades Solicitantes y, consiguientemente, el presupuesto objetivo previsto en el artículo 638.1.1º TRLC para la homologación del Plan de Reestructuración.

**3.2 Sobre las negociaciones llevadas a cabo con los acreedores**

74. Tomando conciencia anticipada de la situación descrita, a la vista de las antedichas dificultades operativas y financieras que se le han presentado al Grupo en los últimos años como consecuencia del contexto macroeconómico y sectorial descrito, en el año 2023 se aprobó la implantación de un plan de transformación (el "**Plan de Transformación 2023**") con el objetivo de ejecutar una reestructuración financiera y operativa que ayudase a desapalancar el balance y optimizar la eficiencia operativa[36]. Aunque la ejecución del Plan de Transformación 2023 ha supuesto un incremento del margen de EBITDA sobre ventas, desde el 8,1 % en el

---

[36] *Vid*. Página web del Grupo Antolín disponible en: https://www.antolin.com/es/antolin-presenta-su-plan-de-transformacion-para-liderar-la-nueva-movilidad-desde-el-interior-del

ejercicio 2023 al 9 % en el ejercicio 2025, con la mejora de rentabilidad que ello implica, no ha sido suficiente para superar la situación de excesivo apalancamiento financiero que lastra al Grupo.

75. Por este motivo, y en paralelo, con el fin de actuar con la diligencia y previsión que la coyuntura demandaba, las Sociedades Solicitantes iniciaron conversaciones con sus principales acreedores bancarios en orden a (a) garantizar la habilitación de las líneas de financiación circulante imprescindibles para el mantenimiento de la actividad del Grupo, y (b) adaptar su endeudamiento a las posibilidades de generación de caja que ofrece el actual contexto económico y de mercado.

76. En este contexto, y de cara a impulsar dichas negociaciones, las Sociedades Solicitantes presentaron ante este Iltre. Tribunal, con fecha 28 de abril de 2026, solicitud de nombramiento de experto en la reestructuración al amparo del artículo 672 TRLC. Por Auto de 14 de mayo de 2026 –completado por otro del posterior 1 de junio-, este Iltre. Tribunal acordó la designación de LEXAUDIT como Experto en la Reestructuración, recayendo en él las funciones legalmente atribuidas para asistir a las Sociedades Solicitantes y a sus acreedores en la negociación y elaboración del Plan.

77. Desde la designación del Experto, las Sociedades Solicitantes intensificaron el proceso de negociación con acreedores financieros, articulado a través de rondas de reuniones, intercambios de propuestas y contrapropuestas, intercambios de información financiera y trabajos de modelización financiera, todo ello bajo la supervisión del Experto en la Reestructuración. En este sentido, dada la necesidad de circulante para mantener la operativa del Grupo, las negociaciones comenzaron con las entidades bancarias que pueden proporcionar los instrumentos necesarios para cubrir esa necesidad.

78. La seriedad de las negociaciones y la razonabilidad del resultado que se materializa en el Plan de Reestructuración finalmente acordado vienen acreditadas por la participación en todo el proceso de las principales firmas internacionales de asesoramiento financiero, con experiencia reconocida en los procesos de reestructuración más relevantes acometidos en España en los últimos años; Houlihan Lokey por el lado del Grupo Antolín, y PJT Partners por el lado de los Acreedores Participantes Originales.

79. Fruto de este intenso proceso negociador, las Sociedades Solicitantes junto con una serie de acreedores financieros, entre otros, suscribieron el RSA el pasado día 23 de junio de 2026, comprometiéndose con ello los acreedores firmantes a votar favorablemente el Plan de Reestructuración Original. Como se ha explicado en el Hecho Primero, tras la firma del RSA se remitió una invitación para a adhesión al Plan de Reestructuración Original.

80. El envío de esta invitación dio lugar a la continuación de las negociaciones con otros acreedores, incluido el mantenimiento de contactos con tenedores de Bonos al objeto de explorar sus necesidades y su posible adhesión. Contactos que no sólo se realizaron a través de las Sociedades Reestructuradas, sino también fueron promovidos por el Experto en la Reestructuración.

81. Posteriormente, se consideró necesaria la corrección de una omisión involuntaria del Plan de Reestructuración Original y la realización de una serie de ajustes menores. En consecuencia, se elaboró el Plan de Reestructuración Refundido y se procedió a ponerlo en conocimiento de todos los Acreedores Afectados mediante el envío de una nueva Invitación.

82. Finalmente, el 10 de julio de 2026 las Sociedades Solicitantes y los Acreedores Participantes Originales suscribieron el Plan de Reestructuración Refundido, al que se adhirieron el mismo día varios acreedores y al que se podrán adherir otros Acreedores Afectados hasta la finalización del Periodo de Adhesión, el 22 de julio de 2026.

83. A fecha actual, el Plan de Reestructuración ha sido suscrito por Acreedores Participantes que suponen una mayoría suficiente de los Acreedores Afectados en cada una de las Sociedades Reestructuradas a los efectos del artículo 639.2 TRLC (*vid*. Hecho Duodécimo (Sección 12.5)).

84. En atención a lo expuesto, el Plan de Reestructuración constituye el resultado de un proceso negociador sólido, asistido por el Experto en la Reestructuración y conducido en estricto cumplimiento del marco legal aplicable, lo que avala el cumplimiento de todos los presupuestos formales y materiales exigidos para su homologación por este Iltre. Tribunal.

**CUARTO. - Endeudamiento financiero de las Sociedades Solicitantes**

85. La deuda financiera afectada por el Plan a Fecha de Firma se corresponde con los siguientes instrumentos de deuda (conjuntamente, los "**Contratos Afectados**"):

(i) la emisión por Antolín Irausa de bonos sénior garantizados y sujetos a ley del Estado de Nueva York (EE.UU.) con vencimiento final el 30 de abril de 2028, regidos por el instrumento de emisión (*indenture*) de fecha 29 de junio de 2021 (tal y como el mismo haya sido novado y complementado en cada momento, el "**Instrumento de Emisión de los Bonos 2028**"), y formalizada en la escritura de emisión de obligaciones otorgada el 23 de julio de 2021 ante el notario de Burgos, D. José María Gómez-Oliveros, con el número 2881 de orden de su protocolo (los "**Bonos 2028**");

(ii) la emisión por Antolín Irausa de bonos sénior garantizados y sujetos a ley del Estado de Nueva York (EE.UU.) con vencimiento final el 30 de enero de 2030, regidos por el instrumento de emisión (*indenture*) de fecha 31 de julio de 2024 (tal y como el mismo haya sido novado y complementado en cada momento, el "**Instrumento de Emisión de los Bonos 2030**"), y formalizada en la escritura de emisión de obligaciones otorgada en esa misma fecha ante el notario de Burgos, D. José María Gómez-Oliveros, con el número 3132 de orden de su protocolo (los "**Bonos 2030**" y, conjuntamente con los Bonos 2028, los "**Bonos Existentes**");

(iii) el contrato de financiación sindicada (*senior facilities agreement*) sujeto a ley inglesa originalmente suscrito el 13 de marzo de 2014 por, entre otros, Antolín Irausa, como deudora, ciertas sociedades del Grupo, como garantes personales, Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., Bankinter, S.A., BNP Paribas S.A. Sucursal en España, CaixaBank, S.A. y Deutsche Bank AG, London Branch, como *mandated lead arrangers*, Banca March, S.A. y Banco Espírito Santo, S.A. Sucursal en España, como *arrangers*, Deutsche Bank AG, London Branch, como agente y agente de garantías, y las entidades financieras que en cada momento ostentan la condición de acreditantes, elevado a público mediante escritura otorgada el 2 de abril de 2014 ante el notario de Burgos, D. José María Gómez-Oliveros Sánchez de Rivera, con el número 683 de orden de su protocolo (tal y como el mismo ha sido novado y refundido en cada momento, y, particular, tal y como fue novado y refundido el 19 de julio de 2024, el "**Contrato de Financiación Sindicada Existente**");

(iv) el contrato de financiación sindicada sujeto a ley española y con aval del Estado en virtud de la línea de avales concedida a empresas del Real Decreto-Ley 4/2025, de 8 de abril, de Medidas Urgentes de Respuesta a la Amenaza Arancelaria y de Relanzamiento Comercial (junto con su norma de desarrollo, el "**Aval ICO Aranceles**"), suscrito el 4 de agosto de 2025 por Antolín Irausa, Antolín Aragusa, Antolín Eurotrim, Antolín Ingeniería, Antolín Plasbur y Antolín RyA, como deudores, ciertas sociedades del Grupo, como garantes personales, Banco Bilbao Vizcaya Argentaria, S.A., como agente, Deutsche Bank AG, London Branch, como agente de garantías, y Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., CaixaBank, S.A., , HSBC Continental Europe, Sucursal en España e Instituto de Crédito Oficial, E.P.E., como entidades financiadoras, elevado a público mediante escritura otorgada en la misma fecha ante el notario de Madrid, D. Andrés Domínguez Nafría, con número 5225 de orden de su protocolo (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación ICO Existente**");

29

*(v)* el contrato de financiación (*finance contract*) denominado "Antolin Car Interiors RDI" suscrito el 12 de junio de 2018 por Antolín Irausa, como deudora, ciertas sociedades del Grupo, como garantes personales, y el Banco Europeo de Inversiones ("**BEI**"), como acreedor, elevado a público mediante escritura otorgada en esa misma fecha ante el notario de Burgos, D. José María Gómez-Oliveros Sánchez de Rivera, con el número 1806 de orden de su protocolo (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación BEI I**");

*(vi)* el contrato de financiación (*finance contract*) denominado "Antolin Car Interiors RDI B" suscrito el 23 de diciembre de 2020 por Antolín Irausa, como deudora, ciertas sociedades del Grupo, como garantes personales, y BEI, como acreedor, elevado a público mediante escritura otorgada el 9 de julio de 2021 ante el notario de Burgos, D. José María Gómez-Oliveros Sánchez de Rivera, con el número 2688 de orden de su protocolo (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación BEI II**" y, conjuntamente con el Contrato de Financiación BEI I, los "**Contratos de Financiación BEI Existentes**")[37].

*(vii)* los avales emitidos bajo las líneas de avales y seguros de caución suscritos entre Antolín Irausa, por un lado, y BBVA, BBVA USA, HSBC Europe y Atradius, por otro, que se detallan en el Anexo II Parte III del Plan de Reestructuración y que incluyen, a efectos aclaratorios, la Línea de Avales BBVA como línea accesoria (*Ancillary Facility*) suscrita al amparo del Contrato de Financiación Sindicada Existente (las "**Líneas de Avales Existentes**"); y

*(viii)* los contratos de préstamo intragrupo suscritos entre las Sociedades Reestructuradas y que se detallan en el Anexo II Parte IV del Plan de Reestructuración (los "**Préstamos Intragrupo**"), junto con sus correspondientes intereses devengados y no pagados.

86. Además, debemos indicar que:

(i) todas las Sociedades Reestructuradas a excepción de Antolín Irausa (que es quien suscribe el contrato con carácter principal) tienen la condición de garantes personales de los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes[38]; y

---

[37] Nos referiremos conjuntamente al Contrato de Financiación Sindicada Existente, al Contrato de Financiación ICO Existente y a los Contratos de Financiación BEI Existentes como "**Deuda Bancaria**".

[38] Es debido a esas garantías personales a primer requerimiento, con renuncia expresa a los beneficios de excusión u otras excepciones, otorgadas al amparo de los citados contratos, que dichas Sociedades Reestructuradas son parte del Plan.

(ii) que los mencionados instrumentos de deuda[39] están vinculados por un contrato entre acreedores suscrito el 21 de marzo de 2014 por, entre otros, Antolín Irausa, determinadas sociedades del Grupo, Deutsche Bank AG, London Branch y Deutsche Trustee Company Limited (el "**Contrato entre Acreedores**" o el "**ICA**"). Debido a su extensión, adjuntamos, como **Documento nº 22**, un compendio de las principales cláusulas del ICA a los efectos de la presente Solicitud, y su traducción al español como **Documento nº 22 bis**.

El Contrato entre Acreedores fue elevado a público mediante escritura otorgada el 2 de abril de 2014 ante el Notario de Burgos D. José María Gómez-Oliveros, con el número 684 de su protocolo, y establece, entre otros aspectos, el rango de prelación *pari passu* de las obligaciones debidas bajo los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes.

La existencia de este Contrato entre Acreedores y, en particular, del referido rango *pari passu* refuerza, por lo demás, la necesidad de afrontar la reestructuración de manera conjunta, y en los términos previstos en el Plan, sobre los principales instrumentos financieros del Grupo.

87. A Fecha de Firma[40] del Plan de Reestructuración, los importes debidos en virtud de los Contratos Afectados se detallaron en el Anexo II del Plan y constituyen la "**Deuda Afectada**"[41]. Tal y como se dispone en el Plan, a efectos aclaratorios y en relación con artículo 616 del TRLC, se deja expresa constancia de que la Deuda Afectada se deriva de los créditos financieros derivados de los Contratos Afectados (los "**Créditos Afectados**").

**QUINTO. – Sobre el contenido del Plan de Reestructuración cuya homologación se solicita**

88. En esencia, el Plan de Reestructuración pretende dar una solución conjunta a la situación de probabilidad de insolvencia que afecta a las Sociedades Solicitantes de modo que, a través de la implementación de las medidas en él contempladas, se pretende:

---

[39] En particular, los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes.

[40] La Fecha de Firma significa la fecha de firma del Plan de Reestructuración, esto es, el día 10 de julio de 2026 (*vid*. Anexo I del Plan).

[41] Cada Sociedad Reestructurada tiene importes distintos de Deuda Afectada, incluso respecto de Contratos Afectados comunes, por cuánto en los referidos contratos, en ocasiones, sus garantías presentan distintos límites.

(i)  asegurar el negocio de las Sociedades Reestructuradas en el corto y medio plazo, evitando así un eventual concurso de acreedores, al tiempo que se garantiza su estabilidad en el largo plazo;

(ii)  el mantenimiento del empleo y la actividad de las Sociedades Reestructuradas en los términos actuales;

(iii)  ajustar los vencimientos de la Deuda Afectada de conformidad con el Plan de Viabilidad;

(iv)  asegurar la habilitación de la nueva financiación que precisa el Grupo a través del Contrato de Financiación de Circulante y, de manera provisional hasta la entrada en vigor con plena disponibilidad de dicho contrato, mediante las Prórrogas del Factoring Sindicado Existente, sujeto a las condiciones del Plan[42];

(v)  atender de forma ordenada el pago de la Deuda Afectada;

(vi)  el mantenimiento de la estructura actual de capital; y

(vii)  asegurar la viabilidad del Grupo.

89.  Visto lo anterior, procedemos a explicar en los apartados siguientes cuestiones concretas del Plan de Reestructuración que son de particular interés para lograr los objetivos enunciados.

**SEXTO. – Sobre el perímetro del Plan de Reestructuración cuya homologación se solicita**

90.  El perímetro objetivo del Plan de Reestructuración cuya homologación se solicita está integrado, exclusivamente, por la denominada Deuda Afectada, constituida por los créditos derivados de los Contratos Afectados identificados en el Expositivo II del Plan y en el Hecho Cuarto de esta Solicitud. Quedan, por tanto, expresamente excluidos del perímetro todos aquellos créditos que no tengan la consideración de Deuda Afectada conforme al propio Plan, los cuales serán satisfechos por las Sociedades Solicitantes en sus términos originales y sin sufrir modificación alguna como consecuencia del proceso de reestructuración.

---

[42] Las prórrogas del Factoring Sindicado Existente que se produzcan como consecuencia de lo previsto en la Cláusula 6.1. del Plan de Reestructuración se denominan, de manera conjunta, las "**Prórrogas del Factoring Sindicado Existente**".

**6.1 Deuda Afectada**

91. La deuda que sí queda incluida en el perímetro del Plan de Reestructuración está integrada por los Contratos Afectados que han sido detallados en el Hecho Cuarto. A continuación, relacionamos los Contratos Afectados de forma resumida: (i) los Bonos 2028; (ii) los Bonos 2030; (iii) el Contrato de Financiación Sindicada Existente; (iv) el Contrato de Financiación ICO Existente; (v) los Contratos de Financiación BEI Existentes; (vi) los avales emitidos bajo las Líneas de Avales Existentes; y (vii) los Préstamos Intragrupo, con sus intereses ordinarios devengados y no pagados y cualquier derecho de reembolso o repetición en los términos del Plan.

**6.2 Deuda excluida**

92. Por el contrario, el Plan de Reestructuración no afecta —y, en consecuencia, no impone modificación alguna sobre los mismos— a los siguientes créditos:

   i.   Créditos dimanantes de la partida "Intereses a Corto Plazo", correspondientes a los intereses ordinarios a corto plazo y comisiones

        Los intereses ordinarios y comisiones devengados y no pagados derivados de los Créditos Afectados, excluyendo los asociados a los Préstamos Intragrupo, continuarán abonándose en sus fechas de pago durante todo el proceso de reestructuración, en los términos que recoge la Cláusula 5.6 del Plan (entre los que figura que no resultará de aplicación a dichos pagos obligación de reembolso o reintegro que pueda estar prevista en el Contrato entre Acreedores o en los Contratos Afectados).

        En este sentido, las Sociedades Reestructuradas disponen de capacidad suficiente para continuar satisfaciendo dichos intereses ordinarios y comisiones sin comprometer su viabilidad en el corto y medio plazo, todo ello en el ánimo de solicitar el menor esfuerzo posible a los acreedores.

        Asimismo, habida cuenta de que las Sociedades Reestructuradas se encuentran en una situación de mera probabilidad de insolvencia en los términos del artículo 584.2 del TRLC, resulta fundamental evitar cualquier actuación en el marco de la Reestructuración que cause un incumplimiento de pago que, a su vez, provoque el vencimiento anticipado de los Créditos Afectados.

ii. <u>Créditos dimanantes de las partidas tituladas "Deuda IFRS 16" y "Acreedores Comerciales"</u>

Se trata de créditos dimanantes de contratos en vigor con obligaciones recíprocas pendientes de cumplimiento y que, por tanto, en un escenario concursal tendrían la condición de créditos contra la masa, que gozarían de prioridad de cobro y serían satisfechos con normalidad de forma íntegra a fin de poder seguir contando con las prestaciones derivadas de los mismos. Estos créditos dimanan, además, de relaciones o contratos operativos (es decir, de naturaleza no financiera), de naturaleza comercial (contratos comerciales o de arrendamiento operativo necesarios para la continuación de la actividad empresarial).

iii. <u>Créditos dimanantes de las partidas "Proveedores con Empresas del Grupo"</u>

Estas partidas se refieren a créditos dimanantes de contratos de naturaleza también operativa (no financiera) necesarios para el día a día de la actividad empresarial, los cuales las Sociedades Reestructuradas pueden continuar satisfaciendo sin comprometer su viabilidad en el corto y medio plazo.

iv. <u>Créditos dimanantes de las partidas de "Deuda con Hacienda Pública Acreedora, Administración Pública y Entidades Públicas Empresariales"</u>

Se trata de deuda de las Sociedades Reestructuradas con acreedores públicos, que no queda sujeta al Plan por no ser necesaria para asegurar su viabilidad en el corto y medio plazo, y por las limitaciones legales que vienen impuestas por la legislación vigente para su afectación bajo un plan de reestructuración.

v. <u>Créditos derivados de las partidas "Remuneraciones Pendientes de Pago"</u>

La deuda de las Sociedades Reestructuradas derivada de relaciones laborales, incluyendo potenciales remuneraciones en variable de trabajadores, no puede quedar afectada por el Plan de Reestructuración por imperativo de lo dispuesto en el artículo 616.2 TRLC.

vi. <u>Créditos dimanantes de la partida "Avales (deuda contingente) Deutsche Bank íntegramente garantizados con prendas sobre IPFs" prevista para Antolín Irausa y referida a los avales emitidos por Deutsche Bank, S.A.E. en virtud de un acuerdo denominado "contrato en garantía de línea de avales y/o fianzas multidivisa" suscrito el 10 de noviembre de 2015 con Antolín Irausa.</u>

34

El Plan tampoco afecta a los créditos de reembolso que pudieran nacer a favor de Deutsche Bank como consecuencia de la ejecución de los avales que constan detallados en el punto (vi) del apartado 8 del Anexo VI del Plan de Reestructuración, y ello por cuanto los créditos de reembolso que pudieran nacer por la ejecución de esos avales quedarían íntegramente atendidos con las imposiciones a plazo fijo pignoradas en garantía de los referidos créditos, por lo que la existencia de los mismos no afectaría a la viabilidad del Plan, ni tampoco quedaría afectada la paridad de trato entre acreedores. De hecho, una afectación de dichos créditos a este Plan de Reestructuración, dada la existencia de la citada garantía real y los términos y por los importes en que esta está constituida, supondría que Deutsche Bank no tendría ningún incentivo para adherirse al Plan de Reestructuración.

vii.   Créditos derivados de la partida "Leasings - BBVA, Doble G" prevista para Antolín Ingeniería

Se trata de la deuda dimanante de los siguientes contratos:

(a)   el contrato de arrendamiento financiero (*leasing*) suscrito entre Antolín Ingeniería y BBVA el 17 de mayo de 2023, relativo a una máquina de marcado con dispositivo láser TRUMARK 6030 (L026); y

(b)   sendos contratos relativos al servicio energético y arrendamiento de instalación para autoconsumo fotovoltaico en "Edificio Central Antolín" suscritos entre Antolín Ingeniería y Doble G Generación y Transformación, S.L. el 10 de febrero de 2020 y el 27 de febrero de 2024.

Estos instrumentos quedan fuera del perímetro de la Deuda Afectada en tanto constituyen contratos con obligaciones recíprocas pendientes de cumplimiento. En un escenario concursal, los créditos derivados de estos contratos tendrían la condición de créditos contra la masa, gozarían de prioridad de cobro y serían satisfechos con normalidad de forma íntegra, a fin de poder seguir contando con las prestaciones necesarias de las contrapartes.

Asimismo, en el caso del apartado (a) anterior, el propio bien arrendado opera como garantía implícita del cumplimiento de las obligaciones de Antolín Ingeniería, como arrendatario, lo que hace innecesaria su inclusión en el Plan, dado que BBVA dispone de suficientes mecanismos contractuales de protección.

35

**SÉPTIMO. – Sobre la formación de clases y el tratamiento o medidas previstas para cada una de ellas**

93. De acuerdo con lo previsto en el artículo 622 del TRLC, los Acreedores Participantes deberán votar agrupados por clases en cada una de las Sociedades Solicitantes. Siendo que la Deuda Afectada en cada Sociedad Solicitante es prácticamente la misma, se ha seguido un esquema de formación de clases sustancialmente uniforme.

94. Conforme al artículo 623 TRLC se han configurado las clases atendiendo al interés común de los acreedores que las forman. En este sentido, se considera que existe interés común entre los créditos de igual rango determinado por el orden de pago en el concurso de acreedores, si bien dentro de un mismo rango concursal podrán separarse en distintas clases, cuando haya razones suficientes que lo justifiquen.

95. En este caso, el rango concursal ha sido uno de los primeros criterios utilizados para la formación de clases del Plan, de forma que –respecto de cada Sociedad Solicitante y siempre que existan créditos de las clases en cuestión– se distinguen aquellos créditos concursales ordinarios (formados por los Bonos Existentes, la Deuda Bancaria y los créditos derivados de las Líneas de Avales Existentes) de los créditos concursales subordinados que se deriven de los Préstamos Intragrupo y de cualesquiera derechos de repetición, reembolso, regreso, indemnización o subrogación que tengan carácter subordinado conforme al Plan.

96. Dentro de los créditos ordinarios, y al amparo del propio artículo 623.3 TRLC, se han configurado a su vez las diferentes clases de créditos por los siguientes motivos (también expuestos en la Cláusula 3.2 del Plan de Reestructuración):

   (i)    Los distintos tratamientos alternativos ofrecidos a cada una de las Clases, esto es, a la Deuda Bancaria, a las Líneas de Avales Existentes y a los Bonos Existentes, se derivan de otorgar un tratamiento paritario a todas las clases ordinarias. En este sentido, resulta un elemento esencial para la viabilidad del Grupo la obtención de un instrumento de financiación de circulante de aquellas entidades que forman parte del denominado grupo (*pool*) bancario del Grupo, atendiendo a los criterios de negocio, operativos y de disponibilidad del producto, que justifican la introducción del tratamiento alternativo para la clase bancaria que puede comprometer esa financiación circulante y, por ende, el equivalente tratamiento, también alternativo, para la clase de bonos.

(ii) Al margen y de forma adicional a lo anterior, la diferente naturaleza de los instrumentos de Deuda Bancaria —contratos privados de financiación con restricciones para su cesión— frente a los Bonos Existentes —valores admitidos a cotización en un mercado regulado, sujetos a la normativa del mercado de capitales—, aconseja articular tratamientos diferenciados y soluciones adaptadas a las particularidades de cada categoría de instrumento.

(iii) La necesidad de modificar determinadas obligaciones y ratios financieros que únicamente se establecen en los instrumentos de financiación bancaria —el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes— para garantizar la viabilidad de las Sociedades Solicitantes a corto y medio plazo, frente a los Bonos Existentes, que no incorporan este tipo de obligaciones ni ratios financieros.

(iv) Por último, la naturaleza de crédito contingente de los avales emitidos bajo las Líneas de Avales Existentes.

97. La adecuación de la formación de clases descrita ha sido validada por el Experto en la Reestructuración, que se pronuncia favorablemente al respecto en el Informe sobre la Configuración de Clases que se acompaña como **Documento nº 23**.

98. A continuación, se exponen las clases configuradas en cada una de las Sociedades Solicitantes y su tratamiento.

**7.1 Configuración de las clases**

**A) Clases de Antolín Irausa**

99. Antolín Irausa, como matriz operativa del Grupo y deudora principal de los Contratos Afectados, cuenta con cuatro clases:

(i) <u>Clase Deuda Bancaria</u>. Comprende los Créditos Afectados derivados del Contrato de Financiación Sindicada Existente (incluyendo, a efectos aclaratorios, el importe del RCF[43] dispuesto a Fecha de Firma; pero excluyendo aquellos Créditos Afectados que se consideren Líneas de Avales Existentes), el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes, en los que Antolín Irausa es deudor principal, prestatario o garante personal. Esta clase tendría la

---

[43] La línea de crédito *revolving* regulada como el tramo denominado "*Revolving Facility 2*" del Contrato de Financiación Sindicada Existente.

consideración de crédito ordinario en un eventual concurso. La Deuda Afectada correspondiente a esta clase se describe en el Anexo II Parte I del Plan.

(ii)   Clase Bonos. Comprende los Créditos Afectados derivados de los Bonos 2028 y los Bonos 2030 en los que Antolín Irausa es el emisor y deudor principal. La Deuda Afectada de la Clase Bonos se encuentra descrita en el Anexo II Parte II del Plan.

En un escenario de concurso estos créditos tendrían la calificación de créditos ordinarios. Como se ha expuesto, su agrupación en una clase separada de la Clase Deuda Bancaria obedece a razones objetivas, tales como la diferente naturaleza del instrumento – los Bonos Existentes son valores negociables cotizados en el mercado Euro MTF de Luxemburgo y la Deuda Bancaria se recoge en los correspondientes contratos de financiación –, por lo que existen diferentes expectativas inversoras del mercado, y la necesidad de canalizar la modificación de las condiciones previstas en la Reestructuración en el caso de los Bonos Existentes mediante el proceso de consentimiento y canje que prevé la normativa aplicable de mercado de capitales.

Asimismo, la separación entre la Clase Deuda Bancaria y la Clase Bonos se justifica también por el distinto tratamiento previsto para cada una de ellas, tal y como se expondrá más adelante, atendiendo a la diferente contribución de una y otra a la viabilidad del Grupo. Todo ello sin perjuicio de que, desde un punto de vista financiero, el tratamiento otorgado a ambas clases resulte equivalente, en cumplimiento de lo dispuesto en la normativa aplicable.

(iii)   Clase Líneas de Avales. Está formada por los Créditos Afectados derivados de las Líneas de Avales Existentes que no cuentan con garantía real y de los que Antolín Irausa es el avalado principal. La Deuda Afectada correspondiente a esta clase es la descrita en el Anexo II Parte III del Plan.

En un escenario concursal estos créditos tendrían la calificación de créditos contingentes con vocación de ordinarios. Su agrupación en clase separada respecto de la Clase Deuda Bancaria y de la Clase Bonos responde, fundamentalmente, a la naturaleza contingente de los avales emitidos —en cuanto solo se materializan en crédito propiamente dicho cuándo, y si, son ejecutados—. Esta singularidad, plenamente reconocida por el artículo 623.4.3º TRLC, justifica un tratamiento diferenciado.

(iv)   Clase Deuda Subordinada. Está formada por (i) los Créditos Afectados derivados de los Préstamos Intragrupo en los que Antolín Irausa es deudor principal, (ii) junto

38

con los intereses devengados y no pagados derivados de dichos Préstamos Intragrupo en los que Antolín Irausa es deudor principal; y, en su caso, por cualesquiera derechos de repetición, reembolso, regreso, indemnización o subrogación frente a Antolín Irausa que tengan carácter subordinado conforme al Plan. La Deuda Afectada correspondiente a esta clase es la descrita en el Anexo II Parte IV del Plan.

En un escenario concursal, dichos créditos se clasificarían como créditos subordinados, motivo por el cual se configuran como clase única separada conforme exige el artículo 623 TRLC.

### B)  Configuración de las clases en las restantes Sociedades Reestructuradas

100.  Por su condición de garantes personales solidarios y/o deudores en parte de los instrumentos financieros afectados, las Sociedades Solicitantes distintas a Antolín Irausa también cuentan con una estructura de clases integrada por las cuatro clases que se relacionan a continuación.

(i)  <u>Clase Deuda Bancaria</u>. Comprende los Créditos Afectados derivados del Contrato de Financiación Sindicada Existente (incluyendo, a efectos aclaratorios, el RCF, pero excluyendo aquellos Créditos afectados que se consideren Líneas de Avales Existentes), del Contrato de Financiación ICO Existente y de los Contratos de Financiación BEI Existentes en los que la Sociedad Reestructurada correspondiente –distinta de Antolín Irausa– es deudora principal, prestataria y/o garante personal, según corresponda. La Deuda Afectada correspondiente a esta Clase se describe en el Anexo II Parte I.

(ii)  <u>Clase Bonos</u>. Comprende los Créditos Afectados derivados de los Bonos 2028 y los Bonos 2030 en los que la Sociedad Reestructurada correspondiente –distinta de Antolín Irausa– es garante personal. La Deuda Afectada correspondiente a esta Clase se describe en el Anexo II Parte II del Plan.

(iii)  <u>Clase Líneas de Avales</u>. Está formada por los Créditos Afectados derivados de las Líneas de Avales Existentes que no cuentan con garantía real y de los que la Sociedad Reestructurada correspondiente (distinta de Antolín Irausa) es garante personal.

(iv)  <u>Clase Deuda Subordinada</u>. Comprende (i) los Créditos Afectados derivados de los Préstamos Intragrupo en los que la Sociedad Reestructurada correspondiente –distinta de Antolín Irausa– es deudora principal, (ii) junto con los intereses

devengados y no pagados derivados de dichos Préstamos Intragrupo en los que cada una de las Sociedades Reestructuradas es deudora principal; y, en su caso, por cualesquiera derechos de repetición, reembolso, regreso, indemnización o subrogación frente a dicha Sociedad Reestructurada que tengan carácter subordinado conforme al Plan. La Deuda Afectada de esta clase es la descrita en el Anexo II Parte VI del Plan.

101. El caso de Antolín South Africa es ligeramente distinto, por no tener Clase Deuda Subordinada.

## 7.2 Tratamiento de la Deuda Afectada

102. La premisa fundamental de la Reestructuración prevista en el Plan es la extensión del vencimiento final de la totalidad de la Deuda Afectada, sin aplicar quita alguna y adaptando las condiciones financieras a la deuda extendida.

103. Adicionalmente, dado que la viabilidad del Grupo exige asegurar líneas de financiación de circulante conforme al Plan de Viabilidad, se ofrece a los Acreedores Afectados de la Deuda Bancaria un tratamiento alternativo consistente en el compromiso de suscripción del Contrato de Financiación de Circulante a cambio de una menor extensión del plazo de vencimiento de su deuda, nuevas garantías con rango sénior y un derecho de cobro prioritario. Para preservar la equivalencia financiera entre clases, se ofrece igualmente a los Acreedores Afectados de los Bonos Existentes y de las Líneas de Avales Existentes un tratamiento alternativo con condiciones financieras equivalentes, que incorpora asimismo una mejora en el paquete de garantías y en la prioridad de su derecho de cobro.

104. El Plan prevé, en consecuencia, un tratamiento por defecto y un tratamiento alternativo para los Acreedores Afectados, atendiendo a la naturaleza de los instrumentos financieros involucrados en cada clase, si bien resultan equivalentes desde el punto de vista financiero.

105. Los Acreedores Afectados tendrán la posibilidad de escoger, de manera incondicional e irrevocable, el tratamiento en los plazos y a través de los mecanismos que se configuran en el propio Plan, siendo que, ante la ausencia de selección, se aplicará respectivamente el tratamiento por defecto[44]. No obstante, en la Fecha de Firma, los Acreedores Participantes Originales manifestaron de manera incondicional e irrevocable la elección por el tratamiento alternativo de su clase, la Deuda Bancaria y las Líneas de Avales Existentes respectivamente.

---

[44] *Vid*., Cláusula 5.2.8. del Plan.

106. Sin perjuicio de que el tratamiento completo de la Deuda Afectada consta detallado en la hoja de términos de la reestructuración que se acompaña como Anexo VII del Plan (la "**Hoja de Términos de la Reestructuración**"), a continuación, describimos sus términos principales:

(i) Tratamiento de la Deuda Bancaria:

    *a) Tratamiento por defecto:*

- extensión a la par, sin descuento, de la fecha de vencimiento final al 31 de diciembre de 2035;

- amortización íntegra del principal en la fecha de vencimiento (*bullet*);

- con respecto a los Créditos Afectados derivados de los importes bajo el RCF, éstos serán prestamizados;

- tipo de interés anual de 6,97%, pagadero en períodos de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad[45] y el 31 de diciembre de 2026 (o, si la Fecha de Cierre[46] no hubiera tenido lugar, el 30 de junio de 2027);

- modificación de determinados ratios financieros de la Deuda Bancaria correspondiente para adaptarlos al Plan de Viabilidad;

- garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Segundo Rango, la Prenda de Tercer Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores, como consecuencia de la Reestructuración de la Deuda Afectada con respecto a las Sociedades Reestructuradas que sean garantes de la Deuda Bancaria; tal y como se describirá en el Hecho Noveno; y

---

[45] La Fecha de Efectividad se corresponde con la fecha en (i) que se dicte el auto de homologación judicial del Plan de Reestructuración y (ii) se haya producido el reconocimiento del Plan de Reestructuración en virtud del Capítulo 15 ("*Chapter 15*") del Título 11 del Código de los Estados Unidos ("*United States Code*") mediante la emisión de una resolución no firme por el Tribunal de Quiebras competentes de Estados Unidos que otorgue el reconocimiento del Plan de Reestructuración con respecto a todas las Sociedades Reestructuradas (*vid*. Anexo I y Cláusula 12 del Plan).

[46] La Fecha de Cierre se corresponde con el día que se señale para la suscripción y formalización de los Documentos de la Reestructuración (*vid*. Anexo I del Plan).

- en el caso de la deuda de las Sociedades Reestructuradas que sean garantes personales del Contrato de Financiación ICO Existente (las "**Garantes del Contrato de Financiación ICO Existente**"), los efectos de la Reestructuración implican la novación del crédito que los Acreedores Afectados del Contrato de Financiación ICO Existente tienen frente a dichas Sociedades Reestructuradas en condición de deudores homologados de tal modo que le aplique el orden de prelación previsto en el Contrato entre Acreedores en relación con determinados cobros o recuperaciones.

b) *Tratamiento alternativo:*

- compromiso firme de suscripción de una parte proporcional del Contrato de Financiación de Circulante, en función de la prorrata de Deuda Bancaria que titule el Acreedor Afectado correspondiente, financiación que tendrá la consideración de nueva financiación de conformidad con el artículo 666 del TRLC;

- extensión de la fecha de vencimiento final al 4 de agosto de 2032 (y del periodo de disponibilidad del RCF al 4 de julio de 2032, sin que los importes dispuestos bajo el RCF sean, por tanto, objeto de prestamización), con un mecanismo de anticipación del periodo de disponibilidad y del vencimiento al 30 de junio de 2030 en caso de que, en o antes de dicha fecha, los Nuevos Bonos B no hayan sido amortizados, redimidos o refinanciados o las Solicitantes no acrediten compromisos vinculantes para su refinanciación;

- amortización del principal pendiente, excluyendo el RCF, de conformidad con el siguiente calendario de amortización con cuotas pagaderas semestralmente:

| Fecha | Deuda a amortizar en o antes de dicha fecha (%) |
|---|---|
| 31/12/2026[47] | 2,414% |
| 30/06/2027 | 2,850% |
| 31/12/2027 | 2,850% |
| 30/06/2028 | 3,762% |
| 31/12/2028 | 3,762% |
| 30/06/2029 | 4,674% |
| 31/12/2029 | 4,674% |
| 30/06/2030 | 5,586% |
| 31/12/2030 | 5,586% |

---

[47] O en la Fecha de Cierre, si fuera posterior.

| Fecha | Deuda a amortizar en o antes de dicha fecha (%) |
|---|---|
| 30/06/2031 | 6,498% |
| 31/12/2031 | 6,498% |
| 30/06/2032 | 7,410% |
| 04/08/2032 | 43,436% |

El calendario de amortización previsto para cada Acreedor Afectado de la Deuda Bancaria que opte por este tratamiento alternativo se calculará sobre la base de su participación en el importe total de la Deuda Bancaria, excluyendo el RCF.

- EURIBOR más un margen equivalente a un tipo de interés anual de 2,50% pagadero en períodos de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no hubiera tenido lugar, el 30 de junio de 2027). Dicho margen será bonificable anualmente desde la formalización de los Documentos de la Reestructuración:

    a. en 100 bps por año sobre el margen base aplicable sin ajustar, siempre que el ratio de apalancamiento previsto en cada uno de los Contratos Afectados de la Deuda Bancaria sea igual o inferior a 3,50x (realizándose el cálculo sin aplicar la norma contable IFRS 16); o, alternativamente,

    b. en 200 bps por año sobre el margen base aplicable sin ajustar, siempre que el ratio de apalancamiento previsto en cada uno de los Contratos Afectados de la Deuda Bancaria sea igual o inferior a 3,00x (realizándose el cálculo sin aplicar la norma contable IFRS 16);

siendo el ratio de apalancamiento calculado sobre el cierre del trimestre anterior con carácter previo al inicio de cada periodo semestral de interés, para fijar el margen aplicable para ese periodo. El primer cálculo se realizará en Fecha de Efectividad teniendo en cuenta la Deuda Afectada proforma post-Reestructuración;

- el RCF tendrá una comisión de disponibilidad equivalente a un 35% del margen aplicable (excluyendo EURIBOR) e incluiría el compromiso de que el importe dispuesto medio durante el año natural sea inferior al 80%, así como un *clean down* del 50% del importe total del RCF una vez al año natural durante 10 días consecutivos;

- garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Primer Rango, la Prenda de Segundo Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores.

- derecho de cobro prioritario sobre los créditos de los Acreedores Afectados de los tratamientos por defecto, de conformidad con la novación del Contrato entre Acreedores, que resulta del propio contenido del Plan en la Deuda Afectada de las Sociedades Reestructuradas que hayan otorgado las Garantías Existentes; y

- modificación de determinados ratios financieros de la Deuda Bancaria correspondiente, así como las definiciones asociadas, para adaptarlos al Plan de Viabilidad, manteniéndose los ajustes de sinergias y partidas excepcionales (*one-offs*) al EBITDA (sin aplicar la norma contable IFRS 16) previstos en el Plan de Viabilidad para los ejercicios 2026, 2027 y 2028 (sujeto a certificación trimestral del director financiero del Grupo o persona debidamente apoderada para ello), pudiéndose incorporar al EBITDA (sujeto a certificación anual del auditor) los correspondientes ajustes de sinergias y partidas excepcionales (*one-offs*) resultantes del cierre y/o venta de algunas plantas no previstas en el Plan de Viabilidad;

(ii) Tratamiento de los Bonos Existentes:

a) *Tratamiento por defecto*:

- extensión a la par, sin descuento, de la fecha de vencimiento final al 31 de diciembre de 2035;

- amortización íntegra del principal en la fecha de vencimiento (*bullet*);

- cupón con un tipo de interés anual de 6,97%, pagadero en períodos de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no hubiera tenido lugar, el 30 de junio de 2027); y

- garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Segundo Rango, la Prenda de Tercer Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores, como consecuencia de la Reestructuración de la Deuda

44

Afectada con respecto a las Sociedades Reestructuradas que sean garantes de los Bonos Existentes.

b) *Tratamiento alternativo:*

- descuento del 32,5% respecto del valor nominal de los Bonos Existentes con carácter previo a la Fecha de Efectividad del Plan;

- extensión de la fecha de vencimiento final al 31 de diciembre de 2030;

- amortización íntegra del principal en la fecha de vencimiento (*bullet*);

- las Sociedades Reestructuradas no realizarán amortizaciones anticipadas voluntarias de los Nuevos Bonos B durante un periodo de 30 meses desde la Fecha de Efectividad (non-call period) salvo abono de una prima make-whole de mercado;

- cupón con un tipo de interés anual de 8,28%, pagadero en período de interés semestrales con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no ha tenido lugar, el 30 de junio de 2027). El cupón se incrementará automáticamente (step-up) en dos (2) puntos porcentuales anuales (2,00%) en cada fecha de aniversario a partir del 30 de junio de 2027, aplicándose dicho incremento sobre el tipo de interés vigente en cada momento;

- derecho de cobro prioritario sobre los Acreedores Afectados de los tratamientos por defecto, de conformidad con la novación del Contrato entre Acreedores; y

- garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Primer Rango, la Prenda de Segundo Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores;

(iii) <u>Tratamiento de las Líneas de Avales Existentes</u>:

a) *Tratamiento por defecto:*

- extensión a la par, sin descuento, hasta el 31 de diciembre de 2035 de la deuda contingente derivada de la ejecución de los avales emitidos al amparo de las Líneas

45

de Avales Existentes, incluyendo los avales emitidos tras la Fecha de Firma y hasta la Fecha de Efectividad al amparo de dichas Líneas de Avales Existentes, sin extensión del periodo de disponibilidad de las Líneas de Avales.

- amortización íntegra del principal en la fecha de vencimiento (*bullet*);

- tipo de interés anual de 6,97%, pagadero en períodos de interés semestrales, a devengar únicamente desde la ejecución del aval correspondiente sobre el importe del aval ejecutado, con fechas de pago el 30 de junio y el 31 de diciembre de cada año, siendo el primer periodo de interés el comprendido entre la Fecha de Efectividad y el 31 de diciembre de 2026 (o, si la Fecha de Cierre no hubiera tenido lugar, el 30 de junio de 2027); y

- garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Segundo Rango, la Prenda de Tercer Rango sobre Cuentas y las Nuevas Garantías Personales ICA, sin perjuicio de la novación del orden de prelación de pagos del Contrato entre Acreedores;

b) *Tratamiento alternativo:*

- extensión del vencimiento por el importe dispuesto bajo las líneas a Fecha de Firma hasta 4 de agosto de 2032, con un mecanismo de anticipación del periodo de disponibilidad y del vencimiento al 30 de junio de 2030 en caso de que, en o antes de dicha fecha, los Nuevos Bonos B no hayan sido amortizados, redimidos o refinanciados, o las Sociedades Reestructuradas no acrediten compromisos vinculantes para su refinanciación;

- el periodo de disponibilidad será siempre hasta seis meses antes de vencimiento;

- ningún aval emitido puede tener fecha de vencimiento superior a la de la línea, en caso de que a fecha de vencimiento de la línea exista un aval en vuelo, Antolín Irausa otorgará un "cash collateral" por el 100% del importe avalado desde la fecha de vencimiento de la línea;

- términos económicos aplicables serán los de la línea cuyo vencimiento sea objeto de extensión;

- los créditos de reembolso que nazcan a favor de los Acreedores Afectados que escojan este tratamiento como resultado de la ejecución de avales emitidos en virtud

46

de las Líneas de Avales Existentes que se encuentren vigentes a Fecha de Firma, recibirán el mismo tratamiento que los Acreedores Afectados que hayan optado por el tratamiento alternativo de la Deuda Bancaria;

- a efectos aclaratorios, si el crédito de reembolso correspondiente naciera una vez transcurridas una o varias fechas de amortización previstas en el calendario de amortización aplicable al tratamiento alternativo de la Deuda Bancaria, el importe agregado de las cuotas que habrían vencido en dichas fechas deberá abonarse en la siguiente fecha de amortización prevista en dicho calendario, junto con la cuota que, en su caso, venza en esa misma fecha;

- los créditos de reembolso que nazcan a favor de los Acreedores Afectados que escojan este tratamiento como resultado de la ejecución de los avales que se emitan desde la Fecha de Efectividad en virtud de las Nuevas Líneas de Avales serán exigibles en ejecución conforme a los términos previstos en las Nuevas Líneas de Avales;

- las Nuevas Líneas de Avales tendrán la consideración de nueva financiación de conformidad con el artículo 666 TRLC;

- derecho de cobro prioritario sobre los Acreedores Afectados de los tratamientos por defecto, de conformidad con la novación del Contrato entre Acreedores; y

- garantías consistentes en las Garantías Existentes, las Nuevas Garantías Reales ICA de Primer Rango, la Prenda de Segundo Rango sobre Cuentas y las Nuevas Garantías Personales ICA. En caso de que la correspondiente Línea de Avales Existentes tuviera garantía de terceros, éstas serán mantenidas y ratificadas.

(iv) <u>Tratamiento de la Deuda Subordinada</u>. Extensión de la fecha de vencimiento final de los Créditos Afectados derivados de los Préstamos Intragrupo al 1 de enero de 2036, con amortización íntegra en la fecha de vencimiento (*bullet*), capitalización de todos los intereses que se devenguen y subordinación frente al resto de la Deuda Afectada. A su vez, se establece expresamente que se considerarán créditos subordinados respecto al resto de la Deuda Afectada y quedarán integrados en la Deuda Subordinada cualquier derecho de repetición, reembolso, regreso o indemnización que pudiera nacer derivado de la Reestructuración en los términos del Plan.

**7.3 Tratamiento paritario intraclase, tratamiento equivalente entre clases del mismo rango y respeto a la regla de la prioridad absoluta**

107. El tratamiento previsto en el Plan de Reestructuración para la Deuda Afectada cumple con las exigencias del TRLC en materia de equidad horizontal y vertical. En primer lugar, se respeta el artículo 638.4.º TRLC, en la medida en que todos los créditos integrados dentro de una misma clase reciben un tratamiento paritario, sin distinción injustificada entre Acreedores Afectados pertenecientes a esa misma clase. En segundo lugar, se respeta la regla de tratamiento equivalente entre clases del mismo rango, pues las clases que en un eventual escenario concursal ostentarían la misma posición económica reciben, bajo el Plan, un tratamiento financieramente equivalente. Y, en tercer lugar, se respeta la regla de la prioridad absoluta, en la medida en que no hay quitas en las alternativas por defecto y, en consecuencia, ninguna clase de rango inferior ni los socios reciben o conservan valor en perjuicio injustificado de una clase de rango superior.

108. A los efectos de acreditar lo anterior, se acompaña como **Documentos nº 24,** el Informe sobre la Aplicación del Principio de la Prioridad Absoluta emitido por LEXAUDIT; como **Documento nº 25**, el Informe sobre la Aplicación del Principio de la Prioridad Relativa emitido por LEXAUDIT; y como **Documento nº 26,** el Informe sobre el Principio de Equidad y la regla de Prioridad Absoluta de Vest Partners, a los que nos remitimos íntegramente. Dichos informes tienen precisamente por objeto analizar la existencia de trato paritario entre los acreedores afectados por el Plan y verificar, desde una perspectiva financiera, si los tratamientos ofrecidos a las distintas clases son equivalentes.

109. En sus informes, LEXAUDIT y Vest Partners concluyen que el Plan de Reestructuración respeta la regla de la paridad de trato entre acreedores y la prioridad absoluta y relativa por las siguientes razones:

    (i)  El tratamiento aplicable por defecto a Deuda Bancaria y Bonos es idéntico en todos sus términos, pues no impone quita alguna, buscando así el mínimo sacrificio posible para los acreedores, siendo la espera a la que se les somete, retribuida, la mínima posible para asegurar el repago sin comprometer la viabilidad de las Sociedades Solicitantes. De esta forma, los créditos que queden vinculados a esta alternativa quedan sometidos a una espera retribuida con un tipo de interés del 6,97 % anual, que es idéntico para todas las clases, lo que permite mantener el valor de los créditos durante todo el periodo de espera.

(ii) En cuanto a la propuesta alternativa que se ofrece a Deuda Bancaria y Bonos, a la vista de su configuración, los informes aportados como Documentos nº 24, 25 y 26 concluyen que se trata de alternativas equivalentes desde el punto de vista financiero.

En concreto, los tratamientos alternativos parten de las siguientes premisas:

- Por un lado, el tratamiento alternativo que se ofrece a la Deuda Bancaria pivota sobre el incremento del riesgo que asumen al aportar el dinero nuevo que se requiere para asegurar la viabilidad del Grupo. Por tanto, a cambio de su esfuerzo al asumir un mayor riesgo, sus créditos afectados se repagarán en un menor plazo, con vencimiento en 2032.

- Por su parte, el tratamiento alternativo que se ofrece a los Bonos también parte de ofrecerles un repago acelerado con vencimiento en 2030, aplicando también un tipo de interés superior al tratamiento alternativo de la Deuda Bancaria.

En este sentido, ante las diferencias existentes entre los términos de los tratamientos alternativos, para mantener la equivalencia financiera entre ambos y, por tanto, respetar la paridad de trato en las medidas aplicables a cada clase de acreedores, como se explica en los informes de Vest Partners y LEXAUDIT, a los créditos de los Bonos que opten por el tratamiento alternativo se les aplicará un descuento del 32,5%.

De este modo, una vez aplicado el descuento y teniendo en cuenta el menor plazo y el mayor tipo de interés aplicable al tratamiento alternativo para los Bonos, éste resulta financieramente equivalente al que se le ofrece a la Deuda Bancaria bajo su tratamiento alternativo – puesto que, bajo esta opción, la Deuda Bancaria no soporta descuento alguno, pero asume un mayor riesgo y cobran un menor tipo de interés que los Bonos durante el periodo de repago.

(iii) Por último, la Clase Deuda Subordinada cobra sus créditos tras el resto de las clases de rango preferente; a las que, como decíamos, no se les impone ninguna quita en el tratamiento aplicable por defecto, quedando así confirmado el cumplimiento de la regla de la prioridad relativa.

110. Asimismo, el Plan de Reestructuración respeta la regla de la prioridad absoluta, como acreditan también los informes emitidos por Vest Partners y LEXAUDIT. Esta regla no exige que todos los acreedores reciban idénticos instrumentos ni idéntico calendario de pagos, sino que impide que una clase de rango inferior —o los socios— reciba o conserve valor en virtud del Plan si

una clase de rango superior no recibe, al menos, un valor financieramente equivalente al importe de sus créditos, salvo que concurra una justificación legal suficiente.

111. El cumplimiento de esta regla no plantea duda alguna a la vista de la propia estructura de medidas que incorpora el Plan de Reestructuración, por cuanto –insistimos– el tratamiento que se aplica por defecto tanto a la Deuda Bancaria como a Bonos no impone quitas a ningún acreedor de rango concursal preferente a los créditos subordinados y a los socios. Esta cuestión se explica en detalle en el informe emitido por Vest Partners y queda igualmente confirmado por el Informe sobre la Aplicación del Principio de la Prioridad Absoluta emitido por el Experto, en el que se establece (*Vid*. pág. 36 y 37):

> "*Precisamente el hecho determinante de no imponer ninguna clase de quitas a los acreedores afectados, tanto ordinarios como subordinados, permite concluir que no existe ninguna vulneración de la regla de la prioridad absoluta.*
>
> *El hecho de ofrecer alternativas a los diferentes grupos de acreedores ordinarios no modifica la conclusión anterior, al tratarse de una opción que se puede acoger de forma voluntaria, aquel que estuviera interesado. Pero siempre bajo la premisa que la oferta base, aquella que se aplica en defecto de manifestación voluntaria del acreedor, es la de pago íntegro de la deuda.*
>
> *Por lo tanto, en su propuesta base, el plan propuesto no impone sacrificios a los acreedores que pudieran considerar no respetar la regla de prioridad absoluta, permitiendo a los socios mantener su posición en la compañía*".

**7.4 Cumplimiento del test del interés superior de los acreedores**

112. El Plan también cumple con el requisito previsto en el artículo 654.7.º TRLC de que éste supere el interés superior de los acreedores.

113. A los efectos de acreditar el cumplimiento del test del interés superior de los acreedores, se aporta como **Documento nº 27** el Informe sobre la Aplicación del Test del Interés Superior de los Acreedores del Plan de Reestructuración del Grupo Antolín emitido por LEXAUDIT (el "**Informe BIC de LEXAUDIT**"); y como **Documento nº 28** el Informe acerca de si el Plan de Reestructuración supera la Prueba del Interés Superior de los acreedores (BIC) emitido por Vest Partners (el "**Informe BIC de Vest Partners**" y junto con el Informe BIC de LEXAUDIT, los "**Informes BIC**").

114. Los Informes BIC analizan expresamente el requisito que regula el artículo 654.7º TRLC y parten de la comparación legalmente exigida entre, de un lado, el valor de lo que los acreedores

reciben conforme al Plan de Reestructuración y, de otro, el valor que razonablemente podría presumirse que habrían recibido en caso de liquidación concursal de los bienes del deudor, considerando que el pago de la cuota de liquidación tendría lugar a los dos años de la formalización del Plan.

115. En este caso, debemos partir de una premisa fundamental, que ya se apunta al inicio del Informe BIC de Vest Partners (Documento nº 28): el test del interés superior de los acreedores ni siquiera sería necesario en este caso, por las siguientes razones:

(i) Nos encontramos ante un Plan de Reestructuración que establece unas alternativas aplicables por defecto que implican que todos los acreedores cobrarán íntegros sus créditos, en tanto se establecen esperas que, además, son remuneradas.

Bajo estas alternativas por defecto, a los acreedores únicamente se les aplica la espera mínima que se requiere para garantizar la viabilidad del negocio, pidiéndoles por tanto el esfuerzo mínimo imprescindible.

(ii) Asimismo, no tiene sentido realizar este análisis individualizado para cada Sociedad Solicitante, pues la responsabilidad de todas ellas sobre la deuda financiera es total debido al sistema de garantías aplicable y al funcionamiento del Grupo mediante un sistema de caja única, que conllevará la centralización de pagos desde Antolín Irausa. Con este esquema, resulta evidente que el valor liquidativo de cada Sociedad Solicitante, individualmente considerado, no sería en ningún caso suficiente para repagar la totalidad de la deuda financiera, como prevé el Plan de Reestructuración.

(iii) Unido a lo anterior, es necesario considerar el impacto negativo que cualquier proceso de liquidación tiene sobre el valor de realización de los activos, incluso aunque los mismos se enajenen como unidad productiva. Este hecho, a su vez, genera importantes incertidumbres sobre la recuperación de valor en un escenario liquidativo, lo que de nuevo haría muy difícil obtener fondos suficientes para repagar la deuda financiera en su totalidad, escenario que sí se prevé bajo el Plan de Reestructuración que, además, asegura íntegra la continuidad de la empresa y el mantenimiento del empleo.

116. En cualquier caso, y sin perjuicio de lo anterior, tanto Vest Partners como LEXAUDIT han realizado en sus Informes BIC la prueba del interés superior de los acreedores, y ambos han concluido que dicho test se superaría al comparar la recuperación de créditos conforme al Plan de Reestructuración con el escenario de liquidación concursal.

51

**OCTAVO. -   Implementación de la Reestructuración en la Deuda Afectada**

117. La reestructuración de la Deuda Afectada irá acompañada, además, de una serie de medidas de apoyo, que se consideran necesarias para la implementación del Plan, que son, entre otras:

(i) los Bonos Existentes, ya opten por el tratamiento por defecto o por el alternativo, serán canjeados por los "**Nuevos Bonos**", con arreglo a lo establecido en la Hoja de Términos de la Reestructuración. En concreto, los Bonos Existentes titularidad de Acreedores Afectados a quienes se aplique el tratamiento por defecto serán canjeados por los denominados en el Plan como "**Nuevos Bonos A**". Por otro lado, los Bonos Existentes titularidad de los Acreedores Afectados que opten por el tratamiento alternativo serán canjeados por los "**Nuevos Bonos B**";

(ii) la Deuda Bancaria será objeto de novación modificativa, no extintiva de la siguiente forma:

a. los créditos de los Acreedores Afectados del Contrato de Financiación Sindicada Existente serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (el "**Nuevo Contrato de Financiación Sindicada**");

b. los créditos de los Acreedores Afectados del Contrato de Financiación ICO Existente serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (el "**Contrato de Financiación ICO Modificado**"); y

c. los créditos de BEI en relación con los Contratos de Financiación BEI Existentes serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (el "**Nuevo Contrato de Financiación BEI**");

(iii) las Líneas de Avales Existentes[48] serán objeto de novación modificativa no extintiva de la siguiente forma:

a. los créditos titularidad de los Acreedores Afectados de las Líneas de Avales Existentes a quienes se aplique el tratamiento por defecto, serán novados con

---

[48] Los Nuevos Bonos, el Nuevo Contrato de Financiación Sindicada, el Contrato de Financiación ICO Modificado, el Nuevo Contrato de Financiación BEI, los Créditos Contingentes de los Avales y las Nuevas Líneas de Avales, serán denominados los "**Instrumentos Post Reestructuración**".

arreglo a la Hoja de Términos de la Reestructuración conforme al propio Plan (los "**Créditos Contingentes de Avales**"); y

    b.   los créditos titularidad de los Acreedores Afectados de las Líneas de Avales Existentes que opten por el tratamiento alternativo de las Líneas de Avales serán novados con arreglo a la Hoja de Términos de la Reestructuración en un nuevo texto refundido (las "**Nuevas Líneas de Avales**"). Las Nuevas Líneas de Avales tendrán la consideración de nueva financiación de conformidad con el artículo 666 TRLC;

(iv)    los Préstamos Intragrupo serán objeto de novación modificativa no extintiva, a los efectos de extender su fecha de vencimiento hasta el 1 de enero de 2036 y establecer la capitalización de todos los intereses que se devenguen hasta la fecha del vencimiento final, así como la subordinación frente al resto de Deuda Afectada. Igualmente, los derechos de repetición, reembolso, regreso, indemnización o subrogación que se integren en la Clase Deuda Subordinada conforme al Plan quedarán sujetos al régimen de subordinación;

(v)    el Contrato entre Acreedores será novado (o, en su caso, se suscribirá un texto refundido) con arreglo a los términos previstos en la Cláusula 5.5 del Plan de Reestructuración y en la Hoja de Términos de la Reestructuración, tal y como se describe en el Hecho Décimo de esta Solicitud;

(vi)    el Contrato de Financiación de Circulante y las Prórrogas del Factoring Sindicado Existente serán otorgadas con arreglo a los términos previstos en la Cláusula 6 en la Hoja de Términos de la Reestructuración, tal y como se describe en el Hecho Undécimo de esta Solicitud; y

(vii)    todos los Contratos Afectados (incluyendo las Líneas de Avales Existentes) incluirán cláusulas de cambio de control directo o indirecto vinculadas a la permanencia de la familia Antolín en el capital del Grupo en términos sustancialmente equivalentes a los previstos en el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes y los Bonos Existentes.

(viii)    Además, tendrán lugar la ratificación, novación y extensión de efectos sobre garantías, así como del ICA, tal y como se analizará en los Hechos Noveno y Décimos siguientes.

**NOVENO. – Régimen de garantías de conformidad con el Plan**

118. El Plan regula el tratamiento que se otorga a las garantías ya existentes y establece un régimen de nuevas garantías adicionales, cuyo otorgamiento obedece a las exigencias de los Acreedores Participantes durante la negociación del Plan para impulsar y garantizar la viabilidad del Grupo.

119. Para el detalle completo del régimen de garantías nos remitimos a la Cláusula 5.4 del Plan de Reestructuración y a la Hoja de Términos de la Reestructuración.

**9.1 Garantías Existentes: ratificación y novación**

120. En primer lugar, las garantías personales otorgadas en garantía de las obligaciones derivadas de los Contratos Afectados (las "**Garantías Personales Existentes**"), así como las Prendas sobre Antolín Irausa (denominadas, junto con las Garantías Personales Existentes, las "**Garantías Existentes**") serán ratificadas y novadas en los términos que resulten necesarios, de manera que garanticen las obligaciones bajo el Nuevo Contrato de Financiación Sindicada, el Contrato de Financiación ICO Modificado, los Nuevos Bonos y el Nuevo Contrato de Financiación BEI.

**9.2 Nuevas Garantías: descripción y asignación**

121. En segundo lugar, el Plan prevé el otorgamiento de nuevas garantías adicionales que se estructuran en función del tratamiento elegido por cada Acreedor Afectado. A efectos de mayor claridad, se distinguen las siguientes garantías, cuya descripción y asignación a los distintos instrumentos de deuda se resume en la tabla siguiente:

| Garantía | Descripción | Rango | Instrumentos garantizados |
|---|---|---|---|
| Nuevas Garantías Reales ICA de Primer Rango | Prendas de primer rango sobre: (i) acciones del 100% de Antolín RyA, Antolín Eurotrim y Antolín Aragusa; (ii) participaciones del 100% de G.A. Gestión de Inversiones, S.L.U.; (iii) acciones del 100% de Grupo Antolin Besançon SAS; (iv) derechos de crédito derivados de los Préstamos Intragrupo (con restricciones de cesión fuera del Grupo); y (v) acciones del 100% de Antolin China Investments Co. Ltd. | Primer rango | Prórrogas del Factoring Sindicado Existente y Contrato de Financiación de Circulante (en ambos casos, en lo que respecta a las obligaciones con recurso frente al Grupo), Nuevos Bonos B, Nuevas Líneas de Avales y Deuda Bancaria a la que resulte aplicable el tratamiento alternativo |
| Nuevas Garantías Reales ICA | Prendas de segundo rango sobre los mismos activos sobre los que recaen las Nuevas Garantías Reales ICA de Primer Rango | Segundo rango | Nuevos Bonos A, Créditos Contingentes de Avales y Deuda Bancaria a la que resulte |

54

| de Segundo Rango | | | aplicable el tratamiento por defecto |
|---|---|---|---|
| Prenda de Primer Rango sobre Cuentas | Prenda de primer rango sobre los derechos de crédito derivados de: (i) cuenta bancaria NL68HSBC2031728881 (HSBC Amsterdam Branch) y cuentas ES0200190030614010279383 y ES5700190030624052044895 (Deutsche Bank); y (ii) cuenta bancaria de cobro del factoring sin recurso bajo el Contrato de Financiación de Circulante | Primer rango | Contrato de Financiación de Circulante y Prórrogas del Factoring Sindicado Existente. |
| Prenda de Segundo Rango sobre Cuentas | Prenda de segundo rango sobre las mismas cuentas bancarias sobre las que recae la Prenda de Primer Rango sobre Cuentas. | Segundo rango | Nuevos Bonos B, Nuevas Líneas de Avales y Deuda Bancaria a la que resulte aplicable el tratamiento alternativo |
| Prenda de Tercer Rango sobre Cuentas | Prenda de tercer rango sobre las mismas cuentas bancarias sobre las que recae la Prenda de Segundo Rango sobre Cuentas | Tercer rango | Nuevos Bonos A, Créditos Contingentes de Avales y Deuda Bancaria a la que resulte aplicable el tratamiento por defecto |
| Nuevas Garantías Personales ICA | Garantías personales solidarias a primer requerimiento otorgadas por Antolín HoldCo, Grupo Antolin Italia S.R.L., Grupo Antolin Besançon SAS, Antolin Tanger SARL, Trimtec Ltda. e Intertrim Ltda. (las que se han definido en el apartado 1.4.2. como Nuevas Garantes ICA) | | Prórrogas del Factoring Sindicado Existente y Contrato de Financiación de Circulante (en ambos casos, en lo que respecta a las obligaciones con recurso frente al Grupo), Deuda Bancaria tras la Reestructuración, Nuevos Bonos A, Nuevos Bonos B, Nuevas Líneas de Avales y Créditos Contingentes de Avales |

## 9.3 Compromisos adicionales de constitución de garantías

122. Asimismo, Antolín Irausa, con sujeción a los principios de otorgamiento de garantías previstos en los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes:

- otorgará una promesa de constitución de un derecho real de prenda sobre las acciones o participaciones del capital social de las sociedades filiales del Grupo establecidas en India en caso de que dichas sociedades alcancen un 5,0% del EBITDA consolidado del Grupo:

- en primer rango, en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos B, las Prórrogas del Factoring Sindicado Existente, el Contrato de Financiación de Circulante, las Nuevas Líneas de Avales y los créditos cuya titularidad corresponde a los Acreedores Afectados de la Deuda Bancaria que hayan optado por su tratamiento alternativo; y

- en segundo rango, en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos A, los Créditos Contingentes de Avales y los créditos titularidad de los Acreedores Afectados a los que se les apliquen los tratamientos por defecto; y

- otorgará una promesa de constitución de un derecho real de prenda sobre aquellos contratos materiales cuya rentabilidad anual esperada pueda razonablemente representar durante toda la vida del proyecto más de un 2% del EBITDA consolidado del Grupo, cuyos derechos de crédito sean susceptibles de pignoración y no sean objeto de las Prórrogas del Factoring Sindicado Existente o del Contrato de Financiación de Circulante, en garantía del cumplimiento de las obligaciones derivadas de los Nuevos Bonos B, las Nuevas Líneas de Avales, las Prórrogas del Factoring Sindicado Existente, el Contrato de Financiación de Circulante y los créditos cuya titularidad corresponde a los Acreedores Afectados de la Deuda Bancaria que hayan optado por su tratamiento alternativo.

**9.4 Extensión de efectos a las Prendas sobre Antolín Irausa (artículo 652.2 TRLC)**

123. Por otro lado, los efectos del Plan de Reestructuración se extenderán a las Prendas sobre Antolín Irausa ex artículo 652.2 TRLC, tal como se explica en el Hecho Decimotercero (Sección 13.4) de la presente Solicitud y en la Cláusula 5.4.4 y siguientes del Plan.

**DÉCIMO. – Novación del Contrato entre Acreedores**

124. Sin perjuicio del mayor detalle del Plan al respecto (Cláusula 5.5.), al que nos remitimos, el cambio fundamental en el Contrato entre Acreedores será la modificación del orden de prelación de pagos previsto en el mismo a los efectos de recoger que, cualquier importe

obtenido de cualquier cobro o recuperación[49] se destinará (tras el pago de los correspondientes créditos *senior* conforme al ICA[50]):

a. respecto de cualquier importe obtenido de cualquier cobro o recuperación en relación con las Prendas sobre Antolín Irausa, conforme al orden de prelación de pagos el Contrato entre Acreedores existente a Fecha de Firma, novado únicamente a efectos de incluir las obligaciones de pago derivadas de los Nuevos Bonos, el Nuevo Contrato de Financiación Sindicada, el Contrato de Financiación ICO Modificado y el Nuevo Contrato de Financiación BEI para reemplazar las obligaciones de pago derivadas de los correspondientes instrumentos previos existentes respectivamente y

b. respecto de cualquier importe obtenido de cualquier cobro o recuperación en relación con el resto de Garantías Existentes, las Nuevas Garantías Personales ICA y las Nuevas Garantías Reales ICA:

i. primero, a las obligaciones de pago derivadas del Contrato de Financiación de Circulante y de las Prórrogas del Factoring Sindicado Existente (en ambos casos, exclusivamente en lo que respecta a las obligaciones con recurso frente al Grupo);

ii. segundo, a los Créditos Afectados de los Acreedores Afectados que hayan escogido alguno de los tratamientos alternativos correspondientes, hasta un importe máximo de 435.000.000 €; y

iii. tercero, y una vez se haya satisfecho íntegramente el importe al que hace referencia el apartado (ii) anterior, a los restantes Créditos Afectados que se encuentren sujetos al Contrato entre Acreedores (excluyendo, en su caso, los Préstamos Intragrupo), pro rrata y *pari passu*, hasta el límite del importe de dichas obligaciones de pago;

125. Asimismo, se prevé incluir, dentro de su ámbito de aplicación, todos los instrumentos de Deuda Afectada tras la Reestructuración, el Contrato de Financiación de Circulante y las Prórrogas del Factoring Sindicado Existente (en estos dos últimos casos, en lo que respecta a las obligaciones

---

[49] En los supuestos previstos en la Cláusula 13.1 del Contrato entre Acreedores se prevé la distribución de los importes obtenidos por el Agente de Garantías en determinados supuestos (incluyendo por vía de compensación, venta forzosa o venta de deuda) entre los contratos afectos –esto es, los Bonos Existentes, el Contrato de Financiación Sindicada Existente, el Contrato de Financiación ICO Existente y los Contratos de Financiación BEI Existentes. Se ha aportado la citada cláusula como parte del Documento nº 22.

[50] Esto es, el pago de sumas derivadas de costes, honorarios, cargos, gastos, remuneración o similar ostentados por el Agente de Garantías bajo el ICA, el Trustee de los Bonos, el Agente del Contrato de Financiación Sindicado y otros representantes de las financiaciones.

con recurso frente al Grupo), así como adaptar los mecanismos de vencimiento y ejecución de las garantías personales o reales sujetas al Contrato entre Acreedores a este nuevo perímetro de instrumentos de deuda afectados por el Contrato entre Acreedores.

126. Todo lo anterior, de conformidad con la Hoja de Términos de la Reestructuración y como acto de implementación y ejecución de la Reestructuración. Adicionalmente, en todo caso, la Prenda de Primer Rango sobre Cuentas otorgada en garantía del Contrato de Financiación de Circulante y las Prórrogas del Factoring Sindicado Existente no estará sujeta a los términos del Contrato entre Acreedores, tal y como resulte novado.

**UNDÉCIMO. – Prórrogas del Factoring Sindicado Existente y Contrato de Financiación de Circulante**

127. La viabilidad del Grupo, como consecuencia de la marcada estacionalidad propia del sector de la automoción, depende de su capacidad para gestionar adecuadamente sus necesidades de circulante. Los instrumentos de financiación de circulante constituyen un elemento esencial en la operativa de sus negocios, en la medida en que permiten al Grupo atender sus obligaciones corrientes de pago, mantener su actividad comercial ordinaria y preservar las relaciones con sus proveedores, clientes y demás contrapartes comerciales.

128. Como se ha expuesto en el Hecho Tercero de esta Solicitud, el Factoring Sindicado Existente —instrumento de circulante fundamental para la operativa del Grupo— vencería el próximo 23 de enero de 2027, por lo que la necesidad de asegurar una línea bancaria de financiación de circulante a largo plazo se convierte en una cuestión esencial y crítica para la viabilidad del Grupo, lo que ha sido uno de los puntos más relevantes de las negociaciones con los acreedores.

129. En este contexto, resulta fundamental que el Grupo disponga y tenga garantizados instrumentos de financiación de circulante adecuados a sus necesidades operativas, que ofrezcan estabilidad durante un horizonte temporal de, al menos, cinco años y que, a su vez, sean flexibles para adaptarse a las circunstancias del negocio en cada momento. La disponibilidad de estas líneas constituye una condición necesaria para la correcta ejecución del Plan y el aseguramiento de su Plan de Viabilidad.

**11.1 Prórrogas del Factoring Sindicado Existente**

130. El Plan prevé que, en caso de que llegado el 23 de enero de 2027 no haya tenido lugar la entrada en vigor con plena disponibilidad del Contrato de Financiación de Circulante, las entidades participantes en el Factoring Sindicado Existente que sean Parte del Plan (las "**Entidades**

**Adquirentes**") prorrogarán la disponibilidad del Factoring Sindicado Existente de forma automática y con carácter mensual hasta la entrada en vigor del Contrato de Financiación de Circulante, garantizando así la continuidad de las necesidades de circulante del Grupo durante el proceso de implementación de la Reestructuración (las denominadas Prórrogas del Factoring Sindicado Existente).

131. Las Prórrogas del Factoring Sindicado Existente tendrán la consideración de financiación interina o de nueva financiación, según corresponda, de conformidad con los artículos 665 y 666 del TRLC, lo cual es una condición esencial para su otorgamiento. Las Prórrogas del Factoring Sindicado Existente que se produzcan después de la Fecha de Cierre estarán garantizadas con la Prenda de Primer Rango sobre Cuentas, las Nuevas Garantías Reales ICA de Primer Rango y las Nuevas Garantías Personales ICA, y se beneficiarán de la prioridad de cobro prevista en la novación del Contrato entre Acreedores en los mismos términos que el Contrato de Financiación de Circulante.

132. Para el resto de los términos y condiciones aplicables a las Prórrogas del Factoring Sindicado Existente, nos remitimos íntegramente a la Cláusula 6.1 del Plan de Reestructuración.

**11.2 Contrato de Financiación de Circulante**

133. El Plan de Reestructuración contempla asimismo la formalización de un nuevo contrato de financiación de circulante (el "**Contrato de Financiación de Circulante**") que se articula como una línea multiproducto que incorpora el factoring sin recurso como instrumento principal de anticipo de créditos comerciales y una línea de crédito *revolving*. Este instrumento constituye un elemento estructural y esencial del propio Plan y tendrá la consideración de nueva financiación de conformidad con el artículo 666 del TRLC.

134. En cuanto a sus condiciones esenciales, el Contrato de Financiación de Circulante presenta las siguientes características:

- Instrumento: Línea multiproducto que incluye factoring sin recurso y un subtramo de línea de crédito *revolving,* con la posibilidad de generar un instrumento accesorio (*ancillary*) de avales.

- Acreditada del Nuevo Circulante: Antolín Irausa.

- Importe máximo: 220.000.000 €, con un sublímite de 40.000.000 € para el subtramo de líneas de crédito *revolving*.

- Vencimiento: 4 de agosto de 2032, con un mecanismo de anticipación a 30 de junio de 2030 en caso de que, en o antes de dicha fecha, los Nuevos Bonos B no hayan sido amortizados, redimidos o refinanciados, o las Sociedades Reestructuradas no acrediten compromisos vinculantes para su refinanciación.

- Tipo de interés: (i) para los importes dispuestos bajo la modalidad de factoring sin recurso, pagaderas a mes vencido: EURIBOR más 0,60% (EUR) y SOFR más 0,80% (USD); y (ii) para los importes dispuestos bajo la línea de crédito *revolving*: EURIBOR más un margen anual equivalente de 1,25%.

- Garantías: Prenda de Primer Rango sobre Cuentas, Nuevas Garantías Reales ICA de Primer Rango y Nuevas Garantías Personales ICA.

135. Para el resto de los términos y condiciones del Contrato de Financiación de Circulante — incluyendo, entre otros, las Entidades del Nuevo Circulante, el régimen de aseguramiento, las condiciones suspensivas, las condiciones específicas del factoring sin recurso y las restricciones de transmisibilidad— nos remitimos íntegramente a la Cláusula 6.2 y 6.3 del Plan de Reestructuración y a la Hoja de Términos de la Reestructuración.

**DUODÉCIMO. - Aprobación del Plan de Reestructuración**

136. Como consecuencia de las intensas negociaciones mantenidas durante el proceso de reestructuración, el Plan de Reestructuración cuenta con el apoyo y la adhesión de una mayoría suficiente de Acreedores Afectados que permite afirmar que el mismo ha sido aprobado en los términos previstos en los artículos 638 y 639 TRLC (con las mayorías del artículo 639.2 TRLC). A continuación, se exponen los hitos relevantes a los efectos de acreditar la suficiencia de las mayorías y los presupuestos para la extensión de efectos cuya homologación se solicita.

**12.1 Formalización del Plan de Reestructuración en instrumento público**

137. De conformidad con lo exigido por el artículo 634.1 TRLC, el Plan de Reestructuración fue formalizado en instrumento público el 10 de julio de 2026, mediante escritura otorgada ante el Notario de Madrid D. Francisco Miras Ortiz, en sustitución y para el protocolo de D. Andrés Domínguez Nafría, con número de su orden de protocolo 4.281, que se acompaña al presente escrito como Documento nº 2 (la "**Escritura del Plan**"). La Escritura del Plan incorpora la totalidad del Plan de Reestructuración, sus anexos y, en particular, el Plan de Viabilidad.

**12.2 Aplicación del régimen de pacto de sindicación: artículo 630 TRLC**

138. Conforme prevé el artículo 630.1 TRLC, dado que el Plan de Reestructuración afecta a créditos vinculados por pactos de sindicación —como es el caso de los Bonos 2028, los Bonos 2030, el Contrato de Financiación Sindicada y el Contrato de Financiación ICO, constituyendo cada grupo su propio sindicato—, deben aplicárseles, a cada uno de dichos Contratos Afectados respectivamente, las mayorías previstas en el artículo 629 TRLC, dado que ninguno de los referidos pactos de sindicación establece mayorías inferiores a las previstas en el señalado artículo 629 TRLC. En consecuencia, resulta aplicable, en todo caso, el umbral de más de dos tercios del importe del pasivo correspondiente a cada uno de dichos Contratos Afectados para considerar que el Plan ha sido aprobado en cada uno de ellos respectivamente, en tanto que tienen la consideración de Créditos Afectados sin garantía real.

139. Una vez alcanzada dicha mayoría en cada uno de tales Contratos Afectados, opera el efecto del artículo 630.2 TRLC: "*se entenderá que aceptan el plan de reestructuración la totalidad de los créditos sindicados*". En consecuencia, el voto favorable de los Acreedores Afectados que representen más de dos tercios del importe de cada uno de los Bonos 2028, los Bonos 2030, el Contrato de Financiación Sindicada y el Contrato de Financiación ICO supone el voto favorable del 100% de los Acreedores Afectados vinculados a cada uno de dichos instrumentos, respectivamente.

**12.3 Comunicación del Plan a los Acreedores Afectados y Periodo de Adhesión**

140. De acuerdo con lo previsto en el artículo 627 TRLC y en la Cláusula 4.2 del Plan de Reestructuración, tras la firma del RSA, el Agente de la Reestructuración procedió a remitir a los Acreedores Afectados una primera invitación para adherirse al propio RSA y/o votar a favor o en contra y, adherirse libremente al Plan de Reestructuración Original junto con una versión del mismo. Se acompañan al presente escrito como **Conjunto Documental nº 29.1** las referidas comunicaciones y capturas de las páginas web mencionadas, junto a su traducción al español como **Conjunto Documental nº 29.1 bis**.

141. Posteriormente, tras la novación del Plan de Reestructuración Original al Plan de Reestructuración Refundido y de manera previa a su suscripción, el Agente de la Reestructuración remitió a los Acreedores Afectados la Invitación, por la cual, de nuevo, se habilita un periodo de adhesión, hasta el 22 de julio de 2026, para que los Acreedores Afectados pudieran adherirse al RSA y/o votar a favor o en contra y adherirse libremente al Plan en el Periodo de Adhesión. Esta Invitación fue remitida por los medios especificados en el Plan (que son los mismos por los que se remitió la primera invitación) y son los siguientes medios –según corresponda:

(i) en el caso de la Deuda Bancaria y las Líneas de Avales Existentes, mediante notificación conforme a los mecanismos de notificación previstos en los Contratos Afectados correspondientes;

(ii) en el caso de los Bonos Existentes, se remitió al *trustee* de los Bonos para su envío a través de Euroclear Bank SA/NV y Clearstream Banking, S.A. y de conformidad con las normas de Euronext; y se ha publicado en la web de la Bolsa de Luxemburgo (Luxse);

(iii) además, se ha publicado la Invitación en la página web del Grupo (español: https://www.antolin.com/es/inversores/comunicados-2026; inglés: https://www.antolin.com/en/inversores/publications-2026) y en la página web habilitada por el Agente de la Reestructuración en relación con la Reestructuración: (https://glas-agency.appiancloud.com/suite/sites/GRUPO-ANTOLIN-IRAUSA-SAU), en la que se encuentra la Invitación y el Plan de Reestructuración, entre otros documentos;

(iv) igualmente se ha remitido la versión de firma del Plan a los acreedores de la Deuda Subordinada a las direcciones electrónicas facilitadas.

142. A efectos probatorios, se acompañan como **Conjunto Documental nº 29.2** las comunicaciones y capturas de las páginas web remitidas de manera previa a la suscripción del Plan de Reestructuración Refundido, junto a su traducción al español como **Conjunto Documental nº 29.2 bis**.

**12.4 Emisión de la Certificación de Mayorías por el Experto en la Reestructuración**

143. Con fecha 10 de julio de 2026, LEXAUDIT —en su condición de Experto en la Reestructuración— ha emitido la certificación de mayorías y de protección frente a acciones rescisorias (la "**Certificación**"), que se acompaña como **Documento nº 30**. La misma ha sido unida mediante diligencia a la Escritura de elevación a público del Plan, dando con ello debido cumplimiento al requisito establecido en el artículo 634.1 TRLC, que exige que a la solicitud de homologación se acompañe la certificación del experto en la reestructuración sobre la suficiencia de las mayorías.

144. La emisión de la referida Certificación, que certifica tanto las mayorías como el umbral del 51% al que nos referimos en el apartado 12.6 siguiente, supone, además, el cumplimiento de la condición suspensiva para la entrada en vigor del Plan prevista en la Cláusula 11. Si bien la Fecha de Efectividad del Plan sigue quedando sometida al cumplimiento de la condición

suspensiva consistente en que el Iltre. Tribunal dicte auto de homologación judicial del Plan y que se haya producido el reconocimiento del Plan en virtud del Capítulo 15 del Título 11 del Código de los Estados Unidos, en los términos de la Cláusula 12 del Plan.

**12.5 Resultado de las mayorías obtenidas**

145. De conformidad con lo que se desprende de la Certificación emitida por el Experto —y atendiendo a la formación de clases descrita en el anterior Hecho Séptimo—, el resultado de la votación en cada una de las clases de las distintas Sociedades Reestructuradas es:

  - En el caso de Antolín Bohemia, Antolín Logistik Deutschland y Antolín Straubing GmbH:

    o En las Clases Líneas de Avales y Deuda Subordinada, los créditos correspondientes a los Acreedores Afectados firmantes del Plan suponen más de los dos tercios del importe del pasivo correspondiente a cada clase, por lo que, *ex* artículo 629.1 TRLC, las citadas clases han votado a favor del Plan.

    o En la Clase Deuda Bancaria y Bonos no se ha alcanzado las mayorías exigidas por el artículo 629.1 TRLC para considerar que vota a favor del Plan.

  - En el caso de Antolín South Africa

    o En las Clases Deuda Bancaria y Clase Línea de Avales, los créditos correspondientes a los Acreedores Afectados firmantes del Plan suponen más de los dos tercios del importe del pasivo correspondiente a cada clase, por lo que, *ex* artículo 629.1 TRLC, las citadas clases han votado a favor del Plan.

    o En la Clase Bonos no se ha alcanzado las mayorías exigidas por el artículo 629.1 TRLC para considerar que vota a favor del Plan.

    o No tiene Clase Deuda Subordinada.

  - En el caso del resto de Sociedades Solicitantes:

    o En las Clases Deuda Bancaria, Clase Línea de Avales y Deuda Subordinada, los créditos correspondientes a los Acreedores Afectados firmantes del Plan suponen más de los dos tercios del importe del pasivo correspondiente a cada

63

clase, por lo que, *ex* artículo 629.1 TRLC, las citadas clases han votado a favor del Plan.

- o En la Clase Bonos no se ha alcanzado las mayorías exigidas por el artículo 629.1 TRLC para considerar que vota a favor del Plan.

146. El resultado anterior unido a la Valoración de Empresa en Funcionamiento emitida por el Experto e incorporada a la Escritura del Plan junto con la Certificación (y que se aporta para mayor facilidad como **Documento nº 31**), implica que se han alcanzado las mayorías legalmente requeridas para la homologación del Plan como plan no consensual *ex* artículo 639.2 TRLC. En concreto:

- o En el caso de Antolín Irausa y de Antolín Lusitania las Clases Deuda Bancaria, Línea de Avales y Deuda Subordinada votan a favor del Plan y están *in the money* de acuerdo con la Valoración de Empresa en Funcionamiento emitida por el Experto.

- o En el caso de Antolín Logistik Deutschland la Clase Línea de Avales y Deuda Subordinada vota a favor del Plan y está *in the money* de acuerdo con la Valoración de Empresa en Funcionamiento emitida por el Experto

- o En el caso de Antolín Bohemia y Antolín Straubing GmbH la Clase Línea de Avales vota a favor del Plan y está *in the money* de acuerdo con la Valoración de Empresa en Funcionamiento emitida por el Experto

- o En el caso del resto de Sociedades Reestructuradas[51] la Clase Deuda Bancaria y la Clase Línea de Avales votan a favor del Plan y está *in the money* de acuerdo con la Valoración de Empresa en Funcionamiento emitida por el Experto.

147. Por tanto, se cumplen las mayorías legalmente exigidas *ex* articulo 639.2 TRLC para la homologación judicial del Plan.

---

[51] Las diferencias en las aprobaciones de clases entre las distintas Sociedades Reestructuradas (excluida Antolín Irausa), se deben fundamentalmente a las limitaciones de garantías otorgadas por las Sociedades Reestructuradas y sus respectivos valores como empresa en funcionamiento.

**12.6 Acreditación del umbral del 51% para la protección frente a acciones rescisorias y preferencias de cobro en escenario concursal**

148. El Experto en la Reestructuración ha incluido igualmente en la Certificación (Documento nº 30) el certificado de mayorías que acredita que los créditos afectados por el Plan de Reestructuración representan, al menos, el cincuenta y uno por ciento (51%) del pasivo total de las Sociedades Solicitantes (con la excepción de Antolín South Africa y Antolín Logistik Deutschland), umbral exigido por el artículo 667.1 TRLC para que la homologación judicial despliegue el efecto de protección frente a las acciones rescisorias respecto del propio Plan y de los actos, operaciones y negocios jurídicos que sean razonables y necesarios —directa o indirectamente— para su ejecución, así como para la protección de la nueva financiación, materializada en este caso mediante el Contrato de Financiación Circulante, las Nuevas Líneas de Avales y las Prórrogas del Factoring Sindicado Existente, y el otorgamiento de todas las garantías personales y reales incluidas en el Plan.

149. La concurrencia de este umbral resulta especialmente relevante a los efectos del Suplico del presente escrito y será desarrollada en sede de Fundamentos Jurídico-Materiales.

**12.7 Aprobación del Plan de Reestructuración por las Sociedades Solicitantes**

150. En fin, el Plan de Reestructuración ha sido aprobado por los órganos de administración, competentes para solicitar su homologación conforme a lo establecido en el artículo 643.2 TRLC.

**DECIMOTERCERO. - Otras medidas previstas en el Plan de Reestructuración y extensión de los efectos en virtud de la Solicitud de Homologación**

151. En el Plan de Reestructuración se prevé su homologación judicial como condición esencial de la Reestructuración, siendo que las Sociedades Reestructuradas se comprometen a presentar tal solicitud, en los términos que aquí se reproducen y solicitando expresamente los siguientes efectos:

**13.1 Extensión de efectos a Acreedores Afectados no adheridos al Plan**

152. Conforme a lo previsto en los artículos 635.1º y 649 TRLC, la homologación judicial del Plan de Reestructuración dará lugar a la extensión de los efectos del contenido íntegro del Plan de Reestructuración y de los Documentos de la Reestructuración que correspondan a los

Acreedores Afectados que no se hubieran adherido al mismo durante el Periodo de Adhesión o que hubieran votado en contra.

**13.2 Protección frente a acciones rescisorias**

153. Como se ha mencionado, conforme a lo previsto en los artículos 635.3º y 667 TRLC, y dado que los créditos afectados representan al menos el 51 % del pasivo total de cada una de las Sociedades Solicitantes (salvo en el caso de Antolín South Africa y Antolín Logistik Deutschland) –lo que resulta acreditado en la Certificación que se ha acompañado como Documento nº 30–, resulta procedente la protección de todos los actos y negocios jurídicos que se lleven a cabo para implementar la Reestructuración, incluyendo, sin limitación, los siguientes:

   a. la Reestructuración de la Deuda Afectada, incluyendo, sin limitación alguna, (i) la novación modificativa y no extintiva de la Deuda Bancaria, (ii) las emisiones de los Nuevos Bonos, (iii) el canje de los Bonos Existentes por dichos Nuevos Bonos y la cancelación de los Bonos Existentes de conformidad con la Solicitud de Consentimiento, (iv) las Nuevas Líneas de Avales y (v) la novación modificativa y no extintiva del Contrato entre Acreedores;

   b. las Prórrogas del Factoring Sindicado Existente;

   c. el Contrato de Financiación de Circulante; y

   d. cualquier operación, acto, pago y garantía en ejecución del Plan no pueda ser objeto de acciones rescisorias en un eventual concurso de acreedores, incluyendo el otorgamiento de todas las garantías personales y reales incluidas en el Plan.

**13.3 Reconocimiento y protección de la nueva financiación y, en su caso, de la financiación interina, así como la concesión de preferencias de cobro**

154. Conforme a lo previsto en los artículos 635.3º, 242.1.17º y 280.6º TRLC, las Sociedades Solicitantes interesarán que se declare que el Contrato de Financiación de Circulante, las Nuevas Líneas de Avales y las Prórrogas del Factoring Sindicado Existente -en caso de hacerse estas necesarias- constituyen nueva financiación a los efectos del artículo 666 TRLC; y, que las Prórrogas del Factoring Sindicado Existente que resulten necesarias con carácter previo a la homologación del Plan tengan la consideración de financiación interina conforme al artículo 665 TRLC. En ambos casos, se solicita el otorgamiento de las preferencias de cobro legalmente previstas (*ex* artículos 242.1.17º y 280.6º TRLC).

155. Como se ha expuesto en el Hecho Undécimo de esta Solicitud, tanto la nueva financiación como la eventual financiación interina resultan indispensables para garantizar la viabilidad del Grupo, de conformidad con el Plan de Viabilidad que se ha acompañado como Documento nº 20. Los instrumentos de circulante previstos en el Plan garantizan que el Grupo pueda atender sus necesidades corrientes de pago, mantener su actividad comercial ordinaria y preservar sus relaciones con proveedores, clientes y demás contrapartes comerciales en un horizonte temporal estable.

156. En concreto, la necesidad de cada uno de estos instrumentos se justifica por las siguientes razones:

   (i) El Contrato de Financiación de Circulante sostiene las necesidades estructurales de capital circulante del Grupo —financiación de inventarios, sostenimiento de los ciclos de producción y cumplimiento regular de las obligaciones frente a proveedores, empleados y demás acreedores operativos—, resulta imprescindible para la correcta ejecución del Plan de Viabilidad y constituye una condición necesaria para el éxito de la Reestructuración.

   (ii) Las Nuevas Líneas de Avales resultan necesarias para que el Grupo pueda seguir emitiendo las garantías que su actividad ordinaria exige, preservando su operativa comercial sin interrupciones que pudieran comprometer la ejecución del Plan.

   (iii) Las Prórrogas del Factoring Sindicado Existente podrían ser necesarias durante el procedimiento de homologación o durante la fase de implementación del Plan ya homologado, para evitar que su ausencia provoque tensiones en la situación financiera de las Sociedades Reestructuradas en el período transitorio hasta la plena disponibilidad del Contrato de Financiación de Circulante.

157. La concesión de las preferencias de cobro previstas en el artículo 667 TRLC queda condicionada a un doble requisito: de un lado, la homologación del Plan de Reestructuración; de otro, que los créditos afectados representen al menos el 51% del pasivo total. Ambos requisitos concurrirían en el presente caso respecto de cada una de las Sociedades Solicitantes[52] de homologarse el Plan, pues, según resulta acreditado mediante la Certificación que se ha acompañado como Documento nº 30, el requisito de afectación de créditos superior al 51% ya se ha alcanzado.

---

[52] Salvo en lo relativo a Antolín South Africa y Antolín Logistik Deutschland.

**13.4 Extensión de efectos a garantías otorgadas por terceros: extensión a las Prendas sobre Antolín Irausa (artículo 652.2 TRLC)**

158. El artículo 652.2 TRLC establece una excepción al régimen general de intangibilidad de las garantías de terceros previsto en el artículo 652.1 TRLC. En virtud de dicha excepción, los efectos de un plan de reestructuración de una sociedad de un grupo se pueden extender, en las condiciones previstas en el propio plan, a las garantías personales o reales prestadas por cualquier otra sociedad del mismo grupo no sometida al plan de reestructuración, cuando la ejecución de la garantía pueda causar la insolvencia tanto de la sociedad garante como de la propia deudora.

159. En el presente caso, las Sociedades Solicitantes interesan la extensión de los efectos del Plan de Reestructuración a las Prendas sobre Antolín Irausa constituidas por Antolín HoldCo, al concurrir la totalidad de los presupuestos exigidos por el artículo 652.2 TRLC, según se expone a continuación.

**A) Descripción de las Prendas sobre Antolín Irausa**

160. Como se avanzó en el Hecho Primero, HoldCo es titular del 100% de las acciones de Antolín Irausa, ostentando en consecuencia la propiedad de la totalidad de su capital social.

161. En garantía de las obligaciones derivadas de los distintos instrumentos de financiación del Grupo —los Bonos 2028 y los Bonos 2030[53], el Contrato de Financiación Sindicada Existente, los Contratos de Financiación BEI Existentes, y el Contrato de Financiación ICO Existente—, HoldCo, en su condición de pignorante no deudor, constituyó sucesivos derechos reales de prenda de distinto rango sobre la totalidad de las referidas acciones de Antolín Irausa a favor de los acreedores garantizados, actuando Deutsche Bank AG, London Branch como Agente de Garantías (a las que nos hemos referido como Prendas sobre Antolín Irausa). Prendas sobre Antolín Irausa[54] que están vigentes tal y como se acredita mediante las distintas pólizas de

---

[53] Referenciados en las Prendas sobre Antolín Irausa como Bonos 2021 y Bonos 2024.

[54] Se aportan como documentos adjuntos las escrituras y pólizas relativas a las Prendas sobre Antolín Irausa, a fin de permitir al Iltre. Tribunal apreciar de forma completa la evolución histórica de dichas garantías, incluyendo sus sucesivas constituciones, extensiones, novaciones, ratificaciones, cambio de rango y cancelaciones. En particular, actualmente permanecen vigentes las siguientes prendas: (i) prendas de primer rango en garantía de la financiación senior (actualmente en relación con el Tramo A6 y *Revolving* 2, que se corresponde con la deuda del Contrato de Financiación Sindicada Existente), constituidas inicialmente mediante Escritura de 2 de abril de 2014, Prot. 687 (Documento nº 32.1), y Escritura de 16 de septiembre de 2014, Prot. 2.403 (Documento nº 32.2), posteriormente novadas y ratificadas, entre otras, por la Póliza de 17 de octubre de 2024, nº 380 (Documento nº 32.14), y por la Póliza de 4 de agosto de 2025, Asiento 1.058 (Documento nº 32.15); (ii) prenda de segundo rango en garantía del Contrato de Financiación BEI I, constituida mediante Escritura de 12 de junio de 2018, Prot. 1.807 (Documento nº 32.9), renumerada y novada por la Póliza de 17 de octubre de 2024, nº 380 (Documento nº 32.14); (iii) prendas de tercer rango en garantía de los Bonos 2028 (denominados en la póliza de prenda Bonos 2021) y del Contrato de Financiación BEI II, constituidas mediante Póliza de 23 de julio de 2021, nº 434 (Documento nº 32.12),

prendas que se aportan como **Documento nº 32**, destacando, entre ellas, la aportada como Documento nº 32.15 que es la Póliza de Novación, Constitución y Ratificación de Prendas otorgada el 4 de agosto de 2025 ante el Notario de Madrid, D. Andrés Domínguez Nafría, con número de asiento 1058 de su Libro Registro de Operaciones; en la que se describe todo el iter de las Prendas sobre Antolín Irausa por ser la última otorgada.

162. Por tanto, las Prendas sobre Antolín Irausa[55] – otorgadas en su momento por HoldCo en condición de pignorante no deudor– se constituyeron para garantizar las obligaciones derivadas de los principales instrumentos de financiación del Grupo que ahora pretenden afectarse por medio del Plan de Reestructuración. Adicionalmente, en virtud del propio Plan, las citadas Prendas sobre Antolín Irausa se novarán y ratificarán, y se otorgará una nueva prenda en los mismos términos para la deuda reestructurada (tal y como se define en el Plan) y HoldCo adquirirá la condición de garante personal dentro del paquete de Nuevas Garantías Personales.

## B) Concurrencia de los presupuestos del artículo 652.2 TRLC

163. La extensión de los efectos del Plan a las Prendas sobre Antolín Irausa otorgadas por HoldCo exige la concurrencia de tres requisitos acumulativos, que se satisfacen en el presente caso:

### (i) HoldCo y las Sociedades Solicitantes pertenecen al mismo grupo de sociedades

HoldCo es la sociedad matriz directa y socio único de Antolín Irausa, que a su vez encabeza el grupo operativo integrado por las restantes Sociedades Solicitantes. Existe, por tanto, un dominio total directo de HoldCo sobre Antolín Irausa e, indirecto, respecto del resto de Sociedades Solicitantes, lo que, de conformidad con lo dispuesto en el artículo 42 del Código de Comercio, satisface el presupuesto subjetivo exigido por el artículo 652.2 TRLC. En otras palabras, HoldCo forma parte del grupo de las Sociedades Reestructuradas y Solicitantes de la homologación.

### (ii) HoldCo no está sometida al Plan de Reestructuración

---

renumeradas por la Póliza de 17 de octubre de 2024, nº 380 (Documento nº 32.14); (iv) prenda de quinto rango en garantía de los Bonos 2030 (denominados en la Póliza de Prenda Bonos 2024), constituida mediante Póliza de 17 de octubre de 2024, nº 380 (Documento nº 32.14); y (v) prenda de sexto rango en garantía del Contrato Financiación ICO Existente, constituida mediante Póliza de 4 de agosto de 2025, Asiento 1.058 (Documento nº 32. 15). Las prendas constituidas para el Tramo 1 y *Revolving* 1 del Contrato de Financiación Sindicada y para la Financiación con COFIDES (que sería de cuarto rango) no han sido formalmente canceladas, si bien las deudas fueron amortizadas en su integridad.

[55] La estructura y funcionamiento de las Prendas sobre Antolín Irausa se articulan bajo el ICA (entre otras cuestiones, se regula el mecanismo de ejecución de la prenda y las reglas de distribución de los importes obtenidos como consecuencia de la ejecución, estableciendo un rango de prelación *pari passu* entre los acreedores senior firmantes).

HoldCo no ostenta la condición de Sociedad Reestructurada bajo el Plan (al no ser ni deudora ni garante de la deuda sujeta a reestructuración), de modo que se trata de una sociedad del grupo no sometida al Plan de Reestructuración en el sentido del artículo 652.2 TRLC. Su intervención en relación con la Reestructuración se circunscribe a (como se ha expuesto en el Hecho Primero) tomar razón y consentir la extensión de efectos del Plan sobre las Prendas de Antolín Irausa *ex* art. 652.2 TRLC y otorgar una nueva garantía personal (que forma parte de las Nuevas Garantías Personales).

### (iii) La ejecución de las Prendas sobre Antolín Irausa causaría la insolvencia tanto de la garante (HoldCo) como de las Sociedades Reestructuradas

Requisito que también se cumple como se analizará detalladamente a continuación.

164. En este caso, es especialmente evidente la aplicación de la excepción prevista en el artículo 652.2 TRLC por cuanto las Prendas sobre Antolín Irausa no constituyen una garantía ajena, accesoria o periférica respecto de la Deuda Afectada, sino una garantía funcionalmente vinculada a los principales instrumentos de financiación afectados por el Plan. Precisamente por garantizar dicha deuda, su tratamiento debe quedar integrado en la solución unitaria prevista en el Plan de Reestructuración, pues esa imposibilidad de ejecución y, por tanto, preservación en los términos contemplados en el Plan resulta necesaria para asegurar la viabilidad del grupo, evitar la ruptura del equilibrio económico-financiero de la reestructuración y garantizar la plena eficacia de las medidas previstas en el Plan.

165. Debe recordarse en este punto que la finalidad del artículo 652.2 TRLC es evitar que la ejecución individual de una garantía intragrupo pueda frustrar la eficacia de un plan de reestructuración cuando comprometa la viabilidad de la propia deudora.

166. Desde esta perspectiva, la ejecución de las Prendas sobre Antolín Irausa no deben valorarse como una realización aislada de una garantía, sino atendiendo a sus efectos sobre HoldCo, sobre Antolín Irausa, sobre las restantes Sociedades Solicitantes y sobre la viabilidad del Plan en su conjunto, como se analiza a continuación.

### C) Efectos de la ejecución de las Prendas sobre Antolín Irausa en la garante (HoldCo): situación de insolvencia sobrevenida

167. La ejecución de las Prendas sobre Antolín Irausa provocaría de manera directa e inmediata la insolvencia de HoldCo, por las razones que se exponen a continuación.

168. Conforme al balance de situación de HoldCo a 25 de junio de 2026, que se aporta como **Documento nº 33**, la práctica totalidad de su activo —376.680.088,26 euros de 376.693.144,47 euros de activo total— corresponde a la partida "*Acciones Grupo Antolín Irausa*", que constituye su inversión en empresas del grupo a largo plazo y se corresponde con las acciones objeto de la garantía pignoraticia a la que venimos haciendo referencia. En el activo no corriente también tiene un crédito por pérdidas a compensar de 10.510,06 euros. El activo corriente de HoldCo es de tan solo 2.546,15 euros, compuesto por un crédito a corto plazo con empresas del grupo por importe de 1.850,32 euros y una tesorería de 695,83 euros. En consecuencia, las acciones de Antolín Irausa representan más del 99,99% del activo total de HoldCo (376.693.144,47 euros).

169. La ejecución de las Prendas sobre Antolín Irausa supondría la pérdida de este único activo relevante, dejando a HoldCo desprovista de todo patrimonio significativo[56] y, tal y como está previsto en las Prendas sobre Antolín Irausa, sin un crédito de regreso por la ejecución[57]. Frente a esta situación de vaciamiento patrimonial, HoldCo tendría las siguientes obligaciones:

- En el pasivo no corriente, HoldCo registra una deuda con Avot Inversiones, S.L. por importe de 70.518,70 euros, así como un pasivo por impuestos diferidos de 657.979,00 euros, resultando un pasivo no corriente total de 728.497,70 euros.

- Adicionalmente, HoldCo mantiene deudas a corto plazo con empresas del grupo por importe de 2.150,11 euros (intereses a corto plazo) y otras deudas con acreedores varios por importe de 2.616,52 euros.

- A lo anterior debe añadirse que, en virtud del propio Plan de Reestructuración, HoldCo asumirá la condición de garante personal de las obligaciones reestructuradas. En consecuencia, como resultado de las cláusulas de cambio de control existentes y las que se van a incluir en el resto de Contratos Afectados de conformidad con la cláusula 5.3.8 del Plan, tendría lugar el vencimiento anticipado[58] de toda la deuda reestructurada con carácter previo a la ejecución de las Prendas sobre Antolín Irausa, intensificándose con ello su situación de insolvencia.

---

[56] Téngase en cuenta, además, que la ejecución no es un supuesto de venta ordenada en el que se maximice el valor, por lo que el valor que se obtendría por las participaciones en ejecución forzosa posiblemente sería inferior.
[57] En concreto, la Póliza de Prenda de 4 de agosto de 2025 (Documento nº 32.15) establece: "*Atendiendo a la naturaleza y estructura de la operación financiera de la que nacen las Obligaciones Garantizadas, el Pignorante reconoce que, a fin de evitar mermar el valor de las Acciones en ejecución, de la Prenda no emergerán derechos (de repetición o de cualquier otro tipo) a su favor frente a los Deudores o GAI, los Acreedores Garantizados o los adjudicatarios de las Acciones*".
[58] O institución equivalente, ya sea la amortización anticipada, la resolución contractual, la devolución de avales vigentes u otra similar.

- A todo ello habría además que añadir los pasivos fiscales que aflorarían como consecuencia de la ejecución de las Prendas sobre Antolín Irausa, que daría lugar a la ruptura del grupo de consolidación fiscal del que HoldCo es parte, al perder el control sobre Antolín Irausa y, por extensión, sobre el resto de las sociedades del grupo fiscal.

En este sentido, en primer lugar, conforme a la Ley del Impuesto sobre Sociedades ("**LIS**"), la ruptura del grupo fiscal tendría un impacto en los importes a satisfacer por este concepto en el ejercicio en el que se produzca la desconsolidación.

Los principales efectos de la desconsolidación serían: (i) la integración en la última declaración consolidada de las pérdidas fiscales diferidas conforme a la Disposición Adicional 19 LIS, (ii) la incorporación a la base imponible de determinadas operaciones intragrupo previamente eliminadas, y (iii) la reasignación entre las entidades del grupo de bases imponibles negativas, gastos financieros no deducidos y créditos fiscales pendientes. Si bien estos efectos se compensarían con los efectos de pérdidas fiscales y bases imponibles negativas disponibles, darían lugar a un impacto fiscal negativo en HoldCo que no podría afrontar al carecer de bienes.

Adicionalmente, de conformidad con lo establecido en el artículo 57 LIS, las entidades que hubieran formado el grupo fiscal responderán solidariamente del pago de la deuda tributaria de las distintas entidades del grupo previas a la desconsolidación.

170. Así, en un supuesto de ejecución de las Prendas sobre Antolín Irausa, HoldCo quedaría con un activo residual prácticamente nulo —apenas 2.546,15 euros— frente a pasivos exigibles que resultarían manifiestamente inatendibles con el patrimonio remanente. HoldCo, privada del 99,99% de su activo, se encontraría en una situación de insolvencia actual, abocada al concurso de acreedores, al no poder cumplir regularmente sus obligaciones exigibles en los términos del artículo 2.3 TRLC.

### D) Efectos de la ejecución de las Prendas sobre Antolín Irausa y el resto de Sociedades Solicitantes: situación de insolvencia sobrevenida

171. La ejecución de las Prendas sobre Antolín Irausa provocaría igualmente la insolvencia de Antolín Irausa y, por extensión, de las restantes Sociedades Solicitantes, como consecuencia de los siguientes efectos encadenados:

### (i) Resolución masiva de contratos comerciales con clientes por cambio de control

La ejecución de las Prendas sobre Antolín Irausa y el consiguiente cambio de control sobre Antolín Irausa activaría derechos de resolución contractual a favor de parte de los principales clientes del Grupo.

Del análisis de las condiciones generales de compra de los clientes de Grupo Antolín se desprende que una parte muy significativa de dichos contratos contiene cláusulas de cambio de control —directo e indirecto— que facultan al cliente para resolver la relación contractual. En particular, contienen cláusulas de esta naturaleza los contratos suscritos con Dacia (cancelación de pedidos por cambio de control indirecto), Ford (terminación por cambio de control, incluyendo la venta de una participación de control en las acciones del proveedor), General Motors North America (resolución por cambio de control directo o indirecto), JLR (resolución por cambio de control), Mercedes Benz (posibilidad de resolver ante cambio de control), North America ECs&Trucks (posibilidad de resolución por cambio de control de Antolín Irausa), Stellantis (resolución por cambio de control directo o indirecto), Volvo (resolución por cambio de control), Toyota (derecho de resolución por cambio de control) y Volkswagen (resolución por cambio significativo en la estructura de control que perjudique los intereses de VW), entre otros. Se ha aportado la cláusula mencionada en relación con cada uno de los contratos indicados como Documento nº 11.

La resolución masiva de estos contratos comerciales privaría a Antolín Irausa y a las restantes Sociedades Solicitantes de su principal fuente de ingresos —la cartera de pedidos de los fabricantes de automóviles—, haciendo inviable la continuidad de la actividad empresarial y determinando su insolvencia.

**(ii) Pasivos financieros de las distintas sociedades del Grupo**

Las Sociedades Solicitantes del Grupo se enfrentarían a la imposibilidad de pagar todo el pasivo financiero sujeto a este Plan de Reestructuración que habría vencido anticipadamente como consecuencia de las cláusulas de cambio de control incorporadas en virtud del Plan (como señala, por ejemplo, la Cláusula 5.3.8 del Plan). Estas cláusulas se han incorporado en el Plan y ya están en gran parte de los instrumentos financieros afectados por el Plan, lo que evidencia, una vez más, la importancia de la permanencia de la familia Antolín en el capital social del Grupo.

**(iii) Pasivos comerciales de las distintas sociedades del Grupo**

La ejecución de las Prendas sobre Antolín Irausa provocaría igualmente un efecto determinante de la insolvencia de Antolín Irausa y de las restantes Sociedades

73

Solicitantes: la imposibilidad de atender su pasivo comercial frente a proveedores y otros acreedores operativos.

Las Sociedades Solicitantes desarrollan una actividad industrial intensiva en capital circulante, propia de su condición de proveedores del sector de automoción. Dicha actividad genera un elevado volumen de obligaciones comerciales frente a proveedores de materias primas, componentes, servicios logísticos y otros acreedores operativos, que constituyen el pasivo comercial corriente de cada sociedad. Conforme al Anexo III del Plan, el pasivo comercial[59] de las Sociedades Solicitantes alcanza importes muy significativos en cada una de las Sociedades Solicitantes, como se detalla a continuación:

| N.º | Sociedad | Pasivo comercial |
| --- | --- | --- |
| 1 | Antolín Irausa (GAI) | 11.920.967,19 € |
| 2 | Antolín Aragusa | 16.548.761,15 € |
| 3 | Antolín Autotrim | 1.112.067,75 € |
| 4 | Antolín Eurotrim | 11.748.286,65 € |
| 5 | Antolín Glass | 4.534.716,70 € |
| 6 | Antolín Ingeniería | 4.645.555,90 € |
| 7 | Antolín Plasbur | 5.271.244,08 € |
| 8 | Antolín RyA | 7.273.926,27 € |
| 9 | Antolín Interiors UK | 44.906.588,66 € |
| 10 | Antolín Leamington | 9.010.291,53 € |
| 11 | Antolín UK | 1.527.911,61 € |
| 12 | Antolín North America | 173.488,30 € |
| 13 | Antolín Alabama | 17.282.347,58 € |
| 14 | Antolín Interiors USA | 39.946.133,78 € |
| 15 | Antolín Shelby | 21.594.186,94 € |
| 16 | Antolín Missouri | 6.631.224,27 € |
| 17 | Antolín Kentucky | 12.911.782,20 € |
| 18 | Antolín Michigan | 11.853.901,31 € |
| 19 | Antolín Sibiu | 64.781.500,45 € |
| 20 | Antolín Silesia | 11.152.876,29 € |
| 21 | Antolín South Africa | 7.234.143,09 € |
| 22 | Antolín Bohemia | 16.871.661,79 € |
| 23 | Antolín Ostrava | 15.781.903,57 € |
| 24 | Antolín Turnov | 35.201.405,86 € |
| 25 | Antolín Liban | 46.683.265,58 € |
| 26 | Antolín Deutschland | 3.151.770,07 € |
| 27 | Antolín Bamberg | 19.957.560,83 € |

[59] Además, habría otros pasivos como los derivados de proveedores con empresas del Grupo u otros de los contemplados en el Anexo III.

| 28 | Antolín Logistik Deutschland | 10.268.257,29 € |
| 29 | Antolín Straubing | 38.662.464,46 € |
| 30 | Antolín Interiors Mexico | 63.346.059,10 € |
| 31 | Antolín Silao | 25.842.494,02 € |
| 32 | Antolín Saltillo | 15.975.584,23 € |
| 33 | Antolín Tlaxcala | 29.592.147,72 € |
| 34 | Antolín Cuautitlán | 6.761.629,63 € |
| 35 | Antolín Lusitania | 14.447.794,23 € |
| 36 | Antolín Bratislava | 22.208.834,44 € |

Este pasivo sólo puede atenderse gracias al flujo continuo de cobros derivados de los contratos comerciales con los fabricantes de automóviles (clientes), que alimenta el ciclo de caja y permite atender el pasivo comercial a medida que vence.

La ejecución de las Prendas sobre Antolín Irausa rompería de manera irreversible este equilibrio operativo. Tal como se ha expuesto en el apartado (i) anterior, el cambio de control derivado de la ejecución activaría cláusulas de resolución contractual a favor de los principales clientes del Grupo.

La pérdida masiva de estos contratos comerciales tendría un doble efecto devastador sobre la capacidad de las Sociedades Solicitantes y garantes para atender su pasivo comercial:

o   En primer lugar, las sociedades dejarían de percibir los ingresos derivados de los pedidos de fabricación.

o   En segundo lugar, la reducción de la actividad productiva impediría a las sociedades realizar el activo corriente registrado en sus balances.

En definitiva, incluso considerando exclusivamente la partida acreedores comerciales, las Sociedades Solicitantes se encontrarían en una situación de insolvencia, al resultar manifiestamente incapaces de cumplir regularmente sus obligaciones exigibles frente a proveedores y acreedores operativos, en los términos del artículo 2.3 TRLC.

**(iv) Ruptura del grupo de consolidación fiscal**

Al igual que se ha expuesto respecto de HoldCo, la pérdida del control de HoldCo sobre Antolín Irausa y el resto de Sociedades Solicitantes como consecuencia de la ejecución de las Prendas sobre Antolín Irausa provocaría la disolución del grupo de consolidación fiscal.

Las obligaciones tributarias consolidadas pendientes pasarían a ser exigibles solidariamente frente a todas las sociedades que integraban el grupo fiscal, incluyendo a Antolín Irausa y a las restantes Sociedades Solicitantes. Además, la desconsolidación podría provocar el afloramiento de nuevos pasivos financieros, tal y como hemos indicado anteriormente.

172. En consecuencia, la ejecución de las Prendas sobre Antolín Irausa desencadenaría un efecto en cascada —vencimiento anticipado de deuda financiera reestructurada, resolución masiva de contratos comerciales, incapacidad para atender el pasivo comercial y ruptura del grupo fiscal— que conduciría de manera inevitable a la insolvencia y al concurso de acreedores de Antolín Irausa y de las restantes Sociedades Solicitantes. Concurren, por tanto, los requisitos exigidos por el artículo 652.2 TRLC para el otorgamiento de la protección que interesamos.

173. Por último, no podemos dejar de señalar que la ejecución de la garantía que nos ocupa debe analizarse también desde la perspectiva de sus efectos sistémicos sobre HoldCo, las Sociedades Solicitantes y el Grupo en su conjunto. En particular, su consumación supondría la pérdida de la unidad de dirección y de las sinergias operativas que sustentan la gestión integrada del Grupo, con el consiguiente deterioro de su valor en funcionamiento. Lejos de preservar valor, la ejecución fragmentaría la estructura empresarial, dificultaría la coordinación estratégica y operativa entre las sociedades afectadas y agravaría la insolvencia de HoldCo y de las Sociedades Solicitantes, en perjuicio del interés común de los acreedores.

### 13.5 Apoderamiento al Agente

174. A los efectos que aquí interesan, y sin perjuicio de la remisión íntegra a la Cláusula 14.2 del Plan de Reestructuración, debe destacarse que, como hemos indicado, Glas es el Agente de la Reestructuración y de los restantes Documentos de la Reestructuración. El Plan configura al Agente como una figura instrumental para la ejecución de la Reestructuración, atribuyéndole funciones de naturaleza esencialmente mecánica y administrativa, pero imprescindibles para la efectiva implementación del Plan, incluyendo la intervención en la formalización de los Documentos de la Reestructuración, la recepción y tramitación de documentación, la realización de conciliaciones y cálculos, la remisión de documentación entre las partes y la adopción de las actuaciones necesarias para dar cumplimiento al Plan de Reestructuración y a los Documentos de la Reestructuración.

175. En lo que ahora interesa, y sin perjuicio de la remisión que hacemos a la Cláusula 14.2 del Plan para el examen de las concretas facultades que se atribuyen al Agente, lo relevante desde la perspectiva de la eficacia e implementación del Plan es que dicha estipulación articula un

régimen de representación e instrucción irrevocable que permite al Agente actuar no solo por cuenta de los acreedores que hayan participado activamente o le hayan conferido poderes de forma expresa, sino también respecto de los Acreedores Afectados No Participantes, una vez queden vinculados por el Plan. La intervención del Agente constituye así el cauce previsto por el Plan de Reestructuración para ejecutar los actos documentales y materiales necesarios para la Reestructuración frente al conjunto de Acreedores Afectados, evitando que la efectividad del Plan homologado quede condicionada a la comparecencia o actuación individual posterior de aquellos acreedores que no hubieran participado en el proceso o no hubieran otorgado un apoderamiento separado.

**DECIMOCUARTO. – Sobre el Plan de Viabilidad y el Informe de Razonabilidad del Plan de Viabilidad**

176. La situación de probabilidad de insolvencia a la que se ha hecho referencia en los apartados anteriores queda asimismo documentada y soportada en el Plan de Viabilidad, que se acompaña como Anexo V al Plan de Reestructuración y que en todo caso se ha acompañado como Documento nº 20 del presente escrito. Además, el Plan de Viabilidad ha sido validado por LEXAUDIT en su Informe sobre la Razonabilidad del Plan de Viabilidad, que se ha acompañado como Documento nº 21.

177. El Plan de Viabilidad incluye las proyecciones financieras para el periodo 2026-2035 (las "**Proyecciones Financieras**") que conforman el plan de negocio 2026, así como el plan de pagos derivado del Plan de Reestructuración. En la elaboración de su Informe sobre la Razonabilidad del Plan de Viabilidad, LEXAUDIT ha llevado a cabo un examen crítico de las proyecciones financieras y de las principales hipótesis y asunciones tomadas en su construcción, aplicando procedimientos de análisis sobre la coherencia entre la información histórica y las proyecciones, la consistencia de las principales hipótesis operativas y financieras, y, en fin, la comparación con referencias de mercado y *benchmarks* sectoriales, concluyendo que las mismas son conservadoras teniendo en cuenta el *Backlog*[60] y el Plan de Transformación 2023.

178. Partiendo de dicha situación, el Plan de Viabilidad constata que el Grupo Antolín mantiene un volumen de deuda y estructura financiera considerable —con una ratio de apalancamiento de 3,7x EBITDA (incluyendo pasivos por arrendamiento IFRS 16), por encima de la media del sector— y con una concentración de vencimientos crítica en el ejercicio 2028 por importe aproximado de 494 millones de euros, y que podría adelantarse a octubre de 2027 si no se

---

[60] Cartera de proyectos.

hubieran refinanciado los Bonos 2028 a dicha fecha. En base a lo anterior, no podrá atender la mencionada deuda a sus vencimientos contractualmente previstos ni considera factible la posibilidad de refinanciar dichos vencimientos dado el ratio de apalancamiento actual.

179. No obstante, el Plan de Viabilidad pone de manifiesto que el Grupo se encuentra en pleno proceso de transformación, registrando, a nivel rentabilidad, las mejores cifras de su historia reciente. En efecto, como se ha expuesto, el Plan de Transformación 2023 del Grupo Antolín ha supuesto un incremento del margen EBITDA sobre ventas desde el 8,1% en el ejercicio 2023 hasta el 9% en el ejercicio 2025. Sobre la base de las Proyecciones Financieras, y bajo la premisa de la cristalización de las mejoras pendientes del Plan de Transformación 2023, la "*Commercial Selectivity*" reforzada (o el incremento de exigencia actual en los criterios de aceptación de proyectos) y la optimización de la estructura de costes e inversiones, el Plan de Viabilidad confirma que las medidas contempladas en el Plan de Reestructuración permitirán a las Sociedades Solicitantes:

(i)    Adaptar y optimizar la estructura financiera, reordenando el calendario de vencimientos de la deuda financiera, para alinearlo con la capacidad real de generación de caja del Grupo.

(ii)   Dotar al Grupo del plazo suficiente para cristalizar las mejoras operativas identificadas en el Plan de Transformación 2023, estimándose que el Grupo incremente progresivamente su margen EBITDA sobre ventas hasta el 10,5% en el ejercicio 2029, acompañado de una generación de caja media anual superior a los 105 millones de euros.

(iii)  Asegurar la viabilidad del Grupo en el corto y medio plazo. Así como, asentar las bases para la viabilidad en el largo plazo.

(iv)   Atender la deuda reestructurada en todos los escenarios posibles. En efecto, el Plan de Reestructuración ofrece dos alternativas financieramente equivalentes a los acreedores (tratamiento por defecto y tratamiento alternativo) y, tanto en los escenarios extremos analizados —en los que la Deuda Bancaria opta por el tratamiento alternativo en un 65%[61] y la totalidad de los Bonos optan al 100% por una u otra alternativa— como en cualquiera de los escenarios intermedios, la ratio de apalancamiento alcanzaría niveles compatibles con una refinanciación en

---

[61] Toda vez que el Plan de Reestructuración supone una adhesión mínima del 65% de la Deuda Bancaria al tratamiento alternativo para posibilitar la incorporación de las líneas de circulante previstas, el Plan de Viabilidad analiza los escenarios extremos partiendo de esa adhesión mínima al tratamiento alternativo por parte de la Deuda Bancaria.

condiciones de mercado al vencimiento de los respectivos instrumentos financieros.

180. En definitiva, sobre la base del Plan de Negocio 2026 —construido a partir de los estados financieros individuales de las sociedades del Grupo y soportado por una cartera de proyectos que representa el 89% de las ventas esperadas hasta el ejercicio 2029, con contratos a largo plazo de duración media de 5 a 7 años con los principales fabricantes de automóviles del mundo—, el Plan de Viabilidad concluye que las medidas de reestructuración financiera contempladas en el Plan de Reestructuración, junto con la cristalización de las mejoras operativas del Plan de Transformación 2023, permiten superar la situación de probabilidad de insolvencia de las Sociedades Solicitantes y constituyen una perspectiva razonable de asegurar la viabilidad financiera de las mismas, tal y como exigen los artículos 638.1.º y 633.10.ª TRLC.

181. El Experto valida las conclusiones del Plan de Viabilidad concluyendo en su Informe sobre la Razonabilidad del Plan de Viabilidad que la reestructuración propuesta es "**coherente, necesaria y alineada** con la situación actual del Grupo". El Plan de Viabilidad ofrece una perspectiva razonable de evitar el concurso de acreedores y asegurar la viabilidad a corto y medio plazo, con resultados operativos razonables y flujos de caja suficientes para atender la deuda reestructurada en todos los escenarios.

**DECIMOQUINTO. – Sobre el cumplimiento de requisitos para la homologación del Plan de Reestructuración**

182. El Plan de Reestructuración cumple con la totalidad de los requisitos formales y materiales que el TRLC exige para su homologación judicial. Sin perjuicio del desarrollo técnico que se efectuará en sede de Fundamentos de Derecho, anticipamos, de manera sintética, las razones por las que concurren los presupuestos previstos en los artículos 638 y 639 del TRLC:

   a. **Las Sociedades Solicitantes se encuentran en situación de probabilidad de insolvencia y el Plan ofrece una perspectiva razonable de viabilidad (artículos 584.2 y 638.1º TRLC)**

   Las Sociedades Solicitantes se encuentran en situación de probabilidad de insolvencia en los términos del artículo 584.2 TRLC, según se ha expuesto en el Hecho Tercero, Sección 3.1. El Plan de Reestructuración ofrece, además, una perspectiva razonable de evitar el concurso de acreedores y asegurar la viabilidad de las Sociedades Solicitantes en el corto y medio plazo, tal y como acredita el Plan de Viabilidad elaborado por el Grupo, aportado como Documento nº 20 –que constituye, asimismo, el Anexo V del

propio Plan–; así como el Informe sobre la Razonabilidad del Plan de Viabilidad, emitido por LEXAUDIT y aportado como Documento nº 21.

**b.  Se cumplen los requisitos de contenido y forma (artículo 638. 2.º en relación con el artículo 633 TRLC)**

El Plan de Reestructuración cumple con los requisitos de contenido y forma exigidos en el Título III del Libro II del TRLC (artículos 614 a 671) y, muy en particular, con los previstos en el artículo 633 TRLC. Las Cláusulas 4 y 8.2, entre otras, y los Anexos II a VI del Plan recogen, con el grado de detalle exigido por la norma, la identificación de las Sociedades Reestructuradas y del Experto en la Reestructuración, la descripción de su situación económica, de los trabajadores, y de las causas y alcance de las dificultades financieras, el activo y el pasivo a la fecha de formalización, la identificación individualizada de los Acreedores Afectados y la clase a la que pertenecen, la identificación de los acreedores o socios no afectados con las razones de su no afectación, y las medidas concretas de reestructuración financiera que se proponen, así como las condiciones necesarias para el éxito del Plan.

**c.  El Plan ha sido aprobado por las mayorías de acreedores legalmente exigidos (artículo 639 TRLC)**

Tal y como se ha desarrollado en el Hecho Duodécimo, el Plan de Reestructuración ha sido aprobado por las mayorías exigidas legalmente, conforme a la formación de clases que se detalla en el Hecho Séptimo (cumpliéndose así la condición suspensiva para la entrada en vigor). Así queda acreditado en la Certificación emitida por el Experto que se ha acompañado como Documento nº 30 y que ha sido incorporada mediante diligencia al instrumento público en el que se ha formalizado el Plan.

**d.  Los créditos dentro de la misma clase han sido tratados de forma paritaria (artículo 638.4º TRLC)**

Los créditos incluidos dentro de una misma clase reciben en el Plan de Reestructuración un trato paritario, garantizándose, asimismo, que todos los Acreedores Afectados son tratados de manera equivalente respecto del resto de Acreedores Afectados de su mismo rango, conforme a la formación de clases efectuada en atención a la comunidad de intereses entre ellos (*cfr.*, Cláusula 3 del Plan de Reestructuración).

Asimismo, el Plan de Reestructuración respeta la regla de prioridad absoluta, en la medida en que los Acreedores Afectados no reciben un importe inferior al de sus respectivos créditos, pues no se les impone quita alguna en la alternativa por defecto.

La equivalencia financiera del trato conferido a los Acreedores Afectados, así como el respeto de los principios de paridad de trato y prioridad aplicables, resultan igualmente corroborados por los informes emitidos por Vest Partners y el Experto en la Reestructuración, que se han acompañado como Documentos nº 24, 25 y 26.

**e. El Plan de Reestructuración ha sido comunicado a todos los Acreedores Afectados (artículo 638.5º TRLC)**

El Plan de Reestructuración ha sido comunicado a la totalidad de los Acreedores Afectados con carácter previo a la presente Solicitud de Homologación, en los términos previstos en el artículo 627 TRLC, tal y como se ha explicado en el Hecho 12.3. La acreditación de tales comunicaciones se incorpora a este escrito como Conjunto Documental nº 29. Adicionalmente, se ha procedido a la publicación del Plan de Reestructuración en la página web del Agente de la Reestructuración en relación con la Reestructuración (y en la web corporativa del Grupo Antolín se ha publicado la Invitación que redirige a la citada web del Agente).

183. En definitiva, se verifica así el cumplimiento de todos los presupuestos legalmente exigidos para la homologación del Plan de Reestructuración, en los términos que se desarrollarán con mayor detalle en los Fundamentos Jurídico-Materiales.

184. A los anteriores Hechos les son de aplicación los siguientes,

**FUNDAMENTOS DE DERECHO**

**– I –**

**DE CARÁCTER JURÍDICO-PROCESAL**

**PRIMERO. – Jurisdicción y competencia**

**1.1. Competencia General**

185. La jurisdicción y competencia objetiva para conocer de la presente Solicitud de Homologación corresponde a la Sección de lo Mercantil del Tribunal de Instancia de Burgos, Plaza nº 1, de

conformidad con lo dispuesto en el artículo 87.7 de la Ley Orgánica 6/1985, de 1 de julio, del Poder Judicial ("**LOPJ**"), y en el artículo 641 TRLC, al atribuirles el conocimiento de cuantas cuestiones sean competencia del orden jurisdiccional civil en materia de concurso de acreedores y planes de reestructuración, en los términos establecidos por el TRLC.

186.   A estos efectos, el artículo 45.1 TRLC dispone que:

"*1. La competencia para declarar y tramitar el concurso corresponde al juez de lo mercantil en cuyo territorio tenga el deudor el centro de sus intereses principales. Por centro de intereses principales se entenderá el lugar donde el deudor ejerce de modo habitual y reconocible por terceros la administración de tales intereses.*

*2. En caso de deudor persona jurídica, se presume que el centro de sus intereses principales se halla en el lugar del domicilio social. Será ineficaz a estos efectos el cambio de domicilio inscrito en el Registro mercantil dentro de los seis meses anteriores a la solicitud del concurso (…)*" (Énfasis añadido)

187.   De hecho, este Iltre. Tribunal viene conociendo ya del estadio preconcursal del Grupo Antolín por cuanto tiene acordada la designación de LEXAUDIT como Experto en la Reestructuración por Auto de 14 de mayo de 2026[62], dictado en la pieza de designación de experto con n.º de autos 310/2026. La continuidad del fuero respecto del expediente de homologación es, además de la solución legal, la más coherente con los principios de unidad de procedimiento y eficiencia procesal que inspiran el Libro II del TRLC.

188.   Tratándose de una solicitud de homologación de un plan de reestructuración conjunto, respecto de varias sociedades de un mismo grupo, resulta igualmente de aplicación el artículo 46 TRLC, conforme al cual:

"*1. Será juez competente para la declaración conjunta de concurso el del lugar donde tenga el centro de sus intereses principales el deudor con mayor pasivo y, si se trata de un grupo de sociedades, el de la sociedad dominante o, en supuestos en que el concurso no se solicite respecto de esta, el de la sociedad de mayor pasivo. Si ya hubiera sido declarado el concurso de la sociedad dominante, será juez competente para la declaración del concurso de cualquiera de las sociedades del grupo aquel que esté conociendo del concurso de aquella.*" (Énfasis añadido)

---

[62] Rectificado mediante Auto de 1 de junio de 2026, a instancias de las Sociedades Solicitantes, a los efectos de incluir en el dispositivo que el nombramiento del Experto en la Reestructuración se efectuaba para todas las Sociedades Solicitantes.

82

189. En el presente caso, Antolín Irausa —matriz operativa del Grupo y deudora principal de la práctica totalidad de los instrumentos financieros afectados— tiene su domicilio social y su centro de intereses principales en Burgos, lo que determina la competencia inequívoca de este Iltre. Tribunal para conocer de la presente Solicitud de Homologación.

### 1.2. Competencia respecto de la matriz operativa

190. Antolín Irausa, matriz operativa de las Sociedades Solicitantes, es una sociedad mercantil española con domicilio social en Calle Vitoria 307, 09007 Burgos, donde igualmente se localiza su centro de intereses principales por ser el lugar desde el que ejerce de modo habitual y reconocible por terceros la administración de su negocio. Concurriendo, por tanto, la presunción del artículo 45.2 TRLC, no acompañada de elemento alguno que la desvirtúe, el fuero territorial resulta inequívoco a favor de este Iltre. Tribunal.

### 1.3. Competencia respecto a las Filiales Españolas

191. Las Filiales Españolas incluidas en el perímetro del plan —Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Ingeniería, Antolín Plasbur y Antolín RyA— tienen igualmente su domicilio social y su centro de intereses principales en Burgos, por ser éste el lugar desde el que se ejerce de modo habitual y reconocible por terceros la administración de sus intereses (artículo 45.1 TRLC). En consecuencia, la competencia territorial de este Iltre. Tribunal para conocer de la homologación del Plan respecto de las Filiales Españolas se encuentra plenamente justificada.

### 1.4. Competencia respecto a las Filiales Extranjeras: acreditación del COMI en España

192. En relación con las Filiales Extranjeras incluidas en el perímetro del Plan, aun cuando su domicilio social se encuentre fuera de España, la competencia de este Iltre. Tribunal se sustenta en que su COMI se ubica en Burgos. Si bien el artículo 45.2 TRLC presume que el COMI se halla en el lugar del domicilio social, dicha presunción admite prueba en contrario —prueba que concurre con suficiencia, según se ha expuesto en el Hecho Segundo, al que nos remitimos para evitar reiteraciones.

193. En síntesis, los factores fácticos que acreditan que el COMI de las Filiales Extranjeras se localiza en Burgos son los siguientes:

- **Modelo de organización contractual centralizado**: el Grupo Antolín opera a nivel internacional a través de un modelo de negocio integrado y centralizado en Burgos, en el que las Filiales operan bajo la dirección y supervisión de Antolín Irausa y, en lo que

a I+D+i se refiere, de Antolín Ingeniería. En particular, las relaciones entre las Filiales –ya sean Plantas u OTCs– y Antolín Irausa y Antolín Ingeniería se regulan principalmente por medio de los siguientes contratos:

(i) los PMAs, suscritos entre Antolín Irausa y cada una de las Plantas, en los que Antolín Irausa ostenta la condición de "Principal" mientras que las Plantas quedan relegadas a funciones productivas y servicios asociados bajo la dirección y supervisión de Antolín Irausa, sin autonomía decisoria propia;

(ii) los Contratos OTC, suscritos entre Antolín Irausa y Antolín Ingeniería con las Filiales OTCs, en virtud de los cuales las OTCs prestan servicios de colaboración a Antolín Irausa y, en el caso de los contratos de innovación, a Antolín Ingeniería, que son quienes verdaderamente desarrollan las funciones estratégicas desde Burgos; y

(iii) otros contratos, entre los que destacan los acuerdos de *cash pooling*, que permiten mantener un sistema de gestión centralizada de la tesorería, de manera que es Antolín Irausa desde Burgos quién gestiona la liquidez del Grupo.

- **Organización en Unidades de Negocio dirigidas desde Burgos**: el Grupo Antolín divide su actividad productiva en tres grandes Business Units, todas ellas dirigidas desde Burgos. Cada una de estas Business Units es dirigida por un empleado de Antolín Irausa con domicilio corporativo en Burgos, que a su vez depende del Chief Officer & Business Officer, D. Miguel Marañón, también empleado de Antolín Irausa y domiciliado en Burgos.

  Por su parte, las OTCs, si bien no se integran en una Business Unit como tal, sí se agrupan bajo la dirección de la Directora Comercial de Grupo Antolín, Dña. Sonia Aguilar empleada de Antolín Irausa, también radicada en Burgos.

- **Administración desde Burgos**: los órganos de administración de las Filiales están integrados principalmente por personas de nacionalidad española y cuyo centro de trabajo se encuentra en Burgos y, en todo caso, la Consejera Delegada de Antolín Irausa, Dña. Cristina Blanco Santo Tomás, que tiene su domicilio y centro de trabajo en Burgos, ostenta el cargo de administradora o mantiene poderes solidarios en las distintas Filiales Extranjeras en las que existe representación local en su órgano de administración, lo que asegura que el control efectivo de la dirección de las Filiales resida en Burgos.

84

– **Modelo de gestión centralizado y reconocible por terceros**: Antolín Irausa remite, desde Burgos, a todas las Filiales protocolos y modelos de actuación estandarizados, con la instrucción de que sean seguidos por la totalidad de los empleados del Grupo a nivel mundial. Además, el modelo operativo del Grupo Antolín ha sido reconocido tanto por los empleados, como por los acreedores, clientes y proveedores del Grupo. Incluso la Agencia Estatal de la Administración Tributaria ha reconocido validez al modelo de gestión centralizada del Grupo Antolín, a través del APA suscrito con Antolín Irausa con efecto para los ejercicios 2024-2027.

194. La concurrencia de todos estos elementos permite afirmar que, pese al domicilio formal en el extranjero, el COMI de las Filiales Extranjeras se localiza inequívocamente en Burgos, desvirtuando la presunción del artículo 45.2 TRLC y fundamentando la competencia territorial de este Iltre. Tribunal.

## 1.5. Competencia subsidiaria en caso de las Filiales Extranjeras por afectación derivada del artículo 755 TRLC

195. Subsidiariamente, y solo para el hipotético supuesto de que el Iltre. Tribunal al que nos dirigimos no considerara acreditado el COMI en España respecto de la totalidad o de alguna de las Filiales Extranjeras[63] –y a los efectos de afectar al Plan de Reestructuración, al menos, la deuda común con la matriz operativa (Antolín Irausa)–, la competencia del Iltre. Tribunal para conocer de la homologación del Plan de Reestructuración con respecto a las mismas encontraría igualmente acomodo en el artículo 755 TRLC, que dispone lo siguiente:

> "*Cuando los tribunales españoles sean competentes para conocer de los procedimientos que se regulan en el libro segundo en relación con la sociedad matriz de un grupo de sociedades, podrán extender su competencia en relación con sociedades filiales cuyo centro de intereses principales se localice fuera de España, si concurren los siguientes requisitos:*
>
> *1.º Que la sociedad matriz haya instado la comunicación regulada en el libro segundo o vaya a quedar sometida al plan de reestructuración.*
>
> *2.º Que la comunicación o la homologación del plan de reestructuración se hayan solicitado como reservada en relación con las filiales, en cuyo caso ni la comunicación ni las resoluciones sobre la homologación del plan respecto de las filiales se publicarán en el Registro público concursal. Estas resoluciones se dictarán separadamente de las resoluciones relativas a la sociedad matriz.*

---

[63] *Quod non.*

> *3.º Que la extensión de la competencia sobre las filiales resulte necesaria para*
> *garantizar el buen fin de las negociaciones de un plan de reestructuración o la adopción*
> *y cumplimiento del plan."*

196. Como vemos, el artículo 755 TRLC constituye una norma de extensión competencial específicamente diseñada por el legislador para casos de reestructuración de grupos multinacionales en los que la matriz se encuentra en España. Dicho precepto contempla, precisamente, los supuestos en los que el COMI de las filiales se entiende localizado en el extranjero, ofreciendo un mecanismo que permite afrontar de manera unitaria la reestructuración de un grupo internacional, evitando así la fragmentación del proceso en múltiples jurisdicciones.

197. La filosofía del artículo 755 TRLC es enteramente coherente con la del régimen de reestructuración preventiva instaurado por la Directiva (UE) 2019/1023 del Parlamento Europeo y del Consejo, de 20 de junio de 2019, sobre marcos de reestructuración preventiva, exoneración de deudas e inhabilitaciones (en adelante, la "**Directiva**"), cuyo Considerando 15 alude expresamente a la conveniencia de que la mayor coherencia de los procedimientos facilite "*la reestructuración de los grupos de empresas, independientemente de la ubicación en la Unión de los miembros del grupo*". En consecuencia, allí donde no se apreciase la localización en España del COMI de una Filial —pese a lo anteriormente explicado—, el artículo 755 TRLC vendría en todo caso a colmar la laguna competencial mediante una vía complementaria de extensión de la competencia judicial de este Juzgado, garantizando así -de nuevo- la unidad del proceso.

198. Esta posibilidad de extender la competencia de los tribunales españoles a las filiales extranjeras de la matriz, en los términos del artículo 755 TRLC, ha sido expresamente reconocida ya por nuestros Tribunales. Así, entre otros, cabe mencionar el Auto del Juzgado de lo Mercantil n.º 3 de A Coruña, de 30 de septiembre de 2024 [JUR\2024\538725][64]; la Sentencia de la Audiencia Provincial de A Coruña, Sección 4.ª, de 23 de julio de 2025 [JUR\2025\316476][65]; y, de manera particularmente expresiva por su paralelismo con el supuesto de autos, el Auto del Juzgado de lo Mercantil n.º 1 de Sevilla n.º 415/2023, de 12 de junio [JUR\2023\254801][66], que afirma que:

> "*de no reestructurarse las obligaciones de las sociedades solicitantes, la homologación*
> *de los planes de reestructuración solicitada por* [la matriz y otras filiales] *resultaría*

---

[64] En esta Sentencia, la Audiencia Provincial de A Coruña interpreta el artículo 755 TRLC, enfatizando la necesidad de evitar la descoordinación entre foros y la importancia de que la solicitud de homologación para la matriz española y las filiales extranjeras sea contemporánea.

[65] Esta resolución confirma el criterio de procedencia de la extensión *ex.* artículo 755 TRLC cuando es necesaria ante la existencia de acreedores comunes entre la matriz y las filiales extranjeras.

[66] Juzgado de lo Mercantil N°. 1 de Sevilla, Auto 415/2023 de 12 Jun. 2023, Proc. 20401/2023 [JUR\2023\254801].

*insuficiente para asegurar su cumplimiento dado que, sin la participación y sometimiento de las solicitantes a su propia reestructuración [...] los acreedores [...] podrían dirigir inmediatamente las acciones correspondientes contra las solicitantes como deudora y/o garantes respectivamente y sus activos (...)"*.

199. Trasladando todo lo anterior al presente caso, podemos afirmar que los tres requisitos contemplados por el artículo 755 TRLC para la extensión de la competencia concurrirían plenamente en el presente caso (en los términos en que se reproduce la petición al efecto en el suplico):

    (i)    Antolín Irausa, matriz operativa del Grupo, queda sometida al Plan de Reestructuración y ha instado, junto con las Filiales, el nombramiento del Experto en la Reestructuración;

    (ii)    Tanto la solicitud de nombramiento de Experto como la presente Solicitud de Homologación –en la petición subsidiaria– se han instado con carácter reservado en relación con las Filiales Extranjeras, sin publicación en el Registro Público Concursal. Asimismo, las Sociedades Solicitantes asumen expresamente que las resoluciones que en su día se dicten respecto de las Filiales Extranjeras deberán formalizarse de manera separada de las relativas a Antolín Irausa y al resto de Sociedades Solicitantes con COMI español, concediéndose a las primeras el carácter de reservado, conforme exige el apartado 2.º del artículo 755 TRLC; y

    (iii)    La extensión de la competencia respecto de las Filiales Extranjeras es absolutamente necesaria para garantizar el buen fin de la Reestructuración, en la medida en que las Filiales Extranjeras son deudoras y/o garantes solidarias de los principales instrumentos financieros del Grupo —los Bonos Existentes, el Contrato de Financiación Sindicada Existente, los Contratos de Financiación BEI Existentes y el Contrato de Financiación ICO Existente— todos ellos vinculados además entre sí por el Contrato entre Acreedores, que establece su rango *pari passu*. La reestructuración de la matriz y de las Filiales Españolas, sin la simultánea reestructuración de las Filiales Extranjeras, dejaría intactas las obligaciones de éstas frente a los mismos acreedores, los cuales —tal y como recuerda expresamente la jurisprudencia citada— podrían dirigir inmediatamente las acciones correspondientes contra las Filiales Extranjeras como deudoras y/o garantes, comprometiendo así de manera irremediable la viabilidad económica del Grupo en su conjunto dada su indisoluble vinculación operativa y funcional.

200. En atención a lo expuesto, esta parte interesa que, solo para el supuesto de que se considerase que el COMI de las Filiales Extranjeras se encuentra fuera de Burgos —petición que

formulamos aquí de manera subsidiaria y reproducimos en sede de suplico a los meros efectos de hipótesis y cobertura de todas las alternativas posibles—, este Iltre. Tribunal declare, en todo caso, su competencia internacional respecto de dichas entidades al amparo del artículo 755 TRLC, con el objeto de que queden sometidas al presente proceso de homologación del Plan de Reestructuración, siendo además que la Deuda Afectada de las Filiales Extranjeras es común con la matriz, siendo que las Filiales Extranjeras son garantes.

201. Todo ello por resultar dicha extensión competencial indispensable para garantizar la viabilidad del Grupo y la efectividad del proceso de reestructuración en su conjunto, pudiendo dictarse, en su caso, las resoluciones separadas y reservadas.

**SEGUNDO. – Capacidad y legitimación activa**

202. El artículo 643 TRLC reconoce legitimación activa para solicitar la homologación judicial de un plan de reestructuración tanto a los deudores que hayan suscrito el plan como a los acreedores afectados por el mismo. En el presente caso, las Sociedades Solicitantes son las propias sociedades deudoras incluidas en el perímetro del Plan, las cuales han suscrito el mismo en los términos previstos en su sección de Comparecencias, por lo que concurre el presupuesto legal de legitimación.

203. Asimismo, las Sociedades Solicitantes tienen capacidad para ser parte en el presente proceso, en virtud de lo previsto en el artículo 6.1. 3.º de la Ley 1/2000, de 7 de enero, de Enjuiciamiento Civil (“**LEC**”), de aplicación supletoria, al tratarse de personas jurídicas con plena capacidad procesal.

204. Por último, y a los efectos del artículo 664 TRLC, las Sociedades Solicitantes manifiestan que no han solicitado otra homologación judicial de plan de reestructuración dentro del último año.

**TERCERO. – Representación procesal y defensa técnica**

205. Las Sociedades Solicitantes comparecen debidamente representadas por procurador y asistidas por los letrados que suscriben, en cumplimiento de lo exigido por el artículo 643.1 TRLC para la solicitud de homologación judicial del Plan de Reestructuración.

**CUARTO. – Procedimiento: solicitud de homologación sin contradicción previa y homologación de Plan de Reestructuración conjunto**

### 4.1 Solicitud de homologación sin contradicción previa

206. La presente Solicitud debe sustanciarse por los trámites previstos en los artículos 641 y siguientes del TRLC. De conformidad con el artículo 647 TRLC, este Iltre. Tribunal homologará el Plan de Reestructuración siempre que la documentación presentada no evidencie manifiestamente que no se cumplen los requisitos exigidos. La homologación tendrá lugar mediante auto que se adoptará dentro de los quince días siguientes a la publicación de la providencia de admisión a trámite de la solicitud en el Registro Público Concursal.

207. Una vez homologado, y conforme al artículo 649 TRLC, los efectos del Plan de Reestructuración se extenderán inmediatamente a todos los Acreedores Afectados.

### 4.2 Homologación de plan de reestructuración conjunto

208. El artículo 642 del TRLC establece la posibilidad de solicitar la homologación de un plan de reestructuración conjunto para varias compañías:

> "*1. Los deudores que hubieran efectuado una comunicación conjunta podrán solicitar bien la homologación individual o conjunta de los respectivos planes de reestructuración o de alguno de ellos, bien la homologación de un plan conjunto de reestructuración.*
>
> *2. En el caso de solicitud de homologación conjunta de distintos planes de reestructuración o de homologación o de un plan conjunto de reestructuración, los requisitos para la homologación deberán cumplirse en relación con cada uno de los deudores*".

209. En el caso que nos ocupa, la Sociedades Solicitantes, haciendo uso de la facultad expresamente recogida en el artículo 642 TRLC, presentan la Solicitud de Homologación de un Plan de Reestructuración conjunto para todas ellas.

210. Por tanto, la homologación judicial del Plan de Reestructuración conjunto debe concederse al estar la viabilidad de todas las Sociedades Solicitantes estrecha e indisolublemente vinculada entre todas ellas, y por concurrir todos los requisitos necesarios para ello.

– II –

## DE CARÁCTER JURÍDICO-MATERIAL

**PRIMERO. – Sobre el alcance del control judicial del Plan de Reestructuración**

211. El TRLC introdujo en nuestro ordenamiento un nuevo modelo de homologación de planes de reestructuración que se asienta sobre dos pilares fundamentales: (a) el principio mayoritario como mejor indicador de la razonabilidad y necesidad del plan; y (b) la relajación del control judicial respecto del modelo anterior de homologación de acuerdos de refinanciación.

212. La propia Exposición de Motivos de la Ley 16/2022, de 5 de septiembre, de reforma del TRLC así lo expresa, advirtiendo que el juez ha de verificar el cumplimiento de los presupuestos legales del plan "*exclusivamente a partir de la documentación presentada, sin perjuicio de la aplicación de las reglas generales sobre subsanación*".

213. Esta filosofía se traduce, en el plano normativo, en el artículo 647 TRLC, conforme al cual:

> "*Salvo que de la documentación presentada se deduzca manifiestamente que no se cumplen los requisitos exigidos en la sección 1.ª de este capítulo, el juez homologará el plan de reestructuración* […]".

214. Como puede apreciarse, el legislador ha optado por configurar la homologación como regla general, y por reservar su denegación a los supuestos —y solo a los supuestos— en los que el incumplimiento de los requisitos legalmente exigidos resulte manifiesto a partir de la documentación presentada. En consecuencia, el control judicial es mínimo y reglado: el juez no debe valorar el contenido económico del Plan, ni la oportunidad o conveniencia de las medidas pactadas, ni el equilibrio interno de las soluciones acordadas; su labor se limita a verificar, sobre la base de la documentación aportada, que se cumplen los presupuestos formales y materiales del artículo 638 TRLC y, en el caso de los planes no consensuales, los requisitos adicionales del artículo 639 TRLC.

215. La doctrina especializada se ha pronunciado en idéntico sentido. Particularmente expresivo resulta el razonamiento de GARCÍA-MARRERO, J., en el Manual de Derecho concursal (Dir. PULGAR EZQUERRA), Wolters Kluwer, noviembre 2022:

> "*Sin embargo, creemos que en la actualidad no es posible exigir dicho control exhaustivo. Dada la redacción del artículo 647 TRLC (salvo que de la documentación presentada se deduzca manifiestamente que no se cumplen los requisitos exigidos en la sección 1.ª de este capítulo, el juez homologará el Plan de Reestructuración) el control*

90

*de legalidad es mínimo, ya que la regla general es la homologación del plan, salvo que, de la documentación se aprecia de forma manifiesta que no se cumplen los requisitos legales. Se produce, así, en esta fase una relajación del control judicial respecto al sistema anterior, ya que el control se basa en el principio mayoritario (el mejor indicio de la razonabilidad del Plan de Reestructuración, incluida su necesidad e idoneidad para asegurar la viabilidad de la empresa deudora, es que una mayoría cualificada de acreedores está dispuesta a asumir el sacrificio que el plan comporta)".*

216. La jurisprudencia ha asumido de forma generalizada este planteamiento. Así, el Auto del Juzgado de lo Mercantil núm. 5 de Madrid núm. 85/2023, de 10 de abril (caso Single Home)— Auto pionero en la materia y reiteradamente citado por la doctrina mercantil— afirma que:

"*Como se ha mencionado con anterioridad, <u>la labor del juez se limita a verificar salvo que de la documentación se deduzca manifiestamente que no se cumplen los requisitos de la sección 1.ª, y a homologar el PR</u>*" (énfasis añadido).

217. Partiendo de este planteamiento normativo, doctrinal y jurisprudencial, las Sociedades Solicitantes someten a continuación al examen de este Iltre. Tribunal el cumplimiento de los requisitos formales (Fundamento Segundo) y materiales (Fundamento Tercero) exigidos por los artículos 638 y siguientes del TRLC para la homologación del Plan de Reestructuración, en el bien entendido de que dicho cumplimiento resulta inequívoco y, por tanto, el Plan debe ser homologado al amparo del artículo 647 TRLC.

**SEGUNDO. – Sobre el cumplimiento de los requisitos formales para la homologación del Plan de Reestructuración**

218. De conformidad con lo establecido en los artículos 643 y siguientes del TRLC, el cumplimiento de los requisitos formales para la homologación judicial del Plan de Reestructuración exige, en esencia, (i) la presentación de la solicitud por las deudoras, que son las Sociedades Solicitantes, mediante procurador y con asistencia letrada, y (ii) su acompañamiento de la documentación exigida por la norma. Concurren ambos extremos en el presente caso.

**2.1. Firma por procurador y abogado en los términos del artículo 643.1 TRLC**

219. La presente Solicitud de Homologación está firmada por el procurador que suscribe y por los letrados cuyos datos identificativos constan en el pie de firma del presente escrito, en cumplimiento de lo dispuesto en el artículo 643.1 TRLC, que exige que la solicitud de homologación se presente por "abogado y procurador".

**2.2. Acompañamiento de la documentación exigida por el artículo 643.3 TRLC**

220. El artículo 643.3 TRLC dispone, con carácter taxativo, la documentación obligatoria que debe acompañar a la solicitud de homologación judicial:

> "*A la solicitud se acompañará copia íntegra del instrumento público en el que se haya formalizado el plan, incluida la certificación de auditor sobre la suficiencia de las mayorías que se exigen para que se homologue el plan, de acuerdo con lo previsto en esta ley[67], del informe que, en su caso, haya sido emitido por el experto en la reestructuración y, en el caso de que se pretenda que el plan de reestructuración afecte al crédito público de las certificaciones emitidas por la Agencia Estatal de Administración Tributaria y la Tesorería General de la Seguridad Social que acrediten el cumplimiento del requisito previsto en el artículo 616.2.1.º*".

221. A la vista de la norma transcrita, las Sociedades Solicitantes acompañan al presente escrito la totalidad de la documentación legalmente exigida, en los siguientes términos:

   a) Copia íntegra del instrumento público en el que se ha formalizado el Plan de Reestructuración. Se aporta como Documento nº 2 copia íntegra de la escritura otorgada ante el Notario de Madrid D. Francisco Miras Ortiz, en sustitución y para el protocolo de D. Andrés Domínguez Nafría, en fecha 10 de julio de 2026, con número 4.281 de su orden de protocolo, que incorpora la totalidad del Plan de Reestructuración, sus Anexos y la documentación complementaria, todo ello suscrito por las Sociedades Solicitantes y por los Acreedores Participantes.

   b) Plan de Viabilidad. Figura junto con la Escritura del Plan y también como Documento nº 20 de esta Solicitud. En el citado Plan de Viabilidad se acreditan las hipótesis financieras, las proyecciones operativas y las conclusiones técnicas que sustentan la perspectiva razonable de evitar el concurso y de asegurar la viabilidad de las Sociedades Solicitantes en el corto y medio plazo, en los términos exigidos por los artículos 638.1.º y 633.10.ª TRLC.

   c) Certificación de Mayorías emitida por el Experto en la Reestructuración. Se acompaña como Documento nº 30 la Certificación de Mayorías emitida por LEXAUDIT, en su condición de Experto en la Reestructuración designado por este Iltre. Tribunal, a los efectos de lo dispuesto en los artículos 634.1 y 643.3 TRLC, con la finalidad de evidenciar que se han alcanzado las mayorías necesarias para la aprobación del Plan en

---

[67] A efectos aclaratorios, de conformidad con lo dispuesto en el artículo 634.1 del TRLC, la certificación de mayorías es emitida por el experto en la reestructuración en aquellos casos en que se ha procedido a su nombramiento.

cada clase y en cada una de las Sociedades Solicitantes. Asimismo, en el propio Documento nº 30 consta el certificado que acredita que los créditos afectados por el Plan representan, al menos, el 51% del pasivo total de cada una de ellas[68] a los efectos del artículo 667.1 TRLC. Dichos certificados constan igualmente unidos a la Escritura de elevación a público del Plan.

d) Informe de Valoración como empresa en funcionamiento. Se acompaña como Documento nº 31 el Informe de Valoración como empresa en funcionamiento emitido por el Experto en la Reestructuración respecto del Grupo, que, además, se adjunta a la escritura del Plan. Este informe acredita que las clases que han votado favorablemente el Plan en cada una de las Sociedades Solicitantes se encuentran *in the money* en los términos del artículo 639.2 TRLC.

e) Documentación complementaria. Adicionalmente, se acompañan al presente escrito las comunicaciones efectuadas a los Acreedores Afectados conforme al artículo 627 TRLC (Conjunto Documental nº 29), y otros documentos que se han considerado útiles para el Iltre. Tribunal.

222. A la vista de cuanto antecede, debe tenerse por cumplido la totalidad de los requisitos formales exigidos para la homologación judicial del Plan de Reestructuración.


**TERCERO. – Sobre el cumplimiento de los requisitos materiales para la homologación del Plan de Reestructuración**

223. En relación con los requisitos para la homologación de planes de reestructuración, como se ha expuesto en el relato fáctico, el artículo 638 TRLC dispone:

"*El plan de reestructuración, para ser homologado, deberá reunir los siguientes requisitos:*

*1.º Que el deudor se encuentre en probabilidad de insolvencia, insolvencia inminente o actual y el plan ofrezca una perspectiva razonable de evitar el concurso y asegurar la viabilidad de la empresa en el corto y medio plazo.*

*2.º Que cumpla con los requisitos de contenido y de forma exigidos en este título.*

---

[68] Salvo en el caso de Antolín South Africa y Antolín Logistik Deutschland.

*3.° Que haya sido aprobado por todas las clases de créditos de conformidad con las previsiones de este título, por el deudor o, en su caso, por los socios.*

*4.° Que los créditos dentro de la misma clase sean tratados de forma paritaria.*

*5.° Que haya sido comunicado a todos los acreedores afectados conforme a lo establecido en esta ley.*"

224. La presente Solicitud de Homologación del Plan de Reestructuración, junto con los documentos que a ella se acompañan, así como los documentos anexos al Plan de Reestructuración, acreditan que en el presente supuesto se cumplen los requisitos para que el Plan de Reestructuración sea homologado y despliegue los efectos que se interesan en el suplico del presente escrito.

225. A continuación, se justifica el cumplimiento de cada uno de los requisitos expuestos:

## 3.1. Cumplimiento del presupuesto objetivo: probabilidad de insolvencia

226. El artículo 638.1° TRLC exige, como presupuesto objetivo para la homologación de un plan de reestructuración, que el deudor se encuentre en probabilidad de insolvencia, insolvencia inminente o insolvencia actual, escenarios definidos en los artículos 2.3 y 584 TRLC y entre los que existe una clara gradación de proximidad temporal al concurso. Tal y como se ha expuesto en el Hecho Tercero (Sección 3.1) del presente escrito —y se acredita objetivamente a través del Plan de Viabilidad del Grupo, validado por Vest Partners, aportado como Documento n° 20—, las Sociedades Solicitantes se encuentran en el primero de tales escenarios.

227. La probabilidad de insolvencia constituye, conforme al artículo 584.2 TRLC, el estadio más temprano y, por ello, el más favorable para la efectividad de los marcos preventivos de reestructuración. Existe cuando "*sea objetivamente previsible que, de no alcanzarse un plan de reestructuración, el deudor no podrá cumplir regularmente las obligaciones que venzan en los próximos dos años*". Tal y como se ha expuesto, las Sociedades Solicitantes se encuentran inequívocamente en esta fase de insolvencia incipiente.

228. Esta conclusión resulta, además, confirmada por las propias Cuentas Anuales consolidadas del Grupo Antolin del ejercicio 2025[69]. En concreto, el informe de auditoría, incluye un epígrafe de "Incertidumbre material relacionada con la Empresa en funcionamiento" en el que se indica que: *(i)* durante 2026 el Grupo obtuvo determinados *waivers* que suspenden temporalmente el cumplimiento de ratios financieros aplicables a dicho ejercicio; *(ii)* conforme a las proyecciones

---

[69] Acompañadas como Documento n° 8.

financieras disponibles, existe riesgo de incumplimiento de dichos ratios una vez finalizado el periodo cubierto por tales *waivers*; y *(iii)* de producirse dicho incumplimiento en 2027, podría activarse el vencimiento anticipado de una parte significativa de la financiación del Grupo. Las propias Cuentas Anuales reconocen, por tanto, la existencia de un riesgo objetivo de dificultades de cumplimiento financiero en el medio plazo, lo que resulta plenamente coherente con el escenario de probabilidad de insolvencia previsto en el artículo 584.2 TRLC.

229. Del mismo modo, tanto el Plan de Viabilidad, como el Informe sobre la Razonabilidad del Plan de Viabilidad, emitido por el Experto (Documento nº 21), corroboran la concurrencia de las dificultades que determinan la existencia de una situación de probabilidad de insolvencia del Grupo Antolín, que es posible superar con las medidas que recoge el Plan, que permiten asegurar su viabilidad –tal como se ha expuesto en detalle en el Hecho Tercero.

230. Lejos de constituir un presupuesto excepcional o restrictivo, la probabilidad de insolvencia representa el escenario predilecto e idóneo en torno al cual se articulan los marcos de reestructuración preventiva. La Directiva comunitaria, de la que el actual TRLC trae causa por mor de la Ley 16/2022, de 5 de septiembre, persigue como objetivo principal y declarado garantizar que "*las empresas y empresarios viables que se hallen en dificultades financieras tengan acceso a marcos nacionales efectivos de reestructuración preventiva que les permitan continuar su actividad* [70].

231. Con dicho propósito, el legislador europeo proclama que los marcos de reestructuración preventiva "*deben permitir, ante todo, la reestructuración efectiva de los deudores en un* momento *temprano y evitar la insolvencia, limitando así la liquidación innecesaria de empresas viables*"[71]. En la misma línea, el Considerando 16 de la Directiva insiste en que la eliminación de los obstáculos a la reestructuración preventiva temprana de deudores viables "*contribuye a minimizar la pérdida de puestos de trabajo y las pérdidas de valor para los acreedores en la cadena de suministro, permite preservar los conocimientos técnicos y las capacidades y, por lo tanto, beneficia a la economía en general*". Y, de manera particularmente expresiva, el Considerando 22 afirma que "*cuanto antes pueda detectar un deudor sus dificultades financieras y tomar las medidas oportunas, mayor será la probabilidad de evitar una insolvencia inminente*" (*énfasis añadido*). El planteamiento del legislador es inequívoco: actuar pronto, mientras la empresa todavía es viable, es siempre preferible —para el deudor, los acreedores, los trabajadores y la economía en su conjunto— a esperar a que las dificultades se materialicen o agraven.

---

[70] Considerando 1 de la Directiva.
[71] Considerando 2 de la Directiva.

232. Sobre estas premisas, el legislador español ha optado por un planteamiento que va, incluso, más allá del estándar mínimo exigido por la Directiva. Mientras que el artículo 4.1 de la Directiva contempla, como umbral mínimo de acceso a los marcos de reestructuración preventiva, que los deudores "*se hallen en un estado de insolvencia inminente*", el TRLC introduce el concepto, más amplio y anticipativo, de "*probabilidad de insolvencia*", con un horizonte temporal de hasta dos años (artículo 584.2 TRLC). Esta opción legislativa nacional responde a la convicción, plenamente alineada con la filosofía de la Directiva, de que los mejores resultados de reestructuración se obtienen cuando el deudor actúa antes de que las dificultades se materialicen, evitando con ello la destrucción de valor inherente a las situaciones de insolvencia inminente o actual.

233. La jurisprudencia de nuestros tribunales ha tenido ocasión de pronunciarse, recientemente, sobre la probabilidad de insolvencia como presupuesto objetivo para la homologación de un plan de reestructuración. Nos referimos, en concreto, al Auto nº 115/2026, de 11 de marzo de 2026, dictado por el Juzgado de lo Mercantil nº 9 de Barcelona en el procedimiento de homologación del plan de reestructuración de Soluciones Técnicas del Metal, S.L. En dicho Auto, el Juzgado parte de que la deudora había solicitado el nombramiento de experto en reestructuración precisamente "*por encontrarse en probabilidad de insolvencia*", al considerar imprescindible dicha designación para "*la negociación de un nuevo acuerdo que permita restablecer la viabilidad de la empresa*". En este contexto, el Juzgado acuerda la homologación del plan en un escenario de probabilidad de insolvencia, centrando su análisis en la viabilidad del plan y en su aptitud para evitar la insolvencia en el corto y medio plazo.

234. En nuestro caso, las Sociedades Solicitantes encarnan el supuesto paradigmático que el legislador europeo y el legislador nacional han querido definir como ideal para acometer un proceso de reestructuración con plenas garantías de éxito: empresas viables —líderes mundiales en el desarrollo, diseño y fabricación de componentes de interior para la industria del automóvil—, con un negocio operativo sólido y una posición competitiva reforzada, que, conscientes de unas dificultades financieras objetivamente previsibles aunque todavía no actuales, optan por acudir voluntariamente y de forma proactiva a los instrumentos preventivos que el ordenamiento pone a su disposición, evitando con ello la liquidación innecesaria, preservando el empleo de cerca de 20.000 trabajadores en todo el mundo y maximizando el valor para todos los grupos de interés. Esta actuación diligente y anticipativa no solo cumple con el presupuesto objetivo del artículo 638.1º TRLC, sino que constituye la materialización misma de la finalidad protectora preferida que inspiran la Directiva y el TRLC.

235. En fin, y por supuesto, el Plan de Reestructuración cuya homologación se solicita ofrece una perspectiva razonable de evitar el concurso de acreedores y asegurar la viabilidad de las Sociedades Solicitantes en el corto y medio plazo, tal y como acredita el Plan de Viabilidad

96

elaborado por el Grupo (Documento nº 20) y validado por LEXAUDIT, en su Informe sobre la Razonabilidad del Plan de Viabilidad (Documento nº 21). Se cumple, por tanto, no solo el presupuesto objetivo, sino también la finalidad esencial que el artículo 638.1º TRLC anuda al mismo.

236. Procede, en consecuencia, tener por cumplido el presupuesto objetivo de probabilidad de insolvencia exigido para la homologación judicial del Plan de Reestructuración.

**3.2 Cumplimiento de los requisitos de contenido**

237. El Plan de Reestructuración cumple con los requisitos de contenido y forma que prevé el artículo 633 TRLC:

(i)   Se identifica debidamente a las deudoras (Comparecencias del Plan de Reestructuración y Anexo VI).

(ii)  Se identifica debidamente al Experto en la Reestructuración (Expositivo XIII del Plan de Reestructuración y Anexo VI).

(iii) La descripción de la situación económica de las Sociedades Solicitantes, de sus trabajadores y de la descripción de las causas y el alcance de las dificultades financieras que atraviesan se hacen constar en el Plan de Reestructuración (Expositivos VII a XI), así como en el Plan de Viabilidad (Anexo V del Plan).

(iv)  El activo y el pasivo de las Sociedades Solicitantes en el momento de formalizar el Plan de Reestructuración consta en el Apéndice II del Anexo VI del Plan de Reestructuración, que se refiere al Plan de Viabilidad.

(v)   Los Acreedores Afectados por el Plan de Reestructuración constan identificados individualmente, con expresión del importe de sus créditos que quedarán afectados por el Plan de Reestructuración y la clase a la que pertenecen en la Cláusula 3 y Anexo II del Plan.

(vi)  No existen contratos con obligaciones recíprocas pendientes de cumplimiento que vayan a quedar resueltos en virtud del Plan de Reestructuración.

(vii) El Plan de Reestructuración no va a afectar a los derechos de los socios, por lo que, no es necesario precisar el valor nominal de las acciones o participaciones sociales.

97

(viii) Se expone debidamente qué acreedores y socios descritos por clases no van a quedar afectados por el Plan de Reestructuración, así como las razones de su no afectación (Anexo VI del Plan de Reestructuración).

(ix) Se exponen de forma clara las medidas de la reestructuración financiera de la deuda que se proponen (tanto en el Plan de Reestructuración –Cláusulas 5 y 6, entre otras– como en el Plan de Viabilidad).

No se incluye referencia a medidas de reestructuración operativa, ni a consecuencias globales para el empleo, al no preverse ninguna de ellas en virtud del Plan.

(x) Se identifican debidamente las condiciones necesarias para el éxito del Plan de Reestructuración (*cfr.,* Cláusulas 11 y 12, Anexo VI del Plan de Reestructuración y Plan de Viabilidad) y se detallan las razones por las que el Plan de Reestructuración ofrece una perspectiva razonable de garantizar la viabilidad de la empresa en el corto, medio e, incluso, largo plazo, evitando el concurso de acreedores de las Sociedades Solicitantes.

(xi) El Plan de Reestructuración no prevé la afectación de los contratos laborales (Anexo VI del Plan de Reestructuración), por lo que, la legislación laboral no requiere de medidas de información y consulta a los trabajadores.

(xii) El Plan de Reestructuración no afecta a los créditos públicos, tal y como se indica en la Cláusula 3.1 y en el Anexo VI del Plan de Reestructuración.

238. Además, tal como se desprende de la Certificación de Mayorías, el Plan ha sido aprobado por la vía del artículo 639.2 TRLC.

239. De conformidad con lo expuesto, se cumplen todos los requisitos establecidos en el TRLC para la homologación del Plan de Reestructuración.

**CUARTO. – Sobre los efectos de la homologación y su eficacia inmediata**

**4.1 Extensión de efectos a acreedores no adheridos o que hubieran votado en contra, protección de acciones rescisorias, protección de nueva financiación y de la eventual financiación interina**

240. En relación con la necesidad de homologación, dispone el artículo 635 del TRLC que:

> *"La homologación judicial del Plan de Reestructuración será necesaria en cualquiera de los siguientes casos:*
>
> *1.º <u>Cuando se pretenda extender sus efectos a acreedores o clases de acreedores que no hubieran votado a favor del plan</u> o a los socios del deudor persona jurídica;*
>
> *2.º Cuando se pretenda la resolución de contratos en interés de la reestructuración;*
>
> *3.º Cuando se pretenda <u>proteger la financiación interina y la nueva financiación</u> que prevea el plan, así como <u>los actos, operaciones o negocios realizados en el contexto de este frente a acciones rescisorias</u> en los términos previstos en este título, y reconocer a esa financiación las preferencias de cobro previstas en el libro primero"*. (Énfasis añadido)

241. En el supuesto que nos ocupa, la Solicitud de Homologación se justifica por la concurrencia simultánea del primer y tercer presupuestos del artículo 635 TRLC: (i) la necesidad de extender los efectos del Plan a los Acreedores Afectados que no se hayan adherido al mismo durante el Periodo de Adhesión o que hubieran votado en contra; y (ii) la necesidad de proteger frente a acciones rescisorias el propio Plan[72], el Contrato de Financiación de Circulante —que tendrá la consideración de nueva financiación a los efectos del artículo 666 TRLC—, las Prórrogas del Factoring Sindicado Existente –que, de producirse, tendrán la consideración de financiación interina o nueva financiación a los efectos de los artículos 665 y 666 del TRLC– las Nuevas Líneas de Avales —que también tendrán la consideración de nueva financiación a los efectos del artículo 666 TRLC— y los demás actos, operaciones y negocios jurídicos previstos —directa o indirectamente— en el Plan o que se lleven a cabo en su ejecución, en los términos del artículo 667 TRLC.

### A) Extensión de efectos a Acreedores No Participantes

242. El artículo 649 TRLC establece que: *"una vez homologado, los efectos del plan de reestructuración se extienden inmediatamente a todos los créditos afectados, al propio deudor y, si fuera sociedad, a sus socios, aunque el auto no sea firme"*.

243. La eficacia inmediata constituye, por tanto, un efecto *ope legis* del Auto de homologación que opera con independencia de la firmeza de la resolución y, en consecuencia, sin que la eventual

---

[72] Se acredita mediante la Certificación relativa a la protección frente a acciones rescisorias, Documento nº 30, que confirma expresamente que los Créditos Afectados por el Plan representan, al menos, el 51% del pasivo total de cada una de las Sociedades Solicitantes a la fecha de presentación del presente escrito –salvo en el caso de Antolín South Africa y Antolín Logistik Deutschland.

interposición de impugnaciones por los Acreedores Afectados disidentes —al amparo de los artículos 653 y siguientes del TRLC— pueda enervarla. Este principio responde a una opción legislativa consciente, dirigida a evitar que el proceso de reestructuración pueda frustrarse o dilatarse indefinidamente como consecuencia de actuaciones obstructivas y, en última instancia, a salvaguardar la viabilidad económica del deudor —que es, en definitiva, el bien jurídico tutelado por el régimen homologatorio—. En idéntico sentido se pronuncia el Considerando 65 de la Directiva, conforme al cual los recursos contra la decisión de homologación "*no deben tener, por norma, efectos suspensivos sobre la aplicación de los planes de reestructuración*".

244. Por tanto, dictado el Auto de homologación, los efectos del Plan de Reestructuración se desplegarán, automática e inmediatamente, frente a la totalidad de los Acreedores Afectados, frente a las propias Sociedades Solicitantes, y eventualmente frente a aquellas otras sociedades del grupo respecto de las que se haya interesado protección en su condición de garantes, sin perjuicio de las eventuales impugnaciones que pudieran interponerse y que, conforme a la regla expuesta, no tendrán efectos suspensivos.

## B) Protección de actos, operaciones y negocios de ejecución del Plan frente a acciones rescisorias

245. Por su parte, el artículo 667 TRLC, en su apartado primero, dispone lo siguiente:

*1. En caso de concurso posterior, <u>si los créditos afectados por un plan</u> de reestructuración anterior que hubiera sido homologado <u>representasen al menos el cincuenta y uno por ciento del pasivo total</u>, no serán rescindibles, salvo prueba de que se realizaron en fraude de acreedores:*

*1.° Los actos u operaciones razonables y necesarios inmediatamente para el éxito de la negociación con los acreedores, siempre que se hubieran identificado expresamente como tales en el propio plan.*

*2.° La financiación interina y la nueva financiación, incluida la concedida por personas especialmente relacionadas, de conformidad con lo previsto en el artículo siguiente.*

*3.° Los actos, operaciones o negocios que sean razonables e inmediatamente necesarios para la ejecución del plan (…)*". (Énfasis añadido)

246. Por lo tanto, la concesión de la protección frente a acciones rescisorias de los planes de reestructuración y los actos, operaciones y negocios jurídicos previstos para su ejecución, se

100

condiciona a la concurrencia de una determinada proporción de créditos afectados respecto del pasivo total, en concreto, el 51%.

247. En el presente caso, como se ha expuesto en sede de fundamentación fáctica, este requisito se cumple respecto de cada una de las Sociedades Solicitantes (a excepción de Antolín South Africa y Antolín Logistik Deutschland), y resulta acreditado mediante el certificado que se ha acompañado como Documento 30.

248. En virtud de lo anterior, el Auto de homologación deberá conceder la protección del Plan de Reestructuración y de la totalidad de los actos, operaciones y negocios jurídicos necesarios para el éxito de la Reestructuración frente a acciones rescisorias, lo que incluye a título ejemplificativo, la protección del Contrato de Financiación de Circulante y de las Nuevas Líneas de Avales –que deben considerarse como nueva financiación, conforme a lo expuesto en el apartado siguiente–, y de las Prórrogas del Factoring Sindicado Existente –que deben considerarse como financiación interina o nueva financiación, según corresponda, conforme a lo expuesto en el apartado siguiente–, así como el otorgamiento de todas las garantías personales y reales nuevas en virtud del Plan.

## C) Protección de la nueva financiación y la eventual financiación interina frente a acciones rescisorias y privilegios concursales

249. El régimen del TRLC parte de una premisa clara: tanto la financiación interina como la nueva financiación concedidas o previstas en el marco de un plan de reestructuración son merecedoras de protección cuando cumplen sus respectivos presupuestos legales. Así resulta, en primer lugar, del artículo 635.3.º TRLC, que exige la homologación judicial cuando se pretenda proteger la financiación interina y la nueva financiación que prevea el plan frente a acciones rescisorias y reconocerles las preferencias de cobro previstas en el Libro Primero; y, en segundo lugar, del artículo 667.1.2.º TRLC, que declara no rescindibles en un concurso posterior la financiación interina y la nueva financiación cuando los créditos afectados por el plan homologado representen al menos el cincuenta y uno por ciento del pasivo total.

250. En particular, el artículo 665 TRLC define la financiación interina en los siguientes términos:

> *"Se considera financiación interina la concedida por quien no fuera acreedor o por acreedor preexistente si en el momento de la concesión fuera razonable y necesaria inmediatamente, bien para asegurar la continuidad total o parcial de la actividad empresarial o profesional del deudor durante las negociaciones con los acreedores hasta la homologación de ese plan, bien para preservar o mejorar el valor que tuvieran a la fecha de inicio de esas negociaciones el conjunto de la empresa o una o varias unidades productivas".*

101

251. Por su parte, el artículo 666 TRLC define la nueva financiación como sigue:

> *"A los efectos de esta ley se considerará nueva financiación la concedida por quien no fuera acreedor o por acreedor preexistente que, estando prevista en el plan de reestructuración, resulte necesaria para el cumplimiento de ese plan".*

252. La jurisprudencia que se ha pronunciado sobre esta materia confirma la finalidad tuitiva de ambos preceptos. En este sentido, el Auto del Juzgado de lo Mercantil núm. 5 de Barcelona de 23 de enero de 2025 [JUR/2025/16552] (procedimiento de homologación de Inmobiliaria San José, S.A.) señaló que:

> *"13. El art. 280 TRLC señala que "son créditos con privilegio general: [...] 6.º El cincuenta por ciento del importe de los créditos derivados de la financiación interina o de la nueva financiación concedidos en el marco de un plan de reestructuración homologado cuando los créditos afectados por ese plan representen al menos el cincuenta y uno por ciento del pasivo total".*
>
> *14. Es decir, el art. 280 TRLC otorga la clasificación de crédito con privilegio general a los créditos derivados de la financiación interina o de la nueva financiación concedidos en el marco de un plan de reestructuración homologado. <u>Por lo tanto, la clasificación con privilegio general de la nueva financiación es consecuencia - no causa - del auto que homologa el plan de reestructuración. Es uno de los efectos jurídicos derivados del auto homologador. Lo cual tiene su lógica tanto económico-financiera como jurídica, pues fomenta la inyección de nueva financiación o financiación interina que puede ser necesaria para la sustentar la viabilidad del plan empresarial, y al que, como contrapartida, se le da la garantía de su clasificación como crédito privilegiado, pero una vez el plan de reestructuración quede autorizado por el juez</u>."* (Énfasis añadido)

253. Pronunciamientos judiciales como este ponen de manifiesto la finalidad de política legislativa que subyace al régimen de protección de la nueva financiación: incentivar la aportación de nueva financiación ("*fresh money*" o "*new money*", en la práctica de las reestructuraciones) que resulte necesaria para sustentar la viabilidad del plan de reestructuración, ofreciendo como contrapartida la protección frente a acciones rescisorias y las preferencias de cobro que la ley reconoce.

254. En la misma línea, la Sentencia de la Audiencia Provincial de Pontevedra de 10 de abril de 2023 [JUR/2023/171828] (procedimiento de impugnación del plan de reestructuración de Xeldist Congelados, S.L.U.) confirmó la homologación de un plan que incluía expresamente la

102

protección de la nueva financiación frente a acciones rescisorias y el reconocimiento de las preferencias de cobro asociadas.

255. De estos pronunciamientos se desprende que la protección legal y los privilegios concursales de estas financiaciones no constituyen un efecto accesorio o excepcional, sino una pieza esencial del sistema de reestructuración preventiva, orientada a facilitar la continuidad de empresas viables mediante la aportación o mantenimiento de financiación necesaria.

256. Trasladando lo anterior al presente caso, procede analizar separadamente las dos categorías de financiación cuya protección se interesa. De un lado, deben calificarse como nueva financiación el Contrato de Financiación de Circulante, las Nuevas Líneas de Avales y, en su caso, las Prórrogas del Factoring Sindicado Existente que sean necesarias para la implementación del Plan ya homologado. De otro lado, las Prórrogas del Factoring Sindicado Existente tendrán la consideración de financiación interina cuando resulten necesarias antes de la obtención de la homologación, al servir de puente hasta la entrada en vigor con plena disponibilidad del Contrato de Financiación de Circulante.

257. En cuanto a la nueva financiación, concurre, en primer lugar, el requisito de que esté prevista en el Plan de Reestructuración cuya homologación se solicita. El Plan contempla la formalización del Contrato de Financiación de Circulante como una línea multiproducto que incorpora el *factoring* sin recurso como instrumento principal de anticipo de créditos comerciales y una línea de crédito *revolving*, por un importe máximo de 220.000.000 euros, con un sublímite de 40.000.000 euros para el tramo *revolving*. Asimismo, el Plan prevé las Nuevas Líneas de Avales y las eventuales Prórrogas del Factoring Sindicado Existente, en los términos descritos en el Hecho Undécimo de esta Solicitud.

258. En segundo lugar, dicha financiación es razonable e inmediatamente necesaria para la ejecución del Plan. Como se expone en el Hecho Undécimo, la disponibilidad de instrumentos de circulante y de líneas de avales adecuados, estables y flexibles es necesaria para la viabilidad y estabilidad del funcionamiento del Grupo y lograr la ejecución del Plan.

259. En tercer lugar, la nueva financiación es necesaria para la viabilidad de las Sociedades Solicitantes. El Plan de Viabilidad identifica la obtención de un instrumento bancario comprometido de financiación de capital circulante a largo plazo como una premisa de la Reestructuración. Por último, el cumplimiento del umbral del cincuenta y uno por ciento del pasivo total queda acreditado mediante el certificado de protección frente a acciones rescisorias, acompañado como Documento nº 30.

103

260. En consecuencia, concurriendo los requisitos del artículo 666 TRLC, procede que este Iltre. Tribunal declare que el Contrato de Financiación de Circulante, las Nuevas Líneas de Avales y, en su caso, las Prórrogas del Factoring Sindicado Existente necesarias para la implantación del Plan ya homologado tienen la consideración de nueva financiación, con todos los efectos inherentes a dicha calificación, incluida la protección frente a acciones rescisorias y las preferencias de cobro previstas en los artículos 242.1.17.º y 280.6.º TRLC.

261. Por lo que respecta a la financiación interina, su posible calificación se circunscribe a las Prórrogas del Factoring Sindicado Existente que, en su caso, deban producirse antes de la homologación del Plan.

262. También aquí concurren los requisitos del artículo 665 TRLC. En el momento de su concesión, dichas Prórrogas del Factoring Sindicado Existente serían razonables e inmediatamente necesarias para asegurar la continuidad total o parcial de la actividad empresarial durante las negociaciones y hasta la homologación del Plan, evitando que la falta de disponibilidad de financiación de circulante genere tensiones de tesorería que comprometan la actividad ordinaria de las Sociedades Solicitantes. Asimismo, las Prórrogas del Factoring Sindicado Existente permitirían preservar el valor del Grupo durante el periodo anterior a la homologación, al garantizar la continuidad de sus necesidades de circulante durante el procedimiento de homologación. Esta función de puente financiero explica que el propio Plan prevea que dichas prórrogas tendrán la consideración de financiación interina o de nueva financiación, según si son necesarias antes de la homologación o antes de la implementación del Plan, de conformidad con los artículos 665 y 666 TRLC.

263. Por tanto, en la medida en que las Prórrogas del Factoring Sindicado Existente resulten necesarias antes de la obtención de la homologación, procede que este Iltre. Tribunal declare que tienen la consideración de financiación interina a los efectos del artículo 665 TRLC, con la protección frente a acciones rescisorias y las preferencias de cobro legalmente previstas para este tipo de financiación.

264. En definitiva, la financiación interina y la nueva financiación contempladas en el Plan satisfacen los presupuestos del TRLC y responden a la finalidad que justifica su protección: asegurar la continuidad de la actividad, preservar el valor del Grupo y permitir la correcta ejecución de una reestructuración viable. En consecuencia, procede reconocerles la protección frente a acciones rescisorias y las preferencias de cobro previstas en los artículos 242.1.17.º, 280.6.º y 667 TRLC, en los términos interesados en el suplico del presente escrito.

**4.2 Extensión de efectos a las garantías de terceros del grupo (artículo 652.2 TRLC)**

265. El artículo 652 TRLC, rubricado "Garantías de terceros", establece como regla general, en su apartado primero, que el plan de reestructuración no afectará a los derechos de los acreedores frente a los terceros obligados solidarios, fiadores o avalistas del deudor ni frente a cualquier otra persona que hubiera prestado garantía personal o real a favor de este. Este principio de intangibilidad de las garantías otorgadas por terceros responde a la lógica de que el plan de reestructuración es un instrumento que vincula al deudor o deudores sometidos al plan y a sus acreedores afectados (apoyen el plan o queden vinculados a este como consecuencia de la homologación), pero no debe perjudicar, como regla general, las garantías otorgadas por terceros frente a los acreedores disidentes.

266. No obstante, enunciada esa regla general, el apartado segundo del propio artículo 652 TRLC introduce una excepción cualificada cuando concurren tres requisitos acumulativos:

   (i)     Que la garantía haya sido prestada por una sociedad del mismo grupo que la sociedad deudora sometida al plan de reestructuración;

   (ii)    Que la sociedad garante no esté sometida al plan de reestructuración; y

   (iii)   Que la ejecución de la garantía pueda causar la insolvencia de la garante y de la propia deudora.

267. Cuando concurren estos tres requisitos, los efectos del plan pueden extenderse a la garantía en las condiciones previstas en el propio plan, de modo que la garantía quede sujeta a las mismas medidas de reestructuración que la deuda principal (esperas, quitas, conversiones u otras modificaciones) y en todo caso a la imposibilidad de ejecución de la misma mientras se esté cumpliendo el propio plan de reestructuración.

268. Con esta excepción, el legislador pretende proteger la integridad del grupo empresarial como unidad económica cuando la ejecución separada de una garantía intragrupo comprometería la eficacia del plan. Permitir la ejecución aislada de una garantía intragrupo cuando dicha ejecución arrastraría a la insolvencia tanto a la garante como a la deudora frustraría el propósito mismo del plan de reestructuración.

269. En el supuesto que nos ocupa, la extensión de los efectos del Plan de Reestructuración a las Prendas sobre Antolín Irausa otorgadas por HoldCo se fundamenta en la concurrencia acreditada de los tres presupuestos del artículo 652.2 TRLC:

(i) En primer lugar, HoldCo es la sociedad matriz y socio único de Antolín Irausa, por lo que ambas pertenecen al mismo grupo de sociedades en el sentido del artículo 42 del Código de Comercio.

(ii) En segundo lugar, HoldCo no es Sociedad Solicitante bajo el Plan, su pasivo no se reestructura en virtud del Plan y en consecuencia no se encuentra sometida a este ni protegida por la homologación de este como peticionario de la homologación, cumpliendo así el requisito subjetivo.

(iii) En tercer lugar, conforme se ha expuesto en detalle en el Hecho Decimotercero (Sección 13.4), la ejecución de las Prendas sobre Antolín Irausa causaría la insolvencia tanto de HoldCo —al perder su único activo (las acciones de Antolín Irausa, que representan el 99,99% de su patrimonio) y quedar sin capacidad para atender sus obligaciones, incluidas las derivadas de la garantía personal que asumirá en virtud del Plan y la deuda fiscal sobrevenida por ruptura del grupo fiscal— como del resto de Sociedades Solicitantes —por el vencimiento anticipado de toda la deuda financiera reestructurada, la resolución masiva de contratos con clientes y la existencia de pasivos comerciales y la aparición de posibles pasivos fiscales derivados de la ruptura del grupo de consolidación fiscal—.

270. A estos efectos, debe destacarse que las Prendas sobre Antolín Irausa no recaen sobre un activo periférico o meramente financiero, sino sobre la participación de control en la matriz operativa del Grupo. Su eventual ejecución supondría, por tanto, una alteración inmediata del control societario sobre la sociedad que centraliza la dirección operativa y financiera del Grupo y sobre la que pivota la ejecución del Plan. Ello comprometería no solo la posición patrimonial de HoldCo como garante, sino también la estabilidad de Antolín Irausa y del conjunto de las Sociedades Solicitantes, haciendo inviable la implementación ordenada de la Reestructuración.

271. Por todo lo expuesto, la extensión de los efectos del Plan de Reestructuración a las Prendas sobre Antolín Irausa otorgadas por HoldCo resulta no solo procedente, sino necesaria para garantizar la eficacia del Plan y evitar que la ejecución aislada de la garantía por acreedores no adheridos al Plan frustre la finalidad misma de la Reestructuración.

**QUINTO. – Sobre la suspensión de las ejecuciones al amparo del artículo 644 TRLC**

272. De conformidad con lo establecido en el artículo 644 TRLC, la admisión a trámite de la solicitud de homologación judicial conlleva, como efecto automático, la prohibición de iniciar ejecuciones judiciales o extrajudiciales sobre los bienes del deudor, así como la paralización de

106

las ejecuciones ya iniciadas, hasta que se resuelva con carácter firme sobre la homologación. El referido precepto establece, en su literalidad:

> "*Una vez recibida la solicitud de homologación, el juez, de considerarse competente, dictará providencia admitiéndola a trámite. En la providencia expresará los motivos en los que se base su competencia, en particular si se basa en la localización del centro de los intereses principales o de un establecimiento del deudor en su territorio, y decretará la prohibición de iniciar ejecuciones judiciales o extrajudiciales sobre los bienes del deudor y la paralización de las ejecuciones ya iniciadas hasta que se resuelva sobre la homologación.*" (énfasis añadido)

273. Este planteamiento es plenamente coherente con el espíritu de la Directiva (Considerandos 32 a 41 y artículos 6 y 7), que establece como elemento central de los marcos de reestructuración preventiva la posibilidad de obtener una suspensión de ejecuciones singulares con el fin de facilitar las negociaciones y, en su caso, la implementación del plan. El TRLC tiene la misma finalidad última: preservar la integridad del patrimonio del deudor durante el tiempo estrictamente necesario para que el procedimiento homologatorio pueda desplegar sus efectos.

274. A la fecha de presentación del presente escrito, las Sociedades Solicitantes no tienen conocimiento de que se esté siguiendo procedimiento ejecutivo alguno —ya sea judicial o extrajudicial— sobre los bienes de cualquiera de ellas. Las Sociedades Solicitantes vienen, en efecto, atendiendo puntualmente sus obligaciones de pago, según se ha expuesto en los Hechos del presente escrito. Sin perjuicio de ello, y por aplicación del propio artículo 644 TRLC, en caso de que durante la tramitación del expediente apareciera o se pusiera de manifiesto cualquier procedimiento ejecutivo, el mismo deberá quedar suspendido o, en su caso, no podrá ser iniciado, por mandato legal y por virtud de la providencia de admisión a trámite que oportunamente dicte este Iltre. Tribunal.

275. En consecuencia, las Sociedades Solicitantes interesan expresamente —y así se reiterará en el suplico del presente escrito— que, en la providencia de admisión a trámite de la presente Solicitud de Homologación, este Iltre. Tribunal acuerde, al amparo del artículo 644 TRLC, la prohibición de iniciar ejecuciones judiciales o extrajudiciales sobre los bienes de las Sociedades Solicitantes, así como la paralización de las eventualmente iniciadas, hasta que se resuelva con carácter firme sobre la homologación del Plan de Reestructuración.

276. Del mismo modo, como consecuencia de la extensión de los efectos del Plan de Reestructuración a las Prendas sobre Antolín Irausa *ex*. artículo 652.2 TRLC, la prohibición de iniciar ejecuciones, así como la paralización de las que eventualmente sean iniciadas, habrá de extenderse también a la citada garantía, todo ello al amparo del propio artículo 644 TRLC.

107

277. Esta posibilidad se contempla expresamente en el Considerando 32 de la Directiva, que, al referirse a la suspensión temporal de ejecuciones, establece expresamente lo siguiente: "*Cuando así lo disponga la normativa nacional, también debe ser posible que la suspensión se aplique a favor de terceros prestadores de garantías, entre ellos los avalistas y los titulares de garantías*". Lo que resulta ineludible ya que, de lo contrario, se vaciaría de contenido la previsión tuitiva del artículo 652.2 TRLC, pues se podría ejecutar una garantía que luego quedaría afectada por el Plan.

278. Asimismo, la extensión de los efectos del Plan a las Prendas sobre Antolín Irausa debe conllevar la imposibilidad de vencer anticipadamente la deuda financiera garantizada por dichas Prendas, o, en su caso, la imposibilidad de que la deuda financiera garantizada se entienda vencida anticipadamente como consecuencia del inicio del presente procedimiento de homologación, pues tales actuaciones, de producirse, no serían más que actos previos y preparatorios de la ejecución de las Prendas sobre Antolín Irausa.

279. Por lo tanto, para que la extensión de los efectos del Plan de Reestructuración a las Prendas sobre Antolín Irausa sea completa, será necesario evitar el vencimiento anticipado de la deuda garantizada por las mismas, lo que no es sino consecuencia de una interpretación integradora de lo dispuesto en los artículos 644 TRLC y 652.2 TRLC, en relación con lo que disponen los artículos 595.2 y 618.1 TRLC.

280. En este sentido, toda vez que la prohibición de iniciar ejecuciones y la paralización de las que puedan iniciarse no es sino un efecto del Plan de Reestructuración, que se produce desde la admisión a trámite de la Solicitud de Homologación, forma parte de los efectos cuya extensión se solicita, con apoyo en el artículo 652.2 TRLC, respecto de las Prendas sobre Antolín Irausa.

281. En definitiva, resulta indudable que la prohibición de iniciar ejecuciones y la paralización de las que eventualmente puedan iniciarse –incluyendo cualquier acto preparatorio o encaminado a dichas ejecuciones– debe extenderse también a las Prendas sobre Antolín Irausa, cuyo objeto son las acciones de Antolín Irausa.

En méritos de lo expuesto,

**SUPLICO AL TRIBUNAL** que, teniendo por presentado este escrito con los documentos acompañados al mismo, se sirva: admitirlo; unirlo a los autos de su razón; tener por presentada Solicitud de Homologación del Plan de Reestructuración conjunto de Grupo Antolin-Irausa, S.A.U., Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Autotrim, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Grupo Antolin-Glass, S.A.U., Grupo Antolin-Ingeniería, S.A.U., Grupo Antolin-Plasbur, S.A.U., Grupo Antolin-RyA, S.A.U., Antolin Interiors UK Limited, Grupo

Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolin North America, Inc., Antolín Alabama, LLC, Antolin Interiors USA, Inc., Antolin Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolin Kentucky, Inc., Grupo Antolin Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Grupo Antolin South Africa (PTY) Ltd., Grupo Antolin Bohemia, a.s., Grupo Antolin Ostrava, s.r.o., Grupo Antolin Turnov, s.r.o, Antolin Liban, s.r.o., Antolin Deutschland GmbH, Grupo Antolin Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolin Interiors México, S.A. de C.V., Grupo Antolin Silao, S.A. de C.V., Grupo Antolin Saltillo, S.R.L. de C.V., Grupo Antolin Tlaxcala, S.R.L. de C.V., Grupo Antolin Cuautitlán, S.R.L. de C.V., Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. y Grupo Antolin Bratislava, s.r.o. y, tras los trámites oportunos; **con carácter principal** y basando su competencia respecto a todas las Sociedades Solicitantes por tener el domicilio y/o el centro principal de intereses en Burgos:

(i)    Admita a trámite la Solicitud de Homologación judicial del Plan de Reestructuración conjunto de conformidad con lo establecido en el artículo 644 TRLC; lo que, a su vez, implica el despliegue de los efectos regulados en los artículos 618 y 652.2 del TRLC, conforme a lo que se señalará en el apartado (iii), f) y g), de este suplico, como se especifica también en los otrosíes primero, segundo y tercero, desde la Providencia de admisión a trámite de la Solicitud;

(ii)   Ordene la publicación de la Providencia de admisión a trámite en el Registro Público Concursal por medio de edicto, con la forma y contenidos establecidos en el artículo 645 TRLC y con la mención de que el Plan de Reestructuración se encuentra a disposición de acreedores afectados, en la Notaría de D. Andrés Domínguez Nafría, sita en la calle Lagasca 88, así como en el siguiente enlace (*ex*. artículo 643 TRLC): https://ga-p.sharefile.com/public/share/web-s9063654ff7134ecf9bd1749c812dbf1c

(iii)  Y dicte, tras todo ello, Auto por medio del cual:

    a.    Homologue judicialmente el Plan de Reestructuración conjunto de Grupo Antolin-Irausa, S.A.U., Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Autotrim, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Grupo Antolin-Glass, S.A.U., Grupo Antolin-Ingeniería, S.A.U., Grupo Antolin-Plasbur, S.A.U., Grupo Antolin-RyA, S.A.U., Antolin Interiors UK Limited, Grupo Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolin North America, Inc., Antolin Alabama, LLC, Antolin Interiors USA, Inc., Antolin Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolin Kentucky, Inc., Grupo Antolin Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Grupo Antolin South Africa (PTY) Ltd., Grupo

109

Antolin Bohemia, a.s., Grupo Antolin Ostrava, s.r.o., Grupo Antolin Turnov, s.r.o, Antolin Liban, s.r.o., Antolin Deutschland GmbH, Grupo Antolin Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolin Interiors México, S.A. de C.V., Grupo Antolin Silao, S.A. de C.V., Grupo Antolin Saltillo, S.R.L. de C.V., Grupo Antolin Tlaxcala, S.R.L. de C.V., Grupo Antolin Cuautitlán, S.R.L. de C.V., Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. y Grupo Antolin Bratislava, s.r.o. acompañado como Documento nº 2.

b.  Acuerde, de conformidad con los artículos 615.1.1º y 635.1º TRLC, la extensión de los efectos del Plan de Reestructuración a los acreedores que no se han adherido al mismo ordenando que, en consecuencia, éstos quedarán vinculados al Plan de Reestructuración y por todos los Documentos de la Reestructuración que sean necesarios en ejecución del Plan;

c.  Se declare que, conforme a lo previsto en los artículos 635.3º y 667 TRLC, no podrán ser objeto de acciones de rescisión concursal a los efectos de un potencial concurso posterior a la homologación de cualquiera de las Sociedades Solicitantes –a excepción de Grupo Antolin South Africa (PTY) Ltd y Grupo Antolín Logistik Deutschland GmbH–: (1) el Plan de Reestructuración; (2) los actos u operaciones razonables y necesarios inmediatamente para el éxito de la negociación con los acreedores, incluido el pago de la totalidad de los costes asociados a la Reestructuración; y (3) los actos u operaciones razonables y necesarios inmediatamente para la ejecución del Plan de Reestructuración, incluyendo, sin limitación, los siguientes negocios jurídicos (tal y como los mismos están descritos en el Plan de Reestructuración), lo que incluye, sin limitación, los siguientes:

   i.  la Reestructuración de la Deuda Afectada, incluyendo, sin limitación alguna, (i) la novación modificativa y no extintiva de la Deuda Bancaria, (ii) las emisiones de los Nuevos Bonos, (iii) el canje de los Bonos Existentes por dichos Nuevos Bonos y la cancelación de los Bonos Existentes de conformidad con la Solicitud de Consentimiento, (iv) las Nuevas Líneas de Avales y (v) la novación modificativa y no extintiva del Contrato entre Acreedores descrita en la Cláusula 5.5 del Plan;

110

   ii.  las prórrogas del Factoring Sindicado Existente;

   iii.  el Contrato de Financiación de Circulante; y

   iv.  en general cualquier operación, acto, pago y garantía que se haga o constituya en ejecución del Plan (lo que incluye el otorgamiento de todas las garantías personales y reales incluidas en el Plan);

d.  Se declare que el otorgamiento del Contrato de Financiación de Circulante, las Prórrogas del Factoring Sindicado Existente (de ser necesarias para la implantación del Plan ya homologado), y las Nuevas Líneas de Avales tienen la consideración de nueva financiación según lo dispuesto en el artículo 666 TRLC y se les otorgue la protección y preferencias de cobro que se confiere a la misma bajo los artículos 242.1.17º y 280.6º TRLC, en el hipotético escenario en que las Sociedades Reestructuradas fueran declaradas en concurso de acreedores;

e.  Se declare que el otorgamiento de las Prórrogas del Factoring Sindicado Existente de manera previa a la obtención de la homologación tienen la consideración de financiación interina según lo dispuesto en el artículo 665 TRLC y se les otorgue la protección y preferencias de cobro que se confiere a la misma bajo los artículos 242.1.17º y 280.6º TRLC, en el hipotético escenario en que las Sociedades Reestructuradas fueran declaradas en concurso de acreedores;

f.  Se declare, de conformidad con el artículo 618.1 TRLC, que se tendrán por no puestas las cláusulas contractuales (incluyendo, entre otras, las presentes en los Contratos Afectados y el ICA) que establezcan la facultad de la otra parte de suspender o modificar las obligaciones o efectos de los contratos, la facultad de vencimiento anticipado, resolución o extinción, o que dispongan estos efectos de manera automática por el mero motivo de la presentación de la Solicitud de Homologación, su admisión a trámite, la homologación judicial del Plan de Reestructuración o cualquier otra circunstancia análoga o directamente relacionada con ella;

g.  Se declare, de acuerdo con el contenido del artículo 652.2 TRLC, la extensión de los efectos del Plan de Reestructuración a las prendas sobre

las acciones de Grupo Antolín-Irausa, S.A.U. de las que es titular Antolín Holdco, S.A. (denominadas en este escrito Prendas sobre Antolín Irausa);

h. Se declare, de conformidad con lo dispuesto en el artículo 649 TRLC, que, como consecuencia de la extensión de efectos del Plan, los Acreedores No Participantes quedarán automáticamente vinculados, respecto de todas las Sociedades Reestructuradas, por el Plan de Reestructuración y los Documentos de la Reestructuración que correspondan, debiendo por tanto ser considerados legal y contractualmente parte de los mismos a todos los efectos;

i. Se autorice al Agente de la Reestructuración para que, de conformidad con el apoderamiento descrito en la Cláusula 14.2 del Plan de Reestructuración pueda desempeñar todas las facultades y poderes necesarios para el desempeño de sus funciones, lo que implica:

  i. Que actúe como mandatario especial con carácter irrevocable de los Acreedores Afectados (incluyendo, a efectos aclaratorios, los Acreedores No Participantes) a todos los efectos establecidos en el Plan y en los restantes Documentos de la Reestructuración, estando investido de todas las facultades y poderes necesarios para el desempeño de sus funciones en los términos previstos en la Cláusula 14.2 del Plan de Reestructuración.

  ii. Que actúe como agente y representante de cada uno de los Acreedores Afectados (incluyendo, a efectos aclaratorios, los Acreedores No Participantes) a los efectos de celebrar, hacer valer sus derechos y representarlos en relación con el otorgamiento de cualesquiera documentos públicos o privados necesarios o convenientes para implementar la Reestructuración o llevar a cabo actos que deriven de la misma. A su vez, considerarle apoderado con poder de representación irrevocable de los Acreedores Afectados (a excepción de los Acreedores Afectados incluidos en la Cláusula 14.2.6 del Plan de Reestructuración), para:

    - actuar en su nombre y, si así lo exige la legislación aplicable o si procede, en su nombre y por su cuenta, en relación con la aceptación, la preparación, la suscripción, el otorgamiento y suscripción en privado o en documento público de

112

cualquiera de los Documentos de la Reestructuración conforme al Plan de Reestructuración; y

- aceptar cualquier garantía, hipoteca, prenda o cualquier otra garantía real, incluidos derechos de prenda, hipoteca, cesión o transferencia de título a efectos de garantía que se otorguen a favor de ese Acreedor Afectado en relación con los Documentos de la Reestructuración.

iii. Que actúe en nombre de los Acreedores Afectados (incluyendo, a efectos aclaratorios, los Acreedores No Participantes) para celebrar, hacer valer sus derechos y representar a cada uno en relación con el otorgamiento de cualquier documento público para la ratificación o aclaración o novación, según corresponda, del Plan de Reestructuración.

j. Se declare que los actos de ejecución del Plan de Reestructuración que sean inscribibles en los registros públicos podrán inscribirse en éstos, conforme a la legislación que les sea aplicable (artículo 650 TRLC); y

k. Se ordene la publicación del auto de homologación en el Registro Público Concursal (artículo 648 TRLC).

**Subsidiariamente** a lo anterior y únicamente para el caso en que el Iltre. Tribunal no se considere competente para conocer de la Solicitud de Homologación con respecto a las Filiales Extranjeras por considerar que su centro principal de intereses no está en España *-quod non-*, se declare igualmente competente para el conocimiento de la Solicitud de Homologación respecto a las Sociedades Solicitantes españolas por tener su domicilio en Burgos; y respecto a las Sociedades Solicitantes extranjeras (Filiales Extranjeras) por aplicación del artículo 755 TRLC; y en virtud de lo anterior:

(i) Admita a trámite la Solicitud de Homologación judicial del Plan de Reestructuración conjunto de conformidad con lo establecido en el artículo 644 TRLC; lo que, a su vez, implica el despliegue de los efectos regulados en los artículos 618 y 652.2 TRLC, conforme a lo que se señalará en el apartado (v), f) y g), de este suplico, como se especifica también en los otrosíes primero, segundo y tercero, desde la Providencia de admisión a trámite de la Solicitud;

113

(ii)   Tome en consideración que, al amparo de lo previsto en el artículo 755 TRLC, la Solicitud de Homologación del Plan de Reestructuración se efectúa con carácter reservado respecto de las Filiales Extranjeras;

(iii)   Salvo en lo que se refiere a las Filiales Extranjeras, ordene la publicación de la Providencia de admisión a trámite en el Registro Público Concursal por medio de edicto, con la forma y contenidos establecidos en el artículo 645 TRLC y con la mención de que el Plan de Reestructuración se encuentra a disposición de acreedores afectados, en la Notaría de D. Andrés Domínguez Nafría, sita en la calle Lagasca 88, así como en el siguiente enlace (*ex*. artículo 643 TRLC): https://ga-p.sharefile.com/public/share/web-s9063654ff7134ecf9bd1749c812dbf1c

(iv)   Al amparo de lo previsto en el artículo 755 TRLC, se sirva acordar que tanto la Providencia de admisión a trámite mencionada en el párrafo anterior, así como cualquier resolución dictada en el marco del presente procedimiento de homologación en relación con las Filiales Extranjeras, no podrá ser publicada en el Registro Público Concursal como consecuencia del carácter reservado de la solicitud.

(v)   Y, tras todo ello, dicte Auto por medio del cual:

a. Homologue judicialmente el Plan de Reestructuración conjunto de Grupo Antolin-Irausa, S.A.U., Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Autotrim, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Grupo Antolin-Glass, S.A.U., Grupo Antolin-Ingeniería, S.A.U., Grupo Antolin-Plasbur, S.A.U., Grupo Antolin-RyA, S.A.U., Antolin Interiors UK Limited, Grupo Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolin North America, Inc., Antolin Alabama, LLC, Antolin Interiors USA, Inc., Antolin Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolin Kentucky, Inc., Grupo Antolin Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Grupo Antolin South Africa (PTY) Ltd., Grupo Antolin Bohemia, a.s., Grupo Antolin Ostrava, s.r.o., Grupo Antolin Turnov, s.r.o, Antolin Liban, s.r.o., Antolin Deutschland GmbH, Grupo Antolin Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolin Interiors México, S.A. de C.V., Grupo Antolin Silao, S.A. de C.V., Grupo Antolin Saltillo, S.R.L. de C.V., Grupo Antolin Tlaxcala, S.R.L. de C.V., Grupo Antolin Cuautitlán, S.R.L. de C.V., Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. y Grupo Antolin Bratislava, s.r.o. acompañado

114

como Documento nº 2. Para ello deberá dictarse resolución separada para las Sociedades Solicitantes españolas y las Filiales Extranjeras.

b. Acuerde, de conformidad con los artículos 615.1.1º y 635.1º TRLC, la extensión de los efectos del Plan de Reestructuración a los acreedores que no se han adherido al mismo ordenando que, en consecuencia, éstos quedarán vinculados al Plan de Reestructuración y por todos los Documentos de la Reestructuración que sean necesarios en ejecución del Plan;

c. Se declare que, conforme a lo previsto en los artículos 635.3º y 667 TRLC, no podrán ser objeto de acciones de rescisión concursal a los efectos de un potencial concurso posterior a la homologación de cualquiera de las Sociedades Solicitantes –a excepción de Grupo Antolin South Africa (PTY) Ltd y Grupo Antolín Logistik Deutschland GmbH–: (1) el Plan de Reestructuración; (2) los actos u operaciones razonables y necesarios inmediatamente para el éxito de la negociación con los acreedores, incluido el pago de la totalidad de los costes asociados a la Reestructuración; y (3) los actos u operaciones razonables y necesarios inmediatamente para la ejecución del Plan de Reestructuración, incluyendo, sin limitación, los siguientes negocios jurídicos (tal y como los mismos están descritos en el Plan de Reestructuración), lo que incluye, sin limitación, los siguientes:

   i. la Reestructuración de la Deuda Afectada, incluyendo, sin limitación alguna, (i) la novación modificativa y no extintiva de la Deuda Bancaria, (ii) las emisiones de los Nuevos Bonos, (iii) el canje de los Bonos Existentes por dichos Nuevos Bonos y la cancelación de los Bonos Existentes de conformidad con la Solicitud de Consentimiento, (iv) las Nuevas Líneas de Avales y (v) la novación modificativa y no extintiva del Contrato entre Acreedores descrita en la Cláusula 5.5 del Plan;

   ii. las Prórrogas del Factoring Sindicado Existente;

   iii. el Contrato de Financiación de Circulante; y

   iv. en general, cualquier operación, acto, pago y garantía que se haga o constituya en ejecución del Plan (lo que incluye el otorgamiento de todas las garantías personales y reales incluidas en el Plan).

115

d.  Se declare que el otorgamiento del Contrato de Financiación de Circulante, las Prórrogas del Factoring Sindicado Existente (de ser necesarias para la implantación del Plan ya homologado), y las Nuevas Líneas de Avales tienen la consideración de nueva financiación según lo dispuesto en el artículo 666 TRLC y se les otorgue la protección y preferencias de cobro que se confiere a la misma bajo los artículos 242.1.17º y 280.6º TRLC, en el hipotético escenario en que las Sociedades Reestructuradas fueran declaradas en concurso de acreedores;

e.  Se declare que el otorgamiento de las Prórrogas del Factoring Sindicado Existente de manera previa a la obtención de la homologación tienen la consideración de financiación interina según lo dispuesto en el artículo 665 TRLC y se les otorgue la protección y preferencias de cobro que se confiere a la misma bajo los artículos 242.1.17º y 280.6º TRLC, en el hipotético escenario en que las Sociedades Reestructuradas fueran declaradas en concurso de acreedores;

f.  Se declare, de conformidad con el artículo 618.1 TRLC, que se tendrán por no puestas las cláusulas contractuales (incluyendo, entre otras, las presentes en los Contratos Afectados y el ICA) que establezcan la facultad de la otra parte de suspender o modificar las obligaciones o efectos de los contratos, la facultad de vencimiento anticipado, resolución o extinción, o que dispongan estos efectos de manera automática por el mero motivo de la presentación de la Solicitud de Homologación, su admisión a trámite, la homologación judicial del Plan de Reestructuración o cualquier otra circunstancia análoga o directamente relacionada con ella;

g.  Se declare, de acuerdo con el contenido del artículo 652.2 TRLC, la extensión de los efectos del Plan de Reestructuración a las prendas sobre las acciones de Grupo Antolín-Irausa, S.A.U. de las que es titular Antolín Holdco, S.A. (denominadas en este escrito Prendas sobre Antolín Irausa);

h.  Se declare, de conformidad con lo dispuesto en el artículo 649 TRLC, que, como consecuencia de la extensión de efectos del Plan, los Acreedores No Participantes quedarán automáticamente vinculados, respecto de todas las Sociedades Reestructuradas, por el Plan de Reestructuración y los Documentos de la Reestructuración que correspondan, debiendo por tanto ser considerados legal y contractualmente parte de los mismos a todos los efectos;

116

i. Se autorice al Agente de la Reestructuración para que, de conformidad con el apoderamiento descrito en la Cláusula 14.2 del Plan de Reestructuración pueda desempeñar todas las facultades y poderes necesarios para el desempeño de sus funciones, lo que implica:

    i. Que actúe como mandatario especial con carácter irrevocable de los Acreedores Afectados (incluyendo, a efectos aclaratorios, los Acreedores No Participantes) a todos los efectos establecidos en el Plan y en los restantes Documentos de la Reestructuración, estando investido de todas las facultades y poderes necesarios para el desempeño de sus funciones en los términos previstos en la Cláusula 14.2 del Plan de Reestructuración.

    ii. Que actúe como agente y representante de cada uno de los Acreedores Afectados (incluyendo, a efectos aclaratorios, los Acreedores No Participantes) a los efectos de celebrar, hacer valer sus derechos y representarlos en relación con el otorgamiento de cualesquiera documentos públicos o privados necesarios o convenientes para implementar la Reestructuración o llevar a cabo actos que deriven de la misma. A su vez, considerarle apoderado con poder de representación irrevocable de los Acreedores Afectados (a excepción de los Acreedores Afectados incluidos en la Cláusula 14.2.6 del Plan de Reestructuración), para:

- actuar en su nombre y, si así lo exige la legislación aplicable o si procede, en su nombre y por su cuenta, en relación con la aceptación, la preparación, la suscripción, el otorgamiento y suscripción en privado o en documento público de cualquiera de los Documentos de la Reestructuración conforme al Plan de Reestructuración; y

- aceptar cualquier garantía, hipoteca, prenda o cualquier otra garantía real, incluidos derechos de prenda, hipoteca, cesión o transferencia de título a efectos de garantía que se otorguen a favor de ese Acreedor Afectado en relación con los Documentos de la Reestructuración.

    iii. Que actúe en nombre de los Acreedores Afectados (incluyendo, a efectos aclaratorios, los Acreedores No Participantes) para celebrar,

117

hacer valer sus derechos y representar a cada uno en relación con el otorgamiento de cualquier documento público para la ratificación o aclaración o novación, según corresponda, del Plan de Reestructuración.

j. Se declare que los actos de ejecución del Plan de Reestructuración que sean inscribibles en los registros públicos podrán inscribirse en éstos, conforme a la legislación que les sea aplicable (artículo 650 TRLC); y

k. Se ordene la publicación del auto de homologación en el Registro Público Concursal (artículo 648 TRLC), excluyendo de la publicación a las Filiales Extranjeras.

**PRIMER OTROSI DIGO** que, de conformidad con lo dispuesto en el artículo 644.1 TRLC, de modo simultáneo a la admisión a trámite de la Solicitud de Homologación, debe decretarse la prohibición de iniciar ejecuciones judiciales o extrajudiciales y la paralización de las ejecuciones ya iniciadas sobre los bienes de las Sociedades Solicitantes; todo ello hasta que se resuelva sobre la homologación judicial que se pretende.

**SUPLICO AL TRIBUNAL** que tenga por efectuada la anterior manifestación a los efectos oportunos y, en su virtud, se sirva junto con la providencia de admisión a trámite de la Solicitud de Homologación del Plan de Reestructuración decretarse la prohibición de iniciar ejecuciones judiciales o extrajudiciales sobre los bienes de las Sociedades Solicitantes; así como las paralizaciones de aquellas ya iniciadas, todo ello en cumplimiento del artículo 644.1 TRLC, hasta que se resuelva sobre la homologación.

**SEGUNDO OTROSI DIGO** que, de conformidad con lo dispuesto en el artículo 644 TRLC, en relación con el artículo 618.1 TRLC, de modo simultáneo a la admisión a trámite de la Solicitud de Homologación, debe decretarse la prohibición de ejercitar o aplicar cualquier cláusula contractual (incluyendo, entre otras, las presentes en los Contratos Afectados y el ICA) que por el mero motivo de la presentación de la Solicitud de Homologación, su admisión a trámite, la homologación judicial del Plan de Reestructuración o cualquier otra circunstancia análoga o directamente relacionada con ella, establezca (incluso de manera automática): (i) la suspensión o modificación de las obligaciones o efectos de los contratos, o (ii) el vencimiento anticipado, resolución o extinción de las obligaciones o de los contratos.

**SUPLICO AL TRIBUNAL** que tenga por efectuada la anterior manifestación a los efectos oportunos y, en su virtud, junto con la providencia de admisión a trámite de la Solicitud de

Homologación del Plan de Reestructuración decrete la prohibición de ejercitar o aplicar cualquier cláusula contractual (incluyendo, entre otras, las presentes en los Contratos Afectados y el ICA) que por el mero motivo de la presentación de la Solicitud de Homologación, su admisión a trámite, la homologación judicial del Plan de Reestructuración o cualquier otra circunstancia análoga o directamente relacionada con ella, establezca (incluso de manera automática): (i) la suspensión o modificación de las obligaciones o efectos de los contratos, o (ii) el vencimiento anticipado, resolución o extinción de las obligaciones o de los contratos.

**TERCERO OTROSI DIGO** que, de conformidad con lo dispuesto en el artículo 644 TRLC en relación con el artículo 652.2 TRLC, se solicita que: (i) la prohibición de iniciar ejecuciones judiciales o extrajudiciales y de suspender las ya iniciadas se extienda también sobre las Prendas sobre Antolín Irausa (garantías otorgadas por Antolín Holdco, S.A.) a la que se ha solicitado extender los efectos del Plan de Reestructuración *ex* artículo 652.2 TRLC, hasta que se acuerde la homologación del Plan; y (ii) la prohibición de realizar cualesquiera actos previos y preparatorios de dicha ejecución, o suspensión de los ya iniciados, como lo serían la declaración de vencimiento anticipado, resolución o extinción y/o la asunción de derechos políticos sobre las acciones de Antolín Irausa, ya que de lo contrario se vaciaría de contenido la finalidad tuitiva que se pretende.

Todo lo anterior se solicita a los efectos de preservar en la práctica la efectividad de la extensión de efectos solicitada conforme al artículo 652.2 TRLC, pues de permitirse la iniciación de actos de ejecución o de asunción de derechos políticos relacionados con las acciones de Grupo Antolín-Irausa, S.A.U., tal extensión quedaría vacía de contenido antes incluso de haberse otorgado la extensión por parte del Iltre. Tribunal.

**SUPLICO AL TRIBUNAL** que tenga por efectuada la anterior manifestación a los efectos oportunos y, en su virtud, junto con la providencia de admisión a trámite de la Solicitud de Homologación del Plan de Reestructuración decrete que: (i) la prohibición de iniciar ejecuciones judiciales o extrajudiciales, y la suspensión de las ya iniciadas se extiende sobre las Prendas sobre Antolín Irausa (garantías otorgadas por Antolín Holdco S.A.), y (ii) la prohibición de realizar cualesquiera actos previos y/o preparatorios de dicha ejecución o suspensión de los ya iniciados, como lo serían la declaración de vencimiento anticipado, resolución o extinción de la deuda garantizada y/o de asunción de derechos políticos sobre las acciones de Grupo Antolín-Irausa, S.A.U.; todo ello en cumplimiento del contenido del artículo 644.1 TRLC en relación con el artículo 652.2 TRLC, y de ambos en relación con los artículos 595 y 618 del mismo cuerpo legal, hasta que se resuelva sobre la homologación.

119

**CUARTO OTROSI DIGO** que, de conformidad con lo dispuesto en el artículo 152.1.2º LEC, se faculte al Procurador, D. Miguel Ángel Esteban, para que realice todos los actos de comunicación y notificaciones que sean necesarios a los efectos de la tramitación de la presente Solicitud de Homologación judicial.

**SUPLICO AL TRIBUNAL** tenga por efectuada la anterior manifestación y solicitada la realización de las notificaciones oportunas por el procurador de esta parte.

**QUINTO OTROSI DIGO** que, de conformidad con lo establecido en el artículo 265.2 LEC, dejamos designados desde este momento los archivos de cuantas personas jurídicas, públicas o privadas, se nombran en el presente escrito; entre otros, se designan expresamente los archivos en poder de la Notaría sita en Calle Lagasca, núm. 88.

**SUPLICO AL TRIBUNAL** tenga por efectuada la anterior manifestación a los efectos de lo dispuesto en el artículo 265.2 LEC y demás que resulten oportunos.

**SEXTO OTROSI DIGO** que es voluntad de esta representación y sus representadas cumplir en el presente procedimiento con todos los requisitos legales dispuestos en la LEC y el TRLC, que, en caso de que se aprecie la existencia de algún defecto procesal involuntario, se hace expreso ofrecimiento de subsanarlo, conforme a lo dispuesto en el artículo 231 LEC.

**SUPLICO AL TRIBUNAL** tenga por efectuada la anterior manifestación a los efectos de lo dispuesto en el artículo 231 LEC y demás que resulten oportunos.

Es Justicia que pido en Burgos, a 10 de julio de 2026.

RODRIGO LOPEZ GONZALEZ
Firmado digitalmente por RODRIGO LOPEZ GONZALEZ
Fecha: 2026.07.10 15:58:48 +02'00'

_____

Rodrigo López González

Col. ICAM 77.858

BLANCA MORENO HERRERO
Firmado digitalmente por BLANCA MORENO HERRERO
Fecha: 2026.07.10 16:02:06 +02'00'

_____

Blanca Moreno Herrero

Col. ICAM 114.390

_____

Miguel Ángel Esteban

Procurador de los Tribunales

120

**<u>Homologation Request Documents</u>**
**<u>Certified Translation</u>**

  

American Translators Association
ATA MEMBER # M - 186788

**TRADUX USA Corp**
**Certified & Professional Translation Services**
405 Lexington Avenue, Floor 9
(Chrysler Building) NEW YORK, NY 10174
+ 1 650 546-5512
www.traduxusa.com
info@traduxusa.com

# Certification of Translation Accuracy

Translation of
**Application for Judicial Approval of a Restructuring Plan**
from **Spanish** to **English**

As an authorized representative of TRADUX USA Corp, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified, and certified professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text accurately and faithfully reflects the content, meaning, and style of the original document and constitutes in every respect a complete and accurate translation of the original document.  This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, TRADUX USA Corp assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.






Mariagiovanna Oricchio - CEO of TRADUX USA Corp
Order date: July 12, 2026

TRADUX USA Corp
405 Lexington Avenue, Floor 9
New York City 10174
United States
 + 1 650 546-5512

**TRADUX USA Corp**
**108 West 13th Street,**
**Wilmington, DE 19801**

| | |
|---|---|
| **Applicants:** | **Grupo Antolín Irausa S.A.U. and others** |
| **Court Agent:** | **Mr. Miguel Ángel Esteban Ruiz** |

| | |
|---|---|
| **Court:** | **Commercial Section 1 of the Court of First Instance of Burgos. Seat No. 1** |
| **Proceedings:** | **Special Incidental Matter – Ruling (Appointment of a restructuring expert) No. 310/2026** |

| | |
|---|---|
| **Submission:** | **Application for judicial approval of a restructuring plan without prior adversarial proceedings** |

<u>**TO THE COMMERCIAL SECTION OF THE
COURT OF FIRST INSTANCE OF BURGOS, SEAT NO. 1**</u>

**Mr. Miguel Ángel Esteban Ruiz**, Court Agent acting on behalf of Grupo Antolin-Irausa, S.A.U. ("**Antolín Irausa**"), Grupo Antolin-Aragusa, S.A.U. ("**Antolín Aragusa**"), Grupo Antolin-Autotrim, S.A.U. ("**Antolín Autotrim**"), Grupo Antolin-Eurotrim, S.A.U. ("**Antolín Eurotrim**"), Grupo Antolin-Glass, S.A.U. ("**Antolín Glass**"), Grupo Antolin-Ingeniería, S.A.U. ("**Antolín Ingeniería**"), Grupo Antolin-Plasbur, S.A.U. ("**Antolín Plasbur**"), Grupo Antolin-RyA, S.A.U. ("**Antolín RyA**"), Antolin Interiors UK Limited ("**Antolín Interiors UK**"), Grupo Antolin Leamington Limited ("**Antolín Leamington**"), Grupo Antolin UK Limited ("**Antolín UK**"), Grupo Antolin North America, Inc. ("**Antolín North America**"), Antolin Alabama, LLC ("**Antolín Alabama**"), Antolin Interiors USA, Inc. ("**Antolín Interiors USA**"), Antolin Shelby, Inc. ("**Antolín Shelby**"), Grupo Antolin Missouri, LLC ("**Antolín Missouri**"), Grupo Antolin Kentucky, Inc. ("**Antolín Kentucky**"), Grupo Antolin Michigan, Inc. ("**Antolín Michigan**"), Grupo Antolin Sibiu SRL ("**Antolín Sibiu**"), Antolin Silesia Sp. z.o.o. ("**Antolín Silesia**"), Grupo Antolin South Africa (PTY) Ltd. ("**Antolín South África**"), Grupo Antolin Bohemia, a.s. ("**Antolín Bohemia**"), Grupo Antolin Ostrava, s.r.o. ("**Antolín Ostrava**"), Grupo Antolin Turnov, s.r.o. ("**Antolín Turnov**"), Antolin Liban, s.r.o. ("**Antolín Liban**"), Antolin Deutschland GmbH ("**Antolín Deutschland**"), Grupo Antolin Bamberg GmbH & Co. KG ("**Antolín Bamberg**"), Grupo Antolin Logistik Deutschland GmbH ("**Antolín Logistik Deutschland**"), Antolin Straubing GmbH ("**Antolín Straubing**"), Antolin Interiors México, S.A. de C.V. ("**Antolín Interiors Mexico**"), Grupo Antolin Silao, S.A. de C.V. ("**Antolín Silao**"), Grupo Antolin Saltillo, S.R.L. de C.V. ("**Antolín Saltillo**"), Grupo Antolin Tlaxcala, S.R.L. de C.V. ("**Antolín Tlaxcala**"), Grupo Antolin Cuautitlán, S.R.L. de C.V. ("**Antolín Cuautitlán**"), Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. ("**Antolín Lusitania**") and Grupo Antolin Bratislava, s.r.o. ("**Antolín Bratislava**") (all of them, with the exception of Antolín Irausa, the "**Subsidiaries**"; and Antolín Irausa and the Subsidiaries jointly, the "**Applicant Companies**" or the "**Restructured Companies**"), as evidenced by the powers of attorney attached hereto as **Documentary Bundle No. 1**, hereby appear before this Honourable Court and, as may be most appropriate in law, **STATE:**

1


CERTIFIED
TRANSLATION



I.   That, on 2026-04-28, the Applicant Companies applied to this same Honourable Court for the appointment of **LEXAUDIT CONCURSAL, S.L.P.** as restructuring expert ("**LEXAUDIT**", the "**Restructuring Expert**" or the "**Expert**"), which appointment was ordered by an Order dated 14-05-2026 in Expert Appointment Proceedings No. 310/2026[1].

II.   That, as a result of the negotiations conducted, the Applicant Companies prepared a joint restructuring plan which (i) was signed by some of the principal financial creditors, (ii) would make it possible to ensure the viability of the Antolín Group in the short, medium and even long term, and (iii) was executed as a public deed on 2026-06-24 before the Madrid Notary Public, Mr Andrés Domínguez Nafría, under number 3,847 of his notarial records (the "**Original Restructuring Plan**").

III.   That the parties signing the Original Restructuring Plan identified a formal and inadvertent omission and decided to remedy it and incorporate certain non-material adjustments by formalising a restated restructuring plan (the "**Restated Restructuring Plan**", the "**Restructuring Plan**" or the "**Plan**"). Accordingly, on 10-07-2026, the Applicant Companies and, likewise, some of the principal financial creditors signed and executed the Restructuring Plan as a public deed authorised by the Madrid Notary Public, Mr Francisco Miras Ortiz, acting as substitute for and for the notarial records of Mr. Andrés Domínguez Nafría, under number 4,281 of his notarial records, which is attached hereto as **Document No. 2**[2].

IV.   That, by means of this submission and pursuant to Articles 635 et seq. of Royal Legislative Decree 1/2020 of 05-05-2020, approving the Consolidated Text of the Insolvency Act ("**TRLC**"), the Applicant Companies hereby apply for the **JUDICIAL APPROVAL OF THE JOINT RESTRUCTURING PLAN WITHOUT PRIOR ADVERSARIAL PROCEEDINGS** (the "**Application for Approval**"), together with the legal effects inherent in such declaration, on the basis of the following,

---

[1] The Order dated 14-05-2026 was rectified, at the request of the Applicant Companies, by means of an Order dated 2026-06-01, in order to state expressly in the operative part that the appointment of LEXAUDIT as Restructuring Expert applied to all the Applicant Companies.

[2] Unless otherwise indicated, capitalised terms not expressly defined in this submission shall have the meaning attributed to them in the Restructuring Plan.


CERTIFIED TRANSLATION

2



USA CORP

**FACTS**

**PRELIMINARY. – Purpose of the Application for Approval**

1. Pursuant to Article 614 of the TRLC, the Applicant Companies have entered into the Restructuring Plan with some of their principal financial creditors. The Plan sets out the basis for the restructuring of their financial indebtedness (the "**Restructuring**") and the manner in which such Restructuring is to be implemented.

2. Insofar as the Applicant Companies seek *(i)* the extension of the effects of the Restructuring Plan to creditors whose claims are affected and who have not participated in it or who have not adhered thereto as dissenting creditors, *(ii)* the protection of interim financing, new financing, and the acts, transactions and business carried out in the context of the Plan against avoidance actions, as well as the privileges applicable in any subsequent insolvency proceedings, and *(iii)* the extension of such protection to guarantees granted by third parties pursuant to Article 652.2 of the TRLC, this submission applies for the judicial approval of the Restructuring Plan under the terms set forth in Article 635 et seq. of the TRLC.

**FIRST. – Identification of the Parties to the Restructuring Plan**

**1.1 The Applicant Companies**

3. The Applicant Companies form part of a group of companies known as "Antolín" (the "**Antolín Group**" or simply the "**Group**"), which is engaged in the development, design and manufacture of interior components for the automotive industry and, specifically, comprises the companies of the Group that owe the financial liabilities subject to restructuring under the Plan. For a better understanding of the Applicant Companies, a Group organisational chart and an organisational chart limited exclusively to the Applicant Companies are attached as **Documentary Bundle No. 3**.

4. As stated above, and as may be seen from the simplified organisational chart, the Applicant Companies share Antolín Irausa as their operating parent company.

5. Antolín Irausa is a company incorporated under Spanish law, with Tax Identification Number A09092305 and registered office at Calle Vitoria 307, 09007 Burgos. Antolín Irausa is the parent company of the Subsidiaries and exercises control over the other Applicant Companies, namely the Subsidiaries, and is the company from which all the material decisions concerning the Subsidiaries are taken (therefore, as will be seen, their centre of main interests is likewise located in Burgos).


CERTIFIED TRANSLATION



6. The Subsidiaries, whether Spanish or foreign (although all of them have their centre of main interests in Spain), whose financial indebtedness is being restructured under the Plan are as follows:

|  | Subsidiary | Nationality | Tax Identification No. (NIF) | Registered Office |
|---|---|---|---|---|
| 1. | Antolín Aragusa | Spain | A09019191 | 0 Monte de la Abadesa Street, Business Park, Burgos |
| 2. | Antolín Autotrim | Spain | A09097080 | 307 Vitoria Street, 09007 Burgos |
| 3. | Antolín Eurotrim | Spain | A09021759 | 309 Vitoria Street, 09007 Burgos |
| 4. | Antolín Glass | Spain | A09063611 | 309 Vitoria Street, 09007 Burgos |
| 5. | Antolín Ingeniería | Spain | A09276528 | 307 Vitoria Street, 09007 Burgos |
| 6. | Antolín Plasbur | Spain | A09256975 | 21 Condado de Treviño Street, Villalonquéjar Industrial Estate, Burgos, 09001 Burgos |
| 7. | Antolín RyA | Spain | A09075680 | 307 Vitoria Street, 09007 Burgos |
| 8. | Antolín Interiors UK | United Kingdom | N0407133H | Merse Road, North Moons Moat, Redditch, England B98 9HL |
| 9. | Antolín Leamington | United Kingdom | N0404953B | Tachbrook Park Drive, Leamington Spa, Warwick, Warwickshire CV34 6RH |
| 10. | Antolín UK | United Kingdom | N0404945H | Merse Road, North Moons Moat, Redditch, England B98 9HL |
| 11. | Antolín North America | United States | N0405409D | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 12. | Antolín Alabama | United States | N0404938C | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 13. | Antolín Interiors USA | United States | N0404942E | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 14. | Antolín Shelby | United States | N0404939A | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 15. | Antolín Missouri | United States | N0404941G | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 16. | Antolín Kentucky | United States | N0405410B | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 17. | Antolín Michigan | United States | N0405411J | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 18. | Antolín Sibiu | Romania | N0329720GN040 | 7 Europa Unită Street, Sibiu County |
| 19. | Antolín Silesia | Poland | N0405304G | Wrocławska 82, 57-100 Strzelin, Poland |
| 20. | Antolín South Africa | South Africa | N0405412H | Nelson Mandela Bay Logistics Park, Algoa Road, Jagvlakte, Uitenhage Industries, Eastern Cape 2196 |


CERTIFIED TRANSLATION

4


USA CORP

| | | | | |
|---|---|---|---|---|
| 21. | Antolín Bohemia | Czech Republic | N0407143G | Svárovská 696, 463 03 Stráž nad Nisou, Czech Republic |
| 22. | Antolín Ostrava | Czech Republic | N0407142I | Na Rovince 912, Hrabová, 720 00 Ostrava |
| 23. | Antolín Turnov | Czech Republic | N0611285H | Průmyslová 3000, 511 01 Turnov |
| 24. | Antolín Liban | Czech Republic | N0405441G | Komenského 30, 507 23 Libáň |
| 25. | Antolín Deutschland | Germany | N0407141A | Am Ziegelwerk 1, 85391 Allershausen |
| 26. | Antolín Bamberg | Germany | N0405434B | Kronacherstraße 70–80, 96052 Bamberg |
| 27. | Antolín Logistik Deutschland | Germany | N0407139E | Am Coloneum 4, 50829 Cologne |
| 28. | Antolín Straubing | Germany | N0407137I | Stettiner Str. 7, 94315 Straubing |
| 29. | Antolín Interiors Mexico | Mexico | N0405467B | 728 Jesús Valdez Sánchez Blvd., Central District, 25350 Arteaga, Coahuila, Mexico |
| 30. | Antolín Silao | Mexico | N0405430J | 411 Ingenieros Ave., FIPASI Industrial Park, 36100 Silao de la Victoria, Guanajuato, Mexico |
| 31. | Antolín Saltillo | Mexico | N0405496A | Doctor, Jesús Valdez Sánchez Blvd., no street number, Industrial Park, 25350 Arteaga, Coahuila, Mexico |
| 32. | Antolín Tlaxcala | Mexico | N0405486B | 19 Virgen de la Caridad, Vesta Park Tlaxcala I, Xicohtencatl II Industrial Park, 90500 Huamantla, Tlaxcala, Mexico |
| 33. | Antolín Cuautitlán | Mexico | N0405389H | Tlaloc Ave., Block 003, Axotlán, 54719 Cuautitlán Izcalli, State of Mexico, Mexico |
| 34. | Antolín Lusitânia | Portugal | N0405449J | Industrial area near Vila Nova de Cerveira, Viana do Castelo, Portugal, 4920-247 Lusitania, Portugal |
| 35. | Antolín Bratislava | Slovakia | N0407135C | Opletalova 73, 841 07 Devínska Nová Ves, Slovakia |

7. The corporate registry certificates of each of the Applicant Companies are attached as **Documentary Bundle No. 4**, and a non-certified translation into Spanish of those certificates drawn up in languages other than Spanish is attached as **Documentary Bundle No. 4 bis**.

8. The Subsidiaries Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Ingeniería, Antolín Plasbur and Antolín RyA (hereinafter, the "**Spanish Subsidiaries**") have their registered offices in Burgos, which coincides with their centre of main interests ("**COMI**"). Among the Spanish Subsidiaries, Antolín Ingeniería leads the development of all R&D&I projects throughout the Antolín Group, transferring its know-how to the other companies located in the various regions of the world. For their part, the remaining Spanish Subsidiaries are production plants and associated service providers and have entered into agreements with Antolín Irausa which provide
that centralisation of their activities at the registered office of the operating parent company (as will be seen in the following section when explaining the Antolín Group's business model).


CERTIFIED TRANSLATION



9.  As regards the remaining Subsidiaries (the "**Foreign Subsidiaries**"), although their registered offices are located outside Spain, all of them maintain their COMI in Burgos, as explained when describing the Antolín Group's business model and decision-making structure under Fact Two.

**1.2 The Affected Creditors, Participating Creditors and Non-Participating Creditors**

10.  Furthermore, all creditors whose claims are affected by the Restructuring Plan shall be referred to as the "**Affected Creditors**". The Affected Creditors are, in turn, divided into two categories: (i) the "**Participating Creditors**", namely those who voted in favour of and adhered to the Plan; and (ii) the "**Non-Participating Creditors**", namely those Affected Creditors who did not sign the Plan or who voted against it.

11.  In order to explain the various subcategories comprising the Participating Creditors, it is necessary to set out chronologically the process by which the Plan was formalised and acceded to:

–  On 23-06-2026, the Applicant Companies, Grupo Antolín Holdco S.A. and certain original participating creditors, among others, entered into a restructuring support agreement entitled the "Recapitalisation Support Agreement" (hereinafter, the "**RSA**"), pursuant to which they undertook, among other obligations, to vote in favour of the Original Restructuring Plan, or of such plan as amended in accordance with the terms of the RSA itself, and to adopt the measures necessary for the Restructuring. The original participating creditors that signed the RSA on 23-06-2026 were:

|     | Creditors that initially signed the RSA |
| --- | --- |
| 1.  | Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA") |
| 2.  | Banco Bilbao Vizcaya Argentaria, S.A., New York Branch ("**BBVA USA**") |
| 3.  | Banco de Sabadell, S.A. ("**Banco Sabadell**") |
| 4.  | Banco Santander, S.A. ("**Banco Santander**") |
| 5.  | Bankinter, S.A. ("**Bankinter**") |
| 6.  | CaixaBank, S.A. ("**CaixaBank**") |

–  Following the aforementioned execution of the RSA, an invitation was sent to the Affected Creditors, establishing an accession period until 22-07-2026, during which they could: (i) accede to the RSA (with the resulting undertaking to accede to the Original Restructuring Plan); and/or (ii) vote in favour of or against, and accede to, the Original Restructuring Plan.

–  On 24-06-2026, several of the Affected Creditors acceded to the RSA prior to the execution of the Original Restructuring Plan; specifically, they were as follows:





6

|  | Creditors that acceded to the RSA prior to the execution of the Plan |
|---|---|
| 7. | HSBC Continental Europe |
| 8. | HSBC Continental Europe, Spain Branch |

–     On 24-06-2026, the Restructured Companies, the creditors that signed the RSA on 2026-06-23, and those that had acceded thereto (jointly, the "**Original Participating Creditors**") executed the Original Restructuring Plan.

–     Following the aforementioned execution, the Restructured Companies and the Original Participating Creditors decided to novate the Original Restructuring Plan into the Restated Restructuring Plan in order to rectify an omission having no impact on the treatment of the Affected Creditors and to make certain non-material adjustments.

–     Following the proposal to novate the Original Restructuring Plan into the Restated Restructuring Plan, and prior to its execution, a new invitation was sent to the Affected Creditors[3] (the "**Invitation**"[4]), once again establishing an accession period until 2026-07-22[5], during which they could: (i) accede to the RSA, with the resulting undertaking to accede to the Restated Restructuring Plan and the Restructuring Documents[6]; and/or (ii) vote in favour of or against, and freely accede to, the Plan (the "**Accession Period**").

---

[3] Notwithstanding that, as stated above, the terms of the Plan were substantially the same, with only one omission having been corrected and certain non-material adjustments having been made.

[4] The specific terms of the Invitation are set out in Annex VIII to the Plan.

[5] This period may be extended at the request of Antolín Irausa by means of notice to that effect given to the restructuring agent (which shall be referred to in the following section).

[6] The term Restructuring Documents is defined in Annex I to the Plan and includes: (i) the Restructuring Plan itself; (ii) the documents relating to the exchange of the Existing Notes for the New Notes; (iii) the documents relating to the amendatory, non-terminating novation of the Bank Debt; (iv) the documents relating to the amendatory, non-terminating novation of the Existing Guarantee Facilities (that is, the New Guarantee Facilities); (v) the agreement for the amendatory, non-terminating novation of the Intercreditor Agreement; (vi) the Working Capital Facility Agreement; (vii) any documents necessary to implement the mechanism for the automatic monthly extension of the Existing Syndicated Factoring Facility; (viii) the New ICA Security Interests and the New ICA Personal Guarantees; (ix) the Account Pledges; and (x) a mutual release agreement (deed of release), covenant not to sue and waiver of claims, pursuant to which all the Parties (including the Non-Participating Creditors) mutually release one another from any claims, actions or causes of action connected with the


CERTIFIED
TRANSLATION



– On 10-07-2026, during the Accession Period and as provided, the Restructured Companies, the Original Participating Creditors and the restructuring agent (which shall be defined in the following subsection) executed the Restructuring Plan.

– Without prejudice to the formalisation of the Plan, the remaining Affected Creditors may likewise accede thereto throughout the Accession Period, and those that do so shall be referred to as the "**Acceding Creditors**". As at the date of filing the Application for Approval, the following accessions have already been recorded:

| | Acceding Creditors |
|---|---|
| **9.** | Instituto de Crédito Oficial E.P.E. ("**ICO**") |
| **10.** | anco Santander S.A., in respect of the portion of its Affected Claim covered by the ICO Customs Duties Guarantee. |
| **11.** | HSBC Continental Europe, Spain Branch, in respect of the portion of its Affected Claim covered by the ICO Customs Duties Guarantee. |
| **12.** | CaixaBank, S.A., in respect of the portion of its Affected Claim covered by the ICO Customs Duties Guarantee. |
| **13.** | Banco de Sabadell, S.A., in respect of the portion of its Affected Claim covered by the ICO Customs Duties Guarantee. |

The deeds recording the accession of the Acceding Creditors are attached as **Documentary Bundle No. 5**.

12. Finally, the Restructuring Plan shall be deemed to have been executed by the Original Participating Creditors and the Acceding Creditors[7], that is, by the Participating Creditors.

### 1.3 The Restructuring Agent

13. GLAS SPECIALIST SERVICES LIMITED has been appointed by the Applicant Companies to act as agent in respect of the Restructuring, the Plan and the remaining Restructuring Documents ("**Glas**" or the "**Restructuring Agent**"),

---

Restructuring process that may have arisen prior to the Closing Date; and (xi) any other document that Antolín Irausa and the Restructuring Expert agree shall constitute a Restructuring Document.

[7] As indicated above, there may be more Acceding Creditors than those listed in the Application for Approval, since the Accession Period has not yet ended.

an appointment accepted by Glas for the purpose of representing all the Affected Creditors and assuming the functions described in the Plan itself (see Clause 14.2 thereof).





14.    The functions of the Restructuring Agent shall be addressed again under Fact Thirteen (Section 13.5).

### 1.4 Other Antolín Group Companies that are not Restructured Companies under the Restructuring Plan

15.    In addition to the Applicant Companies, which seek approval of the Plan in their capacity as restructured debtors, it is appropriate to refer here to other Antolín Group companies that play a significant role in implementing the effects of the Plan.

### 1.4.1 HoldCo

16.    First, reference must be made to Grupo Antolín Holdco, S.A. ("**Antolín HoldCo**" or "**HoldCo**"), a public limited company incorporated under the laws of Spain, with its registered office at 307 Vitoria Street, 09007 Burgos, registered with the Commercial Registry of Burgos in volume 676, book 467, folio 33, sheet BU/15343, and holding Tax Identification Number A-09553702. A registry extract for HoldCo is attached as **Document No. 6**. Antolín HoldCo holds the entire share capital of Antolín Irausa and is ultimately controlled by several members of the Antolín family.

**17.**    HoldCo's involvement in connection with the Restructuring is limited to:

   **(a)**    Acknowledging and consenting to the extension of the effects of the Plan, pursuant to Article 652.2 of the TRLC, to the rights in rem arising from the pledges granted by it over the shares representing 100% of the share capital of Antolín Irausa (the "**Pledges over Antolín Irausa**"). This matter shall be addressed in detail under Fact Thirteen (Section 13.4).

   **(b)**    Secondly, granting a first-demand personal guarantee.[8]

### 1.4.2 Other Antolín Group Companies

18.    Likewise, pursuant to the Plan, Grupo Antolin Italia S.R.L., Grupo Antolin Besançon SAS, Antolin Tanger SARL, Trimtec Ltda. and Intertrim Ltda. shall grant first-demand personal guarantees

---

[8] See Clause 5.4 of the Plan, which provides for the granting of new guarantees pursuant to the Plan, and Fact Nine.

upon first demand which, together with HoldCo's new first-demand personal guarantee, constitute what are referred to under the Plan as the "**New ICA Personal Guarantees**", and the companies granting them are referred to as the "**New ICA Guarantors**", a matter that shall be addressed again under Fact Nine. The corporate registry certificates of these other companies are attached as **Documentary Bundle No. 7**, and their non-certified translations into Spanish as **Documentary Bundle No. 7 bis**.



9



**SECOND. – The Antolín Group, the Applicant Companies and Their Business Model**

**2.1 The Antolín Group and Its Importance to Spain's Industrial Base**

19. As is well known, the Antolín Group is a leading company in the Spanish automotive sector. Despite its strong international presence, the Group has always retained its identity as a family-owned business, which is reflected in a centralised business model under which all strategic and operational decisions originate from its main headquarters in Burgos. These matters are examined in greater detail below.

**A) The Antolín Group as a Leading Multinational in the Spanish Automotive Industry**

20. The Antolín Group is a Spanish multinational and a world leader in the development, design and manufacture of interior components for the automotive industry, including headliners, doors, lighting, instrument panels and electronic systems. Since its establishment in 1950, originating from a mechanical workshop in Burgos operated by the Antolín family, the Group has evolved into one of the world's leading manufacturers of vehicle interiors. Nevertheless, the Group continues to maintain its headquarters in Burgos and its character as a family-owned business under the leadership of the Antolín family.

21. Consequently, the Antolín Group holds a leading position in the international automotive industry, with its interior components installed in the world's best-selling vehicles, equipping more than 500 different models and supplying 9 out of the 10 best-selling vehicles worldwide. Accordingly, the Group acts as a Tier 1 supplier to virtually all the world's leading automotive manufacturers. By way of example, in the United States, one in every three vehicles incorporates components manufactured by the Antolín Group.[9]

---

[9] Press release issued by the Ministry of Foreign Affairs, European Union and Cooperation, entitled "The Ambassador Attends the Inauguration of the Antolín Group's 10th Facility in Kansas City, Missouri, on the 20th Anniversary of the Company's Operations in the United States", published on 2014-05-23. Available at:





22. At present, the Group has a strong international presence, operating in 23 countries, where it has 111 production facilities and "just-in-time" centres[10], as well as 25 technical and sales offices. Grupo Antolín employs approximately 20,000 people and achieved a turnover of EUR 3.725 billion in 2025[11]. For evidentiary purposes, the Antolín Group's consolidated annual accounts for 2025 are attached as **Document No. 8**; in any event, they are also published on the Group's website[12].

23. The Group is also the world leader in terms of production volume and technological development in automotive headliners. Furthermore, it ranks among the world's leading automotive suppliers[13].

24. As stated above, the importance of the Antolín Group must be understood within the context of the Spanish automotive sector, which constitutes one of the fundamental pillars of the industrial sector and, consequently, of the national economy. It should be borne in mind that Spain is the second-largest vehicle manufacturer in Europe—surpassed only by Germany—and the ninth-largest worldwide[14]. The automotive sector accounts for approximately 10% of Spain's GDP and provides employment for more than 567,000 workers. In 2024, the sector generated turnover of EUR 76.855 billion, with investment amounting to EUR 2.434 billion, and vehicles remained the product making the largest positive contribution to Spain's trade balance, amounting to EUR 15.991 billion[15]. A further point to be taken into account is that, for every euro generated

---

https://www.exteriores.gob.es/Embajadas/washington/es/Comunicacion/Noticias/Paginas/Articulos/20140527_NOT1.aspx#:~:text=Adem%C3%A1s%2C%20uno%20de%20cada%20tres%20coches%20en%20Estados%20Unidos%20tiene%20componentes%20del%20fabricante%20espa%C3%B1ol%2C%20lo%20que%20le%20otorga%20una%20significativa%20cuota%20de%20mercado%20y%20supone%20una%20ayuda%20muy%20importante%20para%20liderar%20el%20mercado%20mundial

[10] Centres in which production is carried out on a just-in-time basis.

[11] For further information on the Antolín Group, please visit its website:
https://www.antolin.com/es/compania-home

[12] https://www.antolin.com/es/informacion-financiera-informes

[13] Antolín **2025 Integrated Report**. Available at:
https://www.antolin.com/sites/default/files/informe_integrado_antolin_2025.pdf

[14] Press release issued by the Ministry of Economy, Trade and Enterprise entitled "Spain is the second-largest vehicle manufacturer in Europe and ranks ninth worldwide in 2024". Available at:
https://www.investinspain.org/es/sectores/automocion-movilidad#:~:text=Espa%C3%B1a%20es%20el%202%C2%BA%20mayor%20fabricante%20de%20veh%C3%ADculos%20europeo%20y%20se%20sit%C3%BA%209%C2%BA%20a%20nivel%20mundial%20en%202024
and the CaixaBank Sectoral Observatory report entitled "The automotive sector in Spain: the challenge of maintaining competitiveness in the new global ecosystem", published on **2024-11-29**. Available at:
https://www.caixabankresearch.com/es/analisis-sectorial/observatorio-sectorial/sector-automocion-espana-reto-mantener-competitividad#:~:text=En%202023%2C%20Espa%C3%B1a%20fabric%C3%B3%20m%C3%A1s%20de%202%2C45%20millones%20de%20veh%C3%ADculos%20y%20se%20coloc%C3%B3%20como%20el%20segundo%20productor%20de%20Europa%2C%20solo%20superada%20por%20Alemania

[15] Press release issued by the Spanish Association of Automobile and Truck Manufacturers entitled "The automotive sector achieved turnover of EUR 76.855 billion in 2024", published on **2025-07-10**. Available at:
https://anfac.com/el-sector-de-la-automocion-alcanzo-los-76-855-millones-de-euros-de-facturacion-en-



11



directly by the automotive sector, approximately EUR 0.80 of additional value is generated throughout the economy, demonstrating the sector's significant multiplier effect on the economy as a whole.

25. Within this ecosystem, the Antolín Group plays a pivotal role as one of the few leading Spanish multinational companies in the automotive components sector, with unique design, engineering and production capabilities serving the world's principal automotive markets. The Group is also one of the largest investors in R&D&I within the sector in Spain, having made innovation one of the pillars of its strategy since 1993, when Antolín Ingeniería was established. In keeping with this innovative approach, the Group has continued to explore new avenues for growth linked to the sector's transformation, including advanced electronics, intelligent systems and strategic partnerships with artificial-intelligence-based engineering platforms.[16]

26. The preservation of the Antolín Group's operations is therefore of interest not only to its creditors and employees, but also to Spain's industrial base as a whole and, in particular, to that of the regions of Burgos and Castile and León, given its status as an anchor company that generates skilled employment, investment and economic activity throughout its value chain.

27. The importance of the Antolín Group to the Spanish economy is likewise illustrated by its substantial workforce, which enables it to operate its successful business model. The following table sets out the number of employees of each of the Applicant Companies:

---

2024/#:~:text=Las%20empresas%20y%20fabricantes%20de%20autom%C3%B3viles%20que%20operan%20en%20Espa%C3%B1a%2C%20asociadas%20en%20ANFAC%2C%20alcanzaron%20en%202024%20una%20facturaci%C3%B3n%20de%2076.855%20millones%20de%20euros

[16] Antolín Group website. Available at:b https://www.antolin.com/innovacion-retos-de-futuro


CERTIFIED TRANSLATION



| No. | Company | Number of Employees | No. | Company | Number of Employees |
|---|---|---|---|---|---|
| 0 | Antolín Irausa | 267 | 18 | Antolín Sibiu | 876 |
| 1 | Antolín Aragusa | 366 | 19 | Antolín Silesia | 209 |
| 2 | Antolín Autotrim | 86 | 20 | Antolín South Africa | 349 |
| 3 | Antolín Eurotrim | 173 | 21 | Antolín Bohemia | 258 |
| 4 | Antolín Glass | 2 | 22 | Antolín Ostrava | 213 |
| 5 | Antolín Ingeniería | 326 | 23 | Antolín Turnov | 653 |
| 6 | Antolín Plasbur | 125 | 24 | Antolín Liban | 308 |
| 7 | Antolín RyA | 348 | 25 | Antolín Deutschland | 233 |
| 8 | Antolín Interiors UK | 459 | 26 | Antolín Bamberg | 204 |
| 9 | Antolín Leamington | 85 | 27 | Antolín Logistik Deutschland | 95 |
| 10 | Antolín UK | 60 | 28 | Antolín Straubing | 431 |
| 11 | Antolín North America | 113 | 29 | Antolín Interiors México | 1,886 |
| 12 | Antolín Alabama | 116 | 30 | Antolín Silao | 604 |
| 13 | Antolín Interiors USA | 347 | 31 | Antolín Saltillo | 361 |
| 14 | Antolín Shelby | 359 | 32 | Antolín Tlaxcala | 617 |
| 15 | Antolín Missouri | 231 | 33 | Antolín Cuautitlán | 94 |
| 16 | Antolín Kentucky | 407 | 34 | Antolín Lusitânia | 203 |
| 17 | Antolín Michigan | 118 | 35 | Antolín Bratislava | 287 |

| TOTAL EMPLOYEES OF THE APPLICANT COMPANIES | 11,869 |
|---|---|

28. Accordingly, the foregoing data clearly demonstrate the considerable scale and economic, business and employment significance of the Antolín Group for Spain.

**B) The Antolín Family as Founder, Manager and Strategic Pillar of the Group**

29. The Antolín Group originated from a modest mechanical workshop in Burgos, established in the 1950s by Mr. Avelino Antolín López together with his sons, Avelino and José, and initially devoted to repairing vehicles and agricultural machinery. From this family workshop, the Antolín brothers demonstrated an innovative spirit that would permanently shape the company's identity: in 1950, they invented the rubber-metal steering ball joint, an innovation that resolved significant vehicle-steering safety problems and was subsequently patented and commercialised.[17] This family and industrial origin is not merely a historical antecedent, but rather one of the factors explaining the Group's continuity, specialisation and capacity to adapt over more than seven decades. historical antecedent, but rather one of the factors explaining the Group's continuity, special

---

[17] Antolín Group website. Available at: https://www.antolin.com/es/compania-historia





30. In 1959, the family founded ANSA, a company engaged in the manufacture of steering and suspension ball joints, and in 1967 they incorporated Talleres ARA, S.L. for the manufacture of automotive trim and accessories. The diversification strategy was consolidated in 1968 through an agreement with the German company Lemförder to establish a company in Burgos, in which the Antolín brothers were the majority shareholders, thereby enabling the acquisition of manufacturing licences for vehicle interior components.[18] In 1985, in view of the growth of the business, the family incorporated the Grupo Antolín holding company for the purpose of managing, coordinating and consolidating all the activities of the corporation's various companies, and, from 1989 onwards, an ambitious internationalisation process was launched. Accordingly, the Group's growth has been built upon a combination of stable family leadership, a long-term industrial vision, reinvestment, innovation and internationalisation, all of which are closely linked to the founding family's continued involvement in the strategic management and governance of the business enterprise throughout its more than 75 years of history.

31. As regards the individuals concerned, in 2015, the long-standing Chairman and founder, Mr. José Antolín Toledano, stepped down from his executive duties after 50 years of service to the company and was appointed Honorary Chairman, while Mr. Ernesto Antolín Arribas assumed the role of Executive Chairman and Mrs. María Helena Antolín Raybaud that of Vice-Chairwoman. In 02-2026, Ms Emma Antolín Granet was unanimously appointed Executive Chairwoman by the Board of Directors.[19] More recently, in 04-2026, Mr. Ernesto Antolín Arribas assumed the Chairmanship of Avot Inversiones, S.L., the holding company through which the family structures its ownership interest and control over the Group, while remaining fully involved in the business enterprise.[20] The internal communication informing employees of this appointment is attached as **Document No. 9**.

32. These successions ensure the orderly continuity of family leadership within a professionalised governance structure focused on implementing the Group's strategic and financial plan.

33. It is also significant that, in 2013, the Antolín family acquired the 22.8% shareholding held by a group of financial institutions, thereby reflecting its commitment

---

[18] Article entitled "Antolín, an Empire Born in a Mechanical Workshop", published in Diario de Castilla y León on 2025-11-23. Available at: https://www.diariodecastillayleon.es/burgos/251123/103264/antolin-imperio-nacio-taller-mecanico.html

[19] Article entitled "Antolín Appoints Emma Antolín as Chairwoman, Replacing Ernesto Antolín, Who Steps Down After 10 Years", published by Europa Press on 2026-02-25. Available at: https://www.europapress.es/motor/sector-00644/noticia-antolin-nombra-presidenta-emma-antolin-sustituye-ernesto-antolin-deja-cargo-10-anos-20260225131207.html

[20] Article entitled "Ernesto Antolín, Chairman of Avot Inversiones, to Strengthen the Role of the Family-Owned Company: 111 Factories in 23 Countries", published in El Español on 2026-04-10. Available at: https://www.elespanol.com/castilla-y-leon/economia/empresas/20260410/ernesto-antolin-presidente-avot-inversiones-reforzar-papel-empresa-familiar-fabricas-paises/1003744201898_0.html





unwavering commitment to the Group's future. In the company's own words, this transaction strengthened the objective of "ensuring sustainable and profitable growth over the coming years".[21] This transaction is particularly significant for the purposes of the present Plan, as it demonstrates that the Antolín family has historically acted as a stable anchor shareholder, ensuring continuity of the business enterprise at key moments of financial and corporate development and, in particular, preventing any fragmentation or alteration of control that could jeopardise the Group's industrial strategy.

34. Institutional recognition of the Antolín family's contribution has been constant. In 2010, Mr. José Antolín was awarded the Gold Medal for Merit at Work, Spain's highest distinction for a worker. In 2016, King Felipe VI presented Mr. José Antolín with the Kingdom of Spain Award for Business Achievement. On the occasion of the Group's 75th anniversary in 2025, His Majesty the King visited its headquarters in Burgos and addressed the following words to the family: "You are standard-bearers of the family-owned business, of attachment to the land in which you were born, of excellence and of Brand Spain".[22] This statement undoubtedly encapsulates the value that the Antolín family brings not only to the Group but also to the Spanish economy as a whole, through an industrial group whose identity, reputation, institutional relationships and standing among customers, suppliers, employees and financing providers are closely associated with the continuity of the founding family.

35. More recently, in 05-2026, Mr Ernesto Antolín was awarded the Gold Medal of the Burgos Chamber of Commerce in recognition of his exemplary professional career and his contribution to the economic, business and social progress of the Province of Burgos. The internal communication concerning this event, attached hereto as Document No. 10, highlighted the important work carried out by Mr Ernesto, who has always upheld the Group's values while maintaining its inseparable ties with Burgos.

36. In conclusion, the Antolín family's commitment to the governance of the Group and its continued presence in the capital structure are unwavering and essential to ensuring the Group's long-term stability, for several interrelated reasons:

(a) First, the Group's commercial brand is the surname of the founding family. The name "Antolín" constitutes the corporate identity under which the company operates in the 23 countries in which it is present and under which it supplies the world's leading automotive manufacturers. In 2023, the company itself launched

---

[21] Antolín Group website. Available at: https://www.antolin.com/es/compania-historia
[22] Ibid., footnote 22.


CERTIFIED TRANSLATION

15


USA CORP

a new brand and corporate identity, while always retaining the name "Antolín" as the central element of its image and identity.[23]

(b)    Secondly, the confidence placed in the Antolín Group by the leading automotive manufacturers (OEM) as a global supplier is based to a significant extent on the stability and trust that family management has historically provided to the Group. The Group's 2024 Integrated Report, available on its corporate website, expresses this clearly: "the spirit of this family-owned company remains alive after more than 70 years of activity and is reflected in the close relationship it maintains with customers, employees and all other stakeholders. It maintains strong alliances with all of them, which endure over time owing to their quality, rigour and commitment".[24] In a sector characterised by long-term supply relationships, stringent approval processes, multi-year contract award procedures and a high degree of dependence on customer confidence, any change in shareholding control could have a destabilising effect.

(c)    Thirdly, the experience and relationship capital of the Antolín family are intangible assets of incalculable value to the continuity of the business. On the occasion of the appointment of Mr. Ernesto Antolín as Chairman of Avot Inversiones, the company expressly emphasised that "his experience, his relationship capital and his profound knowledge of the business will continue to be a fundamental asset for the project" and that "the family remains united around the company, and this constitutes a strength that the entire organisation must recognise as its own".[25]

Consistently with the foregoing, numerous creditors and customers require the Antolín family to remain involved in the governance of the Group. This requirement is reflected, for example, in the early repayment, acceleration or termination clauses triggered by a change of control that are included in many of the Group's agreements. By way of illustration, the early repayment, acceleration and/or termination clauses triggered by a change of control contained in agreements with certain principal customers are attached hereto (see **Document No. 11** and its translation, **Document No. 11 bis**). Change-of-control clauses are also present in most financial instruments

---

[23] Antolín Group website. Available at:
https://www.antolin.com/es/antolin-estrena-nueva-marca-como-reflejo-de-su-proceso-de-transformacion
[24] Antolín **2024 Integrated Report**. Available at:
https://www.antolin.com/sites/default/files/2024_informe_integrado_antolin_0.pdf#:~:text=Antolin%20es%20la%20compa%C3%B1%C3%ADa%20l%C3%ADder%20en%20todo%20el%20mundo%20en%0A%0Afabricaci%C3%B3n%20de%20guarnecidos%20de%20techos%20para%20autom%C3%B3viles
[25] Article entitled "Ernesto Antolín, Chairman of Avot Inversiones, to Strengthen the Role of the Family-Owned Company: 111 Factories in 23 Countries", published in *El Español* on **10-04-2026**. Available at:
https://www.elespanol.com/castilla-y-leon/economia/empresas/20260410/ernesto-antolin-presidente-avot-inversiones-reforzar-papel-empresa-familiar-fabricas-paises/1003744201898_0.html



16



affected by the Restructuring[26] and has likewise been required for inclusion in the Restructuring Plan itself, given the need to maintain the current capital structure led by the Antolín family in order to ensure the Group's viability (see Clause 5.3.8 of the Plan).

(d) Fourthly, the family's management and its knowledge of the market in which the Group operates have provided the Group with stability and a long-term outlook that are particularly valuable in a sector as competitive and cyclical as the automotive industry. In the face of market fluctuations, the family has maintained a consistent strategy of investment in I+D+i, internationalisation and product diversification, which has enabled the Group to successfully overcome crises such as the 2008 financial crisis, the COVID-19 pandemic and the recent strains affecting global supply chains.

37. In conclusion, the Antolín family is an essential asset of the Group and constitutes the unifying element of its identity, strategy and position in the global market. Maintaining the current capital structure, with the Antolín family at the helm of management, therefore constitutes an essential prerequisite for the Restructuring Plan and for the Group's future viability.

**2.2 The Antolín Group's Business Model and Decision-Making Structure**

**A) Contractual Organisation Model**

38. As stated above, the Antolín Group operates internationally through an integrated business model centralised in Burgos. The Group's Subsidiaries—both the Spanish Subsidiaries and the Foreign Subsidiaries—are organised into three distinct functional categories: (i) Antolín Ingeniería, a company with its registered office in Burgos, which has entered into a framework agreement with Antolín Irausa for the development of R&D&I activities for the Antolín Group; (ii) the production facilities (the "**Plants**")[27], which are engaged in the manufacture of components and the provision of associated logistics services; and (iii) the technical and sales offices (hereinafter, the "**OTCs**")[28], which provide commercial, technical, innovation and corporate support services.

---

[26] Indeed, the financial instruments defined below—namely, the Existing Notes, the Existing Syndicated Facility Agreement, the Existing EIB Facility Agreements and the Existing ICO Facility Agreement—contain change-of-control provisions directly linked to specific members of the Antolín Family, stipulating that control must remain with the specifically identified members or with parties related to them.

[27] These comprise: Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Plasbur, Antolín RyA, Antolín Interiors UK, Antolín Leamington, Antolín Alabama, Antolín Interiors USA, Antolín Shelby, Antolín Missouri, Antolín Kentucky, Antolín Michigan, Antolín Sibiu, Antolín Silesia, Antolín South Africa, Antolín Bohemia, Antolín Ostrava, Antolín Turnov, Antolín Liban, Antolín Bamberg, Antolín Logistik Deutschland, Antolín Straubing, Antolín Interiors Mexico, Antolín Saltillo, Antolín Tlaxcala, Antolín Cuautitlán, Antolín Silao, Antolín Lusitânia and Antolín Bratislava.

[28] These comprise: Antolín UK, Antolín Deutschland and Antolín North America.


CERTIFIED TRANSLATION



39. Both the Plants and the OTCs operate under the direction and supervision of Antolín Irausa and, as regards R&D&I, of Antolín Ingeniería, with decisions being taken by their corporate bodies from Burgos or by executives whose place of work is located in Burgos. Accordingly, the Subsidiaries merely implement the instructions and guidelines transmitted to them from that city.

40. The relationships between Antolín Irausa and the Plants are governed by agreements known as "Principal Master Agreements" (or "**PMAs**"), entered into between Antolín Irausa—in its capacity as "Principal"—and each of the Plants. Pursuant to these agreements, Antolín Irausa assumes the role of entrepreneur, defining the Group's global business strategy, developing and maintaining the Group's intangible assets and ultimately bearing the economic consequences of the material business risks. The Plants, for their part, are limited to purely production-related functions—order management, manufacturing, quality control and product delivery—under the direction and supervision of Antolín Irausa, without any independent decision-making authority. In this regard, the decisions of these entities are, once again, taken from Burgos.

41. For their part, the relationships between Antolín Irausa and Antolín Ingeniería, on the one hand, and the Subsidiaries acting as OTCs—specifically, Antolín Deutschland, Antolín UK and Antolín North America—on the other, are governed by a set of service agreements (the "**OTC Agreements**"), which include, among others, commercial support services, corporate support services, development and maintenance services, industrial activity services, innovation services and technical-commercial activity services.

42. The relevant feature of all these OTC Agreements is that it is the OTCs that provide support services to Antolín Irausa and, in the case of innovation agreements, to Antolín Ingeniería, which are the companies that actually perform the strategic functions, while the OTCs merely implement the business activity models designed in Burgos.

43. Furthermore, Antolín Irausa maintains a centralised treasury management system with all its Subsidiaries, under the customary single-treasury model, implemented through cash-pooling arrangements; Antolín Irausa also enters into contracts on behalf of all its Subsidiaries, as is the case, for example, with insurance agreements.

44. We do not attach all of these agreements here—the PMAs, the OTC Agreements, the cash-pooling arrangements and other agreements—as they contain commercially sensitive information concerning the Group and its business model, without prejudice to our willingness, of course, to submit them insofar as may be necessary, should this Honourable Court so determine.





**B) Organisation of the Antolín Group into Business Units Managed from Burgos**

45. In addition to all the foregoing, the Antolín Group divides its production activities into three business units ("**Business Units**"), which are described below, to which the various Plants are assigned and which are managed from Burgos:[29]

   (i) Doors, Integrated Products, Centre Consoles and Trim[30]: this Business Unit specialises in the manufacture of these vehicle components and is headed by Mr Ignacio Salazar, an employee of Antolín Irausa based in Burgos.

   The following Applicant Companies form part of this Business Unit: Antolín Aragusa, Antolín Glass, Antolín Plasbur, Antolín RyA, Antolín Interiors UK, Antolín Interiors USA, Antolín Shelby, Antolín Silesia, Antolín Turnov, Antolín Liban, Antolín Straubing, Antolín Interiors Mexico, Antolín Tlaxcala, Antolín Cuautitlán and Antolín Lusitânia.

   (ii) Headliners: this Business Unit focuses on the manufacture of components for vehicle roofs and is headed by Mr Fernando Torija, an employee of Antolín Irausa based in Burgos.

   The Applicant Companies forming part of this Business Unit are: Antolín Autotrim, Antolín Eurotrim, Antolín Leamington, Antolín Alabama, Antolín Missouri, Antolín Kentucky, Antolín Michigan, Antolín South Africa, Antolín Bohemia, Antolín Ostrava, Antolín Logistik Deutschland, Antolín Silao and Antolín Bratislava.

   (iii) Electronic Systems: a Business Unit focused on developing solutions for functions associated with vehicle interiors. It is headed by Mr Enrico Marzinot, an employee of Antolín Irausa based in Burgos.

   The following Applicant Companies form part of this Business Unit: Antolín Bamberg, Antolín Sibiu and Antolín Saltillo.

---

[29] An internal Group communication setting out the changes to the organisation of the Business Units, which were reduced from five to three, is attached as **Document No. 12.**

[30] Using the English abbreviations employed by the Group: *"Doors & IP & CCs & HT".*

46. Furthermore, the directors of the aforementioned Business Units report to the Chief Officer & Business Officer, Mr. Miguel Marañón, who is likewise an employee of Antolín Irausa and is also based in Burgos.

47. For their part, although the OTCs do not form part of a Business Unit as such, they are grouped under the direction of the Commercial Director of the Antolín Group, Ms Sonia Aguilar, an employee of Antolín Irausa whose place of work is likewise located in Burgos.





### C) Management from Burgos

48. Likewise, the governing bodies of Antolín Irausa and the Subsidiaries are generally composed of persons of Spanish nationality whose place of work is located in Burgos. In those cases where, for legal or operational reasons arising from the jurisdiction in which the company operates, it has been necessary to appoint local professionals from the country in which the Plant or OTC is located to the governing body, decisions continue to be taken from Spain.

49. Furthermore, Mrs. Cristina Blanco Santo Tomás, Chief Executive Officer of Antolín Irausa, generally holds the position of director, or has been granted powers of attorney exercisable severally, in the various Foreign Subsidiaries whose governing bodies include local representatives. Accordingly, notwithstanding such local representation, effective managerial control continues to be located in Burgos.

50. We attach as **Document No. 13** a table prepared by us summarising the persons who form part of the governing bodies of the Subsidiaries; as **Document No. 14**, the Antolín Group's management team as shown on its website[32]; as **Document No. 15**, an organisational chart showing the management structure of the Antolín Group; and as **Document No. 16**, the certificate issued by the Human Resources Department of Antolín Irausa confirming that all members of the management team are affiliated with Antolín Irausa and are domiciled in Burgos.

### D) Management Model

51. Accordingly, under this organisational structure, Antolín Irausa sends from Burgos to all the Subsidiaries standardised protocols and operating models that must be followed by all Group employees worldwide, ranging from operating manuals and procedural guidelines to business models, production schedules and corporate directives. This global standardisation of processes, decided upon and implemented from its headquarters, constitutes

---

[31] Including legal, tax, efficiency and operational reasons.
[32] https://www.antolin.com/es/compania-equipo-directivo



20



further evidence that the nerve centre of the Group's management and direction is unequivocally located in Burgos.

52. Once again, as the aforementioned documents contain information that may qualify as trade secrets, they are not attached hereto, without prejudice to their being made available to this Honourable Court should it consider their submission necessary or appropriate.

### E) Model Recognised by Authorities, Employees and Creditors

53. It is particularly relevant to note that this operating model has been analysed and validated by the Spanish Tax Administration. Accordingly, on 21-03-2024, the Spanish State Tax Administration Agency approved a unilateral Advance Pricing Agreement (the "**APA**") entered into with Antolín Irausa, effective for the tax years 2024 to 2027, concerning the valuation of related-party transactions carried out between the Group's entities. In its functional analysis, the APA confirms that the Antolín Group operates under an integrated industrial and commercial management model involving the harmonisation and standardisation of production and commercial processes, as well as the concentration and centralisation of decision-making in Burgos. The APA also recognises that the Group's principal intangible assets—including its customer portfolio, patents, trademarks, manufacturing know-how and logistics management systems—are owned by Antolín Irausa, in which the functions relating to the development, improvement, maintenance, protection and exploitation of those assets are concentrated.

54. Naturally, the employees of the various Antolín Group Subsidiaries are aware, through their day-to-day experience, that the Group's strategic, organisational and operational decisions are taken at its headquarters in Burgos. This is evidenced by the internal communications issued by central management, which are periodically addressed to the entire global workforce through worldwide distribution lists, are systematically drafted in Spanish and English, and are always sent from the single corporate domain (antolin.com), without any differentiation by subsidiary or region. A sample of these communications is attached as **Documentary Bundle No. 17**.

55. Likewise, creditors, customers and suppliers are aware of this centralisation, since the contractual relationships entered into with them are negotiated from Burgos. By way of example, and insofar as relevant here, in virtually all financing transactions, the persons acting as signatories on behalf of all the Group companies—including the Foreign Subsidiaries—are invariably persons resident in Burgos.

56. The Antolín Group itself has acknowledged and expressly stated this centralisation to its creditors, as may be seen from the Consolidated Supporting Memorandum prepared for the purpose of obtaining financing from the ICO, which describes how the industrial model is centralised in terms of decision-making and management, and how the decision-making and control bodies for industrial and commercial management, finance, procurement and human resources are located at its headquarters in Burgos. The aforementioned Memorandum, excluding its annexes, is attached as **Document No. 18**.



21



57. All the aforementioned documentation contains sensitive and confidential information concerning the operations of the Antolín Group. For this reason, once again, it is not attached to this submission, without prejudice to making such evidence available again to this Honourable Court should this be deemed necessary or appropriate.

**THIRD. – The Applicant Companies' Probability of Insolvency and the Negotiations Conducted for the Execution of the Restructuring Plan**

58. The following section describes, on the one hand, the probability of insolvency faced by the Applicant Companies, which justifies the commencement of these proceedings (Section 3.1), and, on the other hand, the negotiations conducted with their financial creditors within the framework of the appointment of the Restructuring Expert, which resulted in the Restructuring Plan whose approval is the subject of the Application (Section 3.2).

**3.1 The Applicant Companies Are in a State of Probability of Insolvency**

59. Pursuant to Article 584.2 of the TRLC, "a probability of insolvency shall be deemed to exist where it is objectively foreseeable that, unless a restructuring plan is reached, the debtor will be unable to regularly meet its obligations falling due within the next two years". This is precisely the situation in which the Applicant Companies find themselves and which justifies their proactive recourse, in compliance with the "early-warning" recommendations, to the preventive restructuring mechanisms provided for under the TRLC.

60. Although the Applicant Companies have, to date, duly met all their financial obligations towards their creditors—including all interest and fee payments falling due[33]—their liability structure and upcoming maturities, considered in light of the current sectoral and macroeconomic environment, demonstrate that, without the approval and implementation of the Restructuring Plan for which judicial approval is sought, they are exposed to the

---

[3] Ordinary interest and fees which, in view of the mere probability of insolvency, shall continue to be paid in accordance with the terms of the Restructuring Plan until the Effective Date, so as to minimise any prejudice to the Affected Creditors.





more likely than not to be unable to regularly meet the obligations falling due within the next two years. There are three factors which, considered jointly, establish the objective condition for the existence of a probability of insolvency.

### A) The Current Macroeconomic and Geopolitical Context and Its Impact on the Automotive Sector

61. The automotive sector is experiencing a period of uncertainty unprecedented in recent decades. The tariff policy pursued by the United States Administration—through the progressive imposition of tariffs on imports of vehicles and automotive components not manufactured in North America—has substantially altered competitive conditions in the sector's principal global market and has had a particularly significant impact on European component suppliers with an industrial presence in the United States, including the Antolín Group, which operates plants and production facilities there.

62. The consolidated annual accounts for the 2024 financial year (**Document No. 19**) had already warned, in their Consolidated Management Report, of the adverse impact that these circumstances could have on the Group's operations.

63. Likewise, references to this situation appear in the consolidated annual accounts for the 2025 financial year, attached as Document No. 8, which state as follows (see page 31, Section (2)(h) of the consolidated notes to the financial statements):
"Furthermore, the uncertainty arising from the geopolitical situation associated with the recent armed conflict in Iran, together with the transformation process currently affecting the automotive sector, could also make it difficult to comply with those financial ratios during the final quarter of the 2026 financial year and the first two quarters of 2027. Such non-compliance could entitle the financial institutions to demand, in 2027, the acceleration of a significant portion of the Group's consolidated financial debt, which would materially affect its liquidity position."

### B) The High Level of Indebtedness Inherited from the Acquisition of Magna Interiors, Aggravated by Subsequent External Crises

64. In addition to the aforementioned sectoral and geopolitical factors, the Antolín Group has borne a high level of indebtedness—above that ordinarily found in the sector—since its acquisition of the interiors business of the Canadian multinational Magna International (the transaction known as the "**Magna Interiors**")[34]. Although this strategic transaction enabled the Antolín Group to consolidate its position as one of the world's leading suppliers of interior components, doubling its size to achieve turnover exceeding EUR 4 billion and a global workforce of nearly 20,000 employees, it required a significant investment of resources, primarily financial resources—in the



23



form of bond issuances and the execution of additional financial instruments—which substantially increased the Group's leverage.

65. The Group's ability to meet the financial obligations arising from the aforementioned expansion transaction was severely impaired by two successive external crises: first, the COVID-19 pandemic, declared in 2020, which temporarily brought global automotive production to a standstill; and subsequently, the war in Ukraine, which began in 02-2022 and remains ongoing, causing significant disruption to supply chains and a widespread increase in the cost of raw materials and energy. These external factors prevented the Antolín Group from reducing its indebtedness at the rate initially envisaged.

66. Although the Group has succeeded in restoring its operating margins in recent financial years and currently enjoys a sound business position, with a diversified customer portfolio and a strengthened competitive position, this recovery occurred after its financial structure had already been adversely affected by the leverage resulting from the acquisition of Magna Interiors—further aggravated by the subsequent crises—meaning that, in the absence of an orderly restructuring, its financial burden would be difficult to sustain in the medium and long term.

### C) The Concentration of Maturities over the Next Two Years and the Need to Secure Working-Capital Financing

67. The maturity profile of the Applicant Companies' financial indebtedness, described in detail under Fact Four, shows a critical concentration that objectively confirms the existence of the condition set forth in Article 584.2 of the TRLC. In particular, the Group faces significant maturities and potential acceleration events in 2027 and 2028, at which time it will be required to make payments totalling EUR 494.3 million.

---

[34] Grupo Antolín published details of this transaction on its corporate website:
https://www.antolin.com/es/grupo-antolin-cierra-la-adquisicion-de-magna-interiors-para-ofrecer-el-interior-completo-del and
https://www.antolin.com/es/grupoantolin-acuerda-la-adquisicion-de-la-mayor-parte-del-negocio-de-interiores-de-magna



24



68.    Furthermore, most of the financial instruments include a mechanism under which their final maturity is brought forward to 29-10-2027 unless a substantial portion of the debt has previously been refinanced. Given current market conditions and the sectoral context described above, such refinancing is unlikely to be achievable on a sustainable basis without first restructuring the Group's financial liabilities.

69.    Likewise, the Existing Syndicated Factoring Facility[35], which is a fundamental working-capital instrument for the Group's operations, is due to mature on 23-01-2027. Consequently, the need to secure a long-term bank working-capital financing facility has become an essential and critical matter for the Group's viability. Securing the working-capital financing required by the Group to continue operating has, precisely, been one of the most significant matters addressed in the negotiations conducted with the creditors for the execution of the Plan.

70.    The probability of insolvency is objectively established by the viability plan prepared by the Antolín Group (the "**Viability Plan**"), which was reviewed and validated by the prestigious firm VEST Partners Estrada, S.L. (hereinafter, "**Vest Partners**"), and which is attached as **Document No. 20** and shall be discussed in detail under Fact Fourteen.

71.    In any event, it should be noted at this stage that, as regards the Applicant Companies' probability of insolvency, the Viability Plan confirms its existence in the following terms:

> *"Although the principal concentration of financial maturities will not occur until the 2028 financial year—although it could be brought forward to 2027-10 if the Notes maturing in 2028 have not been refinanced by that date—the scale and complexity of the Group's financial structure, together with the macroeconomic and sectoral environment in which it operates, have led the Antolín Group to pursue a Restructuring Plan aimed at strengthening its liquidity, aligning its financial structure with its cash-generating capacity and ensuring its future viability.*
>
> *In the absence of such measures, the Group would be unlikely to have the time and financial flexibility required to implement the planned operational improvements and generate the resources necessary to meet its future financial commitments in an orderly manner. Accordingly, the Antolín Group is considered to be in a state of probability of insolvency, since it is reasonably foreseeable that, unless the Restructuring Plan is reached, it will be unable to regularly meet the obligations falling due within the next two years."(see page 41 of the Viability Plan).*

---

[35] The "**Existing Syndicated Factoring Facility**" refers to the syndicated factoring agreement (Receivables Purchase and Servicing Agreement) entered into on 23-01-2025 between Antolín Irausa, as seller and collection agent; BBVA, CaixaBank and HSBC Factoring (France), as purchasers; and BBVA, as agent bank.


CERTIFIED TRANSLATION

25



**72.** Likewise, the Restructuring Expert also finds that the difficulties giving rise to a state of probability of insolvency of the Antolín Group exist, as stated in its report on the reasonableness of the Viability Plan (the "**Report on the Reasonableness of the Viability Plan**"), attached as **Document No. 21**, while also concluding that this situation may be overcome through the measures set out in the Plan to ensure the Group's viability:

> *"At present, owing to the volume of debt and the financial structure maintained by the Group, with a concentration of maturities in the 2028 financial year—approximately EUR 494.3 million—which could largely be brought forward to the previous financial year if the Group fails to refinance, before 10-2027, the Notes maturing in 2028, the Antolín Group will be unable to repay the aforementioned debt on its contractually scheduled maturity dates. Furthermore, the Group does not consider it feasible to refinance the debt maturities owing to its current leverage ratio and, in those circumstances, the continued availability of the working-capital facilities, which are essential to the operation of the business, is not assured.*
>
> *Consequently, the Antolín Group proposes a Restructuring Plan that will enable it to adapt and optimise its financial structure and thereby ensure the Group's viability."*
> *(see pages 11 and 12 of the Report on the Reasonableness of the Viability Plan).*

**73.** In conclusion, all the requirements laid down in Article 584.2 of the TRLC for establishing the probability of insolvency of the Applicant Companies are satisfied and, consequently, so is the objective condition provided for in Article 638.1(1) of the TRLC for the judicial approval of the Restructuring Plan.

### 3.2 The Negotiations Conducted with the Creditors

**74.** Having become aware of the situation described above at an early stage, and in view of the aforementioned operational and financial difficulties encountered by the Group in recent years as a result of the macroeconomic and sectoral environment described above, in 2023 the implementation of a transformation plan (the "**2023 Transformation Plan**") was approved, with the aim of carrying out a financial and operational restructuring that would help deleverage the balance sheet and optimise operational efficiency.[36] Although implementation of the 2023 Transformation Plan has resulted in an increase in the EBITDA margin on sales, from 8.1% in the

---

[36] See Antolín Group website, available at: https://www.antolin.com/es/antolin-presenta-su-plan-de-transformacion-para-liderar-la-nueva-movilidad-desde-el-interior-del





2023 financial year to 9% in the 2025 financial year, with the resulting improvement in profitability, this has not been sufficient to overcome the excessive financial leverage burdening the Group.

75. For this reason, and in parallel, in order to act with the diligence and foresight required by the circumstances, the Applicant Companies commenced discussions with their principal banking creditors with a view to: (a) ensuring the continued availability of the working-capital financing facilities essential to maintaining the Group's operations; and (b) adapting their indebtedness to the cash-generation capacity available under the current economic and market conditions.

76. In this context, and in order to advance those negotiations, on 28-04-2026 the Applicant Companies filed an application before this Honourable Court for the appointment of a restructuring expert under Article 672 of the TRLC. By Order dated 14-05-2026— supplemented by a further Order dated 01-06-2026—this Honourable Court appointed LEXAUDIT as Restructuring Expert, which was entrusted with the statutory functions of assisting the Applicant Companies and their creditors in negotiating and preparing the Plan.

77. Following the appointment of the Expert, the Applicant Companies intensified the negotiation process with their financial creditors through successive rounds of meetings, exchanges of proposals and counterproposals, exchanges of financial information and financial modelling exercises, all under the supervision of the Restructuring Expert. In this regard, given the need for working-capital financing to maintain the Group's operations, negotiations commenced with the banking institutions capable of providing the instruments necessary to meet that need.

78. The seriousness of the negotiations and the reasonableness of the outcome embodied in the finally agreed Restructuring Plan are evidenced by the participation throughout the process of leading international financial advisory firms with recognised experience in the most significant restructuring proceedings undertaken in Spain in recent years: Houlihan Lokey, acting for the Antolín Group, and PJT Partners, acting for the Original Participating Creditors.

79. As a result of this intensive negotiation process, on 2026-06-23, the Applicant Companies, together with a number of financial creditors, among others, entered into the RSA, pursuant to which they and the creditor signatories undertook to vote in favour of the Original Restructuring Plan. As explained under Fact One, following execution of the RSA, an invitation to accede to the Original Restructuring Plan was circulated.



27



80. The circulation of this Invitation resulted in the continuation of negotiations with other creditors, including continued discussions with holders of the Notes in order to explore their requirements and possible accession. Such discussions were conducted not only through the Restructured Companies, but were also promoted by the Restructuring Expert.

81. Subsequently, it was considered necessary to correct an inadvertent omission in the Original Restructuring Plan and to make a number of minor adjustments. Consequently, the Restated Restructuring Plan was prepared and brought to the attention of all the Affected Creditors by circulating a new Invitation.

82. Finally, on 10-07-2026, the Applicant Companies and the Original Participating Creditors executed the Restated Restructuring Plan, to which several creditors acceded on that same date and to which other Affected Creditors may accede until the expiry of the Accession Period on 22-07-2026.

83. As at the present date, the Restructuring Plan has been executed by Participating Creditors representing a sufficient majority of the Affected Creditors in respect of each of the Restructured Companies for the purposes of Article 639.2 of the TRLC (see Fact Twelve, Section 12.5).

84. In view of the foregoing, the Restructuring Plan is the result of a robust negotiation process, assisted by the Restructuring Expert and conducted in strict compliance with the applicable legal framework, thereby confirming that all the formal and substantive requirements for its approval by this Honourable Court have been satisfied.

**FOURTH. – Financial Indebtedness of the Applicant Companies**

85. The financial indebtedness affected by the Plan as at the Signing Date comprises the following debt instruments (jointly, the "**Affected Agreements**"):

(i) the issuance by Antolín Irausa of senior secured notes governed by the laws of the State of New York (United States), with a final maturity date of 30-04-2028, governed by the indenture dated 29-06-2021 (as amended and supplemented from time to time, the "**2028 Notes Indenture**"), and formalised in the deed of issuance of debentures executed on 23-07-2021 before the Burgos Notary Public, Mr .José María Gómez-Oliveros, under number 2,881 of his notarial records (the "**2028 Notes**");



28



(ii)     the issuance by Antolín Irausa of senior secured notes governed by the laws of the State of New York (United States), with a final maturity date of 30-01-2030, governed by the indenture dated 31-07-2024 (as amended and supplemented from time to time, the "**2030 Notes Indenture**"), and formalised in the deed of issuance of debentures executed on that same date before the Burgos Notary Public, Mr José María Gómez-Oliveros, under *number 3,132 of his* notarial records (the "**2030 Notes**" and, jointly with the 2028 Notes, the "**Existing Notes**");

(iii)    the syndicated financing agreement (senior facilities agreement) governed by English law, originally entered into on 13-03-2014 by, inter alia, Antolín Irausa, as borrower; certain Group companies, as personal guarantors; Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., Bankinter, S.A., BNP Paribas S.A., Spain Branch, CaixaBank, S.A. and Deutsche Bank AG, London Branch, as mandated lead arrangers; Banca March, S.A. and Banco Espírito Santo, S.A., Spain Branch, as arrangers; Deutsche Bank AG, London Branch, as agent and security agent; and the financing entities that from time to time act as lenders, executed as a public deed on 02-04-2014 before the Burgos Notary Public, Mr José María Gómez-Oliveros Sánchez de Rivera, under number 683 of his notarial records (as amended and restated from time to time and, in particular, as amended and restated on 19-07-2024, the "**Existing Syndicated Facilities Agreement**");

(iv)    the syndicated financing agreement governed by Spanish law and secured by a State guarantee pursuant to the guarantee facility granted to companies under Royal Decree-Law 4/2025 of 08-04-2025, on Urgent Measures in Response to the Tariff Threat and for the Relaunch of Trade (together with its implementing regulations, the "**ICO Customs Duties Guarantee**"), entered into on 2025-08-04 by Antolín Irausa, Antolín Aragusa, Antolín Eurotrim, Antolín Ingeniería, Antolín Plasbur and Antolín RyA, as borrowers; certain Group companies, as personal guarantors; Banco Bilbao Vizcaya Argentaria, S.A., as agent; Deutsche Bank AG, London Branch, as security agent; and Banco Bilbao Vizcaya Argentaria, S.A., Banco de Sabadell, S.A., Banco Santander, S.A., CaixaBank, S.A., HSBC Continental Europe, Spain Branch, and Instituto de Crédito Oficial, E.P.E., as financing entities, executed as a public deed on that same date before the Madrid Notary Public, Mr Andrés Domínguez Nafría, under number 5,225 of his notarial records (as amended from time to time, the "**Existing ICO Facility Agreement**");


CERTIFIED TRANSLATION

29



(v)    the financing agreement (finance contract) entitled "Antolin Car Interiors RDI", entered into on 2018-06-12 by Antolín Irausa, as borrower; certain Group companies, as personal guarantors; and the European Investment Bank ("**EIB**"), as lender, executed as a public deed on that same date before the Burgos Notary Public, Mr José María Gómez-Oliveros Sánchez de Rivera, under number 1,806 of his notarial records (as amended from time to time, the "**EIB Facility Agreement I**");

(vi)    the financing agreement (finance contract) entitled "Antolin Car Interiors RDI B", entered into on 23-12-2020 by Antolín Irausa, as borrower; certain Group companies, as personal guarantors; and the EIB, as lender, executed as a public deed on 2021-07-09 before the Burgos Notary Public, Mr. José María Gómez-Oliveros Sánchez de Rivera, under number 2,688 of his notarial records (as amended from time to time, the "**EIB Facility Agreement II**" and, jointly with EIB Facility Agreement I, the "**Existing EIB Facility Agreements**")[37];

(vii)    the guarantees issued under the guarantee facilities and surety insurance policies entered into between Antolín Irausa, on the one hand, and BBVA, BBVA USA, HSBC Europe and Atradius, on the other, as detailed in Annex II, Part III of the Restructuring Plan, which include, for the avoidance of doubt, the BBVA Guarantee Facility as an Ancillary Facility entered into pursuant to the Existing Syndicated Facilities Agreement (the "**Existing Guarantee Facilities**"); and

(viii)    the intragroup loan agreements entered into between the Restructured Companies and detailed in Annex II, Part IV of the Restructuring Plan (the "**Intragroup Loans**"), together with the corresponding accrued and unpaid interest.

86.    Furthermore, it should be noted that:

(i)    all the Restructured Companies, with the exception of Antolín Irausa—which is the principal contracting party—act as personal guarantors under the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement and the Existing EIB Facility Agreements[38]; and

---

[37] The Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement and the Existing EIB Facility Agreements shall be referred to jointly as the "**Bank Debt**".

[38] It is by virtue of those first-demand personal guarantees, with express waiver of the benefit of excussion and any other defences, granted pursuant to the aforementioned agreements, that those Restructured Companies are parties to the Plan.



30



(ii)    the aforementioned debt instruments[39] are linked by an intercreditor agreement entered into on 21-03-2024 by, among others, Antolín Irausa, certain Group companies, Deutsche Bank AG, London Branch, and Deutsche Trustee Company Limited (the "**Intercreditor Agreement**" or the "**ICA**"). Given its length, a summary of the principal provisions of the ICA relevant to this Application is attached as **Document No. 22**, together with its translation into Spanish as **Document No. 22 bis**.

The Intercreditor Agreement was executed as a public deed on 02-04-2014 before the Burgos Notary Public, Mr. José María Gómez-Oliveros, under number 684 of his notarial records, and provides, among other matters, for the pari passu ranking of the obligations owed under the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement and the Existing EIB Facility Agreements.

The existence of this Intercreditor Agreement and, in particular, the aforementioned pari passu ranking further reinforces the need to undertake the restructuring jointly, and in accordance with the terms set forth in the Plan, in respect of the Group's principal financial instruments.

87.    As at the Signing Date[40] of the Restructuring Plan, the amounts owed under the Affected Agreements were detailed in Annex II to the Plan and constitute the "**Affected Debt**"[41]. As provided in the Plan, for clarification purposes and in connection with Article 616 of the TRLC, it is expressly stated that the Affected Debt arises from the financial claims deriving from the Affected Agreements (the "**Affected Claims**").

**FIFTH. – The Content of the Restructuring Plan for Which Approval Is Sought**

88.    In essence, the Restructuring Plan seeks to provide a comprehensive solution to the probability of insolvency affecting the Applicant Companies, so that, through the implementation of the measures contemplated therein, it is intended to:

---

[39] In particular, the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement and the Existing EIB Facility Agreements.

[40] The Signing Date means the date on which the Restructuring Plan was executed, namely 10-07-2026 (see Annex I to the Plan).

[41] Each Restructured Company has different amounts of Affected Debt, including in respect of common Affected Agreements, since the guarantees provided by them under those agreements are, in some cases, subject to different limits.



31



(i)    ensure the continuity of the Restructured Companies' business in the short and medium term, thereby avoiding any potential insolvency proceedings while ensuring their long-term stability;

(ii)    maintain the current levels of employment and operations of the Restructured Companies;

(iii)    adjust the maturities of the Affected Debt in accordance with the Viability Plan;

(iv)    ensure the availability of the new financing required by the Group through the Working Capital Facility Agreement and, on an interim basis until that agreement enters into force and becomes fully available, through extensions of the Existing Syndicated Factoring Facility, subject to the conditions of the Plan[42];

(v)    provide for the orderly repayment of the Affected Debt;

(vi)    maintain the current capital structure; and

(vii)    ensure the viability of the Group.

89.    In view of the foregoing, the following sections explain specific aspects of the Restructuring Plan that are of particular relevance to achieving the objectives set out above.

**SIXTH. – The Scope of the Restructuring Plan for Which Approval Is Sought**

90.    The objective scope of the Restructuring Plan for which approval is sought comprises exclusively the so-called Affected Debt, consisting of the claims arising under the Affected Agreements identified in Recital II of the Plan and under Fact Four of this Application. Accordingly, all claims that do not qualify as Affected Debt pursuant to the Plan are expressly excluded from its scope and shall be paid by the Applicant Companies in accordance with their original terms, without undergoing any amendment as a result of the restructuring process.

---

[42] The extensions of the Existing Syndicated Factoring Facility implemented pursuant to Clause 6.1 of the Restructuring Plan are collectively referred to as the "**Existing Syndicated Factoring Extensions**".



32



**6.1 Affected Debt**

91.    The debt falling within the scope of the Restructuring Plan comprises the Affected Agreements described under Fact Four. In summary, the Affected Agreements are: (i) the 2028 Notes; (ii) the 2030 Notes; (iii) the Existing Syndicated Facilities Agreement; (iv) the Existing ICO Facility Agreement; (v) the Existing EIB Facility Agreements; (vi) the guarantees issued under the Existing Guarantee Facilities; and (vii) the Intragroup Loans, together with the corresponding accrued and unpaid ordinary interest and any right of reimbursement or recourse, in accordance with the terms of the Plan.

**6.2 Excluded Debt**

92.    Conversely, the Restructuring Plan does not affect—and, consequently, does not impose any amendment upon—the following claims:

   i.    Claims arising from the "Short-Term Interest" line item, corresponding to short-term ordinary interest and fees

   Accrued and unpaid ordinary interest and fees arising from the Affected Claims, excluding those associated with the Intragroup Loans, shall continue to be paid on their respective payment dates throughout the restructuring process, in accordance with Clause 5.6 of the Plan (including any payments giving rise to subrogation, reimbursement or recourse claims that may be provided for under the Intercreditor Agreement or the Affected Agreements).

   In this regard, the Restructured Companies have sufficient capacity to continue paying such ordinary interest and fees without jeopardising their viability in the short and medium term, all with the aim of requiring the least possible sacrifice from creditors.

   Likewise, given that the Restructured Companies are merely in a state of probability of insolvency within the meaning of Article 584.2 of the TRLC, it is essential to avoid any action taken in connection with the Restructuring that would result in a payment default which, in turn, would trigger the acceleration of the Affected Claims.





ii.   Claims arising from the line items entitled "IFRS 16 Debt" and "Trade Payables"

These claims arise from ongoing contracts involving reciprocal obligations that remain to be performed and which, therefore, in insolvency proceedings would qualify as claims against the insolvency estate, enjoying priority of payment and being paid in full in the ordinary course so that the services and benefits arising therefrom may continue to be received. Furthermore, these claims arise from operational relationships or agreements—that is, agreements of a non-financial nature—and are commercial in nature, including commercial agreements or operating leases necessary for the continuation of the business operations.

iii.   Claims arising from the line item "Trade Payables to Group Companies"

These line items relate to claims arising from agreements that are likewise operational and non-financial in nature and are necessary for the day-to-day conduct of the business. The Restructured Companies may continue to satisfy such claims without jeopardising their viability in the short and medium term.

iv.   Claims arising from the line items "Debt Owed to the Public Treasury, Public Authorities and Public-Sector Business Entities"

These comprise debts owed by the Restructured Companies to public-sector creditors. Such debts are not subject to the Plan because their inclusion is not necessary to ensure the Restructured Companies' viability in the short and medium term and because of the statutory restrictions imposed by the legislation in force on their inclusion within the scope of a restructuring plan.

v.   Claims arising from the line item "Outstanding Remuneration"

The indebtedness of the Restructured Companies arising from employment relationships, including potential variable remuneration payable to employees, may not be affected by the Restructuring Plan pursuant to the mandatory provisions of Article 616.2 of the TRLC.

vi.   Claims arising from the line item "Deutsche Bank Guarantees (Contingent Debt), Fully Secured by Pledges over Fixed-Term Deposits (IPFs)" recorded for Antolín Irausa and relating to the guarantees issued by Deutsche Bank, S.A.E. pursuant to an agreement entitled "Multi-Currency Guarantee and/or Surety Facility Security Agreement", entered into with Antolín Irausa on 10-11-2015.
The Plan likewise does not affect any reimbursement claims that may arise in favour of Deutsche Bank as a consequence of the enforcement of the guarantees detailed in point (vi) of Section 8 of Annex VI to the Restructuring Plan. This is because any


CERTIFIED TRANSLATION



reimbursement claims arising from the enforcement of those guarantees would be fully satisfied from the fixed-term deposits pledged as security for such claims. Accordingly, the existence of those claims would not affect the viability of the Plan, nor would the equal treatment of creditors be affected. Indeed, given the existence of the aforementioned security interest and the terms and amounts for which it has been granted, making such claims subject to this Restructuring Plan would mean that Deutsche Bank would have no incentive to accede to the Restructuring Plan.

vii.  Claims arising from the line item "Leases – BBVA, Doble G" recorded for Antolín Ingeniería

These claims arise from the following agreements:

(a)  the finance lease agreement (*leasing*) entered into between Antolín Ingeniería and BBVA on 2023-05-17, relating to a TRUMARK 6030 (L026) laser-marking machine; and

(b)  two agreements concerning energy services and the lease of a photovoltaic self-consumption installation at the "Antolín Headquarters Building", entered into between Antolín Ingeniería and Doble G Generación y Transformación, S.L. on 10-02-2020 and 27-02-2024, respectively.

These instruments fall outside the scope of the Affected Debt insofar as they constitute agreements involving reciprocal obligations that remain to be performed. In insolvency proceedings, the claims arising from these agreements would qualify as claims against the insolvency estate, would enjoy priority of payment and would be paid in full in the ordinary course, so that the necessary services and benefits provided by the counterparties may continue to be received.

Furthermore, in the case referred to in paragraph (a) above, the leased asset itself constitutes implicit security for the performance of Antolín Ingeniería's obligations as lessee, rendering its inclusion in the Plan unnecessary, since BBVA has sufficient contractual protection mechanisms available to it.





**SEVENTH. – Classification into Classes and the Treatment or Measures Provided for Each Class**

93. Pursuant to Article 622 of the TRLC, the Participating Creditors must vote in groups by classes in respect of each of the Applicant Companies. Since the Affected Debt of each Applicant Company is substantially the same, a largely uniform class-formation structure has been followed.

94. In accordance with Article 623 of the TRLC, the classes have been formed by reference to the common interests of the creditors comprising them. In this regard, creditors whose claims have the same insolvency ranking, determined by the order of payment applicable in insolvency proceedings, are deemed to share a common interest, although claims falling within the same insolvency ranking may be separated into different classes where sufficient grounds exist to justify such separation.

95. In the present case, insolvency ranking has been one of the primary criteria used in forming the classes under the Plan. Accordingly—in respect of each Applicant Company and wherever claims falling within the relevant classes exist—a distinction is drawn between ordinary insolvency claims, comprising the Existing Notes, the Bank Debt and the claims arising from the Existing Guarantee Facilities, and subordinated insolvency claims, arising from the Intragroup Loans and from any rights of recourse, reimbursement, recovery, indemnification or subrogation that are subordinated pursuant to the Plan.

96. Within the category of ordinary claims, and pursuant to Article 623.3 itself, the various classes of claims have in turn been established for the following reasons, which are also set out in Clause 3.2 of the Restructuring Plan:

    (i)   The different alternative treatments offered to each of the Classes, namely the Bank Debt, the Existing Guarantee Facilities and the Existing Notes, arise from the fact that pari passu treatment is granted to all ordinary classes. In this regard, obtaining a working-capital financing instrument from those entities forming part of the Group's so-called banking pool, in accordance with business, operational and product-availability criteria, is an essential element for the Group's viability. This justifies the introduction of an alternative treatment for the banking class that may commit such working-capital financing and, consequently, an equivalent alternative treatment for the notes class.

    (ii)   In addition to the foregoing, the differing nature of the Bank Debt instruments— private financing agreements subject to restrictions on assignment—as compared with the Existing Notes—securities admitted to trading on a regulated market and subject to capital-markets legislation—warrants the establishment of



36



differentiated treatments and solutions tailored to the particular characteristics of each category of instrument.

(iii) The need to amend certain obligations and financial ratios established exclusively in the bank financing instruments—the Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement and the Existing EIB Facility Agreements—in order to ensure the viability of the Applicant Companies in the short and medium term, as opposed to the Existing Notes, which do not contain obligations or financial ratios of this nature.

(iv) Lastly, the contingent nature of the claims arising from the guarantees issued under the Existing Guarantee Facilities.

97. The appropriateness of the class formation described above has been validated by the Restructuring Expert, who expresses a favourable opinion in this regard in the Report on the Formation of Classes, attached as **Document No. 23**.

98. The classes formed in respect of each of the Applicant Companies and their respective treatment are set out below.

### 7.1 Formation of the Classes

#### A) Classes of Antolín Irausa

99. Antolín Irausa, as the Group's operating parent company and principal debtor under the Affected Agreements, has four classes:

(i) <u>Bank Debt Class</u>. This class comprises the Affected Claims arising under the Existing Syndicated Facilities Agreement—including, for clarification purposes, the amount drawn under the RCF[43] as at the Signing Date, but excluding those Affected Claims qualifying as Existing Guarantee Facilities—the Existing ICO Facility Agreement and the Existing EIB Facility Agreements, under which Antolín Irausa acts as principal debtor, borrower or personal guarantor. This class would have the

---

[43] The revolving credit facility governed as the tranche entitled "Revolving Facility 2" under the Existing Syndicated Facilities Agreement.


CERTIFIED TRANSLATION

37



status of an ordinary claim in any insolvency proceedings. The Affected Debt corresponding to this class is described in Annex II, Part I of the Plan.

(ii)   Notes Class. This class comprises the Affected Claims arising under the 2028 Notes and the 2030 Notes, in respect of which Antolín Irausa is the issuer and principal debtor. The Affected Debt corresponding to the Notes Class is described in Annex II, Part II of the Plan.

In insolvency proceedings, these claims would rank as ordinary claims. As stated above, their inclusion in a class separate from the Bank Debt Class is based on objective grounds, including the differing nature of the instruments— the Existing Notes are negotiable securities listed on the Euro MTF market of the Luxembourg Stock Exchange, whereas the Bank Debt is governed by the corresponding financing agreements—which gives rise to different market-investor expectations, and the need, in the case of the Existing Notes, to implement the amendments to the terms contemplated under the Restructuring through the consent and exchange process provided for under the applicable capital-markets legislation.

Furthermore, the separation between the Bank Debt Class and the Notes Class is also justified by the different treatment contemplated for each of them, as shall be explained below, having regard to their respective contributions to the Group's viability. This is without prejudice to the fact that, from a financial perspective, the treatment afforded to both classes is equivalent, in compliance with the applicable legislation.

(iii)   Guarantee Facilities Class. This class comprises the Affected Claims arising under the Existing Guarantee Facilities that are not secured by security interests and in respect of which Antolín Irausa is the principal guaranteed party. The Affected Debt corresponding to this class is described in Annex II, Part III of the Plan.

In insolvency proceedings, these claims would rank as contingent claims intended to become ordinary claims. Their inclusion in a class separate from the Bank Debt Class and the Notes Class is based primarily on the contingent nature of the guarantees issued, since they only crystallise into actual claims when and if they are enforced. This particular feature, expressly recognised in Article 623.4(3) of the TRLC, justifies differentiated treatment.

(iv)   Subordinated Debt Class. This class comprises: (i) the Affected Claims arising under the Intragroup Loans in respect of which Antolín Irausa is the principal debtor; and (ii), together with together with the accrued and unpaid interest arising from such Intragroup Loans under which Antolín Irausa is the principal


CERTIFIED TRANSLATION



debtor; and, where applicable, any rights of recourse, reimbursement, recovery, indemnification or subrogation against Antolín Irausa that rank as subordinated pursuant to the Plan. The Affected Debt corresponding to this class is described in Annex II, Part IV of the Plan.

In insolvency proceedings, such claims would be classified as subordinated claims and are therefore placed in a single separate class, as required by Article 623 of the TRLC.

### B) Formation of the Classes in Respect of the Remaining Restructured Companies

100. By virtue of their status as joint and several personal guarantors and/or debtors under certain of the affected financial instruments, the Applicant Companies other than Antolín Irausa likewise have a class structure comprising the following four classes:

(i) <u>Bank Debt Class</u>. This class comprises the Affected Claims arising under the Existing Syndicated Facilities Agreement—including, for clarification purposes, the RCF, but excluding those Affected Claims qualifying as Existing Guarantee Facilities—the Existing ICO Facility Agreement and the Existing EIB Facility Agreements, under which the relevant Restructured Company—other than Antolín Irausa—acts as principal debtor, borrower and/or personal guarantor, as applicable. The Affected Debt corresponding to this Class is described in Annex II, Part I.

(ii) <u>Notes Class</u>. This class comprises the Affected Claims arising under the 2028 Notes and the 2030 Notes, under which the relevant Restructured Company—other than Antolín Irausa—acts as personal guarantor. The Affected Debt corresponding to this Class is described in Annex II, Part II of the Plan.

(iii) <u>Guarantee Facilities Class</u>. This class comprises the Affected Claims arising under the Existing Guarantee Facilities that are not secured by security interests and under which the relevant Restructured Company—other than Antolín Irausa—acts as personal guarantor.

(iv) <u>Subordinated Debt Class</u>. This class comprises: (i) the Affected Claims arising under the Intragroup Loans under which the relevant Restructured Company—other than Antolín Irausa—is the principal debtor; and (ii) together with the interest together with the accrued and unpaid interest arising from such Intragroup Loans under which each of the Restructured Companies is the principal debtor; and, where applicable, any rights of recourse, reimbursement, recovery, indemnification or subrogation against the relevant Restructured Company that rank as subordinated pursuant to the Plan. The Affected Debt corresponding to this class is described in Annex II, Part VI of the Plan.





101. The position of Antolín South Africa is slightly different, as it does not have a Subordinated Debt Class.

**7.2 Treatment of the Affected Debt**

102. The fundamental premise of the Restructuring contemplated under the Plan is the extension of the final maturity of all the Affected Debt, without applying any debt reduction, and the adjustment of the financial terms applicable to the extended debt.

103. Furthermore, since the Group's viability requires the availability of working-capital financing facilities in accordance with the Viability Plan, the Affected Creditors of the Bank Debt are offered an alternative treatment consisting of an undertaking to enter into the Working Capital Facility Agreement in exchange for a shorter extension of the maturity of their debt, new senior-ranking security and priority of payment. In order to preserve financial equivalence between the classes, the Affected Creditors under the Existing Notes and the Existing Guarantee Facilities are likewise offered alternative treatment on equivalent financial terms, which also includes an enhancement of the security package and of the priority of their right to payment.

104. Accordingly, the Plan provides for default treatment and alternative treatment for the Affected Creditors, having regard to the nature of the financial instruments included in each class, although such treatments are financially equivalent.

105. The Affected Creditors shall be entitled to elect, unconditionally and irrevocably, the applicable treatment within the time limits and through the mechanisms established in the Plan itself. In the absence of an election, the default treatment shall apply in each case.[44] Nevertheless, on the Signing Date, the Original Participating Creditors unconditionally and irrevocably elected the alternative treatment applicable to their respective classes, namely the Bank Debt and the Existing Guarantee Facilities.

---

[44] See Clause 5.2.8 of the Plan.


CERTIFIED TRANSLATION


USA CORP

106.    Without prejudice to the fact that the complete treatment of the Affected Debt is set out in detail in the restructuring term sheet attached as Annex VII to the Plan (the "**Restructuring Term Sheet**"), its principal terms are described below:

(i)    <u>Treatment of the Bank Debt:</u>

a)    Default Treatment:

–    extension at par, without any discount, of the final maturity date to 31-12-2035;

–    repayment in full of the principal on the maturity date (bullet repayment);

–    with respect to the Affected Claims arising from the amounts drawn under the RCF, such amounts shall be converted into term loans;

–    an annual interest rate of 6.97%, payable in semi-annual interest periods, with payment dates falling on 30 June and 31 December of each year, the first interest period being the period from the Effective Date[45] to 31-12-2026 or, if the Closing Date[46] has not occurred, to 30-06-2027;

–    amendment of certain financial ratios applicable to the relevant Bank Debt in order to align them with the Viability Plan;

–    security comprising the Existing Security, the New Second-Ranking ICA Security Interests, the Third-Ranking Pledge over Accounts and the New ICA Personal Guarantees, without prejudice to the amendment of the payment-ranking provisions under the Intercreditor Agreement as a consequence of the restructuring of the Affected Debt in respect of the Restructured Companies acting as guarantors of the Bank Debt, as shall be described under Fact Nine; and

---

[45] The Effective Date means the date on which: (i) the order granting judicial approval of the Restructuring Plan is issued; and (ii) the Restructuring Plan has been recognised pursuant to Chapter 15 of Title 11 of the United States Code through the entry of a non-final order by the competent United States Bankruptcy Court granting recognition of the Restructuring Plan in respect of all the Restructured Companies (see Annex I and Clause 12 of the Plan).

[46] The Closing Date means the date designated for the execution





- in the case of the indebtedness of the Restructured Companies acting as personal guarantors under the Existing ICO Facility Agreement (the "**Existing ICO Facility Agreement Guarantors**"), the effects of the Restructuring entail the amendatory novation of the claim held by the Affected Creditors under the Existing ICO Facility Agreement against those Restructured Companies in their capacity as debtors bound by the judicial approval, so that the payment-ranking provisions set forth in the Intercreditor Agreement shall apply to them in respect of certain proceeds or recoveries.

b)   Alternative Treatment:

- a firm commitment to subscribe for a proportionate share of the Working Capital Facility Agreement, based on the pro rata share of Bank Debt held by the relevant Affected Creditor; such financing shall qualify as new financing pursuant to Article 666 of the TRLC;

- extension of the final maturity date to 04-08-2032 and of the RCF availability period to 04-07-2032, without the amounts drawn under the RCF therefore being converted into term loans, subject to a mechanism bringing forward the end of the availability period and the maturity date to 30-06-2030 if, on or before that date, the New B Notes have not been repaid, redeemed or refinanced, or the Applicant Companies have not evidenced binding commitments for their refinancing;

- repayment of the outstanding principal, excluding the RCF, in accordance with the following amortisation schedule, with instalments payable semi-annually:

| Date | Debt to be amortised on or before such date (%) |
|---|---|
| **31-12-2026**[47] | 2.414% |
| **30-06-2027** | 2.850% |
| **31-12-2027** | 2.850% |
| **30-06-2028** | 3.762% |
| **31-12-2028** | 3.762% |
| **30-06-2029** | 4.674% |
| **2029-12-31** | 4.674% |
| **30-06-2030** | 5.586% |
| **31-12-2030** | 5.586% |

---

[47] Or on the Closing Date, if later.



42



| Date | Debt to be amortised on or before such date (%) |
|---|---|
| 30-06-2031 | 6.498% |
| 31-12-2031 | 6.498% |
| 30-06-2032 | 7.410% |
| 04-08-2032 | 43.436% |

The amortisation schedule applicable to each Affected Creditor of the Bank Debt electing this alternative treatment shall be calculated on the basis of its share of the total amount of the Bank Debt, excluding the RCF.

– EURIBOR plus a margin equivalent to an annual interest rate of 2.50%, payable in semi-annual interest periods, with payment dates falling on 30 June and 31 December of each year, the first interest period being the period from the Effective Date to 31-12-2026 or, if the Closing Date has not occurred, to 30-06-2027. Such margin shall be subject to an annual reduction following the execution of the Restructuring Documents:

    a. by 100 bps per annum from the applicable unadjusted base margin, provided that the leverage ratio stipulated in each of the Affected Agreements relating to the Bank Debt is equal to or less than 3.50x, calculated without applying IFRS 16; or, alternatively,

    b. by 200 bps per annum from the applicable unadjusted base margin, provided that the leverage ratio stipulated in each of the Affected Agreements relating to the Bank Debt is equal to or less than 3.00x, calculated without applying IFRS 16;

the leverage ratio being calculated by reference to the end of the preceding quarter, prior to the commencement of each semi-annual interest period, in order to determine the margin applicable to that period. The first calculation shall be made on the Effective Date, taking into account the post-Restructuring pro forma Affected Debt;

– the RCF shall bear a commitment fee equal to 35% of the applicable margin, excluding EURIBOR, and shall include an undertaking that the average amount drawn during each calendar year shall be less than 80%, together with a clean-down requirement equal to 50% of the total RCF amount once per calendar year for 10 consecutive days;

– security comprising the Existing Security, the New First-Ranking ICA Security Interests, the Second-Ranking Pledge over Accounts and the New ICA Personal





Guarantees, without prejudice to the amendment of the payment-ranking provisions under the Intercreditor Agreement;

– a priority right of payment over the claims of the Affected Creditors subject to the default treatments, in accordance with the amendment of the Intercreditor Agreement resulting from the provisions of the Plan itself in respect of the Affected Debt of the Restructured Companies that granted the Existing Security; and

– amendment of certain financial ratios applicable to the relevant Bank Debt, together with the associated definitions, in order to align them with the Viability Plan, while maintaining the adjustments for synergies and exceptional items (one-offs) to EBITDA, calculated without applying IFRS 16, contemplated in the Viability Plan for the 2026, 2027 and 2028 financial years, subject to quarterly certification by the Group's Chief Financial Officer or a person duly authorised for that purpose. The corresponding adjustments for synergies and exceptional items (*one-offs*) resulting from the closure and/or sale of certain plants not contemplated in the Viability Plan may also be included in EBITDA, subject to annual certification by the auditor.

(ii)   <u>Treatment of the Existing Notes:</u>

a)   Default Treatment:

– extension at par, without any discount, of the final maturity date to
 31-12-2035;

– repayment in full of the principal on the maturity date (bullet repayment);

– a coupon bearing interest at an annual rate of 6.97%, payable in semi-annual interest periods, with payment dates falling on 30 June and 31 December of each year, the first interest period being the period from the Effective Date to 31-12-2026 or, if the Closing Date has not occurred, to 30-06-2027; and

– security comprising the Existing Security, the New Second-Ranking ICA Security Interests, the Third-Ranking Pledge over Accounts and the New ICA Personal Guarantees, without prejudice to the amendment of the payment-ranking provisions under the Intercreditor Agreement as a consequence of the restructuring of the Affected Debt


CERTIFIED TRANSLATION

44



Affected Debt in respect of the Restructured Companies acting as guarantors of the Existing Notes.

b)   Alternative Treatment:

−   a 32.5% reduction in the nominal value of the Existing Notes prior to the Effective Date of the Plan;

−   extension of the final maturity date to 31-12-2030;

−   repayment in full of the principal on the maturity date (bullet repayment);

−   the Restructured Companies shall not make any voluntary early repayments of the New B Notes for a period of 30 months from the Effective Date (non-call period), unless a market make-whole premium is paid;

−   a coupon bearing interest at an annual rate of 8.28%, payable in semi-annual interest periods, with payment dates falling on 30 June and 31 December of each year, the first interest period being the period from the Effective Date to 31-12-2026 or, if the Closing Date has not occurred, to 30-06-2027. The coupon shall automatically increase (step-up) by two (2) percentage points per annum (2.00%) on each anniversary date from 30-06-2027, such increase being applied to the interest rate in force at the relevant time;

−   a priority right of payment over the Affected Creditors subject to the default treatments, in accordance with the amendment of the Intercreditor Agreement; and

−   security comprising the Existing Security, the New First-Ranking ICA Security Interests, the Second-Ranking Pledge over Accounts and the New ICA Personal Guarantees, without prejudice to the amendment of the payment-ranking provisions under the Intercreditor Agreement.

(iii)   <u>Treatment of the Existing Guarantee Facilities:</u>

a)   Default Treatment:

−   extension at par, without any discount, until 31-12-2035, of the contingent debt arising from the enforcement of the guarantees issued under the Guarantee Facilities
of the Existing Guarantee Facilities, including guarantees issued after the Signing Date and up to the Effective Date under such Existing Guarantee Facilities, without extending the availability period of the Guarantee Facilities.


CERTIFIED TRANSLATION



–   repayment in full of the principal on the maturity date (bullet repayment);

–   an annual interest rate of 6.97%, payable in semi-annual interest periods and accruing only from the enforcement of the relevant guarantee on the amount of the guarantee so enforced, with payment dates falling on 30 June and 31 December of each year, the first interest period being the period from the Effective Date to 31-12-2026 or, if the Closing Date has not occurred, to 30-06-2027; and

–   security comprising the Existing Security, the New Second-Ranking ICA Security Interests, the Third-Ranking Pledge over Accounts and the New ICA Personal Guarantees, without prejudice to the amendment of the payment-ranking provisions under the Intercreditor Agreement;

b)   Alternative Treatment:

–   extension of the maturity of the amount drawn under the facilities as at the Signing Date to 04-08-2032, subject to a mechanism bringing forward the end of the availability period and the maturity date to 30-06-2030 if, on or before that date, the New B Notes have not been repaid, redeemed or refinanced, or the Restructured Companies have not evidenced binding commitments for their refinancing;

–   the availability period shall always end six months before the maturity date;

–   no guarantee issued may have a maturity date later than that of the relevant facility. If, on the maturity date of the facility, any guarantee remains outstanding, Antolín Irausa shall provide cash collateral equal to 100% of the guaranteed amount from the maturity date of the facility;

–   the applicable financial terms shall be those of the facility whose maturity is being extended;

–   any reimbursement claims arising in favour of the Affected Creditors electing this treatment as a result of the enforcement of guarantees issued pursuant to


CERTIFIED TRANSLATION


USA CORP

the Existing Guarantee Facilities that remain in force as at the Signing Date shall receive the same treatment as the Affected Creditors that have elected the alternative treatment applicable to the Bank Debt;

– for clarification purposes, if the relevant reimbursement claim arises after one or more amortisation dates provided for in the amortisation schedule applicable to the alternative treatment of the Bank Debt have elapsed, the aggregate amount of the instalments that would have fallen due on those dates shall be paid on the next amortisation date provided for in that schedule, together with any instalment falling due on that same date;

– any reimbursement claims arising in favour of the Affected Creditors electing this treatment as a result of the enforcement of guarantees issued from the Effective Date under the New Guarantee Facilities shall be enforceable in accordance with the terms of the New Guarantee Facilities;

– the New Guarantee Facilities shall qualify as new financing pursuant to Article 666 of the TRLC;

– a priority right of payment over the Affected Creditors subject to the default treatments, in accordance with the amendment of the Intercreditor Agreement; and

– security comprising the Existing Security, the New First-Ranking ICA Security Interests, the Second-Ranking Pledge over Accounts and the New ICA Personal Guarantees. Where the relevant Existing Guarantee Facility is secured by third-party guarantees, such guarantees shall be maintained and ratified.

(iv)  <u>Treatment of the Subordinated Debt</u>. Extension of the final maturity date of the Affected Claims arising under the Intragroup Loans to 01-01-2036, with repayment in full on the maturity date (bullet repayment), capitalisation of all accrued interest and subordination to the remainder of the Affected Debt. It is also expressly provided that any right of recourse, reimbursement, recovery or indemnification that may arise from the Restructuring in accordance with the terms of the Plan shall rank as subordinated to the remainder of the Affected Debt and shall form part of the Subordinated Debt.


CERTIFIED TRANSLATION



### 7.3 Equal Treatment Within Classes, Equivalent Treatment Between Classes of the Same Ranking and Compliance with the Absolute Priority Rule

107. The treatment provided for in the Restructuring Plan in respect of the Affected Debt complies with the requirements of the TRLC concerning horizontal and vertical equity. First, Article 638.4 of the TRLC is complied with, insofar as all claims included within the same class receive equal treatment, without any unjustified distinction between Affected Creditors belonging to that same class. Secondly, the rule requiring equivalent treatment between classes of the same ranking is complied with, since classes that would hold the same economic position in potential insolvency proceedings receive financially equivalent treatment under the Plan. Thirdly, the absolute priority rule is complied with, insofar as no write-downs are imposed under the default alternatives and, consequently, no lower-ranking class or shareholders receive or retain value to the unjustified detriment of a higher-ranking class.

108. For the purpose of substantiating the foregoing, the following are attached: as **Document No. 24**, the Report on the Application of the Absolute Priority Principle issued by LEXAUDIT; as **Document No. 25**, the Report on the Application of the Relative Priority Principle issued by LEXAUDIT; and as **Document No. 26**, the Report on the Principle of Equity and the Absolute Priority Rule issued by Vest Partners, to which we refer in full. The specific purpose of those reports is to analyse whether the creditors affected by the Plan receive equal treatment and to verify, from a financial perspective, whether the treatments offered to the various classes are equivalent.

109. In their reports, LEXAUDIT and Vest Partners conclude that the Restructuring Plan complies with the principle of equal treatment among creditors and with the absolute and relative priority rules for the following reasons:

(i) The default treatment applicable to the Bank Debt and the Notes is identical in all respects, since it imposes no write-down whatsoever, thereby seeking to minimise the sacrifice required of creditors. The extension imposed upon them, for which they are remunerated, is the minimum necessary to ensure repayment without jeopardising the viability of the Applicant Companies. Accordingly, the claims subject to this alternative are subject to a remunerated extension bearing interest at an annual rate of 6.97%, which is identical for all classes and enables the value of the claims to be preserved throughout the entire extension period.


CERTIFIED TRANSLATION



(ii)   As regards the alternative treatment offered in respect of the Bank Debt and the Notes, having regard to its structure, the reports attached as Documents Nos. 24, 25 and 26 conclude that the alternatives are financially equivalent.

More specifically, the alternative treatments are based on the following premises:

– On the one hand, the alternative treatment offered in respect of the Bank Debt is based on the increased risk assumed by the relevant creditors in providing the new money required to ensure the Group's viability. Accordingly, in consideration for their efforts in assuming greater risk, their Affected Claims shall be repaid over a shorter period, with maturity in 2032.

– For its part, the alternative treatment offered in respect of the Notes likewise provides for accelerated repayment, with maturity in 2030, while also applying a higher interest rate than that applicable under the alternative treatment of the Bank Debt.

Accordingly, in view of the differences between the terms of the alternative treatments, and in order to maintain financial equivalence between them and therefore ensure equal treatment in respect of the measures applicable to each class of creditors, as explained in the reports issued by Vest Partners and LEXAUDIT, a 32.5% reduction shall be applied to the claims arising under the Notes where the relevant creditors elect the alternative treatment.

Thus, once the reduction has been applied, and taking into account the shorter term and higher interest rate applicable under the alternative treatment of the Notes, such treatment is financially equivalent to that offered in respect of the Bank Debt under its alternative treatment—since, under that option, the Bank Debt is not subject to any reduction, but the relevant creditors assume greater risk and receive a lower interest rate than the Notes during the repayment period.

(iii)   Lastly, the Subordinated Debt Class shall receive payment of its claims after all other higher-ranking classes, upon which, as stated above, no reduction is imposed under the applicable default treatment, thereby confirming compliance with the relative priority rule.

110. Furthermore, the Restructuring Plan complies with the absolute priority rule, as is likewise confirmed by the reports issued by Vest Partners and LEXAUDIT. This rule does not require all creditors to receive identical instruments or an identical payment schedule; rather, it prevents a lower-ranking class—or the shareholders—from receiving or retaining value under the Plan if



49



a higher-ranking class does not receive at least a financially equivalent value equal to the amount of its claims, unless there is sufficient legal justification.

111.   Compliance with this rule is beyond doubt in view of the very structure of the measures incorporated into the Restructuring Plan, since—as we reiterate—the default treatment applicable to both the Bank Debt and the Notes imposes no write-downs on any creditor ranking above the subordinated creditors and shareholders. This matter is explained in detail in the report issued by Vest Partners and is likewise confirmed by the Report on the Application of the Absolute Priority Principle issued by the Expert, which states as follows (see pages 36 and 37):

> "It is precisely the decisive fact that no class of Affected Creditors, whether ordinary or subordinated, is subject to any write-down that enables the conclusion that there is no infringement whatsoever of the absolute priority rule.
>
> The fact that alternatives are offered to the various groups of ordinary creditors does not alter the foregoing conclusion, since these are options that may be elected voluntarily by any interested creditor. However, this is always subject to the premise that the default offer, namely the offer applicable in the absence of a voluntary election by the creditor, provides for payment of the debt in full.
>
> Accordingly, under its base proposal, the proposed plan imposes no sacrifice on creditors that could be regarded as failing to comply with the absolute priority rule, while allowing shareholders to retain their position in the company."

### 7.4 Compliance with the Best-Interest-of-Creditors Test

112.   The Plan also satisfies the requirement laid down in Article 654.7 of the TRLC that it pass the best-interest-of-creditors test.

113.   For the purpose of demonstrating compliance with the best-interest-of-creditors test, the following are attached: as **Document No. 27**, the Report on the Application of the Best-Interest-of-Creditors Test to the Antolín Group Restructuring Plan, issued by LEXAUDIT (the "**LEXAUDIT BIC Report**"); and, as **Document No. 28**, the Report on Whether the Restructuring Plan Passes the Best-Interest-of-Creditors Test (BIC), issued by Vest Partners (the "**Vest Partners BIC Report**" and, jointly with the LEXAUDIT BIC Report, the "**BIC Reports**").

114.   The BIC Reports expressly analyse the requirement governed by Article 654.7 of the TRLC and begin with the legally required comparison between, on the one hand, the value of what the creditor receive under the Restructuring Plan and, on the other hand, the value that they could reasonably be expected to have received in the event of the insolvency liquidation of the debtor's assets, taking into account that payment of the liquidation dividend would take place two years after formalization of the Plan.



50



115. In the present case, it is necessary to begin with a fundamental premise, already noted at the outset of the Vest Partners BIC Report (Document No. 28): the best-interest-of-creditors test would not even be necessary in this case, for the following reasons:

(i) The Restructuring Plan provides for default alternatives under which all creditors shall receive payment in full of their claims, subject only to maturity extensions which, moreover, are remunerated.

Under these default alternatives, creditors are subject only to the minimum extension required to ensure the viability of the business and are therefore required to make only the minimum indispensable sacrifice.

(ii) Likewise, it would make no sense to carry out this analysis individually for each Applicant Company, since all of them bear full liability for the financial indebtedness owing to the applicable guarantee structure and the Group's operation through a single-treasury system, which entails the centralisation of payments through Antolín Irausa. Under this structure, it is clear that the liquidation value of each Applicant Company, considered individually, would in no case be sufficient to repay the financial indebtedness in full, as contemplated under the Restructuring Plan.

(iii) In addition to the foregoing, it is necessary to consider the adverse impact that any liquidation process has on the realisable value of assets, even where they are sold as a business unit. This, in turn, creates significant uncertainty regarding value recovery in a liquidation scenario, which would once again make it extremely difficult to obtain sufficient funds to repay the financial indebtedness in full. Full repayment is, however, contemplated under the Restructuring Plan, which also ensures the complete continuity of the business and the preservation of employment.

116. In any event, and without prejudice to the foregoing, both Vest Partners and LEXAUDIT have applied the best-interest-of-creditors test in their respective BIC Reports, and both have concluded that the test would be satisfied when comparing the recovery of claims under the Restructuring Plan with the recovery available in an insolvency liquidation scenario.


CERTIFIED TRANSLATION

51



**EIGHTH. – Implementation of the Restructuring in Respect of the Affected Debt**

117.   The restructuring of the Affected Debt shall also be accompanied by a series of supporting measures considered necessary for the implementation of the Plan, including, among others, the following:

(i)   the Existing Notes, whether subject to the default treatment or the alternative treatment, shall be exchanged for the "**New Notes**", in accordance with the provisions of the Restructuring Term Sheet. Specifically, the Existing Notes held by Affected Creditors to whom the default treatment applies shall be exchanged for those referred to in the Plan as the "**New A Notes**". Conversely, the Existing Notes held by Affected Creditors electing the alternative treatment shall be exchanged for the "**New B Notes**";

(ii)   the Bank Debt shall be subject to amendatory, non-terminating novation as follows:

a.   the claims held by the Affected Creditors under the Existing Syndicated Facilities Agreement shall be novated in accordance with the Restructuring Term Sheet and incorporated into an amended and restated agreement (the "**New Syndicated Facilities Agreement**");

b.   the claims held by the Affected Creditors under the Existing ICO Facility Agreement shall be novated in accordance with the Restructuring Term Sheet and incorporated into an amended and restated agreement (the "**Amended ICO Facility Agreement**"); and

c.   the EIB claims relating to the Existing EIB Facility Agreements shall be novated in accordance with the Restructuring Term Sheet and incorporated into an amended and restated agreement (the "**New EIB Facility Agreement**");

(iii)   the Existing Guarantee Facilities[48] shall be subject to amendatory, non-terminating novation as follows:

a.   the claims held by the Affected Creditors under the Existing Guarantee Facilities to whom the default treatment applies shall be novated

---

[48] The New Notes, the New Syndicated Facilities Agreement, the Amended ICO Facility Agreement, the New EIB Facility Agreement, the Contingent Claims arising from the Guarantees and the New Guarantee Facilities shall be referred to as the **"Post-Restructuring Instruments"**.





in accordance with the Restructuring Term Sheet and the Plan itself (the "**Contingent Guarantee Claims**"); and

    b.   the claims held by the Affected Creditors under the Existing Guarantee Facilities that elect the alternative treatment applicable to the Guarantee Facilities shall be novated in accordance with the Restructuring Term Sheet and incorporated into an amended and restated agreement (the "**New Guarantee Facilities**"). The New Guarantee Facilities shall qualify as new financing pursuant to Article 666 of the TRLC;

(iv)   the Intragroup Loans shall be subject to amendatory, non-terminating novation in order to extend their maturity date to 01-01-2036, provide for the capitalisation of all interest accruing until the final maturity date and subordinate them to the remainder of the Affected Debt. Likewise, any rights of recourse, reimbursement, recovery, indemnification or subrogation included in the Subordinated Debt Class pursuant to the Plan shall be subject to the subordination regime;

(v)   the Intercreditor Agreement shall be amended or, where applicable, amended and restated, in accordance with the terms set forth in Clause 5.5 of the Restructuring Plan and in the Restructuring Term Sheet, as described under Fact Ten of this Application;

(vi)   the Working Capital Facility Agreement and the Existing Syndicated Factoring Extensions shall be entered into in accordance with the terms set forth in Clause 6 of the Restructuring Term Sheet, as described under Fact Eleven of this Application; and

(vii)   all the Affected Agreements, including the Existing Guarantee Facilities, shall contain direct or indirect change-of-control provisions linked to the Antolín family's continued ownership interest in the Group, on terms substantially equivalent to those contained in the Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement, the Existing EIB Facility Agreements and the Existing Notes.

(viii)   Furthermore, the security interests and guarantees, as well as the ICA, shall be ratified, amended and extended in effect, as shall be analysed under Facts Nine and Ten below.


CERTIFIED
TRANSLATION



**NINTH. – Security Arrangements under the Plan**

118.   The Plan governs the treatment afforded to the existing security and establishes a framework for the granting of additional new security, the provision of which reflects the requirements of the Participating Creditors during the negotiation of the Plan in order to promote and ensure the Group's viability.

119.   For full details of the security arrangements, reference is made to Clause 5.4 of the Restructuring Plan and the Restructuring Term Sheet.

### 9.1 Existing Security: Ratification and Novation

120.   First, the personal guarantees granted as security for the obligations arising under the Affected Agreements (the **"Existing Personal Guarantees"**), together with the Pledges over Antolín Irausa (jointly with the Existing Personal Guarantees, the **"Existing Security"**), shall be ratified and amended by novation to the extent necessary so as to secure the obligations under the New Syndicated Facilities Agreement, the Amended ICO Facility Agreement, the New Notes and the New EIB Facility Agreement.

### 9.2 New Security: Description and Allocation

121.   Secondly, the Plan provides for the granting of additional new security, structured according to the treatment elected by each Affected Creditor. For greater clarity, the following security arrangements are distinguished, the description and allocation of which among the various debt instruments are summarised in the following table:

| Security | Description | Ranking | Secured Instruments |
|---|---|---|---|
| New First-Ranking ICA Security Interests | First-ranking pledges over: (i) 100% of the shares in Antolín RyA, Antolín Eurotrim and Antolín Aragusa; (ii) 100% of the equity interests in G.A. Gestión de Inversiones, S.L.U.; (iii) 100% of the shares in Grupo Antolin Besançon SAS; (iv) the claims arising under the Intragroup Loans, subject to restrictions on assignments outside the Group; and (v) 100% of the shares in Antolin China Investments Co. Ltd. | First ranking | Existing Syndicated Factoring Extensions and the Working Capital Facility Agreement—in both cases, insofar as concerns obligations with recourse against the Group—New B Notes, New Guarantee Facilities and Bank Debt subject to the alternative treatment |
| New Second-Ranking ICA Security Interests | Second-ranking pledges over the same assets subject to the New First-Ranking ICA Security Interests | Second ranking | New A Notes, Contingent Guarantee Claims and Bank Debt subject to the default treatment |


CERTIFIED TRANSLATION

54



| New Second-Ranking ICA Security Interests | | | Bank Debt subject to the default treatment |
|---|---|---|---|
| First-Ranking Pledge over Accounts | First-ranking pledge over the claims arising from: (i) bank account NL68HSBC2031728881 (HSBC Amsterdam Branch) and accounts ES0200190030614010279383 and ES5700190030624052044895 (Deutsche Bank); and (ii) a bank account into which the non-recourse factoring proceeds under the Working Capital Facility Agreement are paid | First ranking | Working Capital Facility Agreement and Existing Syndicated Factoring Extensions |
| Second-Ranking Pledge over Accounts | Second-ranking pledge over the same bank accounts subject to the First-Ranking Pledge over Accounts | Second ranking | New B Notes, New Guarantee Facilities and Bank Debt subject to the alternative treatment |
| Third-Ranking Pledge over Accounts | Third-ranking pledge over the same bank accounts subject to the Second-Ranking Pledge over Accounts | Third ranking | New A Notes, Contingent Guarantee Claims and Bank Debt subject to the default treatment |
| New ICA Personal Guarantees | Joint and several first-demand personal guarantees granted by Antolín HoldCo, Grupo Antolin Italia S.R.L., Grupo Antolin Besançon SAS, Antolin Tanger SARL, Trimtec Ltda. and Intertrim Ltda. (the companies defined in Section 1.4.2 as the New ICA Guarantors) | | Existing Syndicated Factoring Extensions and the Working Capital Facility Agreement—in both cases, insofar as concerns obligations with recourse against the Group—Bank Debt following the Restructuring, New A Notes, New B Notes, New Guarantee Facilities and Contingent Guarantee Claims |

### 9.3 Additional Undertakings to Grant Security

122.  Furthermore, Antolín Irausa, subject to the principles governing the granting of security set forth in the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement and the Existing EIB Facility Agreements, shall:

–    grant an undertaking to create a pledge over the shares or equity interests in the share capital of the Group's subsidiaries incorporated in India, should those companies account for 5.0% of the Group's consolidated EBITDA:



55



&ndash;   on a first-ranking basis, as security for the performance of the obligations arising under the New B Notes, the Existing Syndicated Factoring Extensions, the Working Capital Facility Agreement, the New Guarantee Facilities and the claims held by the Affected Creditors of the Bank Debt that have elected the alternative treatment; and

&ndash;   on a second-ranking basis, as security for the performance of the obligations arising under the New A Notes, the Contingent Guarantee Claims and the claims held by the Affected Creditors to whom the default treatments apply; and

&ndash;   grant an undertaking to create a pledge over any material agreements whose expected annual profitability may reasonably represent, throughout the life of the project, more than 2% of the Group's consolidated EBITDA, provided that the claims arising thereunder are capable of being pledged and are not subject to the Existing Syndicated Factoring Extensions or the Working Capital Facility Agreement, as security for the performance of the obligations arising under the New B Notes, the New Guarantee Facilities, the Existing Syndicated Factoring Extensions, the Working Capital Facility Agreement and the claims held by the Affected Creditors of the Bank Debt that have elected the alternative treatment.

**9.4 Extension of the Effects to the Pledges over Antolín Irausa (Article 652.2 of the TRLC)**

123.   Furthermore, the effects of the Restructuring Plan shall be extended to the Pledges over Antolín Irausa pursuant to Article 652.2 of the TRLC, as explained under Fact Thirteen (Section 13.4) of this Application and in Clause 5.4.4 et seq. of the Plan.

**TENTH. – Novation of the Intercreditor Agreement**

124.   Without prejudice to the more detailed provisions of the Plan in this regard (Clause 5.5), to which reference is made, the fundamental amendment to the Intercreditor Agreement shall consist of modifying the payment-ranking provisions set forth therein in order to provide that any amount obtained from any proceeds or recoveries[49] shall be applied, following payment of the relevant senior claims in accordance with the ICA[50], as follows:


CERTIFIED TRANSLATION



a. in respect of any amount obtained from any proceeds or recoveries relating to the Pledges over Antolín Irausa, in accordance with the payment-ranking provisions of the Intercreditor Agreement in force as at the Signing Date, amended solely for the purpose of including the payment obligations arising under the New Notes, the New Syndicated Facilities Agreement, the Amended ICO Facility Agreement and the New EIB Facility Agreement, in replacement of the payment obligations arising under the corresponding previously existing instruments, respectively; and

b. in respect of any amount obtained from any proceeds or recoveries relating to the remainder of the Existing Security, the New ICA Personal Guarantees and the New ICA Security Interests:

i. first, towards the payment obligations arising under the Working Capital Facility Agreement and the Existing Syndicated Factoring Extensions, in both cases solely insofar as concerns obligations with recourse against the Group;

ii. secondly, towards the Affected Claims of the Affected Creditors that have elected any of the corresponding alternative treatments, up to a maximum amount of EUR 435,000,000; and

iii. thirdly, once the amount referred to in paragraph (ii) above has been paid in full, towards the remaining Affected Claims subject to the Intercreditor Agreement, excluding the Intragroup Loans where applicable, pro rata and pari passu, up to the amount of such payment obligations.

125. It is likewise contemplated that the scope of the Intercreditor Agreement shall include all Post-Restructuring Affected Debt instruments, the Working Capital Facility Agreement and the Existing Syndicated Factoring Extensions—in the latter two cases, insofar as concerns the obligations

---

[49] In the circumstances contemplated in Clause 13.1 of the Intercreditor Agreement, the amounts obtained by the Security Agent in certain circumstances—including by way of set-off, forced sale or debt sale—are to be distributed among the Affected Agreements, namely the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing ICO Facility Agreement and the Existing EIB Facility Agreements. The aforementioned clause has been attached as part of **Document No. 22**.

[50] Namely, the payment of amounts arising from costs, fees, charges, expenses, remuneration or similar amounts payable to the Security Agent under the ICA, the Notes Trustee, the agent under the Existing Syndicated Facilities Agreement and other representatives of the financing providers.



57



with recourse against the Group), and to adapt the maturity and enforcement mechanisms applicable to the personal guarantees and security interests subject to the Intercreditor Agreement to this new scope of debt instruments governed by the Intercreditor Agreement.

126.    All the foregoing shall be carried out in accordance with the Restructuring Term Sheet and as an act implementing and giving effect to the Restructuring. Furthermore, in all cases, the First-Ranking Pledge over Accounts granted as security for the Working Capital Facility Agreement and the Existing Syndicated Factoring Extensions shall not be subject to the terms of the Intercreditor Agreement, as amended.

**ELEVENTH. – Existing Syndicated Factoring Extensions and Working Capital Facility Agreement**

127.    Owing to the pronounced seasonality inherent in the automotive sector, the Group's viability depends on its ability to manage its working-capital requirements appropriately. Working-capital financing instruments constitute an essential element of its business operations, insofar as they enable the Group to meet its current payment obligations, maintain its ordinary business activities and preserve its relationships with suppliers, customers and other commercial counterparties.

128.    As explained under Fact Three of this Application, the Existing Syndicated Factoring Facility—a working-capital instrument essential to the Group's operations—is due to mature on 23-01-2027. Accordingly, the need to secure a long-term bank working-capital financing facility is an essential and critical matter for the Group's viability and has constituted one of the most significant aspects of the negotiations with the creditors.

129.    In this context, it is essential for the Group to have access to, and assurance of, working-capital financing instruments suited to its operational requirements, providing stability over a period of at least five years while remaining sufficiently flexible to adapt to the circumstances of the business from time to time. The availability of such facilities constitutes a necessary condition for the proper implementation of the Plan and the achievement of its Viability Plan.

**11.1 Existing Syndicated Factoring Extensions**

130.    The Plan provides that, should the Working Capital Facility Agreement not have entered into force and become fully available by 23-01-2027, the entities participating in the Existing Syndicated Factoring Facility that are Parties to the Plan (the " **Purchasing Entities**") shall automatically extend the availability period of the Existing Syndicated Factoring Facility on a monthly basis until the Working Capital Facility Agreement enters into force, thereby ensuring continuity of the Group's working-capital requirements throughout the implementation of the Restructuring (the so-called Existing Syndicated Factoring Extensions).





131.   The Existing Syndicated Factoring Extensions shall qualify as interim financing or new financing, as applicable, pursuant to Articles 665 and 666 of the TRLC, which constitutes an essential condition for their provision. Any Existing Syndicated Factoring Extensions occurring after the Closing Date shall be secured by the First-Ranking Pledge over Accounts, the New First-Ranking ICA Security Interests and the New ICA Personal Guarantees, and shall benefit from the payment priority provided for under the amendment of the Intercreditor Agreement on the same terms as the Working Capital Facility Agreement.

132.   For the remaining terms and conditions applicable to the Existing Syndicated Factoring Extensions, reference is made in full to Clause 6.1 of the Restructuring Plan.

**11.2 Working Capital Facility Agreement**

133.   The Restructuring Plan also provides for the execution of a new working-capital financing agreement (the "**Working Capital Facility Agreement**"), structured as a multi-product facility comprising non-recourse factoring as the principal instrument for advancing trade receivables and a revolving credit facility. This instrument constitutes a structural and essential element of the Plan itself and shall qualify as new financing pursuant to Article 666 of the TRLC.

134.   The principal terms of the Working Capital Facility Agreement are as follows:

–   Instrument: a multi-product facility comprising non-recourse factoring and a revolving credit sub-facility, with the possibility of establishing an ancillary guarantee facility.

–   Borrower under the New Working Capital Facility: Antolín Irausa.

–   Maximum amount: EUR 220,000,000, with a sub-limit of EUR 40,000,000 for the revolving credit sub-facility.

–   Maturity: 04-08-2032, subject to a mechanism bringing the maturity date forward to 30-06-2030 if, on or before that date, the New B Notes have not been repaid, redeemed or refinanced, or the Restructured Companies have not evidenced binding commitments for their refinancing.

–   Interest rate: (i) for amounts drawn under the non-recourse factoring facility, payable monthly in arrears: EURIBOR plus 0.60% for amounts denominated in EUR and SOFR plus 0.80% for amounts denominated in USD; and (ii) for amounts drawn under the revolving credit facility: EURIBOR plus an annual margin of 1.25%.



59



&ndash;    Security: the First-Ranking Pledge over Accounts, the New First-Ranking ICA Security Interests and the New ICA Personal Guarantees.

135.   For the remaining terms and conditions of the Working Capital Facility Agreement—including, among other matters, the New Working Capital Entities, the security arrangements, the conditions precedent, the specific terms applicable to non-recourse factoring and the transfer restrictions—reference is made in full to Clauses 6.2 and 6.3 of the Restructuring Plan and to the Restructuring Term Sheet.

### TWELFTH. – Approval of the Restructuring Plan

136.   As a result of the intensive negotiations conducted throughout the restructuring process, the Restructuring Plan has the support and accession of a sufficient majority of the Affected Creditors to establish that it has been approved in accordance with Articles 638 and 639 of the TRLC, with the majorities required under Article 639.2 of the TRLC. The relevant facts demonstrating the sufficiency of the majorities and satisfaction of the requirements for the extension of effects for which judicial approval is sought are set out below.

### 12.1 Execution of the Restructuring Plan as a Public Instrument

137.   In accordance with Article 634.1 of the TRLC, the Restructuring Plan was executed as a public instrument on 2026-07-10, by means of a deed granted before the Madrid Notary Public, Mr Francisco Miras Ortiz, acting as substitute for and for the notarial records of Mr Andrés Domínguez Nafría, under number 4,281 of his notarial records, and is attached to this submission as Document No. 2 (the "**Plan Deed**"). The Plan Deed incorporates the Restructuring Plan in its entirety, together with its annexes and, in particular, the Viability Plan.

### 12.2 Application of the Syndication Agreement Regime: Article 630 of the TRLC


CERTIFIED TRANSLATION


USA CORP

138.   Pursuant to Article 630.1 of the TRLC, since the Restructuring Plan affects claims governed by syndication arrangements—as is the case with the 2028 Notes, the 2030 Notes, the Existing Syndicated Facilities Agreement and the Existing ICO Facility Agreement, each group constituting its own syndicate—the majorities provided for in Article 629 of the TRLC must be applied to each of those Affected Agreements, respectively, since none of the aforementioned syndication arrangements establishes majorities lower than those provided for in Article 629 of the TRLC. Consequently, in all cases, the threshold of more than two-thirds of the amount of the liabilities corresponding to each of those Affected Agreements shall apply in order for the Plan to be deemed approved in respect of each of them, since they qualify as unsecured Affected Claims.

139.   Once that majority has been reached in respect of each such Affected Agreement, the effect provided for in Article 630.2 of the TRLC shall apply: "all syndicated claims shall be deemed to have accepted the restructuring plan". Consequently, the favourable vote of the Affected Creditors representing more than two-thirds of the amount of each of the 2028 Notes, the 2030 Notes, the Existing Syndicated Facilities Agreement and the Existing ICO Facility Agreement shall constitute the favourable vote of 100% of the Affected Creditors bound by each of those instruments, respectively.

**12.3 Communication of the Plan to the Affected Creditors and Accession Period**

140.   In accordance with Article 627 of the TRLC and Clause 4.2 of the Restructuring Plan, following execution of the RSA, the Restructuring Agent sent the Affected Creditors an initial invitation to accede to the RSA itself and/or vote in favour of or against, and freely accede to, the Original Restructuring Plan, together with a copy thereof. The aforementioned communications and screenshots of the relevant webpages are attached to this submission as **Documentary Bundle No. 29.1**, together with their translation into Spanish as **Documentary Bundle No. 29.1 bis**.

141.   Subsequently, following the novation of the Original Restructuring Plan into the Restated Restructuring Plan and prior to its execution, the Restructuring Agent sent the Invitation to the Affected Creditors, thereby once again establishing an accession period until 22-07-2026, during which the Affected Creditors could accede to the RSA and/or vote in favour of or against, and freely accede to, the Plan during the Accession Period. This Invitation was sent through the means specified in the Plan—which are the same means used to send the initial invitation—and comprised the following, as applicable:

   (i)   in the case of the Bank Debt and the Existing Guarantee Facilities, by means of notice given in accordance with the notification mechanisms provided for in the relevant Affected Agreements;



61



(ii)    in the case of the Existing Notes, it was sent to the Notes Trustee for distribution through Euroclear Bank SA/NV and Clearstream Banking, S.A., in accordance with the rules of Euronext; and it was published on the website of the Luxembourg Stock Exchange (LuxSE);

(iii)    furthermore, the Invitation was published on the Group's website (Spanish: https://www.antolin.com/es/inversores/comunicados-2026;    English: https://www.antolin.com/en/investores/publications-2026) and on the website established by the Restructuring Agent in connection with the Restructuring: (https://glas-agency.appiancloud.com/suite/sites/GRUPO-ANTOLIN-IRAUSA-SAU), where the Invitation and the Restructuring Plan, among other documents, are available;

(iv)    likewise, the execution version of the Plan was sent to the creditors of the Subordinated Debt at the email addresses provided.

142.    For evidentiary purposes, the communications and screenshots of the webpages circulated prior to the execution of the Restated Restructuring Plan are attached as **Documentary Bundle No. 29.2**, together with their translation into Spanish as **Documentary Bundle No. 29.2 bis**.

**12.4 Issuance of the Certification of Majorities by the Restructuring Expert**

143.    On 10-07-2026, LEXAUDIT—in its capacity as Restructuring Expert—issued the certification of majorities and protection against avoidance actions (the "**Certification**"), which is attached as **Document No. 30**. The Certification was incorporated by notarial certificate into the deed recording the Plan as a public instrument, thereby duly satisfying the requirement laid down in Article 634.1 of the TRLC, which requires that an application for approval be accompanied by the restructuring expert's certification as to the sufficiency of the majorities.

144.    The issuance of the aforementioned Certification, which certifies both the majorities and the 51% threshold referred to in Section 12.6 below, also constitutes satisfaction of the condition precedent to the entry into force of the Plan provided for in Clause 11. Although the Effective Date of the Plan remains subject to fulfilment of the condition precedent consisting of this Honourable Court issuing an order granting judicial approval of the Plan and the Plan being recognised pursuant to Chapter 15 of Title 11 of the United States Code, in accordance with the terms of Clause 12 of the Plan.

**12.5 Results of the Majorities Obtained**





145. In accordance with the Certification issued by the Expert—and having regard to the formation of classes described under **Fact Seven** above—the voting results in each of the classes of the various Restructured Companies are as follows:

- In the case of Antolín Bohemia, Antolín Logistik Deutschland and Antolín Straubing GmbH:

  ○ In the Guarantee Facilities Class and the Subordinated Debt Class, the claims held by the Affected Creditors that signed the Plan represent more than two-thirds of the amount of the liabilities corresponding to each class. Accordingly, pursuant to Article 629.1 of the TRLC, those classes have voted in favour of the Plan.

  ○ In the Bank Debt Class and the Notes Class, the majorities required under Article 629.1 of the TRLC for those classes to be deemed to have voted in favour of the Plan have not been reached.

- In the case of Antolín South Africa:

  ○ In the Bank Debt Class and the Guarantee Facilities Class, the claims held by the Affected Creditors that signed the Plan represent more than two-thirds of the amount of the liabilities corresponding to each class. Accordingly, pursuant to Article 629.1 of the TRLC, those classes have voted in favour of the Plan.

  ○ In the Notes Class, the majority required under Article 629.1 of the TRLC for that class to be deemed to have voted in favour of the Plan has not been reached.

  ○ It does not have a Subordinated Debt Class.

- In the case of the remaining Applicant Companies:

  ○ In the Bank Debt Class, the Guarantee Facilities Class and the Subordinated Debt Class, the claims held by the Affected Creditors that signed the Plan represent more than two-thirds of the amount of the liabilities corresponding to each class. Accordingly, pursuant to Article 629.1 of the TRLC, those classes have voted in favour of the Plan.

  ○ In the Notes Class, the majority required under Article 629.1 of the TRLC for that class to be deemed to have voted in favour of the Plan has not been reached.

146. The foregoing result, together with the Going-Concern Valuation issued by the Expert and incorporated into the Plan Deed together with the Certification—and also attached separately for ease of reference as **Document No. 31**—means that the majorities legally required for


CERTIFIED TRANSLATION

63



approval of the Plan as a non-consensual plan pursuant to Article 639.2 of the TRLC have been reached. Specifically:

○ In the case of Antolín Irausa and Antolín Lusitânia, the Bank Debt Class, the Guarantee Facilities Class and the Subordinated Debt Class have voted in favour of the Plan and are in the money according to the Going-Concern Valuation issued by the Expert.

○ In the case of Antolín Logistik Deutschland, the Guarantee Facilities Class and the Subordinated Debt Class have voted in favour of the Plan and are in the money according to the Going-Concern Valuation issued by the Expert.

○ In the case of Antolín Bohemia and Antolín Straubing GmbH, the Guarantee Facilities Class has voted in favour of the Plan and is in the money according to the Going-Concern Valuation issued by the Expert.

○ In the case of the remaining Restructured Companies[51], the Bank Debt Class and the Guarantee Facilities Class have voted in favour of the Plan and are in the money according to the Going-Concern Valuation issued by the Expert.

147. Accordingly, the majorities legally required pursuant to Article 639.2 of the TRLC for the judicial approval of the Plan have been satisfied.

---

[51] The differences in class approvals among the various Restructured Companies, excluding Antolín Irausa, are primarily due to the limitations applicable to the guarantees granted by the Restructured Companies and their respective going-concern values.



64



**12.6 Evidence of the 51% Threshold for Protection against Avoidance Actions and Payment Priority in Insolvency Proceedings**

148. The Restructuring Expert has likewise included in the Certification (Document No. 30) the certification of majorities confirming that the claims affected by the Restructuring Plan represent at least fifty-one per cent (51%) of the Applicant Companies' total liabilities, with the exception of Antolín South Africa and Antolín Logistik Deutschland. This is the threshold required under Article 667.1 of the TRLC for judicial approval to afford protection against avoidance actions in respect of the Plan itself and the acts, transactions and legal arrangements that are reasonably and necessarily required—directly or indirectly—for its implementation, as well as protection for the new financing, which in this case is provided through the Working Capital Facility Agreement, the New Guarantee Facilities and the Existing Syndicated Factoring Extensions, and for the granting of all personal guarantees and security interests included in the Plan.

149. Satisfaction of this threshold is particularly relevant for the purposes of the Prayer for Relief contained in this submission and shall be addressed under the Substantive Legal Grounds.

**12.7 Approval of the Restructuring Plan by the Applicant Companies**

150. Lastly, the Restructuring Plan has been approved by the governing bodies competent to apply for its judicial approval pursuant to Article 643.2 of the TRLC.

**THIRTEENTH. – Other Measures Provided for in the Restructuring Plan and Extension of Effects Pursuant to the Application for Approval**

151. The Restructuring Plan provides for its judicial approval as an essential condition of the Restructuring, and the Restructured Companies undertake to file such application on the terms reproduced herein, expressly seeking the following effects:

**13.1 Extension of Effects to Affected Creditors that Have Not Acceded to the Plan**

152. Pursuant to Articles 635.1(1) and 649 of the TRLC, the judicial approval of the Restructuring Plan shall result in the extension of the effects of the entire contents of the Restructuring Plan and of the relevant Restructuring Documents to the Affected Creditors that did not accede thereto during the Accession Period or that voted against it.


CERTIFIED TRANSLATION

65


USA CORP

**13.2 Protection against Avoidance Actions**

153.   As stated above, pursuant to Articles 635.3 and 667 of the TRLC, and given that the affected claims represent at least 51% of the total liabilities of each of the Applicant Companies, except in the case of Antolín South Africa and Antolín Logistik Deutschland—as evidenced by the Certification attached as Document No. 30—all acts and legal transactions carried out to implement the Restructuring should be protected, including, without limitation, the following:

  a.   the restructuring of the Affected Debt, including, without limitation: (i) the amendatory, non-terminating novation of the Bank Debt; (ii) the issuance of the New Notes; (iii) the exchange of the Existing Notes for such New Notes and the cancellation of the Existing Notes in accordance with the Consent Solicitation; (iv) the New Guarantee Facilities; and (v) the amendatory, non-terminating novation of the Intercreditor Agreement;

  b.   the Existing Syndicated Factoring Extensions;

  c.   the Working Capital Facility Agreement; and

  d.   any transaction, act, payment or security implemented pursuant to the Plan, so that it may not be subject to avoidance actions in any subsequent insolvency proceedings, including the granting of all personal guarantees and security interests contemplated under the Plan.

**13.3 Recognition and Protection of New Financing and, Where Applicable, Interim Financing, and the Granting of Payment Priority**

154.   Pursuant to Articles 635.3, 242.1(17) and 280.6 of the TRLC, the Applicant Companies shall request a declaration that the Working Capital Facility Agreement, the New Guarantee Facilities and the Existing Syndicated Factoring Extensions—should such extensions become necessary—constitute new financing for the purposes of Article 666 of the TRLC; and that any Existing Syndicated Factoring Extensions required prior to the judicial approval of the Plan qualify as interim financing pursuant to Article 665 of the TRLC. In both cases, the legally prescribed payment priorities are sought pursuant to Articles 242.1(17) and 280.6 of the TRLC.


CERTIFIED TRANSLATION



155. As explained under Fact Eleven of this Application, both the new financing and any interim financing are essential to ensure the Group's viability, in accordance with the Viability Plan attached as Document No. 20. The working-capital instruments contemplated under the Plan ensure that the Group is able to meet its current payment requirements, maintain its ordinary business operations and preserve its relationships with suppliers, customers and other commercial counterparties over a stable time horizon.

156. More specifically, the need for each of these instruments is justified by the following reasons:

(i) The Working Capital Facility Agreement supports the Group's structural working-capital requirements—including inventory financing, the maintenance of production cycles and the regular performance of obligations owed to suppliers, employees and other operating creditors—is essential to the proper implementation of the Viability Plan and constitutes a necessary condition for the success of the Restructuring.

(ii) The New Guarantee Facilities are necessary to enable the Group to continue issuing the guarantees required in the ordinary course of its business, thereby preserving its commercial operations without interruptions that could jeopardise the implementation of the Plan.

(iii) The Existing Syndicated Factoring Extensions may be necessary during the judicial approval proceedings or during the implementation phase of the judicially approved Plan, in order to prevent their absence from causing strain on the financial position of the Restructured Companies during the transitional period until the Working Capital Facility Agreement becomes fully available.

157. The granting of the payment priorities provided for in Article 667 of the TRLC is subject to two requirements: first, the judicial approval of the Restructuring Plan; and secondly, that the affected claims represent at least 51% of the total liabilities. Both requirements would be satisfied in the present case in respect of each of the Applicant Companies[52] if the Plan is judicially approved, since, as evidenced by the Certification attached as Document No. 30, the requirement that affected claims exceed 51% has already been met.

---

[52] Except in respect of Antolín South Africa and Antolín Logistik Deutschland.





**13.4 Extension of Effects to Security Granted by Third Parties: Extension to the Pledges over Antolín Irausa (Article 652.2 of the TRLC)**

158.  Article 652.2 of the TRLC establishes an exception to the general rule of non-interference with third-party security laid down in Article 652.1 of the TRLC. Pursuant to that exception, the effects of the restructuring plan of a group company may be extended, subject to the conditions established in the plan itself, to personal guarantees or security interests granted by any other company belonging to the same group that is not subject to the restructuring plan, where enforcement of the guarantee or security could cause the insolvency of both the guarantor company and the debtor company itself.

159.  In the present case, the Applicant Companies seek the extension of the effects of the Restructuring Plan to the Pledges over Antolín Irausa created by Antolín HoldCo, since all the requirements laid down in Article 652.2 of the TRLC are satisfied, as explained below.

**A) Description of the Pledges over Antolín Irausa**

160.  As stated under Fact One, HoldCo owns 100% of the shares in Antolín Irausa and therefore holds the entirety of its share capital.

161.  As security for the obligations arising under the Group's various financing instruments—the 2028 Notes and the 2030 Notes[53], the Existing Syndicated Facilities Agreement, the Existing EIB Facility Agreements and the Existing ICO Facility Agreement—HoldCo, in its capacity as a third-party pledgor, successively created security interests by way of pledge, with different rankings, over all the aforementioned shares in Antolín Irausa in favour of the secured creditors, with Deutsche Bank AG, London Branch acting as Security Agent (the security interests referred to herein as the Pledges over Antolín Irausa). The Pledges over Antolín Irausa[54] remain in force, as evidenced by the various deeds and notarial instruments relating thereto.

---

[53] Referred to in the Pledges over Antolín Irausa as the 2021 Notes and the 2024 Notes.

[54] The deeds and notarial instruments relating to the Pledges over Antolín Irausa are attached as supporting documents in order to enable this Honourable Court to assess fully the historical development of those security interests, including their successive creation, extension, novation, ratification, changes in ranking and cancellation. In particular, the following pledges currently remain in force: (i) first-ranking pledges securing the senior financing—currently in relation to Tranche A6 and Revolving 2, corresponding to the indebtedness under the Existing Syndicated Facilities Agreement—initially created by Deed dated 02-04-2014, Protocol No. 687 (Document No. 32.1), and Deed dated 16-09-2014, Protocol No. 2,403 (Document No. 32.2), subsequently novated and ratified, among others, by the Notarial Instrument dated 17-10-2024, No. 380 (Document No. 32.14), and by the Notarial Instrument dated 04-08-2025, Entry No. 1,058 (Document No. 32.15); (ii) a second-ranking pledge securing EIB Facility Agreement I, created by Deed dated 12-06-2018, Protocol No. 1,807 (Document No. 32.9), renumbered and novated by the Notarial Instrument dated 17-10-2024, No. 380 (Document No. 32.14); and (iii) third-ranking pledges securing the 2028 Notes—referred to in the pledge instrument as the 2021 Notes—and EIB Facility Agreement II, created by Notarial Instrument dated 23-07-2021, No. 434 (Document No. 32.12),





pledges, which are attached as **Document No. 32**. Of particular note among them is Document No. 32.15, namely the Notarial Instrument of Novation, Creation and Ratification of Pledges, executed on 2025-08-04 before the Madrid Notary Public, Mr. Andrés Domínguez Nafría, under entry number 1,058 in his Register of Transactions, which describes the entire history of the Pledges over Antolín Irausa, as it is the most recently executed instrument.

162. Accordingly, the Pledges over Antolín Irausa[55]—originally granted by HoldCo in its capacity as a third-party non-debtor pledgor—were created as security for the obligations arising under the Group's principal financing instruments, which are now intended to be affected by the Restructuring Plan. Furthermore, pursuant to the Plan itself, the aforementioned Pledges over Antolín Irausa shall be amended by novation and ratified, and a new pledge shall be granted on the same terms in respect of the restructured debt, as defined in the Plan, while HoldCo shall become a personal guarantor under the New Personal Guarantees package.

### B) Satisfaction of the Requirements of Article 652.2 of the TRLC

163. The extension of the effects of the Plan to the Pledges over Antolín Irausa granted by HoldCo requires the satisfaction of three cumulative requirements, all of which are met in the present case:

**(i)  HoldCo and the Applicant Companies belong to the same group of companies**

HoldCo is the direct parent company and sole shareholder of Antolín Irausa, which in turn heads the operating group comprising the remaining Applicant Companies. Accordingly, HoldCo exercises full direct control over Antolín Irausa and indirect control over the remaining Applicant Companies. Pursuant to Article 42 of the Commercial Code, this satisfies the subjective requirement laid down in Article 652.2 of the TRLC. In other words, HoldCo forms part of the same group as the Restructured Companies applying for judicial approval.

**(ii)  HoldCo is not subject to the Restructuring Plan**

---

renumbered by the Notarial Instrument dated 17-10-2024, No. 380 (Document No. 32.14); (iv) a fifth-ranking pledge securing the 2030 Notes—referred to in the pledge instrument as the 2024 Notes—created by Notarial Instrument dated 17-10-2024, No. 380 (Document No. 32.14); and (v) a sixth-ranking pledge securing the Existing ICO Facility Agreement, created by Notarial Instrument dated 04-08-2025, Entry No. 1,058 (Document No. 32.15). The pledges created in respect of Tranche 1 and Revolving 1 under the Existing Syndicated Facilities Agreement and the COFIDES financing—which would rank fourth—have not been formally cancelled, although the corresponding indebtedness has been repaid in full.

[55] The structure and operation of the Pledges over Antolín Irausa are governed by the ICA, which regulates, among other matters, the mechanism for enforcing the pledges and the rules governing distribution of the proceeds obtained from enforcement, establishing a pari passu ranking among the senior creditor signatories.


CERTIFIED TRANSLATION


USA CORP

HoldCo does not qualify as a Restructured Company under the Plan, since it is neither a debtor nor a guarantor of the debt subject to the Restructuring. Accordingly, it is a Group company that is not subject to the Restructuring Plan within the meaning of Article 652.2 of the TRLC. Its involvement in the Restructuring is limited to acknowledging and consenting—as stated under Fact One—to the extension of the effects of the Plan to the Pledges over Antolín Irausa pursuant to Article 652.2 of the TRLC and to granting a new personal guarantee forming part of the New Personal Guarantees package.

**(iii)    Enforcement of the Pledges over Antolín Irausa would cause the insolvency of both the guarantor (HoldCo) and the Restructured Companies**

This requirement is likewise satisfied, as shall be analysed in detail below.

164.    In the present case, the exception provided for in Article 652.2 of the TRLC is particularly clearly applicable, since the Pledges over Antolín Irausa do not constitute security that is unrelated, ancillary or peripheral to the Affected Debt, but rather security that is functionally linked to the principal financing instruments affected by the Plan. Precisely because they secure such debt, their treatment must be incorporated into the comprehensive solution contemplated under the Restructuring Plan, since preventing their enforcement—and therefore preserving them on the terms contemplated under the Plan—is necessary to ensure the Group's viability, avoid disruption of the economic and financial balance of the Restructuring and guarantee the full effectiveness of the measures provided for under the Plan.

165.    It should be recalled at this point that the purpose of Article 652.2 of the TRLC is to prevent the individual enforcement of intragroup security from frustrating the effectiveness of a restructuring plan where it jeopardises the viability of the debtor company itself.

166.    From this perspective, enforcement of the Pledges over Antolín Irausa should not be assessed as the isolated enforcement of security, but rather by reference to its effects on HoldCo, Antolín Irausa, the remaining Applicant Companies and the viability of the Plan as a whole, as analysed below.

**C)    Effects of Enforcement of the Pledges over Antolín Irausa on the Guarantor (HoldCo): Resulting Insolvency**

167.    Enforcement of the Pledges over Antolín Irausa would directly and immediately cause HoldCo's insolvency, for the reasons set out below.



70



168. According to HoldCo's statement of financial position as at 25-06-2026, attached as **Document No. 33**, virtually all of its assets—EUR 376,680,088.26 out of total assets of EUR 376,693,144.47—correspond to the line item "Shares in Grupo Antolín Irausa", which constitutes its long-term investment in Group companies and comprises the shares subject to the pledge security referred to above. HoldCo's non-current assets also include a tax credit in respect of tax losses carried forward amounting to EUR 10,510.06. HoldCo's current assets amount to only EUR 2,546.15, comprising a short-term receivable from Group companies of EUR 1,850.32 and cash of EUR 695.83. Consequently, the shares in Antolín Irausa represent more than 99.99% of HoldCo's total assets of EUR 376,693,144.47.

169. Enforcement of the Pledges over Antolín Irausa would entail the loss of this sole material asset, depriving HoldCo of any significant assets[56] and, as provided for in the Pledges over Antolín Irausa, without giving rise to any recourse claim as a consequence of such enforcement.[57] In that situation of an immediate depletion of its assets, HoldCo would have the following liabilities:

  – Under non-current liabilities, HoldCo records a debt owed to Avot Inversiones, S.L. amounting to EUR 70,518.70, together with a deferred tax liability of EUR 657,979.00, resulting in total non-current liabilities of EUR 728,497.70.

  – Furthermore, HoldCo has short-term debts owed to Group companies amounting to EUR 2,150.11, comprising short-term interest, and other debts owed to various creditors amounting to EUR 2,616.52.

  – In addition to the foregoing, pursuant to the Restructuring Plan itself, HoldCo shall assume the status of personal guarantor of the restructured obligations. Consequently, as a result of the existing change-of-control provisions and those to be included in the remaining Affected Agreements pursuant to Clause 5.3.8 of the Plan, all the restructured debt would be accelerated[58] before enforcement of the Pledges over Antolín Irausa, thereby further aggravating its state of insolvency.

---

[56] It should also be borne in mind that enforcement does not constitute an orderly sale designed to maximise value. Accordingly, the value obtained for the shares in a forced-sale scenario would likely be lower.

[57] Specifically, the Pledge Agreement dated 04-08-2025 (Document No. 32.15) provides:

"Having regard to the nature and structure of the financing transaction from which the Secured Obligations arise, the Pledgor acknowledges that, in order to avoid diminishing the value of the Shares upon enforcement, the Pledge shall not give rise to any rights—whether rights of recourse or otherwise—in its favour against the Debtors or GAI, the Secured Creditors or the successful purchasers of the Shares."

[58] Or any equivalent mechanism, whether early repayment, contractual termination, the return of outstanding guarantees or any similar measure.



71



– To all the foregoing must also be added the tax liabilities that would arise as a consequence of enforcing the Pledges over Antolín Irausa, which would result in the break-up of the tax consolidation group of which HoldCo forms part, upon its loss of control over Antolín Irausa and, by extension, over the remaining companies within the tax group.

In this regard, first, pursuant to the Corporate Income Tax Act (the "**LIS**"), the break-up of the tax group would affect the amounts payable in respect thereof in the financial year in which the tax deconsolidation occurs.

The principal effects of the tax deconsolidation would be: (i) the inclusion in the final consolidated tax return of deferred tax losses pursuant to Additional Provision 19 of the LIS; (ii) the inclusion in the taxable base of certain intragroup transactions previously eliminated; and (iii) the reallocation among the Group entities of tax loss carryforwards, non-deducted financial expenses and outstanding tax credits. Although these effects would be offset by the available tax losses and tax loss carryforwards, they would give rise to an adverse tax impact on HoldCo that it would be unable to meet owing to its lack of assets.

Furthermore, pursuant to Article 57 of the LIS, the entities that formed part of the tax group shall be jointly and severally liable for payment of the tax liabilities of the various Group entities arising prior to the tax deconsolidation.

170. Accordingly, if the Pledges over Antolín Irausa were enforced, HoldCo would be left with virtually no residual assets—only EUR 2,546.15—against due and payable liabilities that could manifestly not be satisfied from its remaining assets. Having been deprived of 99.99% of its assets, HoldCo would be in a state of current insolvency and would inevitably be subject to insolvency proceedings, since it would be unable to regularly meet its due and payable obligations within the meaning of Article 2.3 of the TRLC.

### D) Effects of Enforcement of the Pledges over Antolín Irausa on the Remaining Applicant Companies: Resulting Insolvency

171. Enforcement of the Pledges over Antolín Irausa would likewise cause the insolvency of Antolín Irausa and, by extension, of the remaining Applicant Companies, as a consequence of the following chain of effects:

### (i) Mass Termination of Commercial Agreements with Customers as a Result of a Change of Control



CERTIFIED TRANSLATION

72



Enforcement of the Pledges over Antolín Irausa and the resulting change of control over Antolín Irausa would trigger contractual termination rights in favour of some of the Group's principal customers.

An analysis of the general purchasing terms and conditions of the Antolín Group's customers shows that a very significant proportion of those agreements contain direct and indirect change-of-control provisions entitling the customer to terminate the contractual relationship. In particular, provisions of this nature are contained in the agreements entered into with Dacia (cancellation of orders upon an indirect change of control), Ford (termination upon a change of control, including the sale of a controlling interest in the supplier's shares), General Motors North America (termination upon a direct or indirect change of control), JLR (termination upon a change of control), Mercedes-Benz (right to terminate upon a change of control), North America ECs & Trucks (right to terminate upon a change of control of Antolín Irausa), Stellantis (termination upon a direct or indirect change of control), Volvo (termination upon a change of control), Toyota (right to terminate upon a change of control) and Volkswagen (termination upon a material change in the control structure that adversely affects VW's interests), among others. The relevant provision relating to each of the aforementioned agreements has been submitted as Document No. 11.

The mass termination of these commercial agreements would deprive Antolín Irausa and the remaining Applicant Companies of their principal source of revenue—the order book of automotive manufacturers—thereby rendering the continuation of their business operations unviable and causing their insolvency.

**(ii)   Financial Liabilities of the Various Group Companies**

The Group's Applicant Companies would be unable to pay all the financial liabilities subject to this Restructuring Plan, which would have become immediately due and payable as a consequence of the change-of-control provisions incorporated pursuant to the Plan, as provided, for example, in Clause 5.3.8 thereof. These provisions have been incorporated into the Plan and are already included in a substantial proportion of the financial instruments affected by the Plan, thereby demonstrating once again the importance of the Antolín family retaining its ownership interest in the Group's share capital.

**(iii)   Commercial Liabilities of the Various Group Companies**

Enforcement of the Pledges over Antolín Irausa would likewise have a decisive effect in causing the insolvency of Antolín Irausa and the remaining Applicant Companies: namely, their inability to meet their trade liabilities owed to suppliers and other operating creditors.



73



The Applicant Companies carry on an industrial activity requiring substantial working capital, inherent in their status as suppliers to the automotive sector. Such activity generates a high volume of trade obligations owed to suppliers of raw materials, components and logistics services, as well as to other operating creditors, which constitute the current trade liabilities of each company. According to Annex III to the Plan, the Applicant Companies' trade liabilities[59] amount to very significant sums for each of the Applicant Companies, as detailed below:

| No. | Company | Trade Liabilities |
|---|---|---|
| 1 | Antolín Irausa (GAI) | EUR 11,920,967.19 |
| 2 | Antolín Aragusa | EUR 16,548,761.15 |
| 3 | Antolín Autotrim | EUR 1,112,067.75 |
| 4 | Antolín Eurotrim | EUR 11,748,286.65 |
| 5 | Antolín Glass | EUR 4,534,716.70 |
| 6 | Antolín Ingeniería | EUR 4,645,555.90 |
| 7 | Antolín Plasbur | EUR 5,271,244.08 |
| 8 | Antolín RyA | EUR 7,273,926.27 |
| 9 | Antolín Interiors UK | EUR 44,906,588.66 |
| 10 | Antolín Leamington | EUR 9,010,291.53 |
| 11 | Antolín UK | EUR 1,527,911.61 |
| 12 | Antolín North America | EUR 173,488.30 |
| 13 | Antolín Alabama | EUR 17,282,347.58 |
| 14 | Antolín Interiors USA | EUR 39,946,133.78 |
| 15 | Antolín Shelby | EUR 21,594,186.94 |
| 16 | Antolín Missouri | EUR 6,631,224.27 |
| 17 | Antolín Kentucky | EUR 12,911,782.20 |
| 18 | Antolín Michigan | EUR 11,853,901.31 |
| 19 | Antolín Sibiu | EUR 64,781,500.45 |
| 20 | Antolín Silesia | EUR 11,152,876.29 |
| 21 | Antolín South Africa | EUR 7,234,143.09 |
| 22 | Antolín Bohemia | EUR 16,871,661.79 |
| 23 | Antolín Ostrava | EUR 15,781,903.57 |
| 24 | Antolín Turnov | EUR 35,201,405.86 |
| 25 | Antolín Liban | EUR 46,683,265.58 |
| 26 | Antolín Deutschland | EUR 3,151,770.07 |
| 27 | Antolín Bamberg | EUR 19,957,560.83 |

---

[59] In addition, there would be other liabilities, such as those arising from Trade Payables to Group Companies, or other liabilities contemplated in Annex III.



74



| 28 | Antolín Logistik Deutschland | EUR 10,268,257.29 |
| 29 | Antolín Straubing | EUR 38,662,464.46 |
| 30 | Antolín Interiors Mexico | EUR 63,346,059.10 |
| 31 | Antolín Silao | EUR 25,842,494.02 |
| 32 | Antolín Saltillo | EUR 15,975,584.23 |
| 33 | Antolín Tlaxcala | EUR 29,592,147.72 |
| 34 | Antolín Cuautitlán | EUR 6,761,629.63 |
| 35 | Antolín Lusitânia | EUR 14,447,794.23 |
| 36 | Antolín Bratislava | EUR 22,208,834.44 |

These trade liabilities can be met only through the continuous flow of collections arising from commercial agreements with automobile manufacturers (customers), which sustains the cash cycle and enables trade liabilities to be paid as they fall due.

Enforcement of the Pledges over Antolín Irausa would irreversibly disrupt this operating balance. As explained in paragraph (i) above, the change of control resulting from enforcement would trigger contractual termination provisions in favour of the Group's principal customers.

The widespread loss of these commercial agreements would have a twofold devastating effect on the ability of the Applicant Companies and guarantors to meet their trade liabilities:

○ First, the companies would cease to receive the revenue generated by manufacturing orders.

○ Secondly, the reduction in production activity would prevent the companies from realising the current assets recorded on their balance sheets.

In conclusion, even considering only the trade-payables line item, the Applicant Companies would be in a state of insolvency, as they would be manifestly unable to regularly meet their due and payable obligations to suppliers and operating creditors within the meaning of Article 2.3 of the TRLC.

**(iv)   Break-up of the Tax Consolidation Group**

As explained above in relation to HoldCo, HoldCo's loss of control over Antolín Irausa and the remaining Applicant Companies as a result of the enforcement of the Pledges over Antolín Irausa would cause the dissolution of the tax consolidation group.
The outstanding consolidated tax liabilities would become jointly and severally payable by all the companies that formed part of the tax group, including Antolín Irausa and the remaining Applicant Companies. Furthermore, the tax deconsolidation could result in the recognition of new financial liabilities, as indicated above.



75



172.    Consequently, enforcement of the Pledges over Antolín Irausa would trigger a cascading effect—acceleration of the restructured financial indebtedness, widespread termination of commercial agreements, inability to meet trade liabilities and break-up of the tax group—which would inevitably lead to the insolvency and commencement of insolvency proceedings in respect of Antolín Irausa and the remaining Applicant Companies. Accordingly, the requirements laid down in Article 652.2 of the TRLC for granting the protection sought herein are satisfied.

173.    Lastly, it must also be emphasised that enforcement of the security at issue must be analysed from the perspective of its systemic effects on HoldCo, the Applicant Companies and the Group as a whole. In particular, its enforcement would entail the loss of the unity of management and the operational synergies underpinning the Group's integrated management, with the resulting deterioration of its going-concern value. Far from preserving value, enforcement would fragment the corporate structure, hinder strategic and operational coordination among the affected companies and aggravate the insolvency of HoldCo and the Applicant Companies, to the detriment of the creditors' common interests.

**13.5 Grant of Powers to the Agent**

174.    For the purposes relevant here, and without prejudice to the full reference made to Clause 14.2 of the Restructuring Plan, it should be emphasised that, as stated above, Glas is the Restructuring Agent in respect of the Restructuring and the remaining Restructuring Documents. The Plan establishes the Agent as an instrumental party for the implementation of the Restructuring, assigning it functions that are essentially mechanical and administrative in nature, but which are indispensable to the effective implementation of the Plan. These include participating in the formalisation of the Restructuring Documents, receiving and processing documentation, carrying out reconciliations and calculations, transmitting documentation between the parties and taking the actions necessary to give effect to the Restructuring Plan and the Restructuring Documents.

175.    For present purposes, and without prejudice to the reference made to Clause 14.2 of the Plan for an examination of the specific powers conferred upon the Agent, what is relevant from the perspective of the effectiveness and implementation of the Plan is that the aforementioned provision establishes an irrevocable representation and instruction arrangement enabling the Agent to act not only on behalf of creditors that have actively participated or expressly granted it powers of attorney, but also in respect of Non-Participating Affected Creditors once they become bound by the Plan. The Agent's involvement therefore constitutes the mechanism established under the Restructuring Plan for carrying out the documentary and substantive acts required to implement the Restructuring vis-à-vis all the Affected Creditors, thereby preventing the effectiveness of the judicially approved Plan from being conditional upon the subsequent individual appearance or action of creditors that did not participate in the process or grant a separate power of attorney.





**FOURTEENTH. – The Viability Plan and the Report on the Reasonableness of the Viability Plan**

176. The probability of insolvency referred to in the preceding sections is likewise documented and supported by the Viability Plan, which is attached as Annex V to the Restructuring Plan and, in any event, has been submitted as Document No. 20 to this application. Furthermore, the Viability Plan has been validated by LEXAUDIT in its Report on the Reasonableness of the Viability Plan, submitted as Document No. 21.

177. The Viability Plan includes the financial projections for the period 2026–2035 (the "**Financial Projections**"), which form part of the 2026 business plan, together with the payment plan arising from the Restructuring Plan. In preparing its Report on the Reasonableness of the Viability Plan, LEXAUDIT conducted a critical review of the Financial Projections and of the principal hypotheses and assumptions used in their preparation, applying analytical procedures to assess the consistency between historical information and the projections, the coherence of the principal operational and financial assumptions and, lastly, their comparison with market references and industry benchmarks. It concluded that the projections are conservative, having regard to the Backlog[60] and the 2023 Transformation Plan.

178. On the basis of that situation, the Viability Plan finds that the Antolín Group maintains a substantial level of debt and a significant financial structure—with a leverage ratio of 3.7x EBITDA, including IFRS 16 lease liabilities, which is above the industry average—and faces a critical concentration of maturities in the 2028 financial year amounting to approximately EUR 494 million, which could be brought forward to 2027-10 if

---

[60] Project portfolio.





the 2028 Notes had not been refinanced by that date. On the basis of the foregoing, the Group would be unable to service the aforementioned debt on its contractually scheduled maturity dates and does not consider it feasible to refinance those maturities, given its current leverage ratio.

179.  Nevertheless, the Viability Plan demonstrates that the Group is undergoing a comprehensive transformation process and is achieving the strongest profitability figures in its recent history. Indeed, as stated above, the Antolín Group's 2023 Transformation Plan has resulted in an increase in the EBITDA margin on sales from 8.1% in the 2023 financial year to 9% in the 2025 financial year. On the basis of the Financial Projections, and assuming the crystallisation of the outstanding improvements under the 2023 Transformation Plan, enhanced "Commercial Selectivity" (that is, the current application of more stringent project-acceptance criteria), and the optimisation of the cost and investment structure, the Viability Plan confirms that the measures contemplated under the Restructuring Plan shall enable the Applicant Companies to:

(i)   Adapt and optimise their financial structure by rescheduling the maturity profile of the financial debt so as to align it with the Group's actual cash-generating capacity.

(ii)  Provide the Group with sufficient time to crystallise the operational improvements identified in the 2023 Transformation Plan, with the Group's EBITDA margin on sales expected to increase progressively to 10.5% in the 2029 financial year, accompanied by average annual cash generation exceeding EUR 105 million.

(iii) Ensure the Group's viability in the short and medium term, while also laying the foundations for its long-term viability.

(iv)  Service the restructured debt under all possible scenarios. Indeed, the Restructuring Plan offers creditors two financially equivalent alternatives—the default treatment and the alternative treatment—and both in the extreme scenarios analysed—in which 65%[61] of the Bank Debt elects the alternative treatment and 100% of the Notes elects one or the other alternative—and in any of the intermediate scenarios, the leverage ratio would reach levels compatible with refinancing

---

[61] Given that the Restructuring Plan requires at least 65% of the Bank Debt to elect the alternative treatment in order to enable the implementation of the contemplated working-capital facilities, the Viability Plan analyses the extreme scenarios on the basis of that minimum level of election of the alternative treatment by the Bank Debt.





market conditions upon the maturity of the respective financial instruments.

180. In conclusion, on the basis of the 2026 Business Plan—prepared from the individual financial statements of the Group companies and supported by a project portfolio representing 89% of expected sales through the 2029 financial year, with long-term contracts having an average duration of 5 to 7 years with the world's leading automotive manufacturers—the Viability Plan concludes that the financial restructuring measures contemplated under the Restructuring Plan, together with the crystallisation of the operational improvements under the 2023 Transformation Plan, will enable the Applicant Companies to overcome their state of probability of insolvency and provide a reasonable prospect of ensuring their financial viability, as required by Articles 638.1(1) and 633(10) of the TRLC.

181. The Expert validates the conclusions of the Viability Plan, concluding in its Report on the Reasonableness of the Viability Plan that the proposed restructuring is "**coherent, necessary and aligned** with the Group's current situation". The Viability Plan offers a reasonable prospect of avoiding insolvency proceedings and ensuring viability in the short and medium term, with reasonable operating results and sufficient cash flows to service the restructured debt under all scenarios.

**FIFTEENTH. – Compliance with the Requirements for Judicial Approval of the Restructuring Plan**

182. The Restructuring Plan satisfies all the formal and substantive requirements laid down by the TRLC for its judicial approval. Without prejudice to the detailed legal analysis to be set out under the Legal Grounds, the reasons why the requirements provided for in Articles 638 and 639 of the TRLC are satisfied are summarised below:

> **a. The Applicant Companies are in a state of probability of insolvency and the Plan offers a reasonable prospect of viability (Articles 584.2 and 638.1(1) of the TRLC)**
>
> The Applicant Companies are in a state of probability of insolvency within the meaning of Article 584.2 of the TRLC, as explained under Fact Three, Section 3.1. Furthermore, the Restructuring Plan offers a reasonable prospect of avoiding insolvency proceedings and ensuring the viability of the Applicant Companies in the short and medium term, as evidenced by the Viability Plan prepared by the Group and attached as Document No. 20—which also constitutes Annex V to the


CERTIFIED TRANSLATION

79



Plan itself—as well as by the Report on the Reasonableness of the Viability Plan, issued by LEXAUDIT and submitted as Document No. 21.

**b. The requirements as to content and form are satisfied (Article 638.2 in conjunction with Article 633 of the TRLC)**

The Restructuring Plan satisfies the requirements as to content and form laid down in Title III of Book II of the TRLC (Articles 614 to 671) and, in particular, those provided for in Article 633 of the TRLC. Clauses 4 and 8.2, among others, and Annexes II to VI of the Plan set out, with the degree of detail required by law, the identification of the Restructured Companies and the Restructuring Expert; a description of their economic situation, their employees, and the causes and extent of their financial difficulties; their assets and liabilities as at the date of formalisation; the individual identification of the Affected Creditors and the class to which they belong; the identification of the unaffected creditors or shareholders and the reasons why they are not affected; the specific financial restructuring measures proposed; and the conditions necessary for the success of the Plan.

**c. The Plan has been approved by the legally required creditor majorities (Article 639 of the TRLC)**

As explained under Fact Twelve, the Restructuring Plan has been approved by the majorities required by law, in accordance with the formation of classes described under Fact Seven, thereby satisfying the condition precedent to its entry into force. This is evidenced by the Certification issued by the Expert, submitted as Document No. 30, which was incorporated by notarial certificate into the public instrument in which the Plan was formalised.

**d. Claims within the same class have received equal treatment (Article 638.4 of the TRLC)**

Claims included within the same class receive equal treatment under the Restructuring Plan. It is likewise ensured that all Affected Creditors are treated equivalently in relation to the other Affected Creditors of the same ranking, in accordance with the formation of classes based on the commonality of interests among them (see Clause 3 of the Restructuring Plan).


CERTIFIED TRANSLATION

80



Furthermore, the Restructuring Plan complies with the absolute priority rule, insofar as the Affected Creditors do not receive an amount lower than that of their respective claims, since no reduction is imposed upon them under the default alternative.

The financial equivalence of the treatment afforded to the Affected Creditors, as well as compliance with the applicable principles of equal treatment and priority, are likewise confirmed by the reports issued by Vest Partners and the Restructuring Expert, attached as Documents Nos. 24, 25 and 26.

**e. The Restructuring Plan has been communicated to all the Affected Creditors (Article 638.5 of the TRLC)**

The Restructuring Plan was communicated to all the Affected Creditors prior to the filing of this Application for Approval, in accordance with Article 627 of the TRLC, as explained under Fact 12.3. Evidence of those communications is attached to this submission as Documentary Bundle No. 29. Furthermore, the Restructuring Plan has been published on the Restructuring Agent's website in connection with the Restructuring, and the Invitation, which redirects users to the aforementioned Agent's website, has been published on the Antolín Group's corporate website.

183. Accordingly, compliance with all the statutory requirements for the judicial approval of the Restructuring Plan is thereby established, on the terms that shall be developed in greater detail under the Substantive Legal Grounds.

184. The following apply to the foregoing Facts:

# LEGAL GROUNDS

# – I –

# PROCEDURAL LEGAL GROUNDS

**FIRST. – Jurisdiction and Competence**

**1.1 General Competence**

185. Jurisdiction and subject-matter competence to hear this Application for Approval lie with the Commercial Section of the Court of First Instance of Burgos, Seat No. 1, in accordance with Article 87.7 of Organic Law 6/1985 of 1985-07-01 on the Judiciary ("**LOPJ**") and Article 641 of the TRLC, which confer upon them jurisdiction over all matters falling within the civil


CERTIFIED TRANSLATION



courts' jurisdiction in relation to insolvency proceedings and restructuring plans, under the terms laid down in the TRLC.

186.   For these purposes, Article 45.1 of the TRLC provides as follows:

> "1. Jurisdiction to declare and conduct insolvency proceedings shall lie with the commercial court judge within whose territorial jurisdiction the debtor has its centre of main interests. <u>The centre of main interests shall mean the place where the debtor regularly administers those interests in a manner ascertainable by third parties.</u>

> 2. Where the debtor is a legal entity, <u>its centre of main interests shall be presumed to be located at its registered office</u>. For these purposes, any change of registered office entered in the Commercial Registry within the six months preceding the application for insolvency proceedings shall be ineffective (…)" (Emphasis added)

187.   Indeed, this Honourable Court is already hearing matters relating to the Antolín Group's pre-insolvency stage, since it ordered the appointment of LEXAUDIT as Restructuring Expert by Order dated 14-05-2025[62], issued in Expert Appointment Proceedings No. 310/2026. In addition to being the solution prescribed by law, the continuation of jurisdiction in respect of the approval proceedings is the approach most consistent with the principles of procedural unity and procedural efficiency underpinning Book II of the TRLC.

188.   Since this is an application for approval of a joint restructuring plan concerning several companies belonging to the same group, Article 46 of the TRLC likewise applies and provides as follows:

> "1. <u>Jurisdiction to declare joint insolvency proceedings</u> shall lie with the court of the place where the debtor with the greatest liabilities has its centre of main interests and, <u>in the case of a group of companies, with the court having jurisdiction over the parent company</u> or, where insolvency proceedings are not sought in respect of the parent company, over the company with the greatest liabilities. Where insolvency proceedings in respect of the parent company have already been declared, the court hearing those proceedings shall have jurisdiction to declare the insolvency of any other company within the group." *(Emphasis added)*

---

[62] Rectified by Order dated 01-06-2026, at the request of the Applicant Companies, in order to state expressly in the operative part that the appointment of the Restructuring Expert applied to all the Applicant Companies.



82



189. In the present case, Antolín Irausa—the Group's operating parent company and principal debtor under virtually all the affected financial instruments—has its registered office and centre of main interests in Burgos, thereby unequivocally establishing the jurisdiction of this Honourable Court to hear the present Application for Approval.

## 1.2 Jurisdiction in Respect of the Operating Parent Company

190. Antolín Irausa, the operating parent company of the Applicant Companies, is a Spanish commercial company with its registered office at Calle Vitoria 307, 09007 Burgos, where its centre of main interests is likewise located, since that is the place from which the administration of its business is regularly conducted in a manner ascertainable by third parties. Accordingly, the presumption laid down in Article 45.2 of the TRLC applies and, in the absence of any evidence rebutting it, territorial jurisdiction unequivocally lies with this Honourable Court.

## 1.3 Jurisdiction in Respect of the Spanish Subsidiaries

191. The Spanish Subsidiaries included within the scope of the Plan—Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Ingeniería, Antolín Plasbur and Antolín RyA—likewise have their registered offices and centres of main interests in Burgos, since this is the place from which the administration of their interests is regularly conducted in a manner ascertainable by third parties (Article 45.1 of the TRLC). Consequently, the territorial jurisdiction of this Honourable Court to hear the application for approval of the Plan in respect of the Spanish Subsidiaries is fully justified.

## 1.4 Jurisdiction in Respect of the Foreign Subsidiaries: Evidence that their COMI is located in Spain

192. As regards the Foreign Subsidiaries included within the scope of the Plan, although their registered offices are located outside Spain, the jurisdiction of this Honourable Court is based on the fact that their COMI is located in Burgos. Although Article 45.2 of the TRLC presumes that the COMI is located at the registered office, that presumption may be rebutted—and sufficient evidence to that effect exists in the present case, as explained under Fact Two, to which reference is made in order to avoid repetition.

193. In summary, the factual circumstances demonstrating that the COMI of the Foreign Subsidiaries is located in Burgos are as follows:

   – **Centralised contractual organisation model:** the Antolín Group operates internationally through an integrated business model centralised in Burgos, under which the Subsidiaries operate under the direction and supervision of Antolín Irausa and, insofar as I+D+i is concerned, Antolín Ingeniería. In particular, the relationships between the Subsidiaries—whether Plants or OTCs—and Antolín


CERTIFIED TRANSLATION



Irausa and Antolín Ingeniería are governed primarily by the following agreements:

(i)   the PMAs, entered into between Antolín Irausa and each of the Plants, under which Antolín Irausa acts as the "Principal", while the Plants are limited to production functions and associated services under the direction and supervision of Antolín Irausa, without any independent decision-making authority;

(ii)   the OTC Agreements, entered into by Antolín Irausa and Antolín Ingeniería with the OTC Subsidiaries, pursuant to which the OTCs provide support services to Antolín Irausa and, in the case of innovation agreements, to Antolín Ingeniería, those being the companies that actually perform the strategic functions from Burgos; and

(iii)   other agreements, most notably cash-pooling arrangements, which enable a centralised treasury management system to be maintained, whereby Antolín Irausa manages the Group's liquidity from Burgos.

–   **Organisation into Business Units managed from Burgos:** the Antolín Group divides its production activities into three major Business Units, all of which are managed from Burgos. Each of these Business Units is headed by an employee of Antolín Irausa whose corporate place of work is located in Burgos and who, in turn, reports to the Chief Officer & Business Officer, Mr Miguel Marañón, likewise an employee of Antolín Irausa and based in Burgos.

For their part, although the OTCs do not form part of a Business Unit as such, they are grouped under the direction of the Commercial Director of the Antolín Group, Ms Sonia Aguilar, an employee of Antolín Irausa who is likewise based in Burgos.

–   **Management from Burgos:** the governing bodies of the Subsidiaries are composed primarily of Spanish nationals whose place of work is located in Burgos. In all cases, the Chief Executive Officer of Antolín Irausa, Mrs. Cristina Blanco Santo Tomás, whose residence and place of work are in Burgos, holds the position of director or has been granted powers of attorney exercisable severally in the various Foreign Subsidiaries whose governing bodies include local representatives, thereby ensuring that effective managerial control of the Subsidiaries remains in Burgos.

–   **Centralised management model ascertainable by third parties:** from Burgos, Antolín Irausa sends standardised protocols and operating models to all the Subsidiaries, instructing that they be followed by all Group employees worldwide. Furthermore, the Antolín Group's operating model has been recognised by the Group's employees, creditors, customers and suppliers. Even the Spanish State



84



Tax Administration Agency has recognised the validity of the Antolín Group's centralised management model through the APA entered into with Antolín Irausa, effective for the 2024–2027 financial years.

194. The cumulative presence of all these elements makes it possible to conclude that, notwithstanding their formal registered offices abroad, the COMI of the Foreign Subsidiaries is unequivocally located in Burgos, thereby rebutting the presumption laid down in Article 45.2 of the TRLC and establishing the territorial jurisdiction of this Honourable Court.

**1.5 Subsidiary Jurisdiction in Respect of the Foreign Subsidiaries by Virtue of Article 755 of the TRLC**

195. In the alternative, and solely in the hypothetical event that this Honourable Court were not to consider it established that the COMI of all or any of the Foreign Subsidiaries is located in Spain[63]—and for the purpose of subjecting at least the debt shared with the operating parent company, Antolín Irausa, to the Restructuring Plan—the jurisdiction of this Honourable Court to hear the application for approval of the Restructuring Plan in respect of those companies would likewise be supported by Article 755 of the TRLC, which provides as follows:

> *"Where the Spanish courts have jurisdiction to hear the proceedings governed by Book Two in relation to the parent company of a group of companies, they may extend their jurisdiction to subsidiary companies whose centre of main interests is located outside Spain, provided that the following requirements are satisfied:*
>
> *1. The parent company has filed the notice governed by Book Two or is to become subject to the restructuring plan.*
>
> *2. The notice or the application for approval of the restructuring plan has been filed on a confidential basis in relation to the subsidiaries, in which case neither the notice nor the decisions concerning approval of the plan in respect of the subsidiaries shall be published in the Public Insolvency Register. Such decisions shall be issued separately from the decisions relating to the parent company."*

---

[63] *Which is not the case.*

> *3. The extension of jurisdiction to the subsidiaries must be necessary to ensure the successful conclusion of the negotiations concerning a restructuring plan or the adoption and implementation of the plan."*


CERTIFIED TRANSLATION


USA CORP

196.   As may be seen, Article 755 of the TRLC constitutes a rule extending jurisdiction specifically designed by the legislature for cases involving the restructuring of multinational groups in which the parent company is located in Spain. That provision specifically addresses cases in which the subsidiaries' COMI is deemed to be located abroad, providing a mechanism that enables the restructuring of an international group to be dealt with as a single process, thereby avoiding the fragmentation of the proceedings across multiple jurisdictions.

197.   The rationale underlying Article 755 of the TRLC is entirely consistent with the preventive restructuring regime established by Directive (EU) 2019/1023 of the European Parliament and of the Council of 20-06-2019 on preventive restructuring frameworks, discharge of debt and disqualifications (hereinafter, the "**Directive**"), Recital 15 of which expressly refers to the desirability of greater consistency among proceedings in order to facilitate "the restructuring of groups of companies, regardless of where in the Union the members of the group are located". Consequently, even where the COMI of a Subsidiary were not considered to be located in Spain—notwithstanding the matters explained above—Article 755 of the TRLC would, in any event, fill the jurisdictional gap through a complementary means of extending the jurisdiction of this Court, thereby ensuring—once again—the unity of the proceedings.

198.   This possibility for the Spanish courts to extend their jurisdiction to the foreign subsidiaries of the parent company, under Article 755 of the TRLC, has already been expressly recognised by our Courts. Thus, among others, reference may be made to the Order of Commercial Court No. 3 of A Coruña dated 2024-09-30 [JUR\2024\538725][64]; the Judgment of the Provincial Court of A Coruña, Section 4, dated 23-07-2025 [JUR\2025\316476][65]; and, particularly significant owing to its similarity to the present case, the Order of Commercial Court No. 1 of Seville No. 415/2023, dated 12-06-2023 [JUR\2023\254801][66], which states as follows:

> *"if the obligations of the applicant companies were not restructured, the judicial approval of*
> *the restructuring plans sought by [the parent company and other subsidiaries] would prove*

---

[64] In this Judgment, the Provincial Court of A Coruña interprets Article 755 of the TRLC, emphasising the need to avoid a lack of coordination between jurisdictions and the importance of the applications for judicial approval relating to the Spanish parent company and the foreign subsidiaries being filed simultaneously.

[65] This decision confirms that an extension of jurisdiction pursuant to Article 755 of the TRLC is appropriate where necessary owing to the existence of creditors common to the parent company and the foreign subsidiaries.

[66] Commercial Court No. 1 of Seville, Order No. 415/2023 dated 2023-06-12, Proceedings No. 20401/2023 [JUR\2023\254801].





*insufficient to ensure compliance, since, without the participation of the applicant companies and their submission to their own restructuring [...] the creditors [...] could immediately bring the relevant actions against the applicant companies in their respective capacities as debtor and/or guarantors, and against their assets (...)".*

199. Applying all the foregoing to the present case, it may be concluded that the three requirements laid down in Article 755 of the TRLC for the extension of jurisdiction are fully satisfied in the present case, on the terms set out in the corresponding request in the Prayer for Relief:

(i) Antolín Irausa, the Group's operating parent company, is subject to the Restructuring Plan and, jointly with the Subsidiaries, applied for the appointment of the Restructuring Expert;

(ii) Both the application for the appointment of the Expert and the present Application for Approval—in its alternative request—were filed on a confidential basis in relation to the Foreign Subsidiaries, without publication in the Public Insolvency Register. Furthermore, the Applicant Companies expressly acknowledge that any decisions issued in due course in respect of the Foreign Subsidiaries must be formalised separately from those relating to Antolín Irausa and the remaining Applicant Companies whose COMI is located in Spain, and that the former must be treated as confidential, as required by Article 755(2) of the TRLC; and

(iii) The extension of jurisdiction in respect of the Foreign Subsidiaries is absolutely necessary to ensure the successful completion of the Restructuring, insofar as the Foreign Subsidiaries are debtors and/or joint and several guarantors under the Group's principal financial instruments—the Existing Notes, the Existing Syndicated Facilities Agreement, the Existing EIB Facility Agreements and the Existing ICO Facility Agreement—all of which are also interconnected through the Intercreditor Agreement, which establishes their pari passu ranking. Restructuring the parent company and the Spanish Subsidiaries without simultaneously restructuring the Foreign Subsidiaries would leave the latter's obligations towards the same creditors unaffected. As expressly noted in the case law cited above, those creditors could immediately bring the relevant actions against the Foreign Subsidiaries in their capacities as debtors and/or guarantors, thereby irreparably jeopardising the economic viability of the Group as a whole, given their inseparable operational and functional interdependence.

200. In view of the foregoing, this party requests that, solely in the event that the COMI of the Foreign Subsidiaries is deemed to be located outside Burgos—a request which is submitted herein in the alternative and reproduced in the Prayer for Relief solely for the purposes of addressing a hypothetical scenario and covering all possible alternatives—this Honourable Court should, in any event, declare that it has international jurisdiction over those entities pursuant to Article 755 of the TRLC, so that they may be subject to the present judicial approval proceedings concerning the Restructuring Plan, particularly since the Affected Debt



87



of the Foreign Subsidiaries is shared with the parent company and the Foreign Subsidiaries act as guarantors.

201. Such an extension of jurisdiction is indispensable to ensure the Group's viability and the effectiveness of the restructuring process as a whole, without prejudice to the issuance, where appropriate, of separate and confidential decisions.

**SECOND. – Capacity and Standing**

202. Article 643 of the TRLC confers standing to apply for the judicial approval of a restructuring plan both upon the debtors that have executed the plan and upon the creditors affected thereby. In the present case, the Applicant Companies are the debtor companies included within the scope of the Plan and have executed it on the terms set out in the Appearances section. Accordingly, the statutory requirement concerning standing is satisfied.

203. Likewise, the Applicant Companies have capacity to be parties to these proceedings pursuant to Article 6.1(3) of Law 1/2000 of 2000-01-07 on Civil Procedure ("**LEC**"), which applies on a supplementary basis, since they are legal entities with full procedural capacity.

204. Lastly, for the purposes of Article 664 of the TRLC, the Applicant Companies state that they have not applied for any other judicial approval of a restructuring plan within the preceding year.

**THIRD. – Procedural Representation and Legal Counsel**

205. The Applicant Companies duly appear through a Court Agent and are assisted by the undersigned legal counsel, in compliance with Article 643.1 of the TRLC governing applications for the judicial approval of restructuring plans.

**FOURTH. – Procedure: Application for Judicial Approval without Prior Adversarial Proceedings and Approval of a Joint Restructuring Plan**


CERTIFIED TRANSLATION



**4.1 Application for Judicial Approval without Prior Adversarial Proceedings**

206.    The present Application shall be processed in accordance with the procedure laid down in Articles 641 et seq. of the TRLC. Pursuant to Article 647 of the TRLC, this Honourable Court shall approve the Restructuring Plan provided that the documentation submitted does not manifestly show that the applicable requirements have not been satisfied. Judicial approval shall be granted by means of an Order issued within 15 days following publication in the Public Insolvency Register of the procedural order admitting the Application for processing.

207.    Once judicial approval has been granted, and pursuant to Article 649 of the TRLC, the effects of the Restructuring Plan shall immediately extend to all the Affected Creditors.

**4.2 Judicial Approval of a Joint Restructuring Plan**

208.    Article 642 of the TRLC provides for the possibility of applying for judicial approval of a joint restructuring plan for several companies:

> *"1. Debtors that have filed a joint notice may apply either for the individual or joint judicial approval of their respective restructuring plans, or of any of them, or for the judicial approval of a joint restructuring plan.*
>
> *2. Where an application is made for the joint judicial approval of separate restructuring plans or for the judicial approval of a joint restructuring plan, the requirements for judicial approval must be satisfied in respect of each debtor."*

209.    In the present case, exercising the power expressly provided for in Article 642 of the TRLC, the Applicant Companies submit an Application for Judicial Approval of a joint Restructuring Plan applicable to all of them.

210.    Accordingly, judicial approval of the joint Restructuring Plan should be granted, since the viability of all the Applicant Companies is closely and inseparably interconnected and all the requirements necessary for such approval have been satisfied.


CERTIFIED TRANSLATION



## – II –

## SUBSTANTIVE LEGAL GROUNDS

### FIRST. – Scope of Judicial Review of the Restructuring Plan

211. The TRLC introduced into Spanish law a new model for the judicial approval of restructuring plans based on two fundamental pillars: (a) the majority principle as the best indicator of the reasonableness and necessity of the plan; and (b) the relaxation of judicial scrutiny compared with the previous model for the judicial approval of refinancing agreements.

212. The Explanatory Memorandum to Law 16/2022 of 05-09-2022, reforming the TRLC, itself states as much, noting that the court must verify compliance with the Plan's statutory requirements "exclusively on the basis of the documentation submitted, without prejudice to the application of the general rules governing the rectification of defects".

213. At the legislative level, this approach is reflected in Article 647 of the TRLC, which provides as follows:

> *"Unless it is manifestly apparent from the documentation submitted that the requirements laid down in Section 1 of this Chapter have not been satisfied, the court shall judicially approve the restructuring plan [...]".*

214. As may be seen, the legislature has chosen to establish judicial approval as the general rule and to reserve refusal exclusively for those cases—and only those cases—in which non-compliance with the statutory requirements is manifestly apparent from the documentation submitted. Consequently, judicial review is limited and regulated: the court must not assess the economic content of the Plan, the appropriateness or expediency of the measures agreed, the internal balance of the agreed solutions or their merits. Its role is limited to verifying, on the basis of the documentation submitted, that the formal and substantive requirements of Article 638 of the TRLC have been satisfied and, in the case of non-consensual plans, that the additional requirements of Article 639 of the TRLC have likewise been met.

215. Legal commentators have expressed the same view. Particularly illustrative is the reasoning of GARCÍA-MARRERO, J., in *Manual de Derecho Concursal* (Director: PULGAR EZQUERRA), Wolters Kluwer, 11-2022:

> *"Nevertheless, we consider that it is currently not possible to require such exhaustive review. In view of the wording of Article 647 of the TRLC—unless it is manifestly apparent from the documentation submitted that the requirements laid down in Section 1 of this Chapter have not been satisfied, the court shall judicially approve the Restructuring Plan— the review the legality review is minimal, since the general rule is the judicial approval of the plan, unless it is manifestly apparent from the documentation that the statutory requirements have not been satisfied. Accordingly, at this stage, judicial scrutiny is relaxed in comparison with the previous system, since such scrutiny is based on the majority*



90



*principle (the best indication of the reasonableness of the Restructuring Plan, including its necessity and suitability for ensuring the viability of the debtor company, is that a qualified majority of creditors is willing to assume the sacrifice entailed by the plan)."*

216. The courts have generally adopted this approach. Thus, Order No. 85/2023 of Commercial Court No. 5 of Madrid, dated 2023-04-10 (the *Single Home* case)—a pioneering decision in this field and repeatedly cited by commercial-law commentators—states as follows:

> *"As previously stated, <u>the court's role is limited to verifying, unless it is manifestly apparent from the documentation that the requirements of Section 1 have not been satisfied, and to judicially approving the RP.</u>" (Emphasis added)*

217. On the basis of this statutory, doctrinal and judicial approach, the Applicant Companies now submit for examination by this Honourable Court their compliance with the formal requirements (Legal Ground Two) and substantive requirements (Legal Ground Three) laid down in Articles 638 et seq. of the TRLC for the judicial approval of the Restructuring Plan, on the clear understanding that such compliance is unequivocal and that, consequently, the Plan must be judicially approved pursuant to Article 647 of the TRLC.

**SECOND. – Compliance with the Formal Requirements for the Judicial Approval of the Restructuring Plan**

218.  Pursuant to Articles 643 et seq. of the TRLC, compliance with the formal requirements for the judicial approval of the Restructuring Plan essentially requires: (i) the filing of the application by the debtors, namely the Applicant Companies, through a Court Agent and with the assistance of legal counsel; and (ii) the attachment of the documentation required by law. Both requirements are satisfied in the present case.

**2.1 Signature by a Court Agent and Legal Counsel in Accordance with Article 643.1 of the TRLC**

219. The present Application for Approval is signed by the undersigned Court Agent and by the legal counsel whose identifying details appear in the signature block of this submission, in compliance with Article 643.1 of the TRLC, which requires the application for approval to be filed by "legal counsel and a Court Agent".





**2.2 Attachment of the Documentation Required under Article 643.3 of the TRLC**

220. Article 643.3 of the TRLC exhaustively specifies the mandatory documentation that must accompany an application for judicial approval:

> *"The application shall be accompanied by a complete copy of the public instrument in which the plan was formalised, including the auditor's certification concerning the sufficiency of the majorities required for judicial approval of the plan, in accordance with the provisions of this Law[67]; any report issued, where applicable, by the restructuring expert; and, where it is intended that the restructuring plan affect public-law claims, the certificates issued by the Spanish State Tax Administration Agency and the General Treasury of Social Security confirming compliance with the requirement laid down in Article 616.2(1)."*

221. In view of the provision transcribed above, the Applicant Companies attach to this submission all the documentation required by law, as follows:

a) Complete copy of the public instrument in which the Restructuring Plan was formalised. A complete copy of the deed executed on 10-07-2026 before the Madrid Notary Public, Mr Francisco Miras Ortiz, acting as substitute for and for the notarial records of Mr Andrés Domínguez Nafría, under number 4,281 of his notarial records, is attached as Document No. 2. It incorporates the Restructuring Plan in its entirety, together with its annexes and supplementary documentation, all executed by the Applicant Companies and the Participating Creditors.

b) Viability Plan. This is included with the Plan Deed and is also attached as Document No. 20 to this Application. The Viability Plan sets out the financial assumptions, operating projections and technical conclusions supporting the reasonable prospect of avoiding insolvency proceedings and ensuring the viability of the Applicant Companies in the short and medium term, as required by Articles 638.1(1) and 633(10) of the TRLC.

c) Certification of Majorities issued by the Restructuring Expert. The Certification of Majorities issued by LEXAUDIT, in its capacity as Restructuring Expert appointed by this Honourable Court, is attached as Document No. 30, for the purposes of Articles 634.1 and 643.3 of the TRLC, in order to evidence that the majorities required for approval of the Plan have been attained in

---

[67] For clarification purposes, pursuant to Article 634.1 of the TRLC, where a restructuring expert has been appointed, the certification of majorities shall be issued by that expert.

each class and in respect of each of the Applicant Companies. Likewise, Document No. 30 itself contains the certification confirming that the claims


CERTIFIED TRANSLATION



affected by the Plan represent at least 51% of the total liabilities of each of them[68], for the purposes of Article 667.1 of the TRLC. Both certifications are likewise attached to the deed recording the Plan as a public instrument.

d)   Going-Concern Valuation Report. The Going-Concern Valuation Report issued by the Restructuring Expert in respect of the Group is attached as Document No. 31 and is also appended to the Plan Deed. This report confirms that the classes that voted in favour of the Plan in respect of each of the Applicant Companies are in the money within the meaning of Article 639.2 of the TRLC.

e)   Supplementary documentation. In addition, the communications made to the Affected Creditors pursuant to Article 627 of the TRLC (Documentary Bundle No. 29) and other documents considered useful for this Honourable Court are attached to this submission.

222.   In view of all the foregoing, all the formal requirements for the judicial approval of the Restructuring Plan must be deemed to have been satisfied.

**THIRD. – Compliance with the Substantive Requirements for the Judicial Approval of the Restructuring Plan**

223.   As regards the requirements for the judicial approval of restructuring plans, and as stated in the factual account, Article 638 of the TRLC provides as follows:

*"In order to be judicially approved, the restructuring plan must satisfy the following requirements:*

*1. The debtor must be in a state of probability of insolvency, imminent insolvency or current insolvency, and the plan must offer a reasonable prospect of avoiding insolvency proceedings and ensuring the viability of the business in the short and medium term.*

*2. It must comply with the requirements as to content and form laid down in this Title.*

---

[68] Except in the case of Antolín South Africa and Antolín Logistik Deutschland.


CERTIFIED TRANSLATION


USA CORP

*3. It has been approved by all classes of claims in accordance with the provisions of this Title, by the debtor or, where applicable, by the shareholders.*

*4. Claims within the same class are treated equally.*

*5. It has been communicated to all affected creditors in accordance with the provisions of this Law."*

224. The present Application for Judicial Approval of the Restructuring Plan, together with the documents attached thereto and the annexes to the Restructuring Plan, demonstrates that, in the present case, the requirements for judicial approval of the Restructuring Plan and for it to produce the effects sought in the Prayer for Relief of this submission have been satisfied.

225. Compliance with each of the aforementioned requirements is substantiated below:

**3.1 Satisfaction of the Objective Condition: Probability of Insolvency**

226. Article 638.1(1) of the TRLC requires, as an objective condition for the judicial approval of a restructuring plan, that the debtor be in a state of probability of insolvency, imminent insolvency or current insolvency, scenarios defined in Articles 2.3 and 584 of the TRLC and ranked in increasing order of temporal proximity to insolvency proceedings. As explained under Fact Three, Section 3.1, of this submission—and as objectively evidenced by the Group's Viability Plan, validated by Vest Partners and attached as Document No. 20—the Applicant Companies are in the first of those scenarios.

227. Pursuant to Article 584.2 of the TRLC, probability of insolvency constitutes the earliest stage and is therefore the most favourable for the effectiveness of preventive restructuring frameworks. It exists where "it is objectively foreseeable that, unless a restructuring plan is reached, the debtor will be unable to regularly meet the obligations falling due within the next two years". As explained above, the Applicant Companies are unequivocally in this pre-insolvency stage.

228. This conclusion is also confirmed by the Antolín Group's own consolidated annual accounts for the 2025 financial year.[69] Specifically, the audit report includes a section entitled "Material Uncertainty Related to Going Concern", which states that: (i) during 2026, the Group obtained certain waivers temporarily suspending compliance with the financial ratios applicable to that financial year; and (ii) according to the projections

---

[69] Attached as Document No. 8.





available financial information indicates a risk that those ratios may be breached once the period covered by such waivers has expired; and (iii) if such breach occurs in 2027, the acceleration of a significant portion of the Group's financing could be triggered. The Annual Accounts themselves therefore acknowledge the existence of an objective risk of difficulties in meeting financial obligations over the medium term, which is entirely consistent with the probability-of-insolvency scenario contemplated in Article 584.2 of the TRLC.

229.   Likewise, both the Viability Plan and the Report on the Reasonableness of the Viability Plan, issued by the Expert (Document No. 21), confirm the existence of the difficulties giving rise to a state of probability of insolvency of the Antolín Group. Those difficulties may be overcome through the measures contemplated under the Plan, which make it possible to ensure the Group's viability, as explained in detail under Fact Three.

230.   Far from constituting an exceptional or restrictive condition, probability of insolvency represents the preferred and most appropriate scenario around which preventive restructuring frameworks are structured. The EU Directive, from which the current TRLC derives by virtue of Law 16/2022 of 05-09-2022, pursues the express principal objective of ensuring that "viable enterprises and entrepreneurs experiencing financial difficulties have access to effective national preventive restructuring frameworks which enable them to continue operating".[70]

231.   To that end, the European legislature states that preventive restructuring frameworks "should enable debtors, first and foremost, to restructure effectively at an early stage and to avoid insolvency, thereby limiting the unnecessary liquidation of viable enterprises".[71] Along the same lines, Recital 16 of the Directive emphasises that removing obstacles to the early preventive restructuring of viable debtors "contributes to minimising job losses and losses of value for creditors in the supply chain, preserves know-how and skills and therefore benefits the wider economy". Particularly tellingly, Recital 22 states that "the earlier a debtor can detect its financial difficulties and take appropriate action, the higher the likelihood of avoiding an impending insolvency" *(emphasis added)*. The legislature's approach is unequivocal: acting at an early stage, while the undertaking remains viable, is always preferable—for the debtor, creditors, employees and the economy as a whole—to waiting until the difficulties materialise or worsen.

---

[70] Recital 1 of the Directive.
[71] Recital 2 of the Directive.

232. On the basis of these premises, the Spanish legislature has adopted an approach that goes even beyond the minimum standard required by the Directive. Whereas Article 4.1 of the Directive establishes, as the minimum threshold for access to preventive restructuring frameworks, that debtors "are likely to become insolvent", the TRLC introduces the broader and more forward-looking concept of "probability of insolvency", with a time horizon of up to two years (Article 584.2 of the TRLC). This national legislative choice reflects the conviction—fully aligned with the philosophy of the Directive—that the best restructuring outcomes are achieved when the debtor acts before the difficulties materialise, thereby avoiding the destruction of value inherent in situations of imminent or current insolvency.

233. Our courts have recently had occasion to rule on probability of insolvency as an objective condition for the judicial approval of a restructuring plan. Specifically, reference is made to Order No. 115/2026 dated 11-03-2026, issued by Commercial Court No. 9 of Barcelona in the proceedings concerning the judicial approval of the restructuring plan of Soluciones Técnicas del Metal, S.L. In that Order, the Court noted that the debtor had applied for the appointment of a restructuring expert precisely "because it was in a state of probability of insolvency", considering such appointment essential for "the negotiation of a new agreement capable of restoring the company's viability". In that context, the Court approved the plan in a probability-of-insolvency scenario, focusing its analysis on the viability of the plan and its ability to prevent insolvency in the short and medium term.

234. In the present case, the Applicant Companies represent the paradigmatic situation that both the European and Spanish legislatures intended to define as ideal for undertaking a restructuring process with every prospect of success: viable companies—world leaders in the development, design and manufacture of interior components for the automotive industry—with sound business operations and a strengthened competitive position which, being aware of objectively foreseeable financial difficulties that have not yet materialised, voluntarily and proactively resort to the preventive instruments made available to them by law, thereby avoiding unnecessary liquidation, preserving the employment of nearly 20,000 workers worldwide and maximising value for all stakeholders. Such diligent and forward-looking action not only satisfies the objective condition laid down in Article 638.1(1) of the TRLC, but also constitutes the very embodiment of the protective purpose underpinning the Directive and the TRLC.

235. Lastly, and naturally, the Restructuring Plan for which judicial approval is sought offers a reasonable prospect of avoiding insolvency proceedings and ensuring the viability of the Applicant Companies in the short and medium term, as evidenced by the Viability Plan prepared by the Group (Document No. 20) and validated by LEXAUDIT in its Report on the Reasonableness of the Viability Plan (Document No. 21). Accordingly, not only is the objective condition satisfied, but so too is the essential purpose pursued by Article 638.1(1) of the TRLC.





236.    Consequently, the objective condition of probability of insolvency required for the judicial approval of the Restructuring Plan must be deemed satisfied.

### 3.2 Compliance with the Content Requirements

237.    The Restructuring Plan complies with the content and form requirements laid down in Article 633 of the TRLC:

(i)    The debtor companies are duly identified (Appearances section of the Restructuring Plan and Annex VI).

(ii)    The Restructuring Expert is duly identified (Recital XIII of the Restructuring Plan and Annex VI).

(iii)    A description of the economic situation of the Applicant Companies, their employees, and the causes and extent of the financial difficulties they are experiencing is set out in the Restructuring Plan (Recitals VII to XI), as well as in the Viability Plan (Annex V to the Plan).

(iv)    The assets and liabilities of the Applicant Companies as at the date of formalisation of the Restructuring Plan are set out in Appendix II to Annex VI of the Restructuring Plan, which refers to the Viability Plan.

(v)    The Affected Creditors under the Restructuring Plan are individually identified, together with the amount of their claims affected by the Restructuring Plan and the class to which they belong, in Clause 3 and Annex II to the Plan.

(vi)    There are no agreements involving reciprocal obligations that remain to be performed which are to be terminated pursuant to the Restructuring Plan.

(vii)    The Restructuring Plan shall not affect the rights of the shareholders and, consequently, it is not necessary to specify the nominal value of the shares or equity interests.





(viii)   The creditors and shareholders, described by class, that will not be affected by the Restructuring Plan are duly identified, together with the reasons why they are not affected (Annex VI to the Restructuring Plan).

(ix)   The proposed financial debt restructuring measures are clearly set out, both in the Restructuring Plan—Clauses 5 and 6, among others—and in the Viability Plan.

No reference is made to operational restructuring measures or to any overall consequences for employment, since no such measures or consequences are contemplated under the Plan.

(x)   The conditions necessary for the success of the Restructuring Plan are duly identified (see Clauses 11 and 12, Annex VI to the Restructuring Plan and the Viability Plan), and the reasons why the Restructuring Plan offers a reasonable prospect of ensuring the viability of the business in the short, medium and even long term, while avoiding insolvency proceedings in respect of the Applicant Companies, are set out in detail.

(xi)   The Restructuring Plan does not provide for any effect on employment agreements (Annex VI to the Restructuring Plan). Accordingly, employment legislation does not require any measures for informing and consulting employees.

(xii)   The Restructuring Plan does not affect public-law claims, as stated in Clause 3.1 and Annex VI to the Restructuring Plan.

238.  Furthermore, as evidenced by the Certification of Majorities, the Plan has been approved pursuant to Article 639.2 of the TRLC.

239.  In accordance with the foregoing, all the requirements laid down in the TRLC for the judicial approval of the Restructuring Plan have been satisfied.

**FOURTH. – The Effects of Judicial Approval and Its Immediate Effectiveness**

**4.1 Extension of Effects to Creditors that Have Not Acceded or that Voted Against the Plan, Protection against Avoidance Actions, and Protection of New Financing and Any Interim Financing**

240.  With regard to the need for judicial approval, Article 635 of the TRLC provides as follows:
*"Judicial approval of the Restructuring Plan shall be required in any of the following circumstances:*



98



*1. Where it is sought to extend its effects to creditors or classes of creditors that did not vote in favour of the plan, or to the shareholders of a debtor that is a legal entity;*

*2. Where termination of agreements is sought in the interests of the restructuring;*

*3. Where it is sought to protect the interim financing and new financing contemplated under the plan, as well as the acts, transactions or business dealings carried out in connection therewith, against avoidance actions in accordance with the terms laid down in this Title, and to grant such financing the payment priorities provided for in Book One." (Emphasis added)*

241.   In the present case, the Application for Approval is justified by the simultaneous satisfaction of the first and third circumstances contemplated in Article 635 of the TRLC: (i) the need to extend the effects of the Plan to the Affected Creditors that did not accede thereto during the Accession Period or that voted against it; and (ii) the need to protect against avoidance actions the Plan itself[72], the Working Capital Facility Agreement—which shall qualify as new financing for the purposes of Article 666 of the TRLC—the Existing Syndicated Factoring Extensions—which, if implemented, shall qualify as interim financing or new financing for the purposes of Articles 665 and 666 of the TRLC—the New Guarantee Facilities—which shall likewise qualify as new financing for the purposes of Article 666 of the TRLC—and all other acts, transactions and legal arrangements contemplated—directly or indirectly—under the Plan or carried out in implementation thereof, in accordance with Article 667 of the TRLC.

### A) Extension of Effects to Non-Participating Creditors

242.   Article 649 of the TRLC provides that: "once judicially approved, the effects of the restructuring plan shall immediately extend to all affected claims, to the debtor itself and, where the debtor is a company, to its shareholders, even if the Order is not final".

243.   Immediate effectiveness therefore constitutes an ope legis effect of the Order granting judicial approval, operating irrespective of whether the decision has become final and, consequently, without the need for any subsequent

---

[72] This is evidenced by the Certification concerning protection against avoidance actions, Document No. 30, which expressly confirms that the Claims Affected by the Plan represent at least 51% of the total liabilities of each of the Applicant Companies as at the filing date of this submission, except in the case of Antolín South Africa and Antolín Logistik Deutschland.





challenge by dissenting Affected Creditors—pursuant to Articles 653 et seq. of the TRLC—being capable of preventing such effectiveness. This principle reflects a deliberate legislative choice aimed at preventing the restructuring process from being frustrated or indefinitely delayed as a result of obstructive conduct and, ultimately, at safeguarding the debtor's economic viability—which is, in the final analysis, the legal interest protected by the judicial approval regime. Recital 65 of the Directive adopts the same approach, providing that appeals against a decision granting judicial approval "should not, as a general rule, have suspensive effects on the implementation of restructuring plans".

244. Accordingly, once the Order granting judicial approval has been issued, the effects of the Restructuring Plan shall apply automatically and immediately to all the Affected Creditors, to the Applicant Companies themselves and, where applicable, to any other Group companies in respect of which protection has been sought in their capacity as guarantors, without prejudice to any challenges that may be brought, which, in accordance with the rule set out above, shall have no suspensive effect.

### B) Protection of Acts, Transactions and Legal Arrangements Implementing the Plan against Avoidance Actions

245. Article 667.1 of the TRLC provides as follows:

> *1. In the event of subsequent insolvency proceedings, <u>where the claims affected by a previously judicially approved restructuring plan represented at least fifty-one per cent of the total liabilities</u>, the following may not be subject to avoidance, unless it is proven that they were carried out in fraud of creditors:*

> *1. Reasonable acts or transactions immediately necessary for the successful conclusion of negotiations with creditors, provided that they were expressly identified as such in the plan itself.*

> *2. Interim financing and new financing, including financing provided by specially related persons, in accordance with the provisions of the following Article.*

> *3. Acts, transactions or legal arrangements that are reasonable and immediately necessary for the implementation of the plan (...)." (Emphasis added)*

246. Accordingly, the granting of protection against avoidance actions in respect of restructuring plans and the acts, transactions and legal arrangements contemplated for their implementation is conditional upon the affected claims representing a specified proportion of the total liabilities, namely 51%.





247. In the present case, as explained in the factual grounds, this requirement is satisfied in respect of each of the Applicant Companies, with the exception of Antolín South Africa and Antolín Logistik Deutschland, as evidenced by the certification attached as Document No. 30.

248. Accordingly, the Order granting judicial approval must afford the Restructuring Plan and all acts, transactions and legal arrangements necessary for the successful implementation of the Restructuring protection against avoidance actions. By way of example, this includes protection of the Working Capital Facility Agreement and the New Guarantee Facilities—which must qualify as new financing, as explained in the following section—and the Existing Syndicated Factoring Extensions—which must qualify as interim financing or new financing, as applicable, as explained in the following section—as well as the granting of all new personal guarantees and security interests pursuant to the Plan.

### C) Protection of New Financing and Any Interim Financing against Avoidance Actions and Granting of Payment Priorities in Insolvency Proceedings

249. The framework established by the TRLC is based on a clear premise: both interim financing and new financing granted or contemplated in connection with a restructuring plan merit protection where they satisfy their respective statutory requirements. This follows, first, from Article 635.3 of the TRLC, which requires judicial approval where protection is sought for the interim financing and new financing contemplated under the plan against avoidance actions and where it is sought to grant them the payment priorities provided for in Book One; and, secondly, from Article 667.1(2) of the TRLC, which provides that interim financing and new financing may not be subject to avoidance in subsequent insolvency proceedings where the claims affected by the judicially approved plan represent at least 51% of the total liabilities.

250. In particular, Article 665 of the TRLC defines interim financing as follows:

> *"Interim financing shall mean financing granted by a person who was not previously a creditor, or by a pre-existing creditor, where, at the time it was granted, it was reasonable and immediately necessary either to ensure the total or partial continuation of the debtor's business or professional activities during negotiations with creditors until the judicial approval of that plan, or to preserve or enhance the value of the business as a whole or of one or more production units as at the date on which those negotiations commenced."*


CERTIFIED TRANSLATION



251. For its part, Article 666 of the TRLC defines new financing as follows:

*"For the purposes of this Law, new financing shall mean financing granted by a person who was not previously a creditor, or by a pre-existing creditor, which, being contemplated in the restructuring plan, is necessary for the implementation of that plan."*

252. The case law addressing this matter confirms the protective purpose of both provisions. In this regard, the Order of Commercial Court No. 5 of Barcelona dated 23-01-2025 [JUR/2025/16552], issued in the proceedings for the judicial approval of the restructuring plan of Inmobiliaria San José, S.A., stated as follows:

*"13. Article 280 of the TRLC provides that 'the following are claims with general privilege: [...] 6. Fifty per cent of the amount of the claims arising from interim financing or new financing granted within the framework of a judicially approved restructuring plan, where the claims affected by that plan represent at least fifty-one per cent of the total liabilities'.*

*14. In other words, Article 280 of the TRLC grants the classification of a claim with general privilege to claims arising from interim financing or new financing granted within the framework of a judicially approved restructuring plan. Accordingly, classification as a claim with general privilege in respect of new financing is a consequence—not a cause—of the Order judicially approving the restructuring plan. It is one of the legal effects arising from the judicial approval Order. This is logical from both an economic-financial and legal perspective, since it encourages the injection of new financing or interim financing that may be necessary to support the viability of the business plan and, in return, grants assurance that such financing will be classified as a privileged claim, but only once the restructuring plan has been authorised by the court."* (Emphasis added)

253. Judicial decisions such as the foregoing demonstrate the legislative policy underlying the framework for protecting new financing: to encourage the provision of new financing ("fresh money" or "new money", as it is known in restructuring practice) that is necessary to support the viability of the restructuring plan, while providing, in return, protection against avoidance actions and the payment priorities recognised by law.

254. Along the same lines, the Judgment of the Provincial Court of Pontevedra dated 10-04-2023 [JUR/2023/171828], issued in proceedings challenging the restructuring plan of Xeldist Congelados, S.L.U., upheld the judicial approval of a plan that expressly included the protection of the new financing against avoidance actions and recognition of the associated payment priorities.





255. It follows from these judicial decisions that the statutory protection and insolvency payment priorities afforded to such financing are not merely ancillary or exceptional effects, but rather an essential component of the preventive restructuring framework, intended to facilitate the continued operation of viable businesses through the provision or maintenance of the necessary financing.

256. Applying the foregoing to the present case, the two categories of financing for which protection is sought must be considered separately. On the one hand, the Working Capital Facility Agreement, the New Guarantee Facilities and, where applicable, any Existing Syndicated Factoring Extensions required to implement the judicially approved Plan must qualify as new financing. On the other hand, any Existing Syndicated Factoring Extensions required before judicial approval is obtained shall qualify as interim financing, insofar as they serve as bridge financing until the Working Capital Facility Agreement enters into force and becomes fully available.

257. As regards the new financing, the first requirement satisfied is that it is contemplated under the Restructuring Plan for which judicial approval is sought. The Plan provides for the execution of the Working Capital Facility Agreement as a multi-product facility comprising non-recourse factoring as the principal instrument for advancing trade receivables and a revolving credit facility, for a maximum amount of EUR 220,000,000, with a sub-limit of EUR 40,000,000 for the revolving tranche. The Plan likewise provides for the New Guarantee Facilities and any Existing Syndicated Factoring Extensions, on the terms described under Fact Eleven of this Application.

258. Secondly, such financing is reasonable and immediately necessary for the implementation of the Plan. As explained under Fact Eleven, the availability of appropriate, stable and flexible working-capital instruments and guarantee facilities is necessary to ensure the viability and operational stability of the Group and to achieve the implementation of the Plan.

259. Thirdly, the new financing is necessary for the viability of the Applicant Companies. The Viability Plan identifies the securing of a committed long-term bank working-capital financing facility as a prerequisite of the Restructuring. Lastly, satisfaction of the threshold of fifty-one per cent (51%) of total liabilities is evidenced by the certification concerning protection against avoidance actions, attached as Document No. 30.


CERTIFIED TRANSLATION



260. Accordingly, since the requirements of Article 666 of the TRLC are satisfied, this Honourable Court should declare that the Working Capital Facility Agreement, the New Guarantee Facilities and, where applicable, any Existing Syndicated Factoring Extensions required to implement the judicially approved Plan qualify as new financing, with all the effects inherent in such classification, including protection against avoidance actions and the payment priorities provided for in Articles 242.1(17) and 280.6 of the TRLC.

261. As regards interim financing, its potential classification is limited to any Existing Syndicated Factoring Extensions that may be required prior to the judicial approval of the Plan.

262. The requirements of Article 665 of the TRLC are likewise satisfied in this regard. At the time they are granted, such Existing Syndicated Factoring Extensions would be reasonable and immediately necessary to ensure the total or partial continuation of the business operations during the negotiations and until the judicial approval of the Plan, thereby preventing the unavailability of working-capital financing from causing cash-flow pressures that could jeopardise the ordinary operations of the Applicant Companies. Furthermore, the Existing Syndicated Factoring Extensions would preserve the Group's value during the period preceding judicial approval by ensuring the continued availability of the working capital required throughout the approval proceedings. This bridge-financing function explains why the Plan itself provides that such extensions shall qualify as interim financing or new financing, depending on whether they are required prior to judicial approval or prior to implementation of the Plan, pursuant to Articles 665 and 666 of the TRLC.

263. Accordingly, insofar as the Existing Syndicated Factoring Extensions are required before judicial approval is obtained, this Honourable Court should declare that they qualify as interim financing for the purposes of Article 665 of the TRLC, together with the protection against avoidance actions and the payment priorities provided by law for this type of financing.

264. In conclusion, the interim financing and new financing contemplated under the Plan satisfy the requirements of the TRLC and serve the purpose justifying their protection: ensuring the continuity of business operations, preserving the Group's value and enabling the proper implementation of a viable restructuring. Accordingly, they should be afforded protection against avoidance actions and the payment priorities provided for in Articles 242.1(17), 280.6 and 667 of the TRLC, on the terms requested in the Prayer for Relief of this submission.


CERTIFIED TRANSLATION


USA CORP

**4.2 Extension of Effects to Security Granted by Group Third Parties (Article 652.2 of the TRLC)**

265. Article 652 of the TRLC, entitled "Third-Party Security", establishes as a general rule, in paragraph 1 thereof, that a restructuring plan shall not affect the rights of creditors against joint and several obligors, sureties or guarantors of the debtor, or against any other person that has granted a personal guarantee or security interest in favour of the debtor. This principle of non-interference with security granted by third parties reflects the rationale that a restructuring plan is an instrument binding the debtor or debtors subject to the plan and their affected creditors—whether they support the plan or become bound by it as a result of judicial approval—but, as a general rule, should not prejudice the security granted by third parties in favour of dissenting creditors.

266. Notwithstanding the foregoing general rule, Article 652 of the TRLC introduces a specific exception where the following three cumulative requirements are satisfied:

> (i)     the security was granted by a company belonging to the same group as the debtor company subject to the restructuring plan;

> (ii)    the guarantor company is not subject to the restructuring plan; and

> (iii)   enforcement of the security could cause the insolvency of both the guarantor and the debtor itself.

267. Where these three requirements are satisfied, the effects of the plan may be extended to the security on the terms provided for in the plan itself, so that the security becomes subject to the same restructuring measures as the principal debt—such as maturity extensions, write-downs, conversions or other amendments—and, in all cases, may not be enforced while the restructuring plan is being duly performed.

268. Through this exception, the legislature seeks to protect the integrity of the corporate group as an economic unit where the separate enforcement of intragroup security would jeopardise the effectiveness of the plan. Allowing the isolated enforcement of intragroup security where such enforcement would cause the insolvency of both the guarantor and the debtor would frustrate the very purpose of the restructuring plan.

269. In the present case, the extension of the effects of the Restructuring Plan to the Pledges over Antolín Irausa granted by HoldCo is based on the demonstrated satisfaction of the three requirements laid down in Article 652.2 of the TRLC:

> (i)     First, HoldCo is the parent company and sole shareholder of Antolín Irausa. Accordingly, both companies belong to the same group of companies within the meaning of Article 42 of the Commercial Code.



105



(ii)    Secondly, HoldCo is not an Applicant Company under the Plan; its liabilities are not restructured pursuant to the Plan and, consequently, it is neither subject thereto nor protected by its judicial approval as an applicant for approval, thereby satisfying the subjective requirement.

(iii)    Thirdly, as explained in detail under Fact Thirteen (Section 13.4), enforcement of the Pledges over Antolín Irausa would cause the insolvency of both HoldCo—since it would lose its sole asset, namely the shares in Antolín Irausa, which represent 99.99% of its assets, and would be unable to meet its obligations, including those arising from the personal guarantee it shall assume pursuant to the Plan and the tax liabilities arising from the break-up of the tax group—and the remaining Applicant Companies—as a result of the acceleration of all the restructured financial indebtedness, the widespread termination of customer agreements, the existence of trade liabilities and the potential recognition of tax liabilities resulting from the break-up of the tax consolidation group.

270.    For these purposes, it must be emphasised that the Pledges over Antolín Irausa do not encumber a peripheral or merely financial asset, but rather the controlling interest in the Group's operating parent company. Their enforcement would therefore result in an immediate change in the corporate control of the company that centralises the Group's operational and financial management and upon which implementation of the Plan depends. This would jeopardise not only HoldCo's financial position as guarantor, but also the stability of Antolín Irausa and all the Applicant Companies, rendering the orderly implementation of the Restructuring unviable.

271.    In view of all the foregoing, the extension of the effects of the Restructuring Plan to the Pledges over Antolín Irausa granted by HoldCo is not only appropriate but necessary to ensure the effectiveness of the Plan and to prevent the separate enforcement of the security by creditors that have not acceded to the Plan from frustrating the very purpose of the Restructuring.

**FIFTH. – Stay of Enforcement Proceedings Pursuant to Article 644 of the TRLC**

272.    Pursuant to Article 644 of the TRLC, the admission for processing of the application for judicial approval automatically entails a prohibition on commencing judicial or extrajudicial enforcement proceedings against the debtor's assets, as well as the stay of enforcement proceedings already commenced, until a final decision has been rendered on judicial approval.



106



The aforementioned provision states as follows:

> *"Upon receipt of the application for judicial approval, the court, if it considers that it has jurisdiction, shall issue a procedural order admitting the application for processing. The procedural order shall state the grounds upon which its jurisdiction is based, particularly whether it is based on the location within its territory of the debtor's centre of main interests or of an establishment of the debtor, and shall order the <u>prohibition on commencing judicial or extrajudicial enforcement proceedings against the debtor's assets and the stay of enforcement proceedings already commenced until a decision has been rendered on judicial approval.</u>" (Emphasis added)*

273. This approach is fully consistent with the spirit of the Directive (Recitals 32 to 41 and Articles 6 and 7), which establishes, as a central element of preventive restructuring frameworks, the possibility of obtaining a stay of individual enforcement actions in order to facilitate negotiations and, where applicable, implementation of the plan. The TRLC pursues the same ultimate objective: to preserve the integrity of the debtor's assets for the period strictly necessary to enable the judicial approval proceedings to produce their effects.

274. As at the date of filing this submission, the Applicant Companies are not aware of any enforcement proceedings—whether judicial or extrajudicial—being conducted against the assets of any of them. Indeed, the Applicant Companies have continued to discharge their payment obligations as they fall due, as explained in the Facts section of this submission. Notwithstanding the foregoing, pursuant to Article 644 of the TRLC itself, should any enforcement proceedings arise or come to light during the course of these proceedings, they must be stayed or, where applicable, may not be commenced, by operation of law and pursuant to the procedural order admitting the Application for processing to be issued in due course by this Honourable Court.

275. Consequently, the Applicant Companies expressly request—and shall reiterate this request in the Prayer for Relief of this submission—that, in the procedural order admitting the present Application for Approval for processing, this Honourable Court, pursuant to Article 644 of the TRLC, order the prohibition on commencing judicial or extrajudicial enforcement proceedings against the assets of the Applicant Companies, together with the stay of any such proceedings that may have been commenced, until a final decision has been rendered on the judicial approval of the Restructuring Plan.

276. Likewise, as a consequence of the extension of the effects of the Restructuring Plan to the Pledges over Antolín Irausa pursuant to Article 652.2 of the TRLC, the prohibition on commencing enforcement proceedings and the stay of any proceedings that may be commenced must also extend to the aforementioned security, pursuant to Article 644 of the TRLC.

277. This possibility is expressly contemplated in Recital 32 of the Directive, which, in referring to a temporary stay of enforcement actions, expressly provides as follows: "Where national law so provides, it should also be possible for the stay to apply for the benefit of third-party providers of security, including sureties and guarantors". This is beyond doubt since, otherwise, the protective provision of Article 652.2 of the TRLC would be deprived of any practical effect, as security could be enforced even though it would subsequently be affected by the Plan.





278. Likewise, the extension of the effects of the Plan to the Pledges over Antolín Irausa must entail the inability to accelerate the financial debt secured by those Pledges or, where applicable, the inability for the secured financial debt to be deemed accelerated as a consequence of the commencement of these judicial approval proceedings, since such actions, if taken, would amount to acts preceding and preparatory to the enforcement of the Pledges over Antolín Irausa.

279. Accordingly, for the extension of the effects of the Restructuring Plan to the Pledges over Antolín Irausa to be complete, it is necessary to prevent the acceleration of the debt secured thereby. This follows from a combined interpretation of Articles 644 and 652.2 of the TRLC, in conjunction with Articles 595.2 and 618.1 thereof.

280. In this regard, since the prohibition on commencing enforcement proceedings and the stay of any such proceedings already commenced are themselves effects of the Restructuring Plan arising upon admission of the Application for Approval for processing, they form part of the effects whose extension is sought, pursuant to Article 652.2 of the TRLC, in respect of the Pledges over Antolín Irausa.

281. In conclusion, there can be no doubt that the prohibition on commencing enforcement proceedings and the stay of any such proceedings that may be commenced—including any act preparatory to or aimed at such enforcement—must likewise extend to the Pledges over Antolín Irausa, the subject matter of which is the shares in Antolín Irausa.

In view of the foregoing,

**THE COURT IS RESPECTFULLY REQUESTED**, having regard to this submission and the documents attached hereto, to: admit the same; join it to the relevant proceedings; and deem duly filed the Application for Judicial Approval of the joint Restructuring Plan of Grupo Antolin-Irausa, S.A.U., Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Autotrim, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Grupo Antolin-Glass, S.A.U., Grupo Antolin-Ingeniería, S.A.U., Grupo Antolin-Plasbur, S.A.U., Grupo Antolin-RyA, S.A.U., Antolin Interiors UK Limited, Grupo Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolin North America, Inc., Antolín Alabama, LLC, Antolin Interiors USA, Inc., Antolin Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolin Kentucky, Inc., Grupo Antolin Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Grupo Antolin South Africa (PTY) Ltd., Grupo Antolin Bohemia, a.s., Grupo Antolin Ostrava, s.r.o., Grupo Antolin Turnov, s.r.o., Antolin Liban, s.r.o., Antolin Deutschland GmbH, Grupo Antolín Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolin Interiors México, S.A. de C.V., Grupo Antolin Silao, S.A. de C.V., Grupo Antolin Saltillo, S.R.L. de C.V., Grupo Antolin Tlaxcala, S.R.L. de C.V., Grupo Antolin Cuautitlán, S.R.L. de C.V., Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. and Grupo Antolin Bratislava, s.r.o.; and, following the appropriate procedural steps, **as its principal request**, on the basis that this Court has jurisdiction in respect of all the Applicant Companies because their registered offices and/or centres of main interests are located in Burgos:





(i)   Admit for processing the Application for Judicial Approval of the joint Restructuring Plan pursuant to Article 644 of the TRLC, which shall in turn entail the application of the effects provided for in Articles 618 and 652.2 of the TRLC, as specified in paragraph (iii), f) and g) of this Prayer for Relief and likewise in the First, Second and Third Additional Pleas, from the date of the procedural order admitting the Application for processing;

(ii)   Order publication of the procedural order admitting the Application for processing in the Public Insolvency Register by means of a public notice, in the form and with the content prescribed by Article 645 of the TRLC, stating that the Restructuring Plan is available to the Affected Creditors at the offices of Madrid Notary Public Mr Andrés Domínguez Nafría, located at 88 Lagasca Street, and at the following link, pursuant to Article 643 of the TRLC: https://gap.sharefile.com/public/share/webs9063654ff7134ecf9bd1749c812dbf1c

(iii)   Thereafter, issue an Order whereby it:

> a.   Judicially approves the joint Restructuring Plan of Grupo Antolin-Irausa, S.A.U., Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Autotrim, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Grupo Antolin-Glass, S.A.U., Grupo Antolin-Ingeniería, S.A.U., Grupo Antolin-Plasbur, S.A.U., Grupo Antolin-RyA, S.A.U., Antolin Interiors UK Limited, Grupo Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolin North America, Inc., Antolin Alabama, LLC, Antolin Interiors USA, Inc., Antolin Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolin Kentucky, Inc., Grupo Antolin Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Grupo Antolin South Africa (PTY) Ltd., GrupoAntolin Bohemia, a.s., Grupo Antolin Ostrava, s.r.o., Grupo Antolin Turnov, s.r.o., Antolin Liban, s.r.o., Antolin Deutschland GmbH, Grupo Antolin Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolin Interiors México, S.A. de C.V., Grupo Antolin Silao, S.A. de C.V., Grupo Antolin Saltillo, S.R.L. de C.V., Grupo Antolin Tlaxcala, S.R.L. de C.V., Grupo Antolin Cuautitlán, S.R.L. de C.V., Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. and Grupo Antolin Bratislava, s.r.o., attached as Document No. 2.


CERTIFIED TRANSLATION



b.  Pursuant to Articles 615.1(1) and 635.1 of the TRLC, order the extension of the effects of the Restructuring Plan to the creditors that have not acceded thereto and, consequently, order that such creditors shall be bound by the Restructuring Plan and by all the Restructuring Documents necessary for the implementation of the Plan;

c.  Declare that, pursuant to Articles 635.3 and 667 of the TRLC, the following may not be subject to insolvency avoidance actions in any potential insolvency proceedings commenced after the judicial approval of any of the Applicant Companies—except Grupo Antolin South Africa (PTY) Ltd. and Grupo Antolin Logistik Deutschland GmbH—: (1) the Restructuring Plan; (2) the reasonable acts or transactions immediately necessary for the successful conclusion of the negotiations with creditors, including payment in full of all costs associated with the Restructuring; and (3) the reasonable acts or transactions immediately necessary for the implementation of the Restructuring Plan, including, without limitation, the following legal transactions, as described in the Restructuring Plan:

  i.  the restructuring of the Affected Debt, including, without limitation: (i) the amendatory, non-terminating novation of the Bank Debt; (ii) the issuances of the New Notes; (iii) the exchange of the Existing Notes for such New Notes and the cancellation of the Existing Notes in accordance with the Consent Solicitation; (iv) the New Guarantee Facilities; and (v) the amendatory, non-terminating novation of the Intercreditor Agreement described in Clause 5.5 of the Plan;


CERTIFIED TRANSLATION



ii.   the Existing Syndicated Factoring Extensions;

iii.   the Working Capital Facility Agreement; and

iv.   in general, any transaction, act, payment or security carried out or granted in implementation of the Plan, including the granting of all personal guarantees and security interests contemplated under the Plan;

d.   Declare that the granting of the Working Capital Facility Agreement, the Existing Syndicated Factoring Extensions—should they be necessary for the implementation of the judicially approved Plan—and the New Guarantee Facilities qualify as new financing pursuant to Article 666 of the TRLC, and afford them the protection and payment priorities provided for such financing under Articles 242.1.17 and 280.6 of the TRLC, in the hypothetical event that the Restructured Companies are declared insolvent;

e.   Declare that any Existing Syndicated Factoring Extensions granted prior to obtaining judicial approval qualify as interim financing pursuant to Article 665 of the TRLC, and afford them the protection and payment priorities provided for such financing under Articles 242.1.17 and 280.6 of the TRLC, in the hypothetical event that the Restructured Companies are declared insolvent;

f.   Declare, pursuant to Article 618.1 of the TRLC, that any contractual provisions—including, among others, those contained in the Affected Agreements and the ICA—which entitle the other party to suspend or amend the obligations or effects of the agreements, to accelerate, terminate or extinguish them, or which provide for such effects to arise automatically solely by reason of the filing of the Application for Approval, its admission for processing, the judicial approval of the Restructuring Plan or any other analogous circumstance or circumstance directly related thereto, shall be deemed not written;

g.   Declare, pursuant to Article 652.2 of the TRLC, the extension of the effects of the Restructuring Plan to the pledges over the shares in Grupo Antolín-Irausa, S.A.U. owned by Antolín Holdco, S.A. (referred to in this submission as the Pledges over Antolín Irausa);



111



h.  Declare, pursuant to Article 649 of the TRLC, that, as a consequence of the extension of the effects of the Plan, the Non-Participating Creditors shall automatically be bound, in respect of all the Restructured Companies, by the Restructuring Plan and the relevant Restructuring Documents and shall therefore be deemed, for all legal and contractual purposes, to be parties thereto;

i.  Authorise the Restructuring Agent, pursuant to the authority described in Clause 14.2 of the Restructuring Plan, to exercise all powers and authorities necessary for the performance of its duties, which shall include:

   i.  acting as the irrevocably appointed special attorney of the Affected Creditors, including, for clarification purposes, the Non-Participating Creditors, for all purposes established in the Plan and the remaining Restructuring Documents, with all the powers and authorities necessary to perform its duties on the terms set forth in Clause 14.2 of the Restructuring Plan.

   ii.  acting as agent and representative of each of the Affected Creditors, including, for clarification purposes, the Non-Participating Creditors, for the purposes of entering into the relevant arrangements, exercising and enforcing their rights and representing them in connection with the execution of any public or private documents necessary or appropriate to implement the Restructuring or carry out any acts arising therefrom. The Restructuring Agent shall likewise be deemed the attorney-in-fact of the Affected Creditors, with irrevocable authority to represent them, except for the Affected Creditors referred to in Clause 14.2.6 of the Restructuring Plan, for the purpose of:

      –  acting in their name and, where required by applicable law or otherwise appropriate, in their name and on their behalf, in connection with the acceptance, preparation, execution, delivery and signing, whether privately or by means of a public instrument, of any of the Restructuring Documents in accordance with the Restructuring Plan; and



112



— accept any guarantee, mortgage, pledge or other security interest, including rights of pledge, mortgage, assignment or transfer of title for security purposes, granted in favour of such Affected Creditor in connection with the Restructuring Documents.

iii.   acting on behalf of the Affected Creditors, including, for clarification purposes, the Non-Participating Creditors, for the purpose of entering into arrangements, enforcing their rights and representing each of them in connection with the execution of any public instrument for the ratification, clarification or novation, as applicable, of the Restructuring Plan.

j.   Declare that any acts implementing the Restructuring Plan that are eligible for registration in public registers may be registered therein in accordance with the legislation applicable to them (Article 650 of the TRLC); and

k.   Order publication of the Order granting judicial approval in the Public Insolvency Register (Article 648 of the TRLC).

**IN THE ALTERNATIVE** to the foregoing, and solely in the event that this Honourable Court does not consider that it has jurisdiction to hear the Application for Approval in respect of the Foreign Subsidiaries on the ground that their centre of main interests is not located in Spain—which is not the case—it is likewise requested to declare that it has jurisdiction to hear the Application for Approval in respect of the Spanish Applicant Companies, since their registered offices are located in Burgos, and in respect of the foreign Applicant Companies (the Foreign Subsidiaries) pursuant to Article 755 of the TRLC; and, on the basis of the foregoing:

(i)   Admit for processing the Application for Judicial Approval of the joint Restructuring Plan pursuant to Article 644 of the TRLC, which shall, in turn, entail the application of the effects provided for in Articles 618 and 652.2 of the TRLC, as set out in paragraph (v)(f) and (g) of this Prayer for Relief and as likewise specified in the First, Second and Third Additional Pleas, from the date of the procedural order admitting the Application for processing;





(ii)    Take into consideration that, pursuant to Article 755 of the TRLC, the Application for Judicial Approval of the Restructuring Plan has been filed on a confidential basis in respect of the Foreign Subsidiaries;

(iii)    Except insofar as concerns the Foreign Subsidiaries, order publication of the procedural order admitting the Application for processing in the Public Insolvency Register by means of a public notice, in the form and with the content prescribed by Article 645 of the TRLC, stating that the Restructuring Plan is available to the Affected Creditors at the offices of Madrid Notary Public Mr Andrés Domínguez Nafría, located at 88 Lagasca Street, and at the following link, pursuant to Article 643 of the TRLC: https://gap.sharefile.com/public/share/webs9063654ff7134ecf9bd1749c812dbf1c

(iv)    Pursuant to Article 755 of the TRLC, order that neither the procedural order admitting the Application for processing referred to in the preceding paragraph nor any decision issued in the present judicial approval proceedings in respect of the Foreign Subsidiaries may be published in the Public Insolvency Register, owing to the confidential nature of the Application.

(v)    Thereafter, issue an Order whereby it:

a.    Judicially approves the joint Restructuring Plan of Grupo Antolin-Irausa, S.A.U., Grupo Antolin-Aragusa, S.A.U., Grupo Antolin-Autotrim, S.A.U., Grupo Antolin-Eurotrim, S.A.U., Grupo Antolin-Glass, S.A.U., Grupo Antolin-Ingeniería, S.A.U., Grupo Antolin-Plasbur, S.A.U., Grupo Antolin-RyA, S.A.U., Antolin Interiors UK Limited, Grupo Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolin North America, Inc., Antolin Alabama, LLC, Antolin Interiors USA, Inc., Antolin Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolin Kentucky, Inc., Grupo Antolin Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Grupo Antolin South Africa (PTY) Ltd., Grupo Antolin Bohemia, a.s., Grupo Antolin Ostrava, s.r.o., Grupo Antolin Turnov, s.r.o., Antolin Liban, s.r.o., Antolin Deutschland GmbH, Grupo Antolin Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolin Interiors México, S.A. de C.V., Grupo Antolin Silao, S.A. de C.V., Grupo Antolin Saltillo, S.R.L. de C.V., Grupo Antolin Tlaxcala, S.R.L. de C.V., Grupo Antolin Cuautitlán, S.R.L. de C.V., Grupo Antolin Lusitânia-Componentes Automóvel, Unipessoal, Lda. and Grupo Antolin Bratislava, s.r.o., attached as Document No. 2. For this purpose, separate decisions shall be issued in respect of the Spanish Applicant Companies and the Foreign Subsidiaries.



114



b.  Pursuant to Articles 615.1(1) and 635.1 of the TRLC, order the extension of the effects of the Restructuring Plan to the creditors that have not acceded thereto and, consequently, order that such creditors shall be bound by the Restructuring Plan and by all the Restructuring Documents necessary for the implementation of the Plan;

c.  Declare that, pursuant to Articles 635.3 and 667 of the TRLC, the following may not be subject to insolvency avoidance actions in any potential insolvency proceedings commenced after the judicial approval of any of the Applicant Companies—except Grupo Antolin South Africa (PTY) Ltd. and Grupo Antolin Logistik Deutschland GmbH—: (1) the Restructuring Plan; (2) the reasonable acts or transactions immediately necessary for the successful conclusion of the negotiations with creditors, including payment in full of all costs associated with the Restructuring; and (3) the reasonable acts or transactions immediately necessary for the implementation of the Restructuring Plan, including, without limitation, the following legal transactions, as described in the Restructuring Plan:

   i.  the restructuring of the Affected Debt, including, without limitation: (i) the amendatory, non-terminating novation of the Bank Debt; (ii) the issuances of the New Notes; (iii) the exchange of the Existing Notes for such New Notes and the cancellation of the Existing Notes in accordance with the Consent Solicitation; (iv) the New Guarantee Facilities; and (v) the amendatory, non-terminating novation of the Intercreditor Agreement described in Clause 5.5 of the Plan;

   ii.  the Existing Syndicated Factoring Extensions;

   iii.  the Working Capital Facility Agreement; and

   iv.  in general, any transaction, act, payment or security carried out or granted in implementation of the Plan, including the granting of all personal guarantees and security interests contemplated under the Plan.





d.   Declare that the Working Capital Facility Agreement, the Existing Syndicated Factoring Extensions—should they be necessary for the implementation of the judicially approved Plan—and the New Guarantee Facilities qualify as new financing pursuant to Article 666 of the TRLC, and afford them the protection and payment priorities provided for such financing under Articles 242.1(17) and 280.6 of the TRLC, in the hypothetical event that the Restructured Companies are declared insolvent;

e.   Declare that any Existing Syndicated Factoring Extensions granted prior to obtaining judicial approval qualify as interim financing pursuant to Article 665 of the TRLC, and afford them the protection and payment priorities provided for such financing under Articles 242.1.17 and 280.6 of the TRLC, in the hypothetical event that the Restructured Companies are declared insolvent;

f.   Declare, pursuant to Article 618.1 of the TRLC, that any contractual provisions—including, among others, those contained in the Affected Agreements and the ICA—which entitle the other party to suspend or amend the obligations or effects of the agreements, to accelerate, terminate or extinguish them, or which provide for such effects to arise automatically solely by reason of the filing of the Application for Approval, its admission for processing, the judicial approval of the Restructuring Plan or any other analogous circumstance or circumstance directly related thereto, shall be deemed not written;

g.   Declare, pursuant to Article 652.2 of the TRLC, the extension of the effects of the Restructuring Plan to the pledges over the shares in Grupo Antolín-Irausa, S.A.U. owned by Antolín Holdco, S.A. (referred to in this submission as the Pledges over Antolín Irausa);

h.   Declare, pursuant to Article 649 of the TRLC, that, as a consequence of the extension of the effects of the Plan, the Non-Participating Creditors shall automatically be bound, in respect of all the Restructured Companies, by the Restructuring Plan and the relevant Restructuring Documents and shall therefore be deemed, for all legal and contractual purposes, to be parties thereto;





i.   Authorise the Restructuring Agent, pursuant to the authority described in Clause 14.2 of the Restructuring Plan, to exercise all powers and authorities necessary for the performance of its duties, which shall include:

i.   acting as the irrevocably appointed special attorney of the Affected Creditors, including, for clarification purposes, the Non-Participating Creditors, for all purposes established in the Plan and the remaining Restructuring Documents, with all the powers and authorities necessary to perform its duties on the terms set forth in Clause 14.2 of the Restructuring Plan.

ii.   acting as agent and representative of each of the Affected Creditors, including, for clarification purposes, the Non-Participating Creditors, for the purposes of entering into arrangements, exercising and enforcing their rights and representing them in connection with the execution of any public or private documents necessary or appropriate to implement the Restructuring or carry out any acts arising therefrom. The Restructuring Agent shall likewise be deemed the attorney-in-fact of the Affected Creditors, with irrevocable authority to represent them, except for the Affected Creditors referred to in Clause 14.2.6 of the Restructuring Plan, for the purpose of:

– acting in their name and, where required by applicable law or otherwise appropriate, in their name and on their behalf, in connection with the acceptance, preparation, execution, delivery and signing, whether privately or by means of a public instrument, of any of the Restructuring Documents in accordance with the Restructuring Plan; and

– accepting any guarantee, mortgage, pledge or other security interest, including rights of pledge, mortgage, assignment or transfer of title for security purposes, granted in favour of such Affected Creditor in connection with the Restructuring Documents.

iii.   acting on behalf of the Affected Creditors, including, for clarification purposes, the Non-Participating Creditors, for the purpose of entering into arrangements, enforcing their rights and representing each of them in connection with the execution of any public instrument for the ratification, clarification or novation, as applicable, of the Restructuring Plan.


CERTIFIED TRANSLATION

117



j.  Declare that any acts implementing the Restructuring Plan that are eligible for registration in public registers may be registered therein in accordance with the legislation applicable to them (Article 650 of the TRLC); and

k.  Order publication of the Order granting judicial approval in the Public Insolvency Register (Article 648 of the TRLC), excluding the Foreign Subsidiaries from such publication.

**FIRST ADDITIONAL PLEA**

Pursuant to Article 644.1 of the TRLC, simultaneously with the admission for processing of the Application for Approval, an order must be made prohibiting the commencement of judicial or extrajudicial enforcement proceedings against the assets of the Applicant Companies and staying any enforcement proceedings already commenced, until a decision has been rendered on the judicial approval sought.

**THE COURT IS RESPECTFULLY REQUESTED** to deem the foregoing statement duly made for all appropriate purposes and, accordingly, together with the procedural order admitting the Application for Judicial Approval of the Restructuring Plan for processing, to order the prohibition on commencing judicial or extrajudicial enforcement proceedings against the assets of the Applicant Companies and the stay of any such proceedings already commenced, pursuant to Article 644.1 of the TRLC, until a decision has been rendered on judicial approval.

**SECOND ADDITIONAL PLEA**

Pursuant to Article 644 of the TRLC, in conjunction with Article 618.1 of the TRLC, simultaneously with the admission for processing of the Application for Approval, an order must be made prohibiting the exercise or application of any contractual provision—including, among others, those contained in the Affected Agreements and the ICA—which, solely by reason of the filing of the Application for Approval, its admission for processing, the judicial approval of the Restructuring Plan or any other analogous circumstance or circumstance directly related thereto, provides, including automatically, for: (i) the suspension or amendment of the obligations or effects of the agreements; or (ii) the acceleration, termination or extinguishment of the obligations or agreements.

**THE COURT IS RESPECTFULLY REQUESTED** to deem the foregoing statement duly made for all appropriate purposes and, accordingly, together with the procedural order admitting the Application for Judicial Approval of the Restructuring Plan for processing, order the prohibition on exercising or applying any contractual provision—including, among others, those contained in the Affected Agreements and the ICA—which, solely by reason of the filing of the Application for Approval, its admission for processing, the judicial approval of the Restructuring Plan or any other analogous circumstance or circumstance directly related thereto, provides, including automatically, for: (i) the suspension or amendment of the obligations or effects of the agreements; or (ii) the acceleration, termination or extinguishment of the obligations or agreements.


CERTIFIED TRANSLATION

118


USA CORP

**THIRD ADDITIONAL PLEA** Pursuant to Article 644 of the TRLC, in conjunction with Article 652.2 of the TRLC, it is requested that: (i) the prohibition on commencing judicial or extrajudicial enforcement proceedings and the stay of any such proceedings already commenced likewise extend to the Pledges over Antolín Irausa—security granted by Antolín Holdco, S.A.—to which the effects of the Restructuring Plan are sought to be extended pursuant to Article 652.2 of the TRLC, until judicial approval of the Plan is granted; and (ii) any acts preceding or preparatory to such enforcement likewise be prohibited, and any such acts already commenced be stayed, including the declaration of acceleration, termination or extinguishment and/or the assumption of voting rights attaching to the shares in Antolín Irausa, since otherwise the intended protective purpose would be deprived of practical effect.

All the foregoing is requested in order to preserve, in practice, the effectiveness of the extension of effects sought pursuant to Article 652.2 of the TRLC. Were the commencement of enforcement actions or the assumption of voting rights relating to the shares in Grupo Antolín-Irausa, S.A.U. permitted, that extension would be rendered devoid of practical effect even before it had been granted by this Honourable Court.

**THE COURT IS RESPECTFULLY REQUESTED** to deem the foregoing statement duly made for all appropriate purposes and, accordingly, together with the procedural order admitting the Application for Judicial Approval of the Restructuring Plan for processing, to order that: (i) the prohibition on commencing judicial or extrajudicial enforcement proceedings and the stay of any such proceedings already commenced shall extend to the Pledges over Antolín Irausa—security granted by Antolín Holdco, S.A.; and (ii) any acts preceding and/or preparatory to such enforcement shall be prohibited and any such acts already commenced shall be stayed, including the declaration of acceleration, termination or extinguishment of the secured debt and/or the assumption of voting rights attaching to the shares in Grupo Antolín-Irausa, S.A.U.; all pursuant to Article 644.1 of the TRLC, in conjunction with Article 652.2 of the TRLC, and both provisions in conjunction with Articles 595 and 618 of the same legislation, until a decision has been rendered on judicial approval.


CERTIFIED
TRANSLATION



**FOURTH ADDITIONAL PLEA**

Pursuant to Article 152.1(2) of the LEC, the Court Agent, Mr. Miguel Ángel Esteban, is authorised to carry out all service and notification acts necessary for the processing of the present Application for Judicial Approval.

**THE COURT IS RESPECTFULLY REQUESTED** to deem the foregoing statement duly made and the appropriate notifications duly requested to be carried out by this party's Court Agent.

**FIFTH ADDITIONAL PLEA** Pursuant to Article 265.2 of the LEC, reference is hereby made, as from this time, to the records held by all public and private legal entities named in this submission. In particular, express reference is made, among others, to the records held by the Notary's Office located at No. 88 Lagasca Street.

**THE COURT IS RESPECTFULLY REQUESTED** to deem the foregoing statement duly made for the purposes of Article 265.2 of the LEC and for all other appropriate purposes.

**SIXTH ADDITIONAL PLEA**

It is the intention of this party and the companies it represents to comply in these proceedings with all the statutory requirements laid down in the LEC and the TRLC. Should any inadvertent procedural defect be identified, an express offer is hereby made to remedy it pursuant to Article 231 of the LEC.

**THE COURT IS RESPECTFULLY REQUESTED** to deem the foregoing statement duly made for the purposes of Article 231 of the LEC and for all other appropriate purposes.

It is justice that I respectfully seek in Burgos on 10-07-2026.

[Digitally signed]
RODRIGO LÓPEZ GONZÁLEZ
Digitally signed by RODRIGO LÓPEZ GONZÁLEZ
Date: 10-07-2026 15:58:48 +02:00
Rodrigo López González
Madrid Bar Association, Membership No. 77,858

Miguel Ángel Esteban
Court Agent

[Digitally signed]
BLANCA MORENO HERRERO
Digitally signed by BLANCA MORENO HERRERO
Date: 10-07-2026 16:02:06 +02:00
Blanca Moreno Herrero
Madrid Bar Association, Membership No. 114,390



120



**Homologation Request Order**



**TRIBUNAL DE INSTANCIA**
**SECCION DE LO MERCANTIL**
**PLAZA N° 1 DE BURGOS**

AVDA REYES CATOLICOS, 51 BIS
**Teléfono:** 947284055
**Correo electrónico:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Equipo/usuario: ALP
Modelo: S40020 PROVIDENCIA TEXTO LIBRE ART 206.1 LEC

**N.I.G:** 09059 42 1 2026 0003344
**CLC COMUNIC PREVIA CONCURSO Y HOMOLOGACION JUDIC 0000310 / 2026**
Procedimiento origen:   /
**Sobre: OTRAS MATERIAS CONCURSALES**

DEMANDANTE: GRUPO ANTOLIN IRAUSA SA, GRUPO ANTOLIN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GRUPO ANTOLIN BRATISLAVA SRO

**Procurador/a:** MIGUEL ANGEL ESTEBAN RUIZ
**Abogado/a:** BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ

**P R O V I D E N C I A**

LA MAGISTRADA-JUEZ,

Sra.: ANA ISABEL LÓPEZ PÉREZ

En BURGOS, a diecisiete de julio de dos mil veintiséis

Dada cuenta. Se tiene por presentada la solicitud de homologación judicial del plan de reestructuración aportada por el Procurador D. MIGUEL ÁNGEL ESTEBAN RUIZ en nombre y representación de las mercantiles **GRUPO ANTOLÍN-IRAUSA, S.A.U.; GRUPO ANTOLÍN-ARAGUSA, S.A.U.; GRUPO ANTOLÍN-AUTOTRIM, S.A.U.; GRUPO ANTOLÍN-EUROTRIM, S.A.U.; GRUPO ANTOLÍN-GLASS, S.A.U.; GRUPO ANTOLÍN-INGENIERÍA, S.A.U.; GRUPO ANTOLÍN-**



**Código Seguro de Verificación:** E04799402-MI:U2Zj-af9z-of47-4ovc-B
Puede verificar este documento en https://www.administraciondejusticia.gob.es

**FIRMA (1):** Ana Isabel Lopez Perez (17/07/2026 15:11)          **FIRMA (2):** Blanca Esther Hoyo Moreno (20/07/2026 08:23)



PLASBUR, S.A.U.; GRUPO ANTOLÍN-RyA, S.A.U.; ANTOLÍN INTERIORS UK LIMITED; GRUPO ANTOLÍN LEAMINGTON LIMITED; GRUPO ANTOLÍN UK LIMITED; GRUPO ANTOLÍN NORTH AMERICA, INC.; ANTOLÍN ALABAMA, LLC; ANTOLÍN INTERIORS USA, INC.; ANTOLÍN SHELBY, INC.; GRUPO ANTOLÍN MISSOURI, LLC.; GRUPO ANTOLÍN KENTUCKY, INC.; GRUPO ANTOLÍN MICHIGAN, INC.; GRUPO ANTOLÍN SIBIU, S.R.L.; ANTOLÍN SILESIA SP. Z.O.O.; GRUPO ANTOLÍN SOUTH AFRICA (PTY) LTD.; GRUPO ANTOLÍN BOHEMIA, A.S.; GRUPO ANTOLÍN OSTRAVA, S.R.O.; GRUPO ANTOLÍN TURNOV, S.R.O.; ANTOLÍN LIBAN, S.R.O.; ANTOLÍN DEUTSCHLAND GMBH; GRUPO ANTOLÍN BAMBERG GMBH & CO. KG; GRUPO ANTOLÍN LOGISTIK DEUTSCHLAND GMBH; ANTOLÍN STRAUBING GMBH; ANTOLÍN INTERIORS MÉXICO, S.A. DE C.V.; GRUPO ANTOLÍN SILAO, S.A. DE C.V.; GRUPO ANTOLÍN SALTILLO, S.R.L. DE C.V.; GRUPO ANTOLÍN TLAXCALA, S.R.L. DE C.V.; GRUPO ANTOLÍN CUAUTITLÁN, S.R.L. DE C.V.; GRUPO ANTOLÍN LUSITÂNIA-COMPONENTES AUTOMÓVEL, UNIPESSOAL, LDA.; y GRUPO ANTOLÍN BRATISLAVA, S.R.O. y, a su vista, procede realizar los siguientes pronunciamientos:

A) Acordar su admisión a trámite, conforme a lo dispuesto en el artículo 644.1 T.R.L.C., puesto en relación con los artículos 45.2 y 755 del mismo cuerpo legal: la competencia territorial de este órgano judicial para conocer de la mencionada solicitud dimana de la localización del centro de intereses principales de la mercantil GRUPO ANTOLÍN IRAUSA, S.A.U., con CIF A09092305 (que funge como sociedad matriz y cabecera de las restantes sociedades filiales, tanto nacionales como extranjeras), en el lugar en el que radica su domicilio social, emplazado en la calle Vitoria, núm. 307, C.P. 09007, en Burgos.

B) Decretar, con arreglo a lo dispuesto en el artículo 644.1 T.R.L.C., la prohibición de iniciar ejecuciones judiciales o extrajudiciales sobre los bienes de los deudores, así como la paralización de las ejecuciones ya iniciadas hasta que se





resuelva la homologación. De igual modo, en consideración a los pedimentos efectuados en los Otrosíes Digo segundo y tercero del escrito de solicitud de homologación judicial del plan de reestructuración, se efectúan las siguientes disposiciones:

- Conforme a lo establecido en el artículo 618.1 T.R.L.C., se decreta que la mera presentación de la solicitud de homologación judicial del plan de reestructuración y su admisión a trámite, por sí solas, no afectarán a los contratos con obligaciones recíprocas pendientes de cumplimiento. En particular, se tendrán por no puestas las cláusulas contractuales (incluidas las presentes en los contratos afectados y el ICA) que establezcan la facultad de la otra parte de suspender o de modificar las obligaciones o los efectos de los contratos, así como la facultad de vencimiento anticipado, la de resolución o la de extinción de las obligaciones o de los contratos.

- Dado que mercantil GRUPO ANTOLÍN HOLDCO, S.A. es titular del 100% de las acciones de la sociedad GRUPO ANTOLÍN IRAUSA, S.A.U., que ha constituido una serie de derechos reales de prenda de distinto rango sobre la totalidad de las referidas acciones en garantía de las obligaciones derivadas de los principales instrumentos de financiación del Grupo (Bonos 2028, Bonos 2030, Contrato de Financiación Sindicada, Contratos de Financiación BEI y Contrato de Financiación ICO) que pretenden afectarse por medio del plan de reestructuración cuya homologación judicial se ha solicitado, y que podría llegar a producirse la insolvencia de la mercantil GRUPO ANTOLÍN IRAUSA, S.A.U. y, por extensión, la de las restantes mercantiles solicitantes si los acreedores en cuyo favor se han constituido aquellos derechos reales de prenda



**FIRMA (1):** Ana Isabel Lopez Perez (17/07/2026 15:11)          **FIRMA (2):** Blanca Esther Hoyo Moreno (20/07/2026 08:23)



instaran su ejecución forzosa (véanse los folios 38 a 41 del informe sobre la razonabilidad del plan de reestructuración, elaborado por el experto en reestructuración designado por este órgano judicial, que se ha aportado como documento núm. 21 de la carpeta comprimida en formato ZIP indexada en el acontecimiento núm. 17 del expediente judicial digital), se acuerda que, desde el momento de la admisión a trámite de la solicitud de homologación judicial del plan de reestructuración, sus efectos se extiendan a los mencionados derechos reales de prenda constituidos por la mercantil GRUPO ANTOLÍN HOLDCO, S.A., conforme a lo dispuesto en el artículo 652.2 T.R.L.C.

C) Acordar, en los términos del artículo 645 T.R.L.C., que la Sra. Letrada de la Administración de Justicia de este órgano judicial ordene la publicación de la presente Providencia en el Registro Público Concursal por medio de edicto, que contendrá los datos que identifiquen a los deudores, el órgano jurisdiccional competente y el fundamento de su competencia, el número del procedimiento judicial de homologación y la fecha del plan de reestructuración, con indicación de que el mismo se encuentra a disposición de los acreedores afectados en el órgano judicial competente para conocer de la homologación, así como en la notaría de D. Andrés Domínguez Nafría, sita en la calle Lagasca, núm. 88, sin perjuicio de la posibilidad de acceder a su contenido por medios telemáticos (a través del siguiente enlace: https://ga-p.sharefile.com/public/share/web-s9063654ff7134ecf9bd1749c812dbf1c).



**FIRMA (1):** Ana Isabel Lopez Perez (17/07/2026 15:11)          **FIRMA (2):** Blanca Esther Hoyo Moreno (20/07/2026 08:23)



**MODO DE IMPUGNACIÓN**: recurso de reposición en el plazo de cinco días ante este Tribunal.

Para la admisión del recurso se deberá acreditar haber constituido, en la cuenta de depósitos y consignaciones de este órgano, un depósito de 25 euros, salvo que el recurrente sea: beneficiario de Justicia gratuita, el Ministerio Fiscal, el Estado, Comunidad Autónoma, Entidad Local u Organismo Autónomo Dependiente de alguno de los anteriores.

Lo acuerda y firma la Juez.

**LA MAGISTRADA-JUEZ**

La difusión del texto de esta resolución a partes no interesadas en el proceso en el que ha sido dictada sólo podrá llevarse a cabo previa disociación de los datos de carácter personal que los mismos contuvieran y con pleno respeto al derecho a la intimidad, a los derechos de las personas que requieran un especial deber de tutelar o a la garantía del anonimato de las víctimas o perjudicados, cuando proceda.

Los datos personales incluidos en esta resolución no podrán ser cedidos, ni comunicados con fines contrarios a las leyes.



**FIRMA (1):** Ana Isabel Lopez Perez (17/07/2026 15:11)          **FIRMA (2):** Blanca Esther Hoyo Moreno (20/07/2026 08:23)

**Homologation Request Order**
**Certified Translation**

  

American Translators Association
ATA MEMBER # M - 186788

**TRADUX USA Corp**
**Certified & Professional Translation Services**
405 Lexington Avenue, Floor 9
(Chrysler Building) NEW YORK, NY 10174
+ 1 650 546-5512
www.traduxusa.com
info@traduxusa.com

# Certification of Translation Accuracy
Translation of
**Translation of Court Order**
from **Spanish** to **English**

As an authorized representative of TRADUX USA Corp, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified, and certified professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text accurately and faithfully reflects the content, meaning, and style of the original document and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, TRADUX USA Corp assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

 

Mariagiovanna Oricchio - CEO of TRADUX USA Corp
Order date: July 20, 2026

TRADUX USA Corp
405 Lexington Avenue, Floor 9
New York City 10174
United States
 + 1 650 546-5512

**TRADUX USA Corp**
**108 West 13th Street,**
**Wilmington, DE 19801**

[Coat of Arms of Spain]
Administration of Justice

**COURT OF INSTANCE**
**COMMERCIAL SECTION**
**COURT NO. 1 OF BURGOS**

51 Bis Avenida de los Reyes Católicos
**Telephone**: 947284055
**Email**: https://sedejudicial.justicia.es/-/presentacion-de-escritos

Team/User: ALP
Form: S40020 FREE-TEXT COURT ORDER, ART. 206.1 LEC

**N.I.G.**: 09059 42 1 2026 0003344
**CLC PRE-INSOLVENCY NOTICE AND JUDICIAL CONFIRMATION 0000310 / 2026**
Originating Proceedings: /
**Subject Matter: OTHER INSOLVENCY MATTERS**

CLAIMANTS: GRUPO ANTOLIN IRAUSA SA, GRUPO ANTOLIN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GRUPO ANTOLIN BRATISLAVA SRO

**Court Representative**: MIGUEL ANGEL ESTEBAN RUIZ
**Attorneys**: BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ

**C O U R T   O R D E R**

THE JUDGE,
Ms. ANA ISABEL LÓPEZ PÉREZ

In BURGOS, on July 17, 2026

Upon review. The application for judicial confirmation of the restructuring plan filed by Court Representative Mr. MIGUEL ÁNGEL ESTEBAN RUIZ, in the name and on behalf of the companies **GRUPO ANTOLÍN-IRAUSA, S.A.U.; GRUPO ANTOLÍN-ARAGUSA, S.A.U.; GRUPO ANTOLÍN-AUTOTRIM, S.A.U.; GRUPO ANTOLÍN-EUROTRIM, S.A.U.; GRUPO ANTOLÍN-GLASS, S.A.U.; GRUPO ANTOLÍN-INGENIERÍA, S.A.U.; GRUPO ANTOLÍN-**

[Coat of Arms of Hueva]

Secure Verification Code: E04799402-MI:U2Zj-af9z-of47-4ovc-B
You may verify this document at https://www.administraciondejusticia.gob.es

SIGNATURE (1): Ana Isabel Lopez Perez (07/17/2026 15:11)      SIGNATURE (2): Blanca Esther Hoyo Moreno (07/20/2026 08:23)





[Coat of Arms of Spain]
Administration of Justice

**PLASBUR, S.A.U.; GRUPO ANTOLÍN-RyA, S.A.U.; ANTOLÍN INTERIORS UK LIMITED; GRUPO ANTOLÍN LEAMINGTON LIMITED; GRUPO ANTOLÍN UK LIMITED; GRUPO ANTOLÍN NORTH AMERICA, INC.; ANTOLÍN ALABAMA, LLC; ANTOLÍN INTERIORS USA, INC.; ANTOLÍN SHELBY, INC.; GRUPO ANTOLÍN MISSOURI, LLC; GRUPO ANTOLÍN KENTUCKY, INC.; GRUPO ANTOLÍN MICHIGAN, INC.; GRUPO ANTOLÍN SIBIU, S.R.L.; ANTOLÍN SILESIA SP. Z.O.O.; GRUPO ANTOLÍN SOUTH AFRICA (PTY) LTD.; GRUPO ANTOLÍN BOHEMIA, A.S.; GRUPO ANTOLÍN OSTRAVA, S.R.O.; GRUPO ANTOLÍN TURNOV, S.R.O.; ANTOLÍN LIBAN, S.R.O.; ANTOLÍN DEUTSCHLAND GMBH; GRUPO ANTOLÍN BAMBERG GMBH & CO. KG; GRUPO ANTOLÍN LOGISTIK DEUTSCHLAND GMBH; ANTOLÍN STRAUBING GMBH; ANTOLÍN INTERIORS MÉXICO, S.A. DE C.V.; GRUPO ANTOLÍN SILAO, S.A. DE C.V.; GRUPO ANTOLÍN SALTILLO, S.R.L. DE C.V.; GRUPO ANTOLÍN TLAXCALA, S.R.L. DE C.V.; GRUPO ANTOLÍN CUAUTITLÁN, S.R.L. DE C.V.; GRUPO ANTOLÍN LUSITÂNIA-COMPONENTES AUTOMÓVEL, UNIPESSOAL, LDA.; and GRUPO ANTOLÍN BRATISLAVA, S.R.O.** and, upon review thereof, the following rulings shall be issued:

A) To accept the application for consideration, pursuant to Article 644.1 of the Consolidated Text of the Insolvency Act (T.R.L.C.), in conjunction with Articles 45.2 and 755 of the same legal text: the territorial jurisdiction of this Court to hear the aforementioned application derives from the location of the center of main interests of GRUPO ANTOLÍN IRAUSA, S.A.U., with Tax Identification No. (CIF) A09092305 (which serves as the parent company and head of the other subsidiaries, both domestic and foreign), at its registered office, located at 307 Calle Vitoria, Postal Code 09007, Burgos.

B) To order, pursuant to Article 644.1 of the T.R.L.C., that no judicial or extrajudicial enforcement proceedings be commenced against the debtors' assets and that any enforcement proceedings already commenced be stayed until

[Coat of Arms of Hueva]

---

SIGNATURE (1): Ana Isabel Lopez Perez (07/17/2026 15:11)          SIGNATURE (2): Blanca Esther Hoyo Moreno (07/20/2026 08:23)





[Coat of Arms of Spain]
Administration of Justice

judicial confirmation is decided. Likewise, in consideration of the relief requested in the Second and Third Additional Requests of the application for judicial confirmation of the restructuring plan, the following provisions are made:

• Pursuant to Article 618.1 of the T.R.L.C., it is ordered that the mere filing of the application for judicial confirmation of the restructuring plan and its acceptance for consideration shall not, in and of themselves, affect contracts with outstanding reciprocal obligations. In particular, any contractual clauses (including those contained in the affected contracts and the ICA) entitling the other party to suspend or modify the obligations or effects of the contracts, or providing for acceleration, termination or extinguishment of the obligations or contracts, shall be deemed not to have been included.

• Given that GRUPO ANTOLÍN HOLDCO, S.A. holds 100% of the shares of GRUPO ANTOLÍN IRAUSA, S.A.U., which has granted a series of security interests in the form of pledges of different ranks over all such shares as security for the obligations arising from the Group's principal financing instruments (2028 Notes, 2030 Notes, Syndicated Financing Agreement, EIB Financing Agreements and ICO Financing Agreement), which are intended to be affected by the restructuring plan for which judicial confirmation has been sought, and that GRUPO ANTOLÍN IRAUSA, S.A.U. and, by extension, the other applicant companies could become insolvent if the creditors in whose favor those security interests have been granted

[Coat of Arms of Hueva]

SIGNATURE (1): Ana Isabel Lopez Perez (07/17/2026 15:11)        SIGNATURE (2): Blanca Esther Hoyo Moreno (07/20/2026 08:23)


CERTIFIED TRANSLATION



[Coat of Arms of Spain]
Administration of Justice

were to seek their compulsory enforcement (see pages 38 through 41 of the report on the reasonableness of the restructuring plan, prepared by the restructuring expert appointed by this Court, which was submitted as Document No. 21 of the compressed ZIP folder indexed under Event No. 17 of the electronic court record), it is ordered that, from the time the application for judicial confirmation of the restructuring plan is accepted for consideration, its effects shall extend to the aforementioned security interests in the form of pledges granted by GRUPO ANTOLÍN HOLDCO, S.A., pursuant to Article 652.2 of the T.R.L.C.

C) To order, pursuant to Article 645 of the T.R.L.C., that the Court Clerk of this Court arrange for the publication of this Court Order in the Public Insolvency Registry by means of a notice containing information identifying the debtors, the court having jurisdiction and the basis for its jurisdiction, the number of the judicial confirmation proceedings and the date of the restructuring plan, indicating that the plan is available to the affected creditors at the court having jurisdiction over the confirmation proceedings, as well as at the notarial office of Mr. Andrés Domínguez Nafría, located at 88 Calle Lagasca, without prejudice to the possibility of accessing its contents electronically through the following link:

https://ga-p.sharefile.com/public/share/web-s9063654ff7134ecf9bd1749c812dbf1c.

[Coat of Arms of Hueva]

SIGNATURE (1): Ana Isabel Lopez Perez (07/17/2026 15:11)          SIGNATURE (2): Blanca Esther Hoyo Moreno (07/20/2026 08:23)





[Coat of Arms of Spain]
Administration of Justice

**MEANS OF APPEAL**: A motion for reconsideration may be filed with this Court within five days.

For the motion to be accepted, proof must be provided that a deposit of 25 euros has been paid into this Court's deposit and consignment account, unless the appellant is a legal aid beneficiary, the Public Prosecutor's Office, the State, an Autonomous Community, a Local Authority or an autonomous agency under any of the foregoing.

So ordered and signed by the Judge.

**THE JUDGE**

The text of this ruling may be disclosed to persons who are not parties to the proceedings in which it was issued only after the personal data contained therein have been anonymized and with full respect for the right to privacy, the rights of persons requiring a special duty of protection and the guarantee of anonymity of victims or injured parties, where applicable.

The personal data included in this ruling may not be transferred or disclosed for purposes contrary to law.

[Coat of Arms of Hueva]

SIGNATURE (1): Ana Isabel Lopez Perez (07/17/2026 15:11)          SIGNATURE (2): Blanca Esther Hoyo Moreno (07/20/2026 08:23)





**Lexaudit Appointment Documents**

**Solicitantes: Grupo Antolín-Irausa, S.A.U. y otras**

**Procurador:  D. Miguel Ángel Esteban**

**Objeto del escrito: Solicitud de nombramiento de experto en la reestructuración**

## A LA SECCIÓN DE LO MERCANTIL
## DEL TRIBUNAL DE INSTANCIA DE BURGOS

**D. Miguel Ángel Esteban**, Procurador de los Tribunales y de Grupo Antolín-Irausa, S.A.U. ("**Antolín Irausa**"), Grupo Antolín-Aragusa, S.A.U. ("**Antolín Aragusa**"), Grupo Antolín-Autotrim, S.A.U. ("**Antolín Autotrim**"), Grupo Antolín-Eurotrim, S.A.U. ("**Antolín Eurotrim**"), Grupo Antolín-Glass, S.A.U. ("**Antolín Glass**"), Grupo Antolín-Ingeniería, S.A.U. ("**Antolín Ingeniería**"), Grupo Antolín-Plasbur, S.A.U. ("**Antolín Plasbur**"), Grupo Antolín-RyA, S.A.U. ("**Antolín RyA**"), Antolin Interiors UK Limited (" **Antolín Interiors UK**"), Grupo Antolin Leamington Limited ("**Antolín Leamington**"), Grupo Antolin UK Limited ("**Antolin UK**"), Grupo Antolín North America, Inc. ("**Antolín North America**"), Antolín Alabama, LLC ("**Antolín Alabama**"), Antolin Interiors USA, Inc. ("**Antolín Interiors USA**"), Antolín Shelby, Inc. ("**Antolín Shelby**"), Grupo Antolin Missouri, LLC ("**Antolín Missouri**"), Grupo Antolín Kentucky, Inc. ("**Antolín Kentucky**"), Grupo Antolín Michigan, Inc. ("**Antolín Michigan**"), Grupo Antolin Sibiu SRL ("**Antolín Sibiu**"), Antolin Silesia Sp. z o.o. ("**Antolín Silesia**"), Grupo Antolín South Africa (PTY) Ltd. ("**Antolin South Africa**"), Grupo Antolín Bohemia, a.s. ("**Antolín Bohemia**"), Grupo Antolín Ostrava, s.r.o. ("**Antolín Ostrava**"), Grupo Antolín Turnov, s.r.o. ("**Antolín Turnov**"), Antolin Liban, s.r.o. ("**Antolín Liban**"), Antolin Deutschland GmbH ("**Antolin Deutschland**"), Grupo Antolín Bamberg GmbH & Co. KG ("**Antolín Bamberg**"), Grupo Antolin Logistik Deutschland GmbH ("**Antolín Logistik Deutschland**"), Antolin Straubing GmbH ("**Antolín Straubing**"), Antolín Interiors México, S.A. de C.V. ("**Antolín Interiors Mexico**"), Grupo Antolín Silao, S.A. de C.V. ("**Antolín Silao**"), Grupo Antolín Saltillo, S.R.L. de C.V. ("**Antolín Saltillo**"), Grupo Antolín Tlaxcala, S.R.L. de C.V. ("**Antolín Tlaxcala**"), Grupo Antolín Cuautitlán, S.R.L. de C.V. ("**Antolín Cuautitlán**"), Grupo Antolín Lusitânia-Componentes Automóvel, Unipessoal, Lda. ("**Antolin Lusitania**"), y Grupo Antolín Bratislava, s.r.o. ("**Antolín Bratislava**"), (todas ellas a excepción de Antolín Irausa, las "**Filiales**"; y, juntamente Antolín Irausa y las Filiales, las "**Sociedades Solicitantes**") según se acredita mediante poderes que se acompañan como **Conjunto Documental nº 1**, comparezco ante este Ilustre Juzgado, y como mejor proceda en Derecho **DIGO**:

Que, en virtud de lo dispuesto en el artículo 672 y siguientes del Real Decreto Legislativo 1/2020, de 5 de mayo, por el que se aprueba el texto refundido de la Ley Concursal (en adelante, "**TRLC**"), por medio del presente escrito las Sociedades Solicitantes vienen a **SOLICITAR**

1

de este Ilustre Tribunal el nombramiento de **LEXAUDIT CONCURSAL, S.L.P.** ("**LEXAUDIT**", el "**Experto**" o el "**Experto en la Reestructuración**") como **EXPERTO EN LA REESTRUCTURACIÓN** (la "**Solicitud**"), **con carácter reservado**, con base en las siguientes:

## ALEGACIONES

**PREVIA -      OBJETO DE LA PRESENTE SOLICITUD**

1. Este escrito tiene por objeto solicitar el nombramiento de LEXAUDIT como experto en la reestructuración de las Sociedades Solicitantes en un escenario de probabilidad de insolvencia, a fin de que, con sus conocimientos y experiencia, facilite las negociaciones que sienten las bases de una eventual reestructuración sólida, negociada y que cumpla con los requisitos que nuestra normativa concursal establece.

2. Todo ello, con el fin último de alcanzar la viabilidad sostenible de las Sociedades Solicitantes y evitar, con ello, su escenario concursal en un futuro.

**PRIMERA -   LAS SOCIEDADES SOLICITANTES Y EL MOTIVO DE LA SOLICITUD DE NOMBRAMIENTO DE EXPERTO EN LA REESTRUCTURACIÓN**

**1.1 Sobre el Grupo Antolín**

3. Las Sociedades Solicitantes pertenecen a un grupo de sociedades más amplio denominado "Antolín" (el "**Grupo Antolín**" o, simplemente, el "**Grupo**").

4. El Grupo Antolín es una multinacional española, líder mundial en el desarrollo, diseño y fabricación de componentes de interior para la industria del automóvil; lo que incluye la fabricación de techos, puertas, iluminación, paneles de instrumentos y sistemas electrónicos.

5. Desde su fundación en 1950, a partir de un taller mecánico en Burgos regentado por la familia Antolín, el Grupo ha evolucionado hasta convertirse en uno de los principales fabricantes de interiores de vehículos a nivel global. Con todo, el Grupo mantiene hoy en día su sede central en Burgos y su carácter de empresa familiar, bajo el liderazgo de la familia Antolín.

2

6.   El Grupo Antolin ocupa una posición de referencia en la industria automovilística internacional, con presencia en el interior de los coches más vendidos del planeta, equipando más de 500 modelos diferentes y suministrando a 9 de los 10 vehículos más vendidos a nivel mundial. Trabaja como proveedor de primer nivel para prácticamente la totalidad de los principales fabricantes de automóviles del mundo.

7.   Además, el Grupo cuenta con una sólida implantación internacional, operando hasta en 23 países, donde dispone de 111 plantas productivas y centros "*just in time*", así como de 25 oficinas técnico-comerciales. Esta presencia global, a través de numerosas sociedades dependientes de la matriz operativa, le permite ofrecer capacidad de diseño, ingeniería y producción en los principales mercados automovilísticos del mundo, todo ello desde Burgos[1].

### 1.2 Sobre las Sociedades Solicitantes

8.   Las Sociedades Solicitantes forman parte del Grupo Antolín y, en concreto, son las compañías del Grupo que adeudan los pasivos financieros sobre los que se pretende negociar una reestructuración. Para una mejor comprensión de las Sociedades Solicitantes se aporta como **Documento nº 2** un organigrama de las Sociedades Solicitantes.

9.   Como se ha avanzado y se puede apreciar en el organigrama anterior, las Sociedades Solicitantes comparten como matriz operativa a Antolín Irausa.

10.  Antolín Irausa es una sociedad mercantil de nacionalidad española, con número de identificación fiscal A09092305, y domicilio social en Calle Vitoria 307, 09007 Burgos. Antolín Irausa es la sociedad cabecera de las Filiales, que ejerce control (directo o indirecto) sobre el resto de las Sociedades Solicitantes, es decir, sobre las Filiales y desde la cual se adoptan todas las decisiones relevantes de las Filiales (siendo, por tanto, que, como veremos, el centro principal de intereses de las mismas se sitúa igualmente en Burgos).

11.  Las Filiales, españolas o extranjeras, que resultarían incluidas en el posible plan de reestructuración, cuya deuda financiera se vería afectada en consecuencia, son las siguientes:

---

[1] Para consultar toda la información sobre el Grupo Antolín, puede visitarse su página web: https://www.antolin.com/es/compania-home

3

| | Filial | Nacionalidad | Domicilio |
|---|---|---|---|
| 1. | Antolín Aragusa | España | Calle Monte de la Abadesa, 0, Parque Empresarial, Burgos |
| 2. | Antolín Autotrim | España | Calle Vitoria 307, 09007 Burgos |
| 3. | Antolín Eurotrim | España | Calle Vitoria 307, 09007 Burgos |
| 4. | Antolín Glass | España | Calle Vitoria 307, 09007 Burgos |
| 5. | Antolín Ingeniería | España | Calle Vitoria 307, 09007 Burgos |
| 6. | Antolín Plasbur | España | Calle Condado de Treviño, 21, Polígono Industrial de Villalonquéjar, Burgos |
| 7. | Antolín RyA | España | Calle Vitoria 307, 09007 Burgos |
| 8. | Antolín Interiors UK | Reino Unido | Merse Road, North Moons Moat, Redditch, Inglaterra B98 9HL |
| 9. | Antolín Leamington | Reino Unido | Tachbrook Park Drive, Leamington Spa, Warwick, Warwickshire CV34 6RH |
| 10. | Antolin UK | Reino Unido | Merse Road, North Moons Moat, Redditch, Inglaterra B98 9HL |
| 11. | Antolín North America | Estados Unidos | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 12. | Antolín Alabama | Estados Unidos | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 13. | Antolín Interiors USA. | Estados Unidos | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 14. | Antolín Shelby | Estados Unidos | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 15. | Antolín Missouri | Estados Unidos | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 16. | Antolín Kentucky | Estados Unidos | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 17. | Antolín Michigan | Estados Unidos | 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911 |
| 18. | Antolín Sibiu | Rumania | Calle Europa Unită, n.º 7, Condado de Sibiu |
| 19. | Antolín Silesia | Polonia | Wrocławska 82, 57-100 Strzelin, Polonia |
| 20. | Antolin South Africa | Sudáfrica | Nelson Mandela Bay Logistics Park, Algoa Road, Jagvlakte, Uitenhage Industries, Eastern Cape 2196 |
| 21. | Antolín Bohemia | República Checa | Svárovská 696, 463 03 Stráž nad Nisou República Checa |
| 22. | Antolín Ostrava | República Checa | Na Rovince 912, Hrabová, 720 00 Ostrava |
| 23. | Antolín Turnov | República Checa | Průmyslová 3000, 511 01 Turnov |
| 24. | Antolín Liban | República Checa | Komenského 30, 507 23 Libán |
| 25. | Antolin Deutschland | Alemania | Am Ziegelwerk 1, 85391 Allershausen |
| 26. | Antolín Bamberg | Alemania | Kronacherstraße 70-80, 96052 Bamberg |
| 27. | Antolín Logistik Deutschland | Alemania | Am Coloneum 4, 50829 Colonia |

4

| 28. | Antolín Straubing | Alemania | Stettiner Str. 7, 94315 Straubing |
|---|---|---|---|
| 29. | Antolín Interiors México | México | Blvd. Jesús Valdez Sánchez 728, Zona Centro, 25350 Arteaga, Coah., México |
| 30. | Antolín Silao | México | Av. Ingenieros 411, Parque Industrial FIPASI, 36100 Silao de la Victoria, Gto., México |
| 31. | Antolín Saltillo | México | Doctor, Blvd. Jesús Valdez Sánchez s/n, Parque Industrial, 25350 Arteaga, Coah., México |
| 32. | Antolín Tlaxcala | México | Virgen de la Caridad 19 Vesta Park Tlaxcala I Parque Industrial Xicontecatl II, 90500 Huamantla, Tlax., México |
| 33. | Antolín Cuautitlán | México | Av. Tlaloc Manzana 003, Axotlan, 54719 Cuautitlán Izcalli, Méx., México |
| 34. | Antolín Lusitânia | Portugal | Zona industrial cerca de Vila Nova de Cerveira, Viana do Castelo, Portugal, 4920-247 Lusitania, Portugal |
| 35. | Antolin Bratislava | Eslovaquia | Opletalova 73, 841 07 Devínska Nová Ves, Eslovaquia |

12.   Se aporta como **Conjunto Documental nº 3** los certificados registrales de cada Sociedad Solicitante y como **Conjunto Documental nº 3 bis**, traducción simple de aquellos certificados que están en idiomas distintos al español.

13.   Las Filiales Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Ingeniería, Antolín Plasbur y Antolín RyA (en adelante, las "**Filiales Españolas**") tienen el domicilio en Burgos, coincidiendo con su centro de intereses principal ("**COMI**"), como veremos.

14.   En cuanto al resto de Filiales (las "**Filiales Extranjeras**"), aunque su domicilio social se encuentre fuera de España, todas ellas mantienen su COMI en Burgos, tal y como se desarrolla a continuación al explicar el modelo de negocio y esquema decisor del Grupo Antolín.

15.   En efecto, el Grupo Antolín opera a nivel internacional a través de un modelo de negocio integrado y centralizado en Burgos. Las Filiales del Grupo –tanto las Filiales Españolas como las Filiales Extranjeras– se organizan en tres categorías funcionales diferenciadas: (i) Antolín Ingeniería, sociedad con domicilio social en Burgos, que tiene suscrito un contrato marco con Antolín Irausa para el desarrollo de I+D+i para el Grupo Antolín; (ii) las plantas productivas (las "**Plantas**")[2], dedicadas a la fabricación de componentes y a las operaciones logísticas

---

[2] Se corresponden con: Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Plasbur, Antolín RyA, Antolín Interiors UK, Antolín Leamington, Antolín Alabama, Antolín Interiors USA, Antolín Shelby, Antolín Missouri, Antolín Kentucky, Antolín Michigan, Antolín Sibiu, Antolín Silesia, Antolin South

asociadas; y (iii) las Oficinas Técnico-Comerciales[3] (en adelante, "**OTCs**"), que prestan servicios de soporte comercial, técnico, de innovación y corporativo.

16.   Tanto las Plantas como las OTCs operan bajo la dirección y supervisión de Antolín Irausa y, en lo que a I+D+i se refiere, de Antolín Ingeniería. Siendo que las decisiones se adoptan por sus órganos sociales desde Burgos o por directivos en Burgos. Así, las Filiales se limitan a la ejecución de instrucciones y directrices que se les transmiten desde dicha ciudad.

17.   Las relaciones entre Antolín Irausa y las Plantas se regulan a través de contratos denominados "*Principal Master Agreements*" (los "**PMAs**"), suscritos entre Antolín Irausa –en calidad de "Principal"– y cada una de las Plantas. En virtud de estos contratos, Antolín Irausa asume la condición de empresario (entrepreneur) del negocio, definiendo la estrategia empresarial a nivel mundial, desarrollando y manteniendo los activos intangibles del Grupo y asumiendo las consecuencias económicas últimas de los riesgos significativos del negocio. Las Plantas, por su parte, quedan relegadas a funciones puramente productivas –gestión de pedidos, fabricación, control de calidad y entrega de productos– bajo la dirección y supervisión de Antolín Irausa, sin autonomía decisoria propia. En este sentido, las decisiones de estas entidades se adoptan desde Burgos.

18.   Por su parte, las relaciones entre Antolín Irausa y Antolín Ingeniería con las Filiales que ostentan la condición de OTCs –en concreto, Antolin Deutschland, Antolin UK y Antolín North America– se regulan a través de un conjunto de contratos de prestación de servicios ("**Contratos OTC**") que comprenden, entre otros, servicios de apoyo comercial, servicios de soporte corporativo, servicios de desarrollo y mantenimiento, servicios de actividad industrial, servicios de innovación y servicios de actividad técnico-comercial.

19.   El matiz relevante de todos estos Contratos OTC es que son las OTCs las que prestan servicios de colaboración a Antolín Irausa y, en el caso de los contratos de innovación, a Antolín Ingeniería, que son quienes verdaderamente desarrollan las funciones estratégicas, limitándose las OTCs a implementar los modelos de actividad empresarial diseñados desde Burgos.

20.   A mayor abundamiento, Antolín Irausa mantiene con todas sus Filiales un sistema de gestión centralizada de tesorería (bajo el modelo habitual de unidad de caja), instrumentado a través de acuerdos de *cash pooling*.

---

Africa, Antolín Bohemia, Antolín Ostrava, Antolín Turnov, Antolín Liban, Antolín Bamberg, Antolín Logistik Deutschland, Antolín Straubing, Antolín Interiors Mexico, Antolín Saltillo, Antolín Tlaxcala, Antolín Cuautitlán, Antolín Silao, Antolin Lusitania, Antolín Bratislava.

[3] Se corresponden con: Antolín UK, Antolín Deutschland y  Antolín North America.

21.   Asimismo, los órganos de administración de las Filiales están compuestos, con carácter general, por personas de nacionalidad española y residentes en España. En aquellos casos en los que, por razones legales[4] u operativas del país en cuestión, ha sido preciso incluir en el órgano de administración a personas del país donde se ubica la Planta o la OTC, las decisiones continúan tomándose desde España. Además, Dña. Cristina Blanco Santo Tomás, Consejera Delegada de Antolín Irausa, además de administradora, ostenta por lo general poderes solidarios en las distintas Filiales Extranjeras en las que existe representación local en sus órganos de administración, de modo que, con independencia de ese componente local, el control efectivo de la dirección resida en Burgos. Aportamos como **Documento nº 4** cuadro de elaboración propia a partir de los certificados aportados como Documento nº 3, que resume las personas que forman parte del órgano de administración de las Filiales.

22.   A todo lo anterior se suma que, desde Burgos, Antolín Irausa remite a todas las Filiales protocolos y modelos de actuación estandarizados que deben ser seguidos por la totalidad de los empleados del Grupo a nivel mundial, lo que abarca desde manuales operativos y guías de procedimientos hasta modelos de negocio, calendarios de producción y directrices corporativas. Esta estandarización global de procesos, decidida e implementada desde la sede central en Burgos, constituye un indicio adicional de que el centro neurálgico de la gestión y dirección del Grupo se encuentra inequívocamente en dicha ciudad.

23.   Es especialmente relevante destacar que este modelo operativo ha sido analizado y validado por la administración tributaria española. En efecto, con fecha 21 de marzo de 2024, la Agencia Estatal de la Administración Tributaria aprobó un Acuerdo Previo de Valoración de carácter unilateral (el "**APA**") suscrito con Antolín Irausa, con efectos para los ejercicios 2024 a 2027, que tiene por objeto la valoración de las operaciones vinculadas realizadas entre las entidades del Grupo. En su análisis funcional, el APA confirma que el Grupo Antolín opera bajo un modelo de gestión industrial y comercial integrado que supone una homogeneización y estandarización de los procesos productivos y comerciales, así como una concentración y centralización en la toma de decisiones en Burgos.

24.   Tanto la documentación contractual mencionada, el APA, y demás documentación mencionada contiene información de carácter sensible y confidencial del funcionamiento del Grupo Antolín, motivo por el que no se aporta a este escrito. Sin perjuicio de lo anterior, esta parte se pone a disposición de Su Señoría para aportar la referida documentación si se estimase conveniente.

25.   En definitiva, de todo lo anterior se desprende que, a pesar de que las Filiales Extranjeras tienen su domicilio social fuera de España, su centro de intereses principales se localiza

---

[4] Entre las que figuran la conveniencia a efectos de reducir la carga fiscal.

inequívocamente en Burgos, foro desde el que se dirige la estrategia global del Grupo, se toman todas las decisiones empresariales relevantes, se gestionan los clientes y los contratos, se centraliza la tesorería, se desarrolla y controla la innovación y el know-how industrial, y se irradian las directrices corporativas que rigen la totalidad de la actividad del Grupo Antolín a nivel mundial.

**1.3 Motivo de la Solicitud de nombramiento de Experto en la Reestructuración**

26. La presente Solicitud de nombramiento del Experto en la Reestructuración viene motivada por la voluntad de las Sociedades Solicitantes de explorar, de manera proactiva y en el marco de los instrumentos que ofrece el TRLC, alternativas que permitan optimizar la estructura de su pasivo financiero y reforzar la viabilidad sostenible de las Sociedades Solicitantes a medio y largo plazo.

27. Tres son los factores principales que han llevado a las Sociedades Solicitantes a considerar oportuna la designación de un experto en la reestructuración en este momento:

**(i)  El contexto macroeconómico y geopolítico actual y su incidencia sobre el sector de la automoción**

28. El sector de la automoción atraviesa un período de incertidumbre sin precedentes en las últimas décadas, derivado de la confluencia de múltiples factores exógenos que están impactando de forma severa en la cadena de valor del automóvil y, muy en particular, en la industria de fabricantes de componentes, segmento en el que opera el Grupo Antolín.

29. La política arancelaria impulsada por la Administración de los Estados Unidos de América desde el inicio de la segunda legislatura del Presidente Trump ha alterado profundamente las condiciones de competencia en el mercado norteamericano. El anuncio e imposición progresiva de aranceles a la importación de vehículos y componentes de automoción no fabricados en territorio estadounidense ha generado un impacto directo sobre el conjunto de la industria automovilística global y, de forma particularmente acusada, sobre los proveedores de componentes europeos con presencia industrial en Estados Unidos, entre los que se encuentra el Grupo Antolín.

30. Este contexto adverso no es ajeno al Grupo Antolín. Las propias cuentas anuales consolidadas de Antolín Irausa del ejercicio 2024 ya advierten en el Informe de Gestión Consolidado sobre el impacto negativo que la coyuntura global (incluyendo las políticas arancelarias de Estados Unidos de América) podía tener en el sector y en la actividad del Grupo. Se aportan las cuentas

anuales consolidadas de Antolín Irausa y sociedades dependientes del ejercicio 2024 como **Documento nº 5**.

### (ii)   Adquisición de Magna International

31. A los factores sectoriales y geopolíticos anteriormente mencionados se suma el elevado endeudamiento que el Grupo Antolín arrastra desde la adquisición del negocio de interiores de la multinacional canadiense Magna International (conocido como "*Magna Interiors*"). Esta operación estratégica permitió a Grupo Antolín consolidarse como uno de los principales proveedores mundiales de componentes de interior para automóviles, duplicando su tamaño hasta alcanzar ventas superiores a 4.000 millones de euros y una plantilla de aproximadamente 28.000 empleados[5]. No obstante, las necesidades financieras para acometer dicha adquisición incrementaron significativamente el nivel de apalancamiento del Grupo Antolín.

32. La adecuada integración financiera de Magna International se vio gravemente comprometida por dos crisis consecutivas de carácter excepcional: primero, la pandemia de COVID-19 en 2020, que paralizó temporalmente la producción automovilística mundial; y después, el estallido de la guerra de Ucrania en febrero de 2022, que provocó tensiones en las cadenas de suministro y un encarecimiento generalizado de materias primas y energía. Estos factores externos, completamente ajenos a la voluntad y gestión del Grupo, impidieron que Grupo Antolín pudiera reducir su endeudamiento al ritmo inicialmente previsto.

33. En la actualidad, el Grupo Antolín ha logrado recuperar sus márgenes operativos y presenta una situación de negocio sólida, con una cartera de clientes diversificada y una posición competitiva reforzada. Sin embargo, dicha recuperación ha sido reciente, cuando la estructura financiera del Grupo Antolín ya se encontraba comprometida por el elevado apalancamiento heredado de la adquisición de Magna Interiors—agravado por las crisis exógenas sobrevenidas—, lo que genera una carga financiera que el Grupo Antolín prevé que sea difícilmente sostenible a medio y largo plazo. Por ello, resulta conveniente abordar este proceso para garantizar la viabilidad y competitividad de las Sociedades Solicitantes a medio y largo plazo.

### (iii)   La estructura del pasivo financiero de las Sociedades Solicitantes y la conveniencia de su acomodación a las circunstancias actuales

34. Sin perjuicio de que las Sociedades Solicitantes vienen cumpliendo puntualmente con sus obligaciones de pago y con los compromisos financieros asumidos frente a sus acreedores,

---

[5] Grupo Antolín publicó esta operación en su web corporativa: https://www.antolin.com/es/grupo-antolin-cierra-la-adquisicion-de-magna-interiors-para-ofrecer-el-interior-completo-del y https://www.antolin.com/es/grupo-antolin-acuerda-la-adquisicion-de-la-mayor-parte-del-negocio-de-interiores-de-magna.

ostentan un volumen de pasivo financiero relevante cuya estructura, en el contexto macroeconómico descrito, exige de su acomodación con el fin de dotarlas de una mayor solidez y flexibilidad financiera a medio y largo plazo, garantizando su viabilidad a futuro.

35. A los efectos de que este Ilustre Tribunal cuente con una visión general de la deuda financiera que podría ser objeto de reestructuración, se exponen, a continuación, los principales instrumentos financieros que integran el pasivo de las Sociedades Solicitantes de conformidad con lo dispuesto en las últimas cuentas anuales consolidadas del Grupo publicadas correspondientes al ejercicio 2024, que se han acompañado como Documento nº 5 (las "**CCAA 2024**") y los contratos financieros suscritos con posterioridad:

   a) *Obligaciones y bonos*

36. Antolín Irausa tiene en circulación dos emisiones de bonos sénior a largo plazo, ambas cotizadas en el mercado Euro MTF de Luxemburgo:

   (i)    Una emisión de bonos sénior garantizados realizada el 29 de junio de 2021 por un importe de 390.000.000 euros, con vencimiento el 30 de abril de 2028 ("**Bonos 2028**"), esto es, en un escenario inferior a dos años.

   (ii)   Una emisión bonos sénior garantizados realizada el 31 de julio de 2024 por un importe nominal de 250.000.000 euros, con vencimiento el 30 de enero de 2030 ("**Bonos 2030**" y, juntamente con los Bonos 2028, los "**Bonos**").

   b) *Contrato de Financiación Sindicada*

37. El 13 de marzo de 2014, Antolín Irausa, como deudora, y determinadas sociedades del Grupo como garantes, suscribieron un contrato de financiación sindicada con un conjunto de entidades financieras (actuando Deutsche Bank AG, London Branch, como agente y agente de garantías) por un importe inicial de 200.000.000 de euros ,que ha ido ampliándose a través de novaciones modificativas y no extintivas, así como textos refundidos (tal y como el mismo ha sido novado y refundido en cada momento, el "**Contrato de Financiación Sindicada**"). El Contrato de Financiación Sindicada prevé vencimientos en todos los años desde este 2026 hasta 2029.

   c) *Préstamos del Banco Europeo de Inversiones (BEI)*

38. Antolín Irausa como deudora y varias sociedades del Grupo Antolín como garantes han suscrito varios préstamos a largo plazo con el Banco Europeo de Inversiones ("**BEI**") como acreedor:

10

(i) el contrato de financiación denominado "*Antolin Car Interiors RDI*" suscrito el 12 de junio de 2018 (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación BEI I**");

(ii) el contrato de financiación denominado "*Antolin Car Interiors RDI B*" suscrito el 23 de diciembre de 2020 (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación BEI II**" y, juntamente con el Contrato de Financiación BEI I, los "**Contratos de Financiación BEI**").

39. En relación con los Préstamos del Banco Europeo de Inversiones se prevén vencimientos en 2026, 2027 y 2028.

40. Los Bonos, el Contrato de Financiación Sindicada, los Contratos de Financiación BEI y el Contrato de Financiación ICO (tal y como se define a continuación) están garantizados solidariamente por las Sociedades Solicitantes y por derechos reales de prenda sobre el 100% de las acciones de Antolín Irausa, todos ellos con carácter *pari passu*.

### d) *Otras financiaciones posteriores*

41. Como es lógico la deuda financiera del Grupo no ha permanecido estática en los últimos dos años, siendo que han tenido lugar modificaciones, por suscripción de nuevos contratos de financiación y cancelación de otros (como, por ejemplo, el préstamo de COFIDES que aparece en las CCAA 2024, que ha sido objeto de su íntegra amortización ordinaria conforme al calendario pactado).

42. Dentro de las financiaciones suscritas con posterioridad a las CCAA 2024, destacamos a modo ejemplificativo, que no limitativo, el contrato de financiación sindicada y con aval del Estado en virtud de la línea de avales concedida a empresas del Real Decreto-Ley 4/2025, de 8 de abril, de Medidas Urgentes de Respuesta a la Amenaza Arancelaria y de Relanzamiento Comercial, suscrito el 4 de agosto de 2025 por, entre otros, Antolín Irausa, Antolín Aragusa, Antolín Eurotrim, Antolín Ingeniería, Antolín Plasbur y Antolín RyA, como deudores; determinadas sociedades del Grupo Antolín, como garantes personales; Banco Bilbao Vizcaya Argentaria, S.A., como agente; Deutsche Bank AG, London Branch, como agente de garantías; y un conjunto de entidades, como acreedores (tal y como el mismo haya sido novado en cada momento, el "**Contrato de Financiación ICO**"). El Contrato de Financiación ICO tiene vencimientos previstos para 2027, 2028, 2029 y 2030 en adelante.

11

*e) Otras financiaciones bilaterales*

43. Adicionalmente, también podría requerirse la afectación al plan de reestructuración de otras financiaciones bilaterales como serían:

(i) Las líneas de avales suscritas entre Antolín Irausa, por un lado, y varias entidades financieras, por otro (las "**Líneas de Avales Ordinarios**");

(ii) La línea suscrita entre Antolín Irausa y Deutsche Bank de emisión de avales garantizadas con derechos de prenda sobre imposiciones de plazo fijo (la "**Línea de Avales Privilegiados**");

(iii) La línea de crédito denominada "Net Overdraft Facility" sujeta a la ley de Países Bajos y suscrita el 3 de junio de 2019 entre HSBC Continental Europe, The Netherlands (anteriormente, HSBC France, Amsterdam Branch) y Antolín Irausa (tal y como el mismo haya sido novado en cada momento, la "**Línea Bilateral HSBC**");

(iv) Los préstamos bilaterales suscritos por las Sociedades Solicitantes (los "**Préstamos Bilaterales**");

*f) Financiación intragrupo*

44. A su vez, quedarían necesariamente incluidos, por exigencias legales, dentro del perímetro de afectación del posible plan de reestructuración todos los préstamos suscritos intragrupo.

**(iii)    Conclusión**

45. Si bien la concentración de vencimientos más significativa no se producirá hasta 2028[6], el volumen y la complejidad de la estructura de financiación descrita, unido al contexto macroeconómico y sectorial expuesto, aconsejan que las Sociedades Solicitantes actúen con la diligencia y previsión que la situación demanda, explorando fórmulas que permitan, en su caso, adaptar y optimizar dicha estructura para asegurar la viabilidad.

46. Las Sociedades Solicitantes pueden hacer uso de los mecanismos que el TRLC pone a disposición de los deudores, en línea con los principios informadores de la Directiva (UE) 2019/1023, que aboga expresamente por la utilización de mecanismos de alerta temprana y

---

[6] A pesar de los vencimientos mencionados en cada instrumento financiero, en la mayor parte de los mismos el vencimiento podría anticiparse a octubre de 2027 para el caso de que los Bonos 2028 no fueran refinanciados entonces.

marcos de reestructuración preventiva que permitan anticipar soluciones antes de que las dificultades financieras se materialicen o agraven. En este sentido, la designación del experto en la reestructuración constituye un paso esencial para facilitar las negociaciones con los acreedores financieros y sentar las bases de una reestructuración ordenada, negociada y ajustada a Derecho en probabilidad de insolvencia.

47. Para ello, las Sociedades Solicitantes consideran plenamente eficiente y coherente proceder al nombramiento de un único experto en la reestructuración para todas ellas, con el fin de que pueda desempeñar de forma efectiva sus funciones, pues la complejidad de la configuración de las Sociedades Solicitantes hace necesario el nombramiento de un único experto que disponga de una visión global e integral del conjunto de las Sociedades Solicitantes.

**SEGUNDA -   PROCEDIMIENTO PARA EL NOMBRAMIENTO DEL EXPERTO**

48. El artículo 672 TRLC establece aquellos supuestos en los que procede solicitar el nombramiento de experto en reestructuración, entre los que se incluyen la solicitud del deudor.

49. El procedimiento para el nombramiento de experto en la reestructuración se prevé como un trámite no contradictorio, que surte efectos de forma automática siempre y cuando (i) sea solicitado por, entre otros, el deudor; (ii) el experto cumpla con los requisitos exigidos en el artículo 674 TRLC; y (iii) no se encuentre en ningún supuesto de prohibición o incompatibilidad del artículo 675 TRLC.

50. Por tanto, una vez confirmado por Su Señoría la legitimación de las Sociedades Solicitantes para instar la designación del experto en la reestructuración, dicho nombramiento debe realizarse "*a la mayor brevedad posible y, en todo caso, dentro del plazo de dos días*"[7] en la persona propuesta por las Sociedades Solicitantes si concurren, como es el presente caso, y se acredita, como realizaremos en la siguiente alegación, los requisitos que establece el TRLC.

**TERCERA -   CUMPLIMIENTO DE LOS REQUISITOS PARA EL NOMBRAMIENTO DE LEXAUDIT COMO EXPERTO EN LA REESTRUCTURACIÓN**

**3.1 Experiencia y conocimientos de LEXAUDIT para el ejercicio del cargo (art.672.2. 1.º TRLC)**

---

[7] *Vid*. artículo 672.3. TRLC.

51. El requisito establecido por el TRLC para el nombramiento de un experto en la restructuración consiste en acreditar la posesión de conocimientos especializados y experiencia en materia de reestructuraciones y/o cumplir los requisitos para ser administrador concursal (alternativamente). Así, de conformidad con el artículo 674 TRLC que regula las condiciones subjetivas para la designación:

> "*El nombramiento de experto deberá recaer en la persona natural o jurídica, española o extranjera, que tenga los conocimientos especializados, jurídicos, financieros y empresariales, así como experiencia en materia de reestructuraciones o que acredite cumplir los requisitos para ser administrador concursal conforme a esta ley"*.

52. LEXAUDIT cumple con todas las condiciones subjetivas para ser el experto en la reestructuración de las Sociedades Solicitantes. LEXAUDIT es una firma con una gran experiencia en el campo de las reestructuraciones y la insolvencia, habiendo participado tanto como asesor o experto independiente de carácter económico-financiero en este tipo de procesos, y contando entre sus filas con abogados y economistas de primer nivel con capacidad y experiencia suficiente en proyectos análogos. Se adjunta como **Documento nº 6** dossier explicativo del bagaje de LEXAUDIT, incluyendo la acreditación profesional de la firma en procesos concursales y de reestructuración de elevada complejidad.

53. Asimismo, LEXAUDIT no incurriría en ninguno de los supuestos de incompatibilidad y prohibiciones previstas en el artículo 675 TRLC. En particular, LEXAUDIT (i) no ha prestado servicios profesionales relacionados con la reestructuración de las Sociedades Solicitantes, ni de personas especialmente relacionadas con ésta, en los dos años anteriores a la presentación de este escrito; y (ii) no se encuentra en ninguna de las situaciones de incompatibilidad previstas en la legislación en materia de auditoría de cuentas frente a los Deudores o cualquiera de sus personas especialmente relacionadas[8].

**3.2. Aceptación del nombramiento, importe y plazos de devengo en la retribución de LEXAUDIT (art. 672.2.2º TRLC)**

54. LEXAUDIT ha aceptado el encargo propuesto por las Sociedades Solicitantes en lo relativo a los honorarios y los plazos de devengo de su retribución de conformidad con lo dispuesto en el artículo 672.2.2º del TRLC[9]. Se aporta la carta suscrita por LEXAUDIT aceptando su

---

[8] La declaración de LEXAUDIT sobre la ausencia de incompatibilidades o prohibiciones para el ejercicio de su cargo consta en el Documento nº 6 que acompaña a este escrito.

[9] La retribución pactada y su forma de devengo se explicita en el Documento nº 6 que se acompaña a este escrito.

14

nombramiento como experto en la reestructuración de las Sociedades Solicitantes como **Documento nº 7**.

55. La firma LEXAUDIT cuenta con una dilatada experiencia en procesos de reestructuración empresarial, habiendo intervenido como experto en numerosos procedimientos de este tipo. Entre los casos más relevantes en los que ha participado, tanto en condición de experto en la reestructuración como de asesor de los acreedores afectados y/o del deudor, destacan los relacionados en el Documento nº 6, en los que ha participado brindando soluciones viables para la continuidad de la actividad, la satisfacción de los acreedores y la preservación del empleo.

**3.3. Seguro de responsabilidad civil vigente contratado por LEXAUDIT (art. 672.2.3º TRLC)**

56. En cumplimiento del último de los requisitos, LEXAUDIT y la entidad aseguradora AXA SEGUROS, S.A. DE SEGUROS Y REASEGUROS han suscrito un seguro de responsabilidad civil con una cobertura por importe de 4.000.000 euros, que cubre las eventuales contingencias derivadas de su labor como experto en la reestructuración. Se aporta copia de la póliza como **Documento nº 8** y copia del certificado emitido por la citada aseguradora que acredita la vigencia de dicha póliza de responsabilidad civil como **Documento nº 9**.

**CUARTA -      ASPECTOS PROCESALES DE LA SOLICITUD**

**4.1. Competencia y jurisdicción**

    **a)  Competencia por centro de intereses**

57. En lo que respecta a la competencia territorial para conocer la presente Solicitud, así como el posterior expediente de homologación del plan de reestructuración, esta recae en los Juzgados de lo Mercantil de Burgos en virtud de los artículos 45[10] y 641 TRLC, por cuanto, como se ha explicado, las Sociedades Solicitantes tienen su centro de intereses principales en la ciudad de Burgos – en concreto en Calle Vitoria 307, 09007 Burgos, donde se encuentran las oficinas centrales del Grupo – desde donde que se toman la totalidad de las decisiones de gestión y desde donde se genera la actividad del Grupo Antolín.

---

[10] La definición de centro principal de intereses la ofrece el propio art. 45.1 TRLC: "La competencia para declarar y tramitar el concurso corresponde al juez en cuyo territorio tenga el deudor el centro de sus intereses principales. Por centro de los intereses principales se entenderá el lugar donde el deudor ejerce de modo habitual y reconocible por terceros la administración de tales intereses".

58. Así, en Antolín Irausa y las Filiales Españolas el domicilio social coincide con el centro principal de intereses. En lo que se refiere a las Filiales Extranjeras, que son plantas y delegaciones comerciales con domicilio social[11]– Republica Checa, Alemania, Méjico, Portugal, Eslovaquia, Reino Unido, Estados Unidos, Rumanía, Polonia y Sudáfrica – el centro de intereses principales se encuentra igualmente en la ciudad de Burgos, desde, como hemos visto, se toman las decisiones de gestión del negocio a nivel global y se centralizan las actividades de dirección industrial, dirección comercial, finanzas, compras y recursos humanos, entre otras.

59. A la vista de lo anterior, podemos concluir que el centro de intereses principales de todas las Sociedades Solicitantes se localiza en Burgos, motivo por el cual la presente solicitud de nombramiento de experto se dirige al Tribunal de Instancia de esa localidad.

   **b) Competencia en planes conjuntos de reestructuración**

60. En particular, el artículo 672.4 TRLC establece que, en caso de planes conjuntos de reestructuración, se podrá designar el mismo experto para todos los deudores afectados: "1. **En el caso** de comunicación conjunta o de **planes conjuntos de reestructuración, se podrá designar el mismo experto para todos los deudores afectados**". (énfasis y subrayado añadido)

61. El nombramiento de un único experto en la reestructuración responde a criterios de racionalidad y eficiencia, ya que este experto asume, entre otras, la tarea de la elaboración del informe de valoración de la empresa en funcionamiento, tarea que exige conocer en detalle la exposición de la deudora frente a otras sociedades del grupo, para determinar con precisión su valor real[12].

62. Así, el Auto del Juzgado de lo Mercantil N.º 5 de Madrid, de 4 de mayo de 2023 (LA LEY 187107/2023) considera que deberán observarse las normas previstas en los artículos 45 y 46 del TRLC —que regulan la competencia para conocer de concursos singulares y conexos— y, además, que: "**aunque no se encuentre expresamente previsto dicho nombramiento conjunto, es lo más prudente atendiendo a que se puede producir una posterior comunicación conjunta de todas las sociedades para cuyo nombramiento de experto se solicita, o para algunas de ellas, etc., y en el mismo sentido forman parte o pueden formar parte del ulterior plan de reestructuración** ya sea presentado a homologación o no; además

---

[11] En este sentido, la previsión del art. 45.2 TRLC sobre que se presume que el centro de sus intereses principales se halla en el lugar del domicilio social admite prueba en contrario, como ha ocurrido en este caso.

[12] PULGAR EZQUERRA, J., en Comentarios al Texto Refundido de la Ley Concursal, Editorial La Ley Soluciones Legales, 2023.

16

con el nombramiento de dicho experto para todas las sociedades del grupo se produce el efecto de la posibilidad en su caso del art 637 TRLC en relación con una posterior solicitud de concurso por el deudor" (énfasis y subrayado añadido).

63. En consecuencia, la falta de presentación de una comunicación de inicio de negociaciones conjunta respecto del Grupo Antolín no es obstáculo para que ahora se solicite de manera conjunta el nombramiento de LEXAUDIT como experto en la reestructuración de las Sociedades Solicitantes[13].

### 4.2. Legitimación

64. Las Sociedades Solicitantes ostentan legitimación activa para la presentación de esta solicitud en virtud del artículo 672.1. 1º TRLC, en su condición de deudoras.

### 4.3. Representación procesal y defensa técnica

65. Las Sociedades Solicitantes están representadas por el procurador que suscribe y asistidas por los letrados cuyos datos identificativos constan en el pie de firma del presente escrito.

### 4.4. Procedimiento

66. La presente comunicación se encauza en los trámites previstos en los artículos 672 y ss. TRLC.

67. Si bien la redacción del TRLC no precisa el momento desde el que el deudor puede solicitar el nombramiento del experto en reestructuraciones, no existe óbice alguno para que dicha solicitud se lleve a cabo sin que se haya presentado la comunicación del artículo 585 TRLC.

68. Por lo tanto, toda vez que las Sociedades Solicitantes han acreditado el cumplimiento de los requisitos de los artículos 674 y 675 TRLC, y acompañando al presente escrito todos los documentos que establece el artículo 672 TRLC, procede acordar el nombramiento del Experto en la Reestructuración.

69. Así lo ha entendido el Juzgado de lo Mercantil núm. 2 de Barcelona en su Sentencia de 29 de noviembre de 2022 (LA LEY 298450/2022), al considerar que "el juez solo debe efectuar un control de legalidad, atendidos los parámetros legalmente tasados de los artículos 674 y 675 del TRLC, así como verificar que a la solicitud de nombramiento se acompañan los documentos

---

[13] *Vid*. en este sentido NIETO DELGADO, C., "El experto en la reestructuración", en COHEN BENCHETRIT, A., *Nuevo Marco Jurídico de la Reestructuración de Empresas en España*, Aranzadi, Navarra, 2023.

17

del artículo 672-2 del mismo texto legal" o el Juzgado de lo Mercantil núm. 5 de Madrid en el ya mencionado Auto de 4 de mayo de 2023 en virtud del cual: "el nombramiento es obligatorio para el juez, en la persona que ha designado el deudor, salvo que considere el juez que no reúne dichas condiciones".

Por lo expuesto,

**SUPLICO AL TRIBUNAL** que tenga por presentada la presente Solicitud de designación de Experto en la Reestructuración de las sociedades Grupo Antolín-Irausa, S.A.U., Grupo Antolín-Aragusa, S.A.U., Grupo Antolín-Autotrim, S.A.U., Grupo Antolín-Eurotrim, S.A.U., Grupo Antolín-Glass, S.A.U., Grupo Antolín-Ingeniería, S.A.U., Grupo Antolín-Plasbur, S.A.U., Grupo Antolín-RyA, S.A.U., Antolin Interiors UK Limited, Grupo Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolín North America, Inc., Antolín Alabama, LLC, Antolin Interiors USA, Inc., Antolín Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolín Kentucky, Inc., Grupo Antolín Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Grupo Antolín South Africa (PTY) Ltd., Grupo Antolín Bohemia, a.s., Grupo Antolín Ostrava, s.r.o., Grupo Antolín Turnov, s.r.o., Antolin Liban, s.r.o., Antolin Deutschland GmbH, Grupo Antolín Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolín Interiors México, S.A. de C.V., Grupo Antolín Silao, S.A. de C.V., Grupo Antolín Saltillo, S.R.L. de C.V., Grupo Antolín Tlaxcala, S.R.L. de C.V., Grupo Antolín Cuautitlán, S.R.L. de C.V., Grupo Antolín Lusitânia, Componentes Automóvel, Unipessoal, Lda., y Grupo Antolín Bratislava, s.r.o., se sirva a admitirla y, sin más trámite, dicte Auto por el que acuerde nombrar a **LEXAUDIT CONCURSAL, S.L.P.** experto en la reestructuración en los términos previstos en el artículo 672.3 TRLC.

**OTROSÍ PRIMERO DIGO**: que, al amparo de lo dispuesto en el artículo 591 TRLC, y el artículo 232 de la Ley Orgánica 6/1985, de 1 de julio, del Poder Judicial ("**LOPJ**"), esta parte solicita respetuosamente que el presente procedimiento de nombramiento de experto en la reestructuración se tramite con **carácter reservado**, sin que tenga lugar su publicación en el Registro Público Concursal o, subsidiariamente, que la referida publicación se realice sin publicación del nombre de las Sociedades Solicitantes del nombramiento.

Esta solicitud se fundamenta en las siguientes consideraciones:

(i) Las Sociedades Solicitantes operan en el sector de la automoción como proveedores de primer nivel de prácticamente la totalidad de los principales fabricantes de automóviles del mundo. La mera publicidad de la tramitación de un procedimiento de esta naturaleza

18

podría generar una percepción negativa en el mercado y entre los clientes, proveedores y contrapartes comerciales de las Sociedades Solicitantes, con un riesgo cierto de deterioro de las relaciones comerciales y de la confianza inversora, precisamente en un momento en que resulta esencial preservar la estabilidad operativa para garantizar el éxito de la reestructuración pretendida.

(ii) La estructura de financiación de las Sociedades Solicitantes incluye dos emisiones de bonos sénior cotizados en el mercado Euro MTF de Luxemburgo, lo que implica que cualquier información relativa a procedimientos de reestructuración podría tener un impacto inmediato en la cotización de dichos instrumentos y en la percepción del mercado de capitales, dificultando las negociaciones con los acreedores financieros que precisamente se pretenden facilitar con la designación del Experto.

(iii) El artículo 591 TRLC permite expresamente que la comunicación de apertura de negociaciones con los acreedores se realice con carácter reservado, lo que resulta igualmente predicable de los actos preparatorios y previos a dicha comunicación, como lo es el nombramiento de experto en la reestructuración, en tanto que acto instrumental y preparatorio del proceso de reestructuración. En efecto, la finalidad tuitiva que subyace a la reserva —proteger al deudor de los efectos perjudiciales que la publicidad prematura de una situación de dificultad financiera puede ocasionar— concurre con igual o mayor intensidad en esta fase inicial del procedimiento.

En virtud de todo lo anterior,

**SUPLICO AL TRIBUNAL** que, a la vista de las circunstancias expuestas, acuerde: (i) la tramitación con **carácter reservado** del presente procedimiento de nombramiento de experto en la reestructuración, y (ii) la no publicación del nombramiento de experto en el Registro Público Concursal o, subsidiariamente, su publicación sin el nombre de las Sociedades Solicitantes.

**OTROSÍ SEGUNDO DIGO**: que las Sociedades Solicitantes manifiestan su intención de subsanar cualquier defecto en que pudiera haber incurrido tanto en el fondo como en la forma, incluyendo la aportación de cualesquiera documentos adicionales que este Iltre. Juzgado considere pertinentes, conforme a lo dispuesto en los artículos 243.3 y 4 de la Ley Orgánica 6/1985, de 1 de julio, del Poder Judicial (en adelante, la **LOPJ**), y el artículo 231 de la LEC y demás preceptos que resulten de aplicación.

**SUPLICO AL TRIBUNAL** que tenga por efectuada la anterior manifestación a efectos de lo dispuesto en los artículos 243.3 y 4 de la LOPJ y el artículo 231 de la LEC y demás que resulten de aplicación y, en su virtud, se otorgue plazo de subsanación en caso de que existiera cualquier defecto.

Es Justicia que pido en Burgos, a 28 de abril de 2026.

RODRIGO LOPEZ GONZALEZ

Firmado digitalmente por RODRIGO LOPEZ GONZALEZ
Fecha: 2026.04.28 10:00:29 +02'00'

ESTEBAN RUIZ MIGUEL ANGEL - 13131884B

Digitally signed by ESTEBAN RUIZ MIGUEL ANGEL - 13131884B
DN: C=ES, SERIALNUMBER= IDCES-13131884B, G=MIGUEL ANGEL, SN=ESTEBAN RUIZ, CN= ESTEBAN RUIZ MIGUEL ANGEL - 13131884B
Reason: I am the author of this document
Location:
Date: 2026.04.28 11:16:34+02'00'
Foxit PDF Reader Version: 2023.2.0

_____

Rodrigo López González

Col. ICAM 77.858

_____

Miguel Ángel Esteban

Procurador de los Tribunales

BLANCA MORENO HERRERO

Firmado digitalmente por BLANCA MORENO HERRERO
Fecha: 2026.04.28 09:55:30 +02'00'

_____

Blanca Moreno Herrero

Col. ICAM 114.390

20

 

**Mensaje LexNET - Acuse - Iniciador Asunto**　　　　　　　　　　　　**Fecha Generación: 28/04/2026 12:27**

<span style="color:red">Mensaje</span>

| | |
|---|---|
| **IdLexNet** | 1202610875103135 |
| **IdLexnet Del Mensaje Enviado** | 202610875103135 |
| **Asunto** | Derecho mercantil |
| **Remitente** | ESTEBAN RUIZ, MIGUEL ANGEL [112] |
| | **Colegio de Procuradores** Ilustre Colegio de Procuradores de Burgos |
| **Destinatarios** | **Órgano** SRR. CIVIL DEL TI de Burgos, Burgos [0905900042] |
| | **Tipo de órgano** Tribunal de Instancia. Sección Civil/Juzgado de Primera Instancia(CIVIL) |
| | **Oficina de registro** SRR. CIVIL DEL TI de Burgos [0905900042] |
| **Fecha-hora envío** | 28/04/2026 12:27:40 |
| **Documentos** | GA IRAUSA Y OTRAS Solicitud de Nombramiento de experto.pdf(Principal) — Descripción: SOLICITUD NOMBRAMIENTO EXPERTO / Catalogación: DEMANDA / Hash del Documento: 548711a3a472789e545671c526436160968f75134038a2d0367485138b877a43 |
| | 20260428122708_Justificante LexNET.pdf(Anexo) — Descripción: JUSTIFICANTE EXCESO CABIDA / Catalogación: EXCESO DE CABIDA LEXNET / Hash del Documento: e6e51cb36ef6efc824ff08f3d6f6aff1dd9ad4376f83a3143ff3c85ab2e08692 |
| | Documentación incompleta por tamaño |

| Datos del Procedimiento | Intervinientes | | |
|---|---|---|---|
| | | NO CONSTA GRUPO ANTOLIN SIBIU SRL<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN KENTUCKY INC<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN LIAMINGTON LIMITED<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA ANTOLIN STRAUBING GMBH<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN NORTH AMERICA INC<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN BRATISLAVA SRO<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN KENTUCKY INC<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN EUROTRIM SAU<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |

| | | | |
|---|---|---|---|
| | | NO CONSTA ANTOLIN LIBAN SRO<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN ARAGUSA SAU<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN SILAO SA DE CV<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN MISSOURI LLC<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA ANTOLIN SHELBY INC<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN BAMBERG GMBH & KG<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN BOHEMIA AS<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN OSTRAVA SRO<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA ANTOLIN INTERIORS UK LIMITED<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |

| | | | |
|---|---|---|---|
| | | NO CONSTA GRUPO ANTOLIN INGENIERIA SAU<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GUPO ANTOLIN PLASBUR SAU<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN IRAUSA SAU<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN ARAGUSA SAU<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN GLASS SAU<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN AUTOTRIM SAU<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN TLAXCALA SRL DE CV<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN CUAUTITLAN SRL DE CV<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN UK LIMITED<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |

| | | | |
|---|---|---|---|
| | | NO CONSTA ANTOLIN DEUTSCHLAND GMBH<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA ANTOLIN INTERIORS MEXICO SA DE CB<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA ANTOLIN INTERIORS USA INC<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA ANTOLIN INTERIORS UK LIMITED<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN EUROTRIM SAU<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN AUTOTRIM SAU<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN MICHIGAN INC<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA ANTOLIN ALABAMA LLC<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA GRUPO ANTOLIN OUTH AFRICA PTY LTD<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |

| | | NO CONSTA GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH<br><br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | **Materia** | Derecho mercantil | |
| | **Tipo Cuantia** | No procede | |

(*) Todas las horas referidas por LexNET son de ámbito Peninsular.





**Mensaje LexNET - Acuse - Iniciador Asunto**                                    **Fecha Generación: 04/05/2026 11:33**

Mensaje

| | |
|---|---|
| **IdLexNet** | 1202610876539577 |
| **IdLexnet Del Mensaje Enviado** | 202610876539577 |
| **Asunto** | Derecho mercantil |
| **Remitente** | ESTEBAN RUIZ, MIGUEL ANGEL [112] |
| | **Colegio de Procuradores** | Ilustre Colegio de Procuradores de Burgos |
| **Destinatarios** | **Órgano** | SRR. CIVIL DEL TI de Burgos, Burgos [0905900042] |
| | **Tipo de órgano** | Tribunal de Instancia. Sección Civil/Juzgado de Primera Instancia(CIVIL) |
| | **Oficina de registro** | SRR. CIVIL DEL TI de Burgos [0905900042] |
| **Fecha-hora envío** | 04/05/2026 11:32:56 |
| **Documentos** | GA IRAUSA Y OTRAS Solicitud de Nombramiento de experto.pdf(Principal) | Descripción: SOLICITUD NOMBRAMIENTO EXPERTO<br>Catalogación: DEMANDA<br>Hash del Documento:<br>548711a3a472789e545671c526436160968f75134038a2d0367485138b877a43 |
| | 20260504113217_Justificante LexNET.pdf(Anexo) | Descripción: JUSTIFICANTE EXCESO CABIDA<br>Catalogación: EXCESO DE CABIDA LEXNET<br>Hash del Documento:<br>4091b4bc8741319da7fcd6cdefe72920fb1fc1abf0ddb84e37df7d70cd834263 |
| | Documentación incompleta por tamaño | |

| Datos del Procedimiento | Intervinientes | | |
|---|---|---|---|
| | | NO CONSTA Grupo Antolín-Irausa, S.A.U [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín-Aragusa, S.A.U. [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Autotrim, S.A.U. [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín-Eurotrim, S.A.U [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín-Glass, S.A.U. [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín-Ingeniería, S.A.U. [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín-Plasbur, S.A.U. [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín-RyA, S.A. [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolin Interiors UK Limited [DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |

| | | | |
|---|---|---|---|
| | | NO CONSTA Grupo Antolin Leamington Limited<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolin UK Limited<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín North America, Inc.<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolín Alabama, LLC<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolin Interiors USA, Inc.<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolín Shelby, Inc.<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA  Grupo Antolin Missouri, LLC<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Kentucky, Inc<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Michigan, Inc<br>[DTE] Demandante | **Representantes Procesales**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |

| | | | |
|---|---|---|---|
| | | NO CONSTA  Grupo Antolin Sibiu SRL<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolin Silesia Sp. z o.o<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín South Africa PTY Ltd<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Bohemia, a.s.<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Ostrava, s.r.o<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Turnov, s.r.o.<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA  Antolin Liban, s.r.o.<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolin Deutschland GmbH<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Bamberg GmbH Co. KG<br>[DTE] Demandante | **Representantes Procesales** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |

| | | NO CONSTA Grupo Antolin Logistik Deutschland GmbH<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolin Straubing GmbH<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Antolín Interiors México, S.A. de C.V.<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Silao, S.A. de C.V<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Saltillo, S.R.L. de C.V.<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Tlaxcala, S.R.L. de C.V<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Cuautitlán, S.R.L. de C.V.<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Lusitania-Componentes Automóvel, Unipessoal, Lda.<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | | NO CONSTA Grupo Antolín Bratislava, s.r.o<br>[DTE] Demandante | **Representantes Procesales**<br><br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Ilustre Colegio de Procuradores de Burgos |
| | **Materia** | Derecho mercantil | |
| | **Tipo Cuantia** | No procede | |





NOTIFICADO
**08 - MAYO - 2026**
Miguel Angel Esteban Ruiz

**TRIBUNAL DE INSTANCIA**
**SECCION DE LO MERCANTIL**
**PLAZA N° 1 DE BURGOS**

**SERVICIO COMUN TRAMITACION CIVIL, C/A y SOCIAL - BURGOS**
**Teléfono: 0034947284185**

AVDA REYES CATOLICOS, 51 BIS
**Teléfono:** 947284055
**Correo electrónico:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Equipo/usuario: GC1
Modelo: M62660 DIOR DANDO CUENTA PRESENTACION COMUNICACION ART.5

**N.I.G.:** 09059 42 1 2026 0003344
**CLC COMUNIC PREVIA CONCURSO Y HOMOLOGACION JUDIC 0000310 / 2026**
Procedimiento origen:   /
**Sobre OTRAS MATERIAS CONCURSALES**
DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE
D/ña. GRUPO ANTOLIN IRAUSA SA, GRUPO ANTOLIN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GRUPO ANTOLIN BRATISLAVA SRO
Procurador/a Sr/a. MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ
Abogado/a Sr/a. BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ

Cuenta Depósitos y Consignaciones en entidad BANCO SANTANDER.
Cuenta Expediente: 1067 0000 52 0310 26
Beneficiario: PLAZA N° 1 DE LA SECCION DE LO MERCANTIL DEL TRIBUNAL DE INSTANCIA DE BURGOS
Para ingresos por transferencia: ES55 0049 3569 9200 0500 1274. Concepto: 1067 0000 52 0310 26



**FIRMA (1):** Beatriz Briones Santamaria (06/05/2026 13:39)



ADMINISTRACION
DE JUSTICIA

### DILIGENCIA DE ORDENACIÓN

Sr./a. Letrado/a de la Administración de Justicia
D./Dña. BEATRIZ BRIONES SANTAMARIA

En BURGOS, a seis de mayo de dos mil veintiséis.

Presentada solicitud de **nombramiento de experto en la reestructuración** y que este recaiga en la mercantil **LEXAUDIT CONCURSAL, S.L.P.** por el Procurador MIGUEL ÁNGEL ESTEBAN RUIZ, en nombre y representación de **ANTOLÍN IRAUSA, S.A., y sus filiales**, nacionales e internacionales, fórmense los correspondientes autos, que quedan registrados como **CLC 310/2026** y fórmese la correspondiente pieza a fin de dar cuenta a SSª para acordar lo procedente sobre la petición.

**MODO DE IMPUGNACIÓN:** Contra la presente resolución cabe interponer recurso de **reposición** en el plazo de **cinco días**, desde el día siguiente al de su notificación, ante el Letrado de la Administración de Justicia que la dicta. Debiendo expresar en el mismo la infracción en que la resolución hubiera incurrido a juicio del recurrente (arts. 451 y 452 LEC).

Para la interposición del recurso será preciso la consignación como depósito de **25,00 €** en la cuenta arriba indicada.

Lo acuerdo y firmo. Doy fe.

**EL/LA LETRADO/A DE LA ADMINISTRACIÓN DE JUSTICIA**



---

**FIRMA (1):** Beatriz Briones Santamaria (06/05/2026 13:39)



La difusión del texto de esta resolución a partes no interesadas en el proceso en el que ha sido dictada sólo podrá llevarse a cabo previa disociación de los datos de carácter personal que los mismos contuvieran y con pleno respeto al derecho a la intimidad, a los derechos de las personas que requieran un especial deber de tutelar o a la garantía del anonimato de las víctimas o perjudicados, cuando proceda.

Los datos personales incluidos en esta resolución no podrán ser cedidos, ni comunicados con fines contrarios a las leyes.



FIRMA (1): Beatriz Briones Santamaria (06/05/2026 13:39)





NOTIFICADO
**08 - MAYO - 2026**
Miguel Angel Esteban Ruiz

**TRIBUNAL DE INSTANCIA**
**SECCION DE LO MERCANTIL**
**PLAZA N° 1 DE BURGOS**


**SERVICIO COMUN TRAMITACION CIVIL, C/A y SOCIAL - BURGOS**
**Teléfono: 0034947284185**
AVDA REYES CATOLICOS, 51 BIS
**Teléfono:** 947284055
**Correo electrónico:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Equipo/usuario: GC1
Modelo: S40040 DILIGENCIA ORDENACION TEXTO LIBRE ART 206.2 1º LEC

**N.I.G.:** 09059 42 1 2026 0003344
**PCI PIEZA CUESTION INCIDENTAL ESPECIAL PRONUNCIAM 0000310 / 2026 0001 – NOMBRAMIENTO DE EXPERTO EN LA REESTRUCTURACIÓN.**
Procedimiento origen: CLC COMUNIC PREVIA CONCURSO Y HOMOLOGACION JUDIC 0000310 / 2026
**Sobre OTRAS MATERIAS CONCURSALES**
 D/ña.
Procurador/a Sr/a.
Abogado/a Sr/a.
 D/ña.
Procurador/a Sr/a.
Abogado/a Sr/a.

Cuenta Depósitos y Consignaciones en entidad BANCO SANTANDER.
Cuenta Expediente: 1067 0000 52 0310 26
Beneficiario: PLAZA N° 1 DE LA SECCION DE LO MERCANTIL DEL TRIBUNAL DE INSTANCIA DE BURGOS
Para ingresos por transferencia: ES55 0049 3569 9200 0500 1274. Concepto: 1067 0000 52 0310 26


**DILIGENCIA DE ORDENACIÓN**

Sr./a. Letrado/a de la Administración de Justicia
D./Dña. BEATRIZ BRIONES SANTAMARIA

En BURGOS, a seis de mayo de dos mil veintiséis.

Formada la presente pieza de nombramiento de experto en la reestructuración, conforme al art. 672.3 del TRLC, dese cuenta a SSª para acordar lo procedente, de dicha solicitud formulada por GUPO ANTOLÍN IRAUSA, S.A., con sus filiales, nacionales e internacionales:

1°.- Instan que el **nombramiento** de experto en la reestructuración recaiga sobre la mercantil **LEXAUDIT CONCURSAL, S.L.P.**

2°.- Instan el **carácter reservado** de la solicitud y, en su caso, del nombramiento del experto en la reestructuración.

**MODO DE IMPUGNACIÓN:** Contra la presente resolución cabe interponer recurso de **reposición** en el plazo de **cinco días**, desde el día siguiente al de su notificación, ante el Letrado de la Administración de Justicia que la dicta. Debiendo expresar en el mismo la infracción en que la resolución



**Código Seguro de Verificación: E04799402-MI:MUdx-6abt-oS44-gHAj-C**
Puede verificar este documento en https://www.administraciondejusticia.gob.es

**FIRMA (1):** Beatriz Briones Santamaria (06/05/2026 14:10)



hubiera incurrido a juicio del recurrente (arts. 451 y 452 LEC).

Para la interposición del recurso será preciso la consignación como depósito de **25,00 €** en la cuenta arriba indicada.

Lo acuerdo y firmo. Doy fe.

**EL/LA LETRADO/A DE LA ADMINISTRACIÓN DE JUSTICIA**



**FIRMA (1):** Beatriz Briones Santamaria (06/05/2026 14:10)



La difusión del texto de esta resolución a partes no interesadas en el proceso en el que ha sido dictada sólo podrá llevarse a cabo previa disociación de los datos de carácter personal que los mismos contuvieran y con pleno respeto al derecho a la intimidad, a los derechos de las personas que requieran un especial deber de tutelar o a la garantía del anonimato de las víctimas o perjudicados, cuando proceda.

Los datos personales incluidos en esta resolución no podrán ser cedidos, ni comunicados con fines contrarios a las leyes.



FIRMA (1): Beatriz Briones Santamaria (06/05/2026 14:10)



**ADMINISTRACION DE JUSTICIA**



NOTIFICADO
**21 - MAYO - 2026**
Miguel Angel Esteban Ruiz

## TRIBUNAL DE INSTANCIA
## SECCION DE LO MERCANTIL
## PLAZA N° 1
## BURGOS

AUTO: 00089 / 2026
### SERVICIO COMUN TRAMITACION CIVIL, C/A y SOCIAL - BURGOS

AVDA REYES CATOLICOS, 51 BIS
**Teléfono:** 947284055
**Correo electrónico:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Equipo/usuario: GC1
Modelo: N37190 AUTO LIBRE PONIENDO FIN AL PROCEDIMIENTO

**N.I.G.:** 09059 42 1 2026 0003344
**PCI PIEZA CUESTION INCIDENTAL ESPECIAL PRONUNCIAM 0000310 / 2026 0001 – NOMBRAMIENTO DE EXPERTO EN LA REESTRUCTURACIÓN –**
Procedimiento origen: CLC COMUNIC PREVIA CONCURSO Y HOMOLOGACION JUDIC 0000310 / 2026
**Sobre OTRAS MATERIAS CONCURSALES**
DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE
D/ña. GRUPO ANTOLIN IRAUSA SA, GRUPO ANTOLIN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GRUPO ANTOLIN BRATISLAVA SRO
Procurador/a Sr/a. MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ
Abogado/a Sr/a. BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO



## <u>AUTO</u> <u>89/2026</u>

En Burgos, a catorce de mayo de dos mil veintiséis

**HECHOS**

**FIRMA (1):** Ana Isabel Lopez Perez (19/05/2026 22:50)          **FIRMA (2):** Beatriz Briones Santamaria (20/05/2026 09:08)



**ÚNICO.** Por Diligencia de Ordenación de fecha de 6 de mayo de 2026 se ha acordado formar la presente pieza separada incidental de especial pronunciamiento para dar curso a la solicitud de designación de experto en reestructuración presentada por el Procurador D. MIGUEL ÁNGEL ESTEBAN RUIZ en nombre y representación de la mercantil **GRUPO ANTOLÍN-IRAUSA, S.A.U.**, en la que se propone que dicho nombramiento recaiga en la entidad LEXAUDIT CONCURSAL, S.L.P., debiendo darse al mismo un carácter reservado.

## RAZONAMIENTOS JURÍDICOS

**PRIMERO. De las condiciones subjetivas y del régimen de incompatibilidades y de prohibiciones de los expertos en la reestructuración**

1) Condiciones subjetivas

Se encuentran reguladas en el artículo 674 del Real Decreto Legislativo 1/2020, de 5 de mayo, por el que se aprueba el texto refundido de la Ley Concursal (T.R.L.C.). Allí se indica que *"el nombramiento de experto deberá recaer en la persona natural o jurídica, española o extranjera, que tenga los conocimientos especializados, jurídicos, financieros y empresariales, así como experiencia en materia de reestructuraciones o que acredite cumplir los requisitos para ser administrador concursal conforme a esta ley. Cuando la reestructuración que se pretende conseguir tuviera particularidades, bien por el sector en el que opera el deudor, bien por las dimensiones o la complejidad del activo o del pasivo, bien por la existencia de elementos transfronterizos, estas particularidades deberán ser tenidas en cuenta para el nombramiento del experto".*

2) Régimen de incompatibilidades y prohibiciones



El artículo 675 T.R.L.C. señala al respecto que *"no podrán ser propuestos ni nombrados expertos en la reestructuración y,*

---



*en caso de ser nombrados, no podrán aceptar las siguientes personas:*

*1.° Quienes hayan prestado servicios profesionales relacionados con la reestructuración al deudor o a personas especialmente relacionadas con éste en los últimos dos años, salvo que se prestaran como consecuencia de haber sido nombrado experto en una reestructuración previa.*

*2.° Quienes se encuentren en alguna de las situaciones de incompatibilidad previstas en la legislación en materia de auditoría de cuentas en relación con el deudor o las personas especialmente relacionadas con éste".*

**SEGUNDO. Del estatuto del experto en la reestructuración**

El estatuto del experto en la reestructuración se encuentra regulado en los artículos 679 a 681 T.R.L.C., en los siguientes términos:

1) Funciones del experto

Se señala en el artículo 679 T.R.L.C. que "*el experto asistirá al deudor y a los acreedores en las negociaciones y en la elaboración del plan de reestructuración, y elaborará y presentará al juez los informes exigidos por esta ley y aquellos otros que el juez considere necesarios o convenientes".*

2) Deberes de diligencia, independencia e imparcialidad

Refiere el artículo 680 T.R.L.C. que "*el experto ejercerá las funciones propias del cargo con la diligencia propia de un profesional especializado en reestructuraciones y con independencia e imparcialidad tanto respecto del deudor como de los acreedores".*

3) Responsabilidad civil del experto

Al respecto, el artículo 681 T.R.L.C. determina que:





*"1. El experto responderá por los daños y perjuicios causados al deudor o a los acreedores por infracción de los deberes de diligencia, independencia e imparcialidad.*

*2. El experto deberá tener suscrito un seguro de responsabilidad civil o garantía equivalente proporcional a la naturaleza y alcance del riesgo cubierto por cuya virtud el asegurador o entidad de crédito se obligue dentro de los límites pactados, a cubrir el riesgo del nacimiento a cargo del propio experto asegurado de la obligación de indemnizar por los daños y perjuicios causados en el ejercicio de su función. Cuando el experto sea una persona jurídica recaerá sobre esta la exigencia de suscripción del seguro de responsabilidad civil o garantía equivalente.*

*3. La acción de responsabilidad se tramitará por los cauces del incidente concursal".*

**TERCERO. Del nombramiento obligatorio del experto en la reestructuración y de la documentación que debe acompañarse a la solicitud**

El artículo 672.1. 1º T.R.L.C. señala que el nombramiento del experto en la reestructuración sólo procederá, entre otros supuestos, cuando así lo haya solicitado el deudor. Dicha petición deberá ir acompañada de una serie de documentos, a saber:

1) Un escrito razonando que el experto reúne las condiciones establecidas en la legislación concursal para el ejercicio del cargo.

2) La aceptación de su nombramiento por el experto para el caso de ser designado, así como la aceptación del importe y los plazos de devengo de la retribución que se hubiese pactado.

3) Una copia de la póliza de seguro de responsabilidad civil o garantía equivalente que tuviera vigente para responder de los





posibles daños que el experto pudiera causar en el ejercicio de las funciones propias del cargo.

**CUARTO. Análisis del supuesto de hecho planteado; decisión**

En el supuesto de autos, se entiende que la entidad cuyo nombramiento como experto en la reestructuración es propugnado por la solicitante se ajusta al cumplimiento de los requisitos legales previamente desgranados: en efecto, la petición se ha presentado junto con un documento, identificado bajo el número 6, en el que se detallan la identidad de los integrantes de LEXAUDIT CONCURSAL, S.L.P., todos ellos con una dilatada experiencia profesional en el ámbito concursal (en el caso de los socios fundadores, superior a los treinta años), y las numerosas operaciones de reestructuración de deuda en las que han intervenido prestando servicios de asesoramiento legal y/o financiero o como expertos en la reestructuración durante los últimos cinco años. De ello se colige que goza de un conocimiento suficiente y adecuado para acometer correctamente las tareas vinculadas a la reestructuración de la deuda que arrastra GRUPO ANTOLÍN-IRAUSA, S.A.U. También se ha presentado un documento, identificado como número 7, de aceptación de la eventual designación, de fijación de honorarios y de manifestación de no estar incursa en ninguna de las causas de prohibición o incompatibilidad para el ejercicio del cargo que se encuentran previstas en la legislación concursal, además de un certificado emitido por la compañía aseguradora Axa Seguros, S.A. de seguros y reaseguros, designado como documento núm. 8, que acredita que LEXAUDIT CONCURSAL, S.L.P. tiene suscrita una póliza de seguro de responsabilidad civil profesional que se encontraba vigente en el momento de proponerse su designación (véase el documento núm. 9). En definitiva, y conforme a lo previsto en el artículo 672.3 T.R.L.C., procede acceder al nombramiento del experto en la reestructuración que se ha solicitado, al que se dotará del carácter reservado que ha sido expresamente solicitado por el peticionario mediante la aplicación analógica de la norma



**FIRMA (1):** Ana Isabel Lopez Perez (19/05/2026 22:50)          **FIRMA (2):** Beatriz Briones Santamaria (20/05/2026 09:08)



regulada en el artículo 591 T.R.L.C. acerca de la publicidad de la resolución en la que se tenga por efectuada la comunicación de apertura de negociaciones con los acreedores, a la que alude el artículo 585 del mismo cuerpo legal.

Vistos los preceptos legales indicados y demás de general y pertinente aplicación, procede

### PARTE DISPOSITIVA

ESTIMAR la solicitud de designación de experto en la reestructuración efectuada por el Procurador D. MIGUEL ÁNGEL ESTEEBAN RUIZ en nombre y representación de la mercantil **GRUPO ANTOLÍN-IRAUSA, S.A.U.** y, en consecuencia, nombrar como tal a la entidad LEXAUDIT CONCURSAL, S.L.P., con NIF B65697740, con domicilio en la calle Alfonso XII, núm. 4, 2° Izqda., C.P. 28014, en Madrid, con número de teléfono 915-230-223 y dirección de correo electrónico info@lexaudit.com.

La designación del experto y su identidad tendrán carácter reservado (artículo 591 T.R.L.C.).

**MODO DE IMPUGNACIÓN:** el nombramiento como experto en reestructuración de quien no reúna las condiciones establecidas en la legislación concursal, incurra en alguna de las causas de incompatibilidad o de prohibición para desempeñar dicho cargo o de quien no tenga cobertura o garantía adecuada podrá ser impugnado en cualquier momento por quien acreditare tener interés legítimo en el asunto a través del cauce procesal del incidente concursal (artículo 677 T.R.L.C.).



Así, por este Auto, lo pronuncia, manda y firma DÑA. ANA ISABEL LÓPEZ PÉREZ, Magistrada-Juez de la plaza núm. de la Sección de lo Mercantil del Tribunal de Instancia de Burgos.

**LA MAGISTRADA-JUEZ**          **LA LETRADA DE LA ADMINISTRACIÓN DE JUSTICIA**

---

**FIRMA (1):** Ana Isabel Lopez Perez (19/05/2026 22:50)          **FIRMA (2):** Beatriz Briones Santamaria (20/05/2026 09:08)







La difusión del texto de esta resolución a partes no interesadas en el proceso en el que ha sido dictada sólo podrá llevarse a cabo previa disociación de los datos de carácter personal que los mismos contuvieran y con pleno respeto al derecho a la intimidad, a los derechos de las personas que requieran un especial deber de tutelar o a la garantía del anonimato de las víctimas o perjudicados, cuando proceda.

Los datos personales incluidos en esta resolución no podrán ser cedidos, ni comunicados con fines contrarios a las leyes.



**FIRMA (1):** Ana Isabel Lopez Perez (19/05/2026 22:50)          **FIRMA (2):** Beatriz Briones Santamaria (20/05/2026 09:08)

**Pieza Cuestión Incidental Especial 310/2026-0001 – Nombramiento de Experto en la Reestructuración**

| | |
|---|---|
| **Solicitantes:** | Grupo Antolín Irausa S.A.U. y otras |
| **Procurador:** | D. Miguel Ángel Esteban |
| | |
| **Escrito:** | Solicitud de rectificación de error material y subsidiario complemento |

## A LA SECCIÓN DE LO MERCANTIL DEL
## TRIBUNAL DE INSTANCIA DE BURGOS, PLAZA Nº 1

**D. Miguel Ángel Esteban**, Procurador de los Tribunales y de Grupo Antolín-Irausa, S.A.U. ("**Antolín Irausa**"), Grupo Antolín-Aragusa, S.A.U., Grupo Antolín-Autotrim, S.A.U., Grupo Antolín-Eurotrim, S.A.U., Grupo Antolín-Glass, S.A.U., Grupo Antolín-Ingeniería, S.A.U., Grupo Antolín-Plasbur, S.A.U., Grupo Antolín-RyA, S.A.U., Antolin Interiors UK Limited, Grupo Antolin Leamington Limited, Grupo Antolin UK Limited, Grupo Antolín North America, Inc., Antolín Alabama, LLC, Antolin Interiors USA, Inc., Antolín Shelby, Inc., Grupo Antolin Missouri, LLC, Grupo Antolín Kentucky, Inc., Grupo Antolín Michigan, Inc., Grupo Antolin Sibiu SRL, Antolin Silesia Sp. z o.o. , Grupo Antolín South Africa (PTY) Ltd., Grupo Antolín Bohemia, a.s., Grupo Antolín Ostrava, s.r.o., Grupo Antolín Turnov, s.r.o., Antolin Liban, s.r.o, Antolin Deutschland GmbH, Grupo Antolín Bamberg GmbH & Co. KG, Grupo Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolín Interiors México, S.A. de C.V., Grupo Antolín Silao, S.A. de C.V., Grupo Antolín Saltillo, S.R.L. de C.V., Grupo Antolín Tlaxcala, S.R.L. de C.V., Grupo Antolín Cuautitlán, S.R.L. de C.V., Grupo Antolín Lusitânia-Componentes Automóvel, Unipessoal, Lda., y Grupo Antolín Bratislava, s.r.o. (todas ellas, las "**Sociedades Solicitantes**") según la representación que consta debidamente acreditada en los autos al margen referenciados, comparezco ante este Ilustre Tribunal, y como mejor proceda en Derecho **DIGO**:

**I.** El 28 de abril de 2026, todas las referidas Sociedades Solicitantes instaron el nombramiento de **LEXAUDIT CONCURSAL, S.L.P.** ("LEXAUDIT, o el "**Experto**") como experto en la reestructuración respecto de la totalidad de las Sociedades Solicitantes, al amparo de lo dispuesto en los artículos 672 y siguientes del Real Decreto Legislativo 1/2020, de 5 de mayo, por el que se aprueba el texto refundido de la Ley Concursal ("**TRLC**").

**II.** Que, con fecha 21 de mayo de 2026, ha sido notificado a esta parte el Auto de este Ilustre Tribunal de 14 de mayo de 2026 (el "**Auto**") por el que se estima la solicitud de

1

nombramiento LEXAUDIT, aunque únicamente – y entendemos que por mero error material – en relación con la matriz Antolín Irausa, sin referencia a sus filiales (el resto de Sociedades Solicitantes), como es de ver en la parte dispositiva del Auto.

**III.** Que, con el debido respeto y en estrictos términos de defensa, considerando como decimos que el Auto adolece de un mero error material por omisión, por medio del presente escrito y de conformidad con lo previsto en los artículos 214 y 215 de la Ley 1/2000, de 7 de enero, de Enjuiciamiento Civil ("**LEC**") y en el art. 267 de la Ley Orgánica 6/1985, de 1 de julio, del Poder Judicial ("**LOPJ**"), vengo a solicitar la **RECTIFICACIÓN** y **SUBSIDIARIO COMPLEMENTO** del Auto, con base en las siguientes

## ALEGACIONES

**Primera. -** **El Auto adolece de un error material por omisión susceptible de ser rectificado *ex*. artículo 214 LEC al referirse en el dispositivo únicamente a Antolín Irausa como sociedad respecto a la que se designa a LEXAUDIT como experto en la reestructuración, sin incluir al resto de Sociedades Solicitantes**

1. Con fecha 28 de abril de 2026, las Sociedades Solicitantes presentaron conjuntamente escrito de solicitud de nombramiento de experto en la reestructuración. En dicho escrito se expuso que la solicitud se formulaba en nombre y representación de las treinta y seis Sociedades Solicitantes, Antolín Irausa y todas sus filiales (directas e indirectas) que se indican en el encabezado.

2. El Auto estima la solicitud y designa a LEXAUDIT como experto en la reestructuración, con carácter reservado *ex*. artículo 591 TRLC. Sin embargo, su parte dispositiva únicamente se refiere a Antolín Irausa como entidad respecto de la que se acuerda el nombramiento, sin que conste pronunciamiento alguno respecto de las restantes Sociedades Solicitantes en cuyo nombre también se formuló la solicitud.

3. Lo anterior evidencia, entendemos, que se trata de una mera omisión involuntaria en la identificación de las Sociedades Solicitantes contenida en el dispositivo del Auto.

4. Así, el artículo 214.1 LEC establece que los tribunales podrán rectificar en cualquier momento los errores materiales manifiestos y los aritméticos contenidos en sus resoluciones. Concurren en el presente caso los presupuestos de dicho precepto: (i) se trata de un error material manifiesto, detectable por la mera confrontación del escrito de solicitud con el Auto dictado; (ii) no supone una alteración del sentido de la resolución, pues esta es estimatoria de la solicitud

2

formulada; y (iii) su rectificación no implica un cambio en la fundamentación jurídica ni en el fallo de la resolución.

5. Por todo lo anterior, en virtud de lo dispuesto en el artículo 214.1 de la LEC, se solicita a este Ilustre Tribunal que rectifique el Auto en el sentido de extender expresamente el nombramiento de LEXAUDIT como experto en la reestructuración a la totalidad de las Sociedades Solicitantes, también con carácter reservado.

**Segunda. -** **Con carácter subsidiario respecto de la Alegación Primera, el Auto adolecería de una omisión que debe ser completada, al no contener pronunciamiento expreso respecto de las restantes Sociedades Solicitantes aparte de Antolín Irausa**

6. Con carácter subsidiario, para el caso de que el Tribunal considerase que no nos encontramos ante un supuesto de rectificación de error material, sino ante una omisión de pronunciamiento, formulamos solicitud de complemento del Auto al amparo del artículo 215 LEC.

7. El artículo 215.2 LEC establece que, si se hubiere omitido en una resolución manifiestamente un pronunciamiento relativo a una pretensión oportunamente deducida, podrá solicitarse su complemento dentro de los cinco días siguientes a la notificación de la resolución.

8. En la solicitud de esta parte se dedujo de forma expresa y clara la pretensión de que el nombramiento de LEXAUDIT como experto en la reestructuración se acordase respecto de todas las Sociedades Solicitantes, y no únicamente respecto de la matriz Antolín Irausa. Sin embargo, como se ha expuesto, el dispositivo del Auto únicamente se refiere al nombramiento del Experto respecto de Antolín Irausa, omitiendo pronunciamiento alguno respecto de las restantes Sociedades Solicitantes.

9. Por consiguiente, se interesa que este Tribunal complemente el Auto mediante un pronunciamiento expreso que extienda el nombramiento de LEXAUDIT como experto, también con carácter reservado, en la reestructuración a todas las Sociedades Solicitantes para subsanar la omisión advertida conforme a lo previsto en el artículo 215.2 LEC.

Por lo expuesto,

**SUPLICO AL TRIBUNAL**, que tenga por presentado este escrito, se sirva admitirlo, y tenga por solicitada la **RECTIFICACIÓN** y subsidiario **COMPLEMENTO** del Auto de 14 de mayo de 2026, a los efectos de que se extienda el nombramiento de LEXAUDIT CONCURSAL,

3

S.L.P. como experto en la reestructuración de todas las Sociedades Solicitantes, con carácter reservado.

Es Justicia que pido en Burgos, a 22 de mayo de 2026.

RODRIGO LOPEZ GONZALEZ
Firmado digitalmente por RODRIGO LOPEZ GONZALEZ
Fecha: 2026.05.22 10:36:38 +02'00'

ESTEBAN RUIZ MIGUEL ANGEL - 13131884B
Digitally signed by ESTEBAN RUIZ MIGUEL ANGEL - 13131884B
DN: C=ES, SERIALNUMBER=IDCES-13131884B, G=MIGUEL ANGEL, SN=ESTEBAN RUIZ, CN=ESTEBAN RUIZ MIGUEL ANGEL - 13131884B
Reason: I am the author of this document
Location:
Date: 2026.05.22 11:27:11+02'00'
Foxit PDF Reader Version: 2023.2.0

_____

Rodrigo López González

Col. ICAM 77.858

_____

Miguel Ángel Esteban

Procurador de los Tribunales

BLANCA MORENO HERRERO
Firmado digitalmente por BLANCA MORENO HERRERO
Fecha: 2026.05.22 10:38:37 +02'00'

_____

Blanca Moreno Herrero

Col. ICAM 114.390

4



NOTIFICADO
**02 - JUNIO - 2026**
Miguel Angel Esteban Ruiz

**TRIBUNAL DE INSTANCIA**
**SECCION DE LO MERCANTIL**
**PLAZA N° 1 DE BURGOS**

**SERVICIO COMUN TRAMITACION CIVIL, C/A y SOCIAL - BURGOS**

AVDA REYES CATOLICOS, 51 BIS
**Teléfono:** 947284055
**Correo electrónico:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Equipo/usuario: GC1
Modelo: S40040 DILIGENCIA ORDENACION TEXTO LIBRE ART 206.2 1° LEC

**N.I.G.:** 09059 42 1 2026 0003344

**PCI PIEZA CUESTION INCIDENTAL ESPECIAL PRONUNCIAM 0000310 / 2026 0001**

Procedimiento origen: CLC COMUNIC PREVIA CONCURSO Y HOMOLOGACION JUDIC 0000310 / 2026
**Sobre OTRAS MATERIAS CONCURSALES**
DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE
D/ña. GRUPO ANTOLIN IRAUSA SA, GRUPO ANTOLIN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GRUPO ANTOLIN BRATISLAVA SRO
Procurador/a Sr/a. MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ
Abogado/a Sr/a. BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO

Cuenta Depósitos y Consignaciones en entidad BANCO SANTANDER.
Cuenta Expediente: 1067 0000 52 0310 26
Beneficiario: PLAZA N° 1 DE LA SECCION DE LO MERCANTIL DEL TRIBUNAL DE INSTANCIA DE BURGOS
Para ingresos por transferencia: ES55 0049 3569 9200 0500 1274. Concepto: 1067 0000 52 0310 26



**FIRMA (1):** Beatriz Briones Santamaria (29/05/2026 14:59)



## DILIGENCIA DE ORDENACIÓN

Sr./a. Letrado/a de la Administración de Justicia
D./Dña. BEATRIZ BRIONES SANTAMARIA

En BURGOS, a veintinueve de mayo de dos mil veintiséis.

Presentado escrito, registrado con el nº 42.254, por el Procurador MIGUEL ÁNGEL ESTEBAN RUIZ, en nombre y representación de **GRUPO ANTOLÍN IRAUSA, S.A.U. y sus filiales** (identificadas en la cabecera de esta pieza concursal), solicitando, al amparo del artículo 214.3 de la Ley de Enjuiciamiento Civil, **rectificación de error** material producido en el **Auto 89/2026**, de fecha 14 de mayo, alegando que el nombramiento de LEXAUDIT como experto en la reestructuración únicamente se refiere al GRUPO ANTOLÍN IRAUSA y no a sus filiales, únase y dése cuenta a S.Sª. para acordar lo procedente.

**MODO DE IMPUGNACIÓN:** Contra la presente resolución cabe interponer recurso de **reposición** en el plazo de **cinco días**, desde el día siguiente al de su notificación, ante el Letrado de la Administración de Justicia que la dicta. Debiendo expresar en el mismo la infracción en que la resolución hubiera incurrido a juicio del recurrente (arts. 451 y 452 LEC).

Para la interposición del recurso será preciso la consignación como depósito de **25,00 €** en la cuenta arriba indicada.

Lo acuerdo y firmo. Doy fe.

**EL/LA LETRADO/A DE LA ADMINISTRACIÓN DE JUSTICIA**



FIRMA (1): Beatriz Briones Santamaria (29/05/2026 14:59)



La difusión del texto de esta resolución a partes no interesadas en el proceso en el que ha sido dictada sólo podrá llevarse a cabo previa disociación de los datos de carácter personal que los mismos contuvieran y con pleno respeto al derecho a la intimidad, a los derechos de las personas que requieran un especial deber de tutelar o a la garantía del anonimato de las víctimas o perjudicados, cuando proceda.

Los datos personales incluidos en esta resolución no podrán ser cedidos, ni comunicados con fines contrarios a las leyes.



**FIRMA (1):** Beatriz Briones Santamaria (29/05/2026 14:59)



ADMINISTRACION
DE JUSTICIA

**TRIBUNAL DE INSTANCIA**
**SECCION DE LO MERCANTIL**
**PLAZA N° 1 DE BURGOS**

**SERVICIO COMUN TRAMITACION CIVIL, C/A y SOCIAL - BURGOS**

AVDA REYES CATOLICOS, 51 BIS
**Teléfono:** 947284055
**Correo electrónico:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Equipo/usuario: GC1
Modelo: S40010 AUTO TEXTO LIBRE ART 206.1 2° LEC

**N.I.G.:** 09059 42 1 2026 0003344
**PCI PIEZA CUESTION INCIDENTAL ESPECIAL PRONUNCIAM 0000310 / 2026 0001**

Procedimiento origen: CLC COMUNIC PREVIA CONCURSO Y HOMOLOGACION JUDIC 0000310 / 2026
**Sobre OTRAS MATERIAS CONCURSALES**
DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE, DEMANDANTE DEMANDANTE
D/ña. GRUPO ANTOLIN IRAUSA SA, GRUPO ANTOLIN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GRUPO ANTOLIN BRATISLAVA SRO
Procurador/a Sr/a. MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ
Abogado/a Sr/a. BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO



**Código Seguro de Verificación: E04799402-MI:r46d-YW4g-259y-ZyT5-K**
Puede verificar este documento en https://www.administraciondejusticia.gob.es

**FIRMA (1):** Ana Isabel Lopez Perez (01/06/2026 14:37)          **FIRMA (2):** M. Mar Moradillo Arauzo (01/06/2026 22:17)

NOTIFICADO
**03 - JUNIO - 2026**
Miguel Angel Esteban Ruiz



## AUTO RECTIFICACIÓN AUTO 14/05/2026

En BURGOS, a uno de junio de dos mil veintiséis.

### ANTECEDENTES DE HECHO

**PRIMERO.-** En el presente procedimiento concursal se ha dictado Auto 89/2026, con fecha 14 de mayo, en el que se acuerda la designar como experto en la reestructuración a LEXAUDIT CONCURSAL, S.L.P., con NIF B65697740, a petición del Procurador D. MIGUEL ÁNGEL ESTEBAN RUIZ en nombre y representación de la mercantil GRUPO ANTOLÍN-IRAUSA, S.A.U.

**SEGUNDO.-** En escrito presentado el 22 de mayo de 2026 por el representante procesal de GRUPO ANTOLÍN-IRAUSA, S.A.U. y de todas las filiales reseñadas en la designación de demandantes de la cabecera de esta resolución, se ha instado la rectificación de error material solicitando se nombre experto en la reestructuración a LEXAUDIT CONCURSAL, S.L.P., no sólo de la mercantil matriz, GRUPO ANTOLÍN-IRAUSA, S.A.U., sino también de todas sus filiales.

### FUNDAMENTOS DE DERECHO

**PRIMERO.-** El artículo 214.1 de la L.E.C., establece que los tribunales no podrán variar las resoluciones que pronuncien después de firmadas, pero sí aclarar algún concepto oscuro y rectificar cualquier error material de que adolezcan.

**Segundo.-** El artículo 214.3 de la LEC dispone que los errores materiales manifiestos y los aritméticos en que incurran las resoluciones de los Tribunales y Letrados de la Administración de Justicia podrán ser rectificados en cualquier momento.



---

**FIRMA (1):** Ana Isabel Lopez Perez (01/06/2026 14:37)          **FIRMA (2):** M. Mar Moradillo Arauzo (01/06/2026 22:17)



**TERCERO.-** En el presente caso es procedente acceder a la rectificación del auto 89/2026, de fecha 14 de mayo, y nombrar a LEXAUDIT CONCURSAL, S.L.P. como experto en la reestructuración de la totalidad de las sociedades que conforman el GRUPO ANTOLÍN IRAUSA, manteniendo el carácter reservado del nombramiento.

<u>**PARTE DISPOSITIVA**</u>

**ACUERDO:**

**Rectificar el Auto 89/2026**, de 14 de mayo, y designar experto en la reestructuración a LEXAUDIT CONCURSAL, S.L.P., con NIF B65697740, con domicilio en la calle Alfonso XII, núm. 4, 2º Izqda., C.P. 28014, en Madrid, con número de teléfono 915230223 y dirección de correo electrónico info@lexaudit.com, de las mercantiles GRUPO ANTOLÍN IRAUSA SA, GRUPO ANTOLÍN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN



---

**FIRMA (1):** Ana Isabel Lopez Perez (01/06/2026 14:37)          **FIRMA (2):** M. Mar Moradillo Arauzo (01/06/2026 22:17)



CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA y de GRUPO ANTOLIN BRATISLAVA SRO.

Se mantiene el CARÁCTER RESERVADO de la designación del experto y su identidad.

**MODO DE IMPUGNACION:** contra esta resolución **no cabrá recurso alguno**, sin perjuicio de los recursos que procedan, en su caso, contra la resolución a la que se refiere la solicitud de aclaración.

Así, por este Auto, lo pronuncia, manda y firma DÑA. ANA ISABEL LÓPEZ PÉREZ, Ilma. Sra Magistrada-Juez de la Plaza nº 1 de la Sección de lo Mercantil del Tribunal de Instancia de Burgos.

**LA MAGISTRADA-JUEZ**          **LA LETRADA DE LA ADMINISTRACIÓN DE JUSTICIA**

La difusión del texto de esta resolución a partes no interesadas en el proceso en el que ha sido dictada sólo podrá llevarse a cabo previa disociación de los datos de carácter personal que los mismos contuvieran y con pleno respeto al derecho a la intimidad, a los derechos de las personas que requieran un especial deber de tutelar o a la garantía del anonimato de las víctimas o perjudicados, cuando proceda.

Los datos personales incluidos en esta resolución no podrán ser cedidos, ni comunicados con fines contrarios a las leyes.



**FIRMA (1):** Ana Isabel Lopez Perez (01/06/2026 14:37)          **FIRMA (2):** M. Mar Moradillo Arauzo (01/06/2026 22:17)

**<u>Lexaudit Appointment Documents</u>**
**<u>Certified Translation</u>**

**Applicants: Group Antolín-Irausa, S.A.U. and others**

**Attorney-in-Fact: Mr. Miguel Ángel Esteban**

**Subject of Filing: Request for Appointment of a Restructuring Expert**

## TO THE COMMERCIAL DIVISION
## OF THE BURGOS COURT OF FIRST INSTANCE

**Miguel Ángel Esteban**, Attorney-in-Fact (Procurator) for the Courts and for Group Antolín-Irausa, S.A.U. ("**Antolín Irausa**"), Group Antolín-Aragusa, S.A.U. ("**Antolín Aragusa**"), Group Antolín-Autotrim, S.A.U. ("**Antolín Autotrim**"), Group Antolín-Eurotrim, S.A.U. ("**Antolín Eurotrim**"), Group Antolín-Glass, S.A.U. ("**Antolín Glass**"), Group Antolín-Ingeniería, S.A.U. ("**Antolín Ingeniería**"), Group Antolín-Plasbur, S.A.U. ("**Antolín Plasbur**"), Group Antolín-RyA, S.A.U. ("**Antolín RyA**"), Antolin Interiors UK Limited (" **Antolín Interiors UK**"), Group Antolin Leamington Limited ("**Antolín Leamington**"), Group Antolin UK Limited ("**Antolin UK**"), Group Antolín North America, Inc. ("**Antolín North America**"), Antolín Alabama, LLC ("**Antolín Alabama**"), Antolin Interiors USA, Inc. ( "**Antolín Interiors USA**"), Antolín Shelby, Inc. ("**Antolín Shelby**"), Group Antolin Missouri, LLC ("**Antolín Missouri**"), Group Antolín Kentucky, Inc. ("**Antolín Kentucky**"), Group Antolín Michigan, Inc. ("**Antolín Michigan**"), Group Antolin Sibiu SRL ("**Antolín Sibiu**"), Antolin Silesia Sp. z o.o. ("**Antolín Silesia**"), Group Antolín South Africa (PTY) Ltd. ( "**Antolin South Africa**"), Group Antolín Bohemia, a.s. ("**Antolín Bohemia**"), Group Antolín Ostrava, s.r.o. ("**Antolín Ostrava**"), Group Antolín Turnov, s.r.o. ("**Antolín Turnov**"), Antolin Liban, s.r.o. ("**Antolín Liban**"), Antolin Deutschland GmbH ("**Antolin Deutschland**"), Group Antolín Bamberg GmbH & Co. KG ("**Antolín Bamberg**"), Group Antolin Logistik Deutschland GmbH ("**Antolín Logistik Deutschland**"), Antolin Straubing GmbH ("**Antolín Straubing**"), Antolín Interiors México, S.A. de C.V. ("**Antolín Interiors Mexico**"), Group Antolín Silao, S.A. de C.V. ("**Antolín Silao**"), Group Antolín Saltillo, S.R.L. de C.V. ( "**Antolín Saltillo**"), Group Antolín Tlaxcala, S.R.L. de C.V. ("**Antolín Tlaxcala**"), Group Antolín Cuautitlán, S.R.L. de C.V. ("**Antolín Cuautitlán**"), Group Antolín Lusitânia-Componentes Automóvel, Unipessoal, Lda. ("**Antolin Lusitania**"), and Group Antolín Bratislava, s.r.o. ("**Antolín Bratislava**"), (all of them, except Antolín Irausa, the "**Subsidiaries**"; and, together, Antolín Irausa and the Subsidiaries, the "**Applicant Companies**"), as evidenced by the powers of attorney attached as **Document Set No. 1**, I appear before this Honorable Court, and in accordance with applicable law, I **STATE**:

That, pursuant to the provisions of Article 672 et seq. of Royal Legislative Decree 1/2020, of May 5, approving the consolidated text of the Insolvency Act (hereinafter, the "**TRLC**"), by means of this filing the Applicant Companies hereby **REQUEST**

1

before this Honorable Court, the appointment of **LEXAUDIT CONCURSAL, S.L.P.** ( "**LEXAUDIT**," the "**Expert**" or the "**Restructuring Expert**") as **RESTRUCTURING EXPERT** (the "**Application**"), **to be treated as confidential**, based on the following:


## STATEMENTS


PRELIMINARY -                    **PURPOSE OF THIS APPLICATION**

1.  This filing seeks the appointment of LEXAUDIT as the restructuring expert for the Applicant Companies in a scenario where insolvency is likely, so that, drawing on its knowledge and experience, it can support negotiations that lay the groundwork for a potential restructuring that is sound, negotiated, and compliant with the requirements set out in our insolvency framework.

2.  All of the above is ultimately aimed at achieving the Applicant Companies' sustainable viability and, in doing so, avoiding a future insolvency proceeding.


**FIRST -          THE APPLICANT COMPANIES AND THE REASON FOR REQUESTING THE APPOINTMENT OF A RESTRUCTURING EXPERT**


**1.1 Regarding the Antolín Group**

3.  The Applicant Companies are part of a broader group of companies known as "Antolín" (the "**Antolín Group**" or, simply, the "**Group**").

4.  Antolín Group is a Spanish multinational and a global leader in the development, design, and manufacture of interior components for the automotive industry, including headliners, doors, lighting, instrument panels, and electronic systems.

5.  Founded in 1950 out of a mechanical workshop in Burgos run by the Antolín family, the Group has grown into one of the world's leading manufacturers of vehicle interiors. Even so, the Group continues to be headquartered in Burgos and remains a family-owned company under the leadership of the Antolín family. 2

6.      Group Antolin holds a leading position in the global automotive industry, with its components found inside many of the world's best-selling vehicles. It equips more than 500 different models and supplies 9 of the 10 top-selling vehicles worldwide. The Group serves as a tier-one supplier to virtually all of the world's major automakers.

7.      In addition, the Group has a strong international footprint, operating in as many as 23 countries, where it has 111 manufacturing plants and "*just in time*" centers, as well as 25 technical and sales offices. This global presence, through numerous subsidiaries reporting to the operating parent, enables it to provide design, engineering, and production capabilities in the world's key automotive markets, all from Burgos [1].

## 1.2 About the Applicant Companies

8.      The Applicant Companies are part of the Antolín Group and, specifically, are the Group entities that owe the financial liabilities for which a restructuring is intended to be negotiated. To facilitate a clearer understanding of the Applicant Companies, an organizational chart of the Applicant Companies is provided as **Document No. 2** .

9.      As previously noted and as shown in the organizational chart above, the Applicant Companies share Antolín Irausa as their operating parent company.

10.     Antolín Irausa is a Spanish corporation, tax ID number A09092305, with its registered office at Calle Vitoria 307, 09007 Burgos. Antolín Irausa is the parent company of the Subsidiaries, exercising control (directly or indirectly) over the other Applicant Companies—that is, the Subsidiaries—and it is from this entity that all key decisions affecting the Subsidiaries are made (and, therefore, as we will see, their main center of interests is likewise located in Burgos).

11.     The Subsidiaries, whether Spanish or foreign, that would be included in the potential restructuring plan—and whose financial debt would therefore be affected—are as follows:

---

[1] For full information about Group Antolín, please visit its website: https://www.antolin.com/es/compania-home

3

|  | Subsidiary | Nationality | Address |
|---|---|---|---|
| 1. | Antolín Aragusa | Spain | Monte de la Abadesa St., 0, Business Park, Burgos |
| 2. | Antolín Autotrim | Spain | Vitoria St. 307, 09007 Burgos |
| 3. | Antolín Eurotrim | Spain | Vitoria St. 307, 09007 Burgos |
| 4. | Antolín Glass | Spain | Vitoria St. 307, 09007 Burgos |
| 5. | Antolín Engineering | Spain | Vitoria St. 307, 09007 Burgos |
| 6. | Antolín Plasbur | Spain | Condado de Treviño St., 21, Villalonquéjar Industrial Park, Burgos |
| 7. | Antolín RyA | Spain | Vitoria St. 307, 09007 Burgos |
| 8. | Antolín Interiors UK | United Kingdom | Merse Road, North Moons Moat, Redditch, England B98 9HL |
| 9. | Antolín Leamington | United Kingdom | Tachbrook Park Drive, Leamington Spa, Warwick, Warwickshire CV34 6RH |
| 10. | Antolin UK | United Kingdom | Merse Road, North Moons Moat, Redditch, England B98 9HL |
| 11. | Antolín North America | United States | 3410 Belle Chase Way, Suite 600, Lansing, MI 48911 |
| 12. | Antolín Alabama | United States | 3410 Belle Chase Way, Suite 600, Lansing, MI 48911 |
| 13. | Antolín Interiors USA. | United States | 3410 Belle Chase Way, Suite 600, Lansing, MI 48911 |
| 14. | Antolín Shelby | United States | 3410 Belle Chase Way, Suite 600, Lansing, MI 48911 |
| 15. | Antolín Missouri | United States | 3410 Belle Chase Way, Suite 600, Lansing, MI 48911 |
| 16. | Antolín Kentucky | United States | 3410 Belle Chase Way, Suite 600, Lansing, MI 48911 |
| 17. | Antolín Michigan | United States | 3410 Belle Chase Way, Suite 600, Lansing, MI 48911 |
| 18. | Antolín Sibiu | Romania | Europa Unită Street, No. 7, Sibiu County |
| 19. | Antolín Silesia | Poland | Wrocławska 82, 57-100 Strzelin, Poland |
| 20. | Antolin South Africa | South Africa | Nelson Mandela Bay Logistics Park, Algoa Road, Jagvlakte, Uitenhage Industries, Eastern Cape 2196 |
| 21. | Antolín Bohemia | Czech Republic | Svárovská 696, 463 03 Stráž nad Nisou, Czech Republic |
| 22. | Antolín Ostrava | Czech Republic | Na Rovince 912, Hrabová, 720 00 Ostrava |
| 23. | Antolín Turnov | Czech Republic | Průmyslová 3000, 511 01 Turnov |
| 24. | Antolín Liban | Czech Republic | Komenského 30, 507 23 Libán |
| 25. | Antolin Germany | Germany | Am Ziegelwerk 1, 85391 Allershausen |
| 26. | Antolín Bamberg | Germany | Kronacherstraße 70-80, 96052 Bamberg |
| 27. | Antolín Logistics Germany | Germany | Am Coloneum 4, 50829 Cologne |

| 28. | Antolín Straubing | Germany | Stettiner Str. 7, 94315 Straubing |
|---|---|---|---|
| 29. | Antolín Interiors Mexico | Mexico | Blvd. Jesús Valdez Sánchez 728, Downtown Area, 25350 Arteaga, Coah., Mexico |
| 30. | Antolín Silao | Mexico | Av. Ingenieros 411, FIPASI Industrial Park, 36100 Silao de la Victoria, Gto., Mexico |
| 31. | Antolín Saltillo | Mexico | Doctor, Blvd. Jesús Valdez Sánchez s/n, Industrial Park, 25350 Arteaga, Coah., Mexico |
| 32. | Antolín Tlaxcala | Mexico | Virgen de la Caridad 19, Vesta Park Tlaxcala I, Xicontecatl II Industrial Park, 90500 Huamantla, Tlax., Mexico |
| 33. | Antolín Cuautitlán | Mexico | Av. Tlaloc, Block 003, Axotlan, 54719 Cuautitlán Izcalli, State of Mexico, Mexico |
| 34. | Antolín Lusitânia | Portugal | Industrial zone near Vila Nova de Cerveira, Viana do Castelo, Portugal, 4920-247 Lusitania, Portugal |
| 35. | Antolin Bratislava | Slovakia | Opletalova 73, 841 07 Devínska Nová Ves, Slovakia |

12. Submitted as **Document Set No. 3** are the registry certificates for each Applicant Company, and as **Document Set No. 3 bis**, an informal translation of those certificates issued in languages other than Spanish.

13. The subsidiaries Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Ingeniería, Antolín Plasbur, and Antolín RyA (hereinafter, the "**Spanish Subsidiaries**") are domiciled in Burgos, which also matches their center of main interests ("**COMI**"), as will be shown.

14. As for the remaining subsidiaries (the "**Foreign Subsidiaries**"), although their registered offices are outside Spain, all of them keep their COMI in Burgos, as explained below when describing the Antolín Group's business model and decision-making structure.

15. Indeed, the Antolín Group operates internationally through an integrated business model centralized in Burgos. The Group's subsidiaries—both the Spanish Subsidiaries and the Foreign Subsidiaries—are organized into three distinct functional categories: (i) Antolín Ingeniería, a company with its registered office in Burgos, which has entered into a framework agreement with Antolín Irausa for the development of R&amp;D&amp;I for the Antolín Group; (ii) the production plants (the "**Plants**")2 , dedicated to component manufacturing and logistics operations 5

---

2 These correspond to: Antolín Aragusa, Antolín Autotrim, Antolín Eurotrim, Antolín Glass, Antolín Plasbur, Antolín RyA, Antolín Interiors UK, Antolín Leamington, Antolín Alabama, Antolín Interiors USA, Antolín Shelby, Antolín Missouri, Antolín Kentucky, Antolín Michigan, Antolín Sibiu, Antolín Silesia, Antolin South

affiliates; and (iii) the Technical-Commercial Offices 3 (hereinafter, "**OTCs**"), which provide commercial, technical, innovation, and corporate support services.

16. Both the Plants and the OTCs operate under the management and oversight of Antolín Irausa and, as regards R&amp;D&amp;i, of Antolín Ingeniería. Decisions are made by their corporate bodies in Burgos or by executives based in Burgos. Accordingly, the Subsidiaries are limited to carrying out the instructions and guidelines communicated to them from that city.

17. The relationship between Antolín Irausa and the Plants is governed by agreements known as "*Principal Master Agreements*" (the "**PMAs**"), entered into by Antolín Irausa—in its capacity as "Principal"—and each of the Plants. Under these agreements, Antolín Irausa acts as the entrepreneur of the business, setting the Group's global business strategy, developing and maintaining the Group's intangible assets, and ultimately bearing the economic impact of the business's significant risks. The Plants, for their part, are confined to strictly production-related activities—order management, manufacturing, quality control, and product delivery—under Antolín Irausa's direction and supervision, with no independent decision-making authority. In this regard, decisions for these entities are made from Burgos.

18. In turn, the relationships between Antolín Irausa and Antolín Ingeniería and the Subsidiaries that qualify as OTCs—specifically, Antolin Deutschland, Antolin UK, and Antolín North America—are governed by a set of service agreements ("**OTC Agreements**") covering, among other things, commercial support services, corporate support services, development and maintenance services, industrial activity services, innovation services, and technical-commercial activity services.

19. The key point across all of these OTC Agreements is that the OTCs are the ones providing support services to Antolín Irausa and, for the innovation agreements, to Antolín Ingeniería, which are the entities that truly perform the strategic functions; the OTCs are limited to implementing the business operating models designed in Burgos.

20. Furthermore, Antolín Irausa maintains a centralized cash-management system with all of its Subsidiaries (under the standard single-cash-box model), implemented through *cash pooling* agreements. 6

---

Africa, Antolín Bohemia, Antolín Ostrava, Antolín Turnov, Antolín Liban, Antolín Bamberg, Antolín Logistik Deutschland, Antolín Straubing, Antolín Interiors Mexico, Antolín Saltillo, Antolín Tlaxcala, Antolín Cuautitlán, Antolín Silao, Antolin Lusitania, Antolín Bratislava.

3 These correspond to: Antolín UK, Antolín Deutschland, and Antolín North America.

21. Likewise, the management bodies of the Subsidiaries are generally made up of individuals of Spanish nationality who reside in Spain. In those instances where, for legal [4] or operational reasons in the country concerned, it has been necessary to appoint to the management body individuals from the country where the Plant or the OTC is located, decisions nevertheless continue to be made from Spain. In addition, Ms. Cristina Blanco Santo Tomás, Chief Executive Officer of Antolín Irausa, in addition to serving as a director, generally holds joint and several signing authority in the various Foreign Subsidiaries where there is local representation on their management bodies, so that, regardless of that local component, effective management control remains in Burgos. We submit, as **Document No. 4** a table prepared by us based on the certificates submitted as Document No. 3, summarizing the individuals who make up the management body of the Subsidiaries.

22. In addition to all of the above, from Burgos, Antolín Irausa sends all Subsidiaries standardized protocols and operating templates that must be followed by every Group employee worldwide. These range from operating manuals and procedural guides to business models, production schedules, and corporate directives. This worldwide standardization of processes—designed and rolled out from the headquarters in Burgos—provides further evidence that the Group's management and decision-making hub is unquestionably located in that city.

23. It is particularly important to note that this operating model has been reviewed and validated by the Spanish tax authorities. Specifically, on March 21, 2024, the Spanish State Tax Administration Agency approved a unilateral Advance Pricing Agreement (the "**APA**") entered into with Antolín Irausa, effective for tax years 2024 through 2027, which addresses the pricing of related-party transactions carried out among the Group's entities. In its functional analysis, the APA confirms that Group Antolín operates under an integrated industrial and commercial management model that entails harmonizing and standardizing production and commercial processes, as well as concentrating and centralizing decision-making in Burgos.

24. The contractual documentation referenced above, the APA, and the other materials mentioned contain sensitive and confidential information regarding the operations of the Antolín Group, which is why they are not included with this filing. Notwithstanding the foregoing, this party remains at the Court's disposal to submit the referenced documentation should it be deemed appropriate.

25. In short, the foregoing shows that, although the Foreign Subsidiaries have their registered offices outside Spain, their center of main interests is located

---

[4] Including, among other things, the benefit of reducing the tax burden.

7

clearly based in Burgos, the hub from which the Group's global strategy is led: all key business decisions are made, customers and contracts are managed, treasury operations are centralized, innovation and industrial know-how are developed and overseen, and the corporate guidelines that govern the Group Antolín's worldwide activities are issued.

**1.3 Reason for the Request to Appoint a Restructuring Expert**

26. This Request to appoint a Restructuring Expert is driven by the Applicant Companies' intention to proactively explore, within the framework of the tools provided by the TRLC, alternatives that make it possible to optimize their financial debt structure and strengthen the Applicant Companies' sustainable viability over the medium and long term.

27. Three key factors have led the Applicant Companies to conclude that appointing a restructuring expert is appropriate at this time:

### (i) The current macroeconomic and geopolitical environment and its impact on the automotive sector

28. The automotive sector is going through a period of uncertainty unlike anything seen in recent decades, driven by the convergence of multiple external factors that are severely affecting the automotive value chain and, in particular, the component-manufacturing industry—where Group Antolín operates.

29. The tariff policy advanced by the United States Administration since the start of President Trump's second term has profoundly reshaped competitive conditions in the North American market. The announcement and gradual implementation of tariffs on imports of vehicles and automotive components not manufactured in U.S. territory has had a direct impact on the global automotive industry as a whole and, particularly sharply, on European component suppliers with an industrial footprint in the United States, including Group Antolín.

30. This adverse environment has also affected Group Antolín. Antolín Irausa's consolidated annual accounts for fiscal year 2024 already note, in the Consolidated Management Report, the negative impact that global conditions (including U.S. tariff policies) could have on the sector and on the Group's operations. The accounts are provided

8

Antolín Irausa and its subsidiaries' consolidated annual financial statements for fiscal year 2024 as **Document No. 5**.

### (ii)   Acquisition of Magna International

31.   In addition to the industry and geopolitical factors mentioned above, the Antolín Group has also been carrying a high level of debt since acquiring the interiors business of the Canadian multinational Magna International (known as "*Magna Interiors*"). This strategic transaction enabled the Antolín Group to establish itself as one of the world's leading suppliers of automotive interior components, doubling in size to reach sales of more than €4,000 million and a workforce of approximately 28,000 employees [5]. However, the financing required to complete this acquisition significantly increased the Antolín Group's leverage.

32.   The successful financial integration of Magna International was severely disrupted by two back-to-back, extraordinary crises: first, the COVID-19 pandemic in 2020, which temporarily brought global automotive production to a standstill; and then the outbreak of the war in Ukraine in February 2022, which strained supply chains and drove broad-based increases in raw-material and energy costs. These external factors—entirely beyond the Group's control and management—prevented Group Antolín from reducing its debt at the pace originally anticipated.

33.   At present, Group Antolín has restored its operating margins and is in a solid business position, with a diversified customer base and a strengthened competitive standing. However, this rebound has come only recently, at a time when the Group's financial structure was already strained by the high leverage inherited from the Magna Interiors acquisition—further intensified by the subsequent external shocks—resulting in a financial burden that Group Antolín expects will be difficult to sustain in the medium and long term. Accordingly, it is advisable to move forward with this process to safeguard the Applicants' viability and competitiveness over the medium and long term.

### (iii)   The Financial Liabilities Structure of the Applicant Companies and the Need to Align It with Current Conditions

34.   Without prejudice to the fact that the Applicant Companies have been meeting their payment obligations on time and complying with the financial commitments undertaken to their creditors, 9

---

[5] Group Antolín published this transaction on its corporate website:
https://www.antolin.com/es/group-antolin-cierra-la-adquisicion-de-magna-interiors-para-ofrecer-el-interior-completo-del
and
https://www.antolin.com/es/group-antolin-acuerda-la-adquisicion-de-la-mayor-parte-del-negocio-de-interiores-de-magna.

they carry a significant volume of financial liabilities whose structure, in the macroeconomic context described, calls for adjustment in order to provide greater financial strength and flexibility over the medium and long term, ensuring their future viability.

35. So that this Honorable Court may have an overall view of the financial debt that could be subject to restructuring, the principal financial instruments comprising the liabilities of the Applicant Companies are set out below, in accordance with the Group's most recently published consolidated annual accounts for fiscal year 2024, submitted as Document No. 5 (the "**CCAA 2024**"), together with the financial agreements entered into thereafter:

### a) Notes and bonds

36. Antolín Irausa currently has two long-term senior bond issuances outstanding, both listed on the Luxembourg Euro MTF market:

   (i) A secured senior bond issuance dated June 29, 2021, in the amount of €390,000,000, maturing on April 30, 2028 ("**2028 Bonds**"), i.e., under a scenario of less than two years.
   (ii) A secured senior bond issuance dated July 31, 2024, with a principal amount of €250,000,000, maturing on January 30, 2030 ("**2030 Bonds**" and, together with the 2028 Bonds, the "**Bonds**").

### b) Syndicated Financing Agreement

37. On March 13, 2014, Antolín Irausa, as borrower, and certain Group companies as guarantors, entered into a syndicated financing agreement with a group of financial institutions (with Deutsche Bank AG, London Branch, acting as facility agent and security agent) for an initial amount of €200,000,000, which has been increased over time through amending and non-extinguishing novations, as well as restated agreements (as amended and restated from time to time, the "**Syndicated Financing Agreement**"). The Syndicated Financing Agreement provides for maturities in each year from 2026 through 2029.

### c) European Investment Bank (EIB) Loans

38. Antolín Irausa, as borrower, and several companies within the Antolín Group, as guarantors, have entered into several long-term loans with the European Investment Bank ("**EIB**") as lender: 10

(i) the financing agreement titled "*Antolin Car Interiors RDI*" entered into on June 12, 2018 (as amended from time to time, the "**EIB Financing Agreement I**");

(ii) the financing agreement titled "*Antolin Car Interiors RDI B*" entered into on December 23, 2020 (as amended from time to time, the "**EIB Financing Agreement II**" and, together with the EIB Financing Agreement I, the "**EIB Financing Agreements**").

39. With respect to the European Investment Bank Loans, maturities are scheduled for 2026, 2027, and 2028.

40. The Bonds, the Syndicated Financing Agreement, the EIB Financing Agreements, and the ICO Financing Agreement (as defined below) are jointly and severally guaranteed by the Applicant Companies and by in rem pledge security over 100% of the shares of Antolín Irausa, all of them on a *pari passu* basis.

### d) Other subsequent financings

41. As expected, the Group's financial debt has not remained unchanged over the past two years, as adjustments have occurred due to entering into new financing agreements and repaying others (for example, the COFIDES loan shown in the 2024 annual accounts, which has been fully repaid through scheduled amortization in accordance with the agreed timetable).

42. Among the financings entered into after the 2024 annual accounts, we highlight, by way of example and without limitation, the syndicated financing agreement backed by a State guarantee under the guarantee line granted to companies pursuant to Royal Decree-Law 4/2025, of April 8, on Urgent Measures in Response to the Tariff Threat and for Commercial Relaunch, entered into on August 4, 2025 by, among others, Antolín Irausa, Antolín Aragusa, Antolín Eurotrim, Antolín Ingeniería, Antolín Plasbur and Antolín RyA, as borrowers; certain companies within the Antolín Group, as personal guarantors; Banco Bilbao Vizcaya Argentaria, S.A., as agent; Deutsche Bank AG, London Branch, as security agent; and a group of entities, as lenders (as amended from time to time, the "**ICO Financing Agreement**"). The ICO Financing Agreement has maturities scheduled for 2027, 2028, 2029, and from 2030 onward.

*e) Other bilateral financing*

43. In addition, the restructuring plan may also need to cover other bilateral financing arrangements, such as:

> (i) The guarantee facilities entered into between Antolín Irausa, on the one hand, and various financial institutions, on the other (the "**Ordinary Guarantee Facilities**");
>
> (ii) The facility entered into between Antolín Irausa and Deutsche Bank for the issuance of guarantes, secured by pledge rights over time deposits (the "**Preferred Guarantee Facility**");
>
> (iii) The credit facility known as the "Net Overdraft Facility," governed by the laws of the Netherlands and entered into on June 3, 2019 between HSBC Continental Europe, The Netherlands (formerly, HSBC France, Amsterdam Branch) and Antolín Irausa (as amended from time to time, the "**HSBC Bilateral Facility**");
>
> (iv) The bilateral loans entered into by the Applicant Companies (the "**Bilateral Loans**");

*f) Intragroup financing*

44. Likewise, as required by law, all intragroup loans would necessarily fall within the scope of impact of any potential restructuring plan.

**(iii)   Conclusion**

45. Although the most significant concentration of maturities will not occur until 2028 [6] , the size and complexity of the financing structure described, together with the macroeconomic and sector backdrop outlined, suggest that the Applicant Companies should act with the diligence and foresight the circumstances require, exploring options that would allow, where appropriate, that structure to be adjusted and optimized to ensure long-term viability.

46. The Applicant Companies may make use of the mechanisms that the TRLC makes available to debtors, consistent with the guiding principles of Directive (EU) 2019/1023, which expressly promotes the use of early-warning mechanisms and 12

---

[6] Notwithstanding the maturities stated for each financial instrument, in most cases the maturity could be accelerated to October 2027 if the 2028 Bonds were not refinanced at that time.

preventive restructuring frameworks that make it possible to anticipate solutions before financial difficulties arise or worsen. In this regard, appointing the restructuring expert is a key step to facilitate negotiations with financial creditors and to lay the groundwork for an orderly, negotiated, and legally compliant restructuring in a scenario of likely insolvency.

47.   To that end, the Applicant Companies consider it both efficient and consistent to move forward with the appointment of a single restructuring expert for all of them, so that the expert can effectively perform their duties. Given the complex structure of the Applicant Companies, it is necessary to appoint one expert with a comprehensive, end-to-end view of the Applicant Companies as a whole.

**SECOND — PROCEDURE FOR APPOINTING THE EXPERT**

48.   Article 672 of the TRLC sets out the circumstances in which it is appropriate to request the appointment of a restructuring expert, including when the debtor submits the request.

49.   The procedure for appointing a restructuring expert is contemplated as a non-adversarial process and takes effect automatically, provided that (i) it is requested by, among others, the debtor; (ii) the expert meets the requirements set out in Article 674 of the TRLC; and (iii) the expert is not subject to any prohibition or conflict of interest under Article 675 of the TRLC.

50.   Accordingly, once Your Honor has confirmed that the Applicant Companies have standing to request the appointment of the restructuring expert, that appointment must be made "*as soon as possible and, in any event, within two days*"[7] in favor of the individual proposed by the Applicant Companies, provided that— as in this case— the requirements set out in the TRLC are met and substantiated, as we will do in the following submission.

**THIRD — COMPLIANCE WITH THE REQUIREMENTS FOR APPOINTING LEXAUDIT AS RESTRUCTURING EXPERT**

**3.1 LEXAUDIT's experience and expertise to perform the role (art. 672.2(1) TRLC)**

---

[7] *See.* article 672.3 TRLC.

51.   The requirement set out in the TRLC for appointing a restructuring expert is to demonstrate specialized knowledge and experience in restructurings and/or, alternatively, to meet the requirements to serve as an insolvency administrator. Accordingly, under Article 674 of the TRLC, which governs the subjective conditions for appointment: "*The expert must be appointed from among natural persons or legal entities, Spanish or foreign, who have specialized legal, financial, and business knowledge, as well as experience in restructurings, or who can demonstrate that they meet the requirements to act as an insolvency administrator under this law*".

52.   LEXAUDIT meets all subjective requirements to serve as the restructuring expert for the Applicant Companies. LEXAUDIT is a firm with extensive experience in restructurings and insolvency, having participated in these processes both as an advisor and as an independent economic-financial expert, and it includes top-tier attorneys and economists with the capability and proven experience to handle comparable engagements. Attached as **Document No. 6** is an explanatory dossier detailing LEXAUDIT's track record, including the firm's professional credentials in highly complex insolvency and restructuring proceedings.

53.   In addition, LEXAUDIT would not fall under any of the conflict-of-interest scenarios or prohibitions set out in Article 675 of the TRLC. Specifically, LEXAUDIT (i) has not provided professional services related to the restructuring of the Applicant Companies, nor to any persons closely related to them, during the two years prior to the filing of this submission; and (ii) is not subject to any of the incompatibility situations established under the statutory framework governing statutory audits with respect to the Debtors or any of their closely related persons [8].

**3.2. Acceptance of the appointment, amount, and accrual schedule of LEXAUDIT's fees (Art. 672.2.2 of the TRLC)**

54.   LEXAUDIT has accepted the engagement proposed by the Applicant Companies with respect to fees and the accrual schedule for its remuneration, in accordance with Article 672.2.2 of the TRLC [9]. The letter signed by LEXAUDIT accepting its 14

---

[8] LEXAUDIT's statement confirming the absence of any conflicts of interest or prohibitions preventing it from serving in this role is included in Document No. 6 accompanying this filing.

[9] The agreed remuneration and the manner in which it accrues are set out in Document No. 6 accompanying this filing.

appointment as restructuring expert for the Applicant Companies as **Document No. 7**.

55. LEXAUDIT has extensive experience in corporate restructuring processes and has served as an expert in numerous proceedings of this kind. Among the most noteworthy matters in which it has been involved—whether acting as the restructuring expert or advising the affected creditors and/or the debtor—are those listed in Document No. 6, where it has helped deliver workable solutions to ensure business continuity, creditor satisfaction, and job preservation.

**3.3. Current professional liability insurance maintained by LEXAUDIT (art. 672.2.3 TRLC)**

56. To satisfy the final requirement, LEXAUDIT and the insurer AXA SEGUROS, S.A. DE SEGUROS Y REASEGUROS have entered into a professional liability insurance policy with coverage of €4,000,000, which covers any contingencies that may arise from its work as a restructuring expert. A copy of the policy is provided as **Document No. 8** and a copy of the certificate issued by said insurer, confirming that this professional liability policy remains in force, as **Document No. 9**.

**FOURTH -       PROCEDURAL ASPECTS OF THE APPLICATION**

**4.1. Venue and jurisdiction a) Venue based**

**on the center of main interests**

57. As for the territorial venue to hear this Application, as well as the subsequent proceeding to approve the restructuring plan, jurisdiction lies with the Commercial Courts of Burgos pursuant to Articles 45 10 and 641 of the TRLC, since, as explained, the Applicant Companies have their center of main interests in the city of Burgos—specifically at Calle Vitoria 307, 09007 Burgos, where the Group's headquarters are located—from which all management decisions are made and from which the Antolín Group's business activity is generated. 15

---

10 The definition of the center of main interests is provided by Article 45.1 of the TRLC itself: "Jurisdiction to declare and process the insolvency proceeding belongs to the judge in whose territory the debtor has the center of its main interests. The center of main interests shall be understood as the place where the debtor habitually administers those interests in a manner ascertainable by third parties".

58.   Accordingly, for Antolín Irausa and the Spanish Subsidiaries, the registered office matches the company's center of main interests. As for the Foreign Subsidiaries—manufacturing sites and commercial branches with registered offices [11] in the Czech Republic, Germany, Mexico, Portugal, Slovakia, the United Kingdom, the United States, Romania, Poland, and South Africa—their center of main interests is likewise located in the city of Burgos. From there, as noted above, global business-management decisions are made and key functions are centralized, including industrial management, commercial management, finance, purchasing, and human resources, among others.

59.   In light of the foregoing, we may conclude that the center of main interests of all Applicant Companies is located in Burgos, which is why this request for the appointment of an expert is submitted to the Court of First Instance in that city.

### b) Jurisdiction for joint restructuring plans

60.   In particular, Article 672.4 of the TRLC provides that, in the case of joint restructuring plans, the same expert may be appointed for all affected debtors: "1. **In the case** of a joint notice or of **joint restructuring plans, the same expert may be appointed for all affected debtors**". (emphasis and underlining added)

61.   Appointing a single restructuring expert is grounded in rationality and efficiency, since that expert takes on, among other duties, preparing the valuation report for the business as a going concern—work that requires a detailed understanding of the debtor's exposure to other group companies in order to pinpoint its true value [12].

62.   Accordingly, the Order of Madrid Commercial Court No. 5, dated May 4, 2023 (LA LEY 187107/2023), finds that the rules set out in Articles 45 and 46 of the TRLC—which govern jurisdiction over individual and related insolvency proceedings—must be followed and, further, that: "**even though such a joint appointment is not expressly provided for it is the most prudent approach, given that a subsequent joint filing may be made by all of the companies for which the appointment of an expert is being sought**, or by some of them, etc., and **likewise, they are part of—or may become part of—the subsequent restructuring plan** whether or not it is submitted for court approval; moreover [16]

---

[11] In this regard, the provision in Article 45.2 of the TRLC—under which the center of main interests is presumed to be located at the registered office—allows for evidence to the contrary, as has occurred in this case.

[12] PULGAR EZQUERRA, J., in Commentaries on the Consolidated Text of the Insolvency Act, La Ley Soluciones Legales Publishing, 2023.

with the appointment of that expert for all companies within the group, the effect is that, where applicable, the possibility under Article 637 of the TRLC arises in connection with a subsequent insolvency filing by the debtor" (emphasis and underlining added).

63. Accordingly, the fact that no joint notice of commencement of negotiations was filed with respect to the Antolín Group does not prevent a joint request from now being made for the appointment of LEXAUDIT as the restructuring expert for the Applicant Companies [13].

### 4.2. Standing

64. The Applicant Companies have standing to file this request pursuant to Article 672.1(1) of the TRLC, in their capacity as debtors.

### 4.3. Legal representation and counsel

65. The Applicant Companies are represented by the undersigned court agent and advised by the attorneys whose identifying details appear in the signature block of this filing.

### 4.4. Procedure

66. This notice is being submitted in accordance with the steps set out in Articles 672 et seq. of the TRLC.

67. Although the TRLC does not specify when a debtor may request the appointment of a restructuring expert, there is no impediment to making that request even if the notice under Article 585 of the TRLC has not been filed.

68. Accordingly, since the Applicant Companies have demonstrated compliance with the requirements set out in Articles 674 and 675 of the TRLC, and are submitting with this filing all documents required under Article 672 of the TRLC, the appointment of the Restructuring Expert should be ordered.

69. This is also the view taken by Barcelona Commercial Court No. 2 in its Judgment of November 29, 2022 (LA LEY 298450/2022), holding that "the court's role is limited to a legality review, based on the legally prescribed criteria in Articles 674 and 675 of the TRLC, and to verifying that the appointment request is accompanied by the documents [17]

---

[13] See, in this regard, NIETO DELGADO, C., "The Restructuring Expert," in COHEN BENCHETRIT, A., *New Legal Framework for Corporate Restructuring in Spain*, Aranzadi, Navarra, 2023.

under Article 672-2 of that same statute," or as held by Commercial Court No. 5 of Madrid in the above-referenced Order dated May 4, 2023, pursuant to which: "the appointment is mandatory for the judge, of the person designated by the debtor, unless the judge considers that such person does not meet those requirements."

Accordingly,

**I RESPECTFULLY REQUEST THAT THE COURT** accept for filing this Application for the appointment of a Restructuring Expert for the companies Group Antolín-Irausa, S.A.U., Group Antolín-Aragusa, S.A.U., Group Antolín-Autotrim, S.A.U., Group Antolín-Eurotrim, S.A.U., Group Antolín-Glass, S.A.U., Group Antolín-Ingeniería, S.A.U., Group Antolín-Plasbur, S.A.U., Group Antolín-RyA, S.A.U., Antolin Interiors UK Limited, Group Antolin Leamington Limited, Group Antolin UK Limited, Group Antolín North America, Inc., Antolín Alabama, LLC, Antolin Interiors USA, Inc., Antolín Shelby, Inc., Group Antolin Missouri, LLC, Group Antolín Kentucky, Inc., Group Antolín Michigan, Inc., Group Antolin Sibiu SRL, Antolin Silesia Sp. z o.o., Group Antolín South Africa (PTY) Ltd., Group Antolín Bohemia, a.s., Group Antolín Ostrava, s.r.o., Group Antolín Turnov, s.r.o., Antolin Liban, s.r.o., Antolin Deutschland GmbH, Group Antolín Bamberg GmbH & Co. KG, Group Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolín Interiors México, S.A. de C.V., Group Antolín Silao, S.A. de C.V., Group Antolín Saltillo, S.R.L. de C.V., Group Antolín Tlaxcala, S.R.L. de C.V., Group Antolín Cuautitlán, S.R.L. de C.V., Group Antolín Lusitânia, Componentes Automóvel, Unipessoal, Lda., and Group Antolín Bratislava, s.r.o., and, without further proceedings, issue an Order providing for the appointment of **LEXAUDIT CONCURSAL, S.L.P.** as restructuring expert, on the terms set forth in Article 672.3 of the TRLC.

**FIRST OTHER MATTER I STATE**: that, pursuant to Article 591 of the TRLC and Article 232 of Organic Law 6/1985, of July 1, on the Judiciary (**"LOPJ"**), this party respectfully requests that these proceedings for the appointment of a restructuring expert be handled on a **confidential basis**, without publication in the Public Insolvency Register, or, in the alternative, that any such publication be made without disclosing the names of the companies requesting the appointment.

This request is based on the following considerations:

(i) The Applicant Companies operate in the automotive industry as top-tier suppliers to virtually all of the world's leading automakers. The mere public disclosure that a proceeding of this nature is being processed 18

could create a negative perception in the market and among the Applicant Companies' customers, suppliers, and other business counterparties, with a real risk of damage to commercial relationships and investor confidence—at precisely the time when maintaining operational stability is essential to ensure the success of the proposed restructuring.

(ii) The Applicant Companies' financing structure includes two senior bond issuances listed on Luxembourg's Euro MTF market. As a result, any information about restructuring proceedings could have an immediate effect on the trading price of those instruments and on capital-markets sentiment, thereby complicating negotiations with the financial creditors that the appointment of the Expert is specifically intended to facilitate.

(iii) Article 591 of the TRLC expressly allows the notice opening negotiations with creditors to be filed on a confidential basis. The same confidentiality should likewise apply to the preparatory steps leading up to that notice, including the appointment of a restructuring expert, as an instrumental, preparatory measure within the restructuring process. Indeed, the protective purpose underlying confidentiality—shielding the debtor from the harmful effects that premature publicity of financial distress may cause —applies with equal or even greater force at this initial stage of the proceeding.

In light of all of the foregoing,

**RESPECTFULLY REQUESTS THAT THE COURT** that, in view of the circumstances described above, it order: (i) that these proceedings for the appointment of an expert in the restructuring be handled on a **confidential basis** , and (ii) that the appointment of the expert not be published in the Public Insolvency Registry or, in the alternative, that it be published without identifying the Applicant Companies by name.

**FURTHERMORE, I STATE AS FOLLOWS**: that the Applicant Companies express their intent to cure any defect that may have been incurred, whether substantive or procedural, including by submitting any additional documents this Honorable Court may deem appropriate, pursuant to Articles 243.3 and 243.4 of Organic Law 6/1985, of July 1, on the Judiciary (hereinafter, the **LOPJ**), and Article 231 of the LEC and any other provisions that may be applicable.

**I RESPECTFULLY REQUEST OF THE COURT** that it accept the foregoing statement for the purposes set forth in Articles 243.3 and 243.4 of the Organic Law of the Judiciary (LOPJ) and Article 231 of the Civil Procedure Act (LEC), as well as any other provisions that may apply, and, accordingly, that a period be granted to cure any defect should one exist.

This is the justice I request in Burgos, on April 28, 2026.

RODRIGO LOPEZ GONZALEZ
Digitally signed by RODRIGO LOPEZ GONZALEZ
Date: 2026.04.28 10:00:29 +02'00'

Digitally signed by ESTEBAN RUIZ MIGUEL ANGEL - 13131884BDN: C=ES, SERIALNUMBER=IDCES-13131884B, G=MIGUEL ANGEL, SN=ESTEBAN RUIZ, CN=ESTEBAN RUIZ MIGUEL ANGEL - 13131884BReason: I am the author of this documentLocation: Date: 2026.04.28 11:16:34+02'00'Foxit PDF Reader Version: 2023.2.0ESTEBAN RUIZ MIGUEL ANGEL - 13131884B

_____

Rodrigo López González

ICAM Member No. 77,858

_____

Miguel Angel Esteban

BLANCA MORENO HERRERO
Digitally signed by BLANCA MORENO HERRERO Date: 2026.04.28 09:55:30 +02'00'

_____

Blanca Moreno Herrero

ICAM Member No. 114,390

----------------------------------------------------------------------------------------------------------------------------------

I, Nicole Fadel, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed: _____                    Dated: 7/10/2026

20

 

**LexNET Message - Receipt - Subject Initiator**                    **Generated On: 28/04/2026 12:27**

<span style="color:red">Message</span>

| LexNET ID | 1202610875103135 | |
|---|---|---|
| LexNET ID of the Sent Message | 202610875103135 | |
| Subject | Commercial Law | |
| Sender | ESTEBAN RUIZ, MIGUEL ANGEL [112] | |
| | Association of Court Agents | Honorable Burgos Association of Court Agents |
| Recipients | Court/Body | SRR. CIVIL DEL TI of Burgos, Burgos [0905900042] |
| | Type of court/body | Court of First Instance – Civil Section / Court of First Instance (CIVIL) |
| | Registry Office | SRR. CIVIL DEL TI of Burgos [0905900042] |
| Sent date/time | 28/04/2026 12:27:40 | |
| Documents | GA IRAUSA AND OTHERS Request for Appointment of an Expert.pdf (Main) | Description: REQUEST FOR APPOINTMENT OF AN EXPERT<br>Category: COMPLAINT<br>Document Hash:<br>548711a3a472789e545671c526436160968f75134038a2d0367485138b877a43 |
| | 20260428122708_LexNET Receipt.pdf (Attachment) | Description: EXCESS AREA RECEIPT<br>Category: EXCESS AREA (LEXNET)<br>Document Hash:<br>e6e51cb36ef6efc824ff08f3d6f6aff1dd9ad4376f83a3143ff3c85ab2e08692 |
| | Documentation incomplete due to file size | |

| Case Details | Parties Involved | | Legal Representatives |
|---|---|---|---|
| | | NO RECORD OF GROUP ANTOLIN SIBIU SRL<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN KENTUCKY INC<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN LIAMINGTON LIMITED<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF ANTOLIN STRAUBING GMBH<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN NORTH AMERICA INC<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN BRATISLAVA SRO<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN KENTUCKY INC<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN EUROTRIM SAU<br>[DTE] Plaintiff | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |

| | | | |
|---|---|---|---|
| | | NO RECORD OF ANTOLIN LIBAN SRO<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN ARAGUSA SAU<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN SILAO SA DE CV<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN MISSOURI LLC<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF ANTOLIN SHELBY INC<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN BAMBERG GMBH & KG<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN BOHEMIA AS<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF GROUP ANTOLIN OSTRAVA SRO<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD OF ANTOLIN INTERIORS UK LIMITED<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |

| | | | |
|---|---|---|---|
| | | NO RECORD OF GROUP ANTOLIN INGENIERIA SAU<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD FOR GROUP ANTOLIN PLASBUR SAU<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD FOR GROUP ANTOLIN IRAUSA SAU<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD FOR GROUP ANTOLIN ARAGUSA SAU<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD FOR GROUP ANTOLIN GLASS SAU<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD FOR GROUP ANTOLIN AUTOTRIM SAU<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD ON FILE: GROUP ANTOLIN TLAXCALA SRL DE CV<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD ON FILE: GROUP ANTOLIN CUAUTITLAN SRL DE CV<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD ON FILE: GROUP ANTOLIN UK LIMITED<br>[DTE] Plaintiff | **Legal Representatives**<br><br>* [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |

| | | | |
|---|---|---|---|
| | | NO RECORD ON FILE: ANTOLIN DEUTSCHLAND GMBH<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF ANTOLIN INTERIORS MEXICO SA DE CB<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF ANTOLIN INTERIORS USA INC<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF ANTOLIN INTERIORS UK LIMITED<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF GROUP ANTOLIN EUROTRIM SAU<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF GROUP ANTOLIN AUTOTRIM SAU<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF GROUP ANTOLIN MICHIGAN INC<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF ANTOLIN ALABAMA LLC<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |
| | | NO RECORD OF GROUP ANTOLIN OUTH AFRICA PTY LTD<br>[DTE] Plaintiff | **Legal Representatives**<br>* [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Burgos Bar Association of Court Agents |

|  |  | NO RECORD OF GROUP ANTOLIN LOGISTIK DEUTSCHLAND GMBH<br>[PLT] Plaintiff | **Legal Representatives** |
|  |  |  | * [112] ESTEBAN RUIZ, MIGUEL ANGEL<br>[P09059 ]Distinguished Association of Court Agents of Burgos |
|  | **Subject Matter** | Commercial Law |  |
|  | **Amount Type** | Not applicable |  |

(*) All times shown in LexNET are in Mainland Spain time.

-------------------------------------------------------------------------------------------------------------------------------

I, <u>Nicole Fadel</u>, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:                                                        Dated: 7/10/2026

1

 

**LexNET Message - Receipt - Subject Initiator**          **Generated On: 04/05/2026 11:33**

<span style="color:red">**Message**</span>

| LexNET ID | 1202610876539577 | |
|---|---|---|
| Sent Message LexNET ID | 202610876539577 | |
| Subject | Business Law | |
| Sender | ESTEBAN RUIZ, MIGUEL ANGEL [112] | |
| | Association of Court Agents | Distinguished Association of Court Agents of Burgos |
| Recipients | Court/Body | SRR. CIVIL DEL TI of Burgos, Burgos [0905900042] |
| | Type of court/body | Trial Court. Civil Section / Court of First Instance (CIVIL) |
| | Filing Office | SRR. CIVIL DEL TI of Burgos [0905900042] |
| Date/Time Sent | 04/05/2026 11:32:56 | |
| Documents | GA IRAUSA AND OTHERS Request to Appoint an Expert.pdf (Main) | Description: REQUEST TO APPOINT AN EXPERT<br>Classification: COMPLAINT<br>Document Hash:<br>548711a3a472789e545671c526436160968f75134038a2d0367485138b877a43 |
| | 20260504113217_LexNET Receipt.pdf (Attachment) | Description: RECEIPT — EXCESS LAND AREA<br>Classification: EXCESS LAND AREA (LEXNET)<br>Document Hash:<br>4091b4bc8741319da7fcd6cdefe72920fb1fc1abf0ddb84e37df7d70cd834263 |
| | Documentation incomplete due to file size | |

| Case Details | Parties Involved | NOT ON RECORD Group Antolín-Irausa, S.A.U [DTE] Plaintiff | **Legal Representatives** |
|---|---|---|---|
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NO RECORD ON FILE: Group Antolín-Aragusa, S.A.U. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NO RECORD ON FILE: Group Antolín Autotrim, S.A.U. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NO RECORD ON FILE: Group Antolín-Eurotrim, S.A.U. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NO RECORD ON FILE: Group Antolín-Glass, S.A.U. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín-Ingeniería, S.A.U. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín-Plasbur, S.A.U. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín-RyA, S.A. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |
| | | NOT ON RECORD Antolin Interiors UK Limited [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Association of Court Agents of Burgos |

| | | NOT ON RECORD Group Antolin Leamington Limited [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolin UK Limited [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín North America, Inc. [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Antolín Alabama, LLC [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Antolin Interiors USA, Inc. [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Antolín Shelby, Inc. [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD  Group Antolin Missouri, LLC [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Kentucky, Inc [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Michigan, Inc [DTE] Plaintiff | **Procedural Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |

| | | | |
|---|---|---|---|
| | | NO RECORD  Group Antolin Sibiu SRL [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NO RECORD Antolin Silesia Sp. z o.o [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín South Africa PTY Ltd [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Bohemia, a.s. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Ostrava, s.r.o [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Turnov, s.r.o. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD  Antolin Liban, s.r.o. [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Antolin Deutschland GmbH [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Bamberg GmbH Co. KG [DTE] Plaintiff | **Legal Representatives** |
| | | | * [112] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Distinguished Bar Association of Court Agents of Burgos |

| | | NOT ON RECORD Group Antolin Logistik Deutschland GmbH [DTE] Plaintiff | **Attorneys of Record** |
| --- | --- | --- | --- |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Antolin Straubing GmbH [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Antolín Interiors México, S.A. de C.V. [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Silao, S.A. de C.V [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Saltillo, S.R.L. de C.V. [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Tlaxcala, S.R.L. de C.V [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Cuautitlán, S.R.L. de C.V. [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Lusitania-Componentes Automóvel, Unipessoal, Lda. [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | | NOT ON RECORD Group Antolín Bratislava, s.r.o [DTE] Plaintiff | **Attorneys of Record** |
| | | | * [I12] ESTEBAN RUIZ, MIGUEL ANGEL [P09059 ]Honorable Bar Association of Court Agents of Burgos |
| | **Subject Matter** | Commercial law | |
| | **Amount Type** | Not applicable | |

I, <u>Nicole Fadel</u>, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:                                                              Dated: 7/10/2026

1





NOTIFICADO
08 · MAYO · 2026
Miguel Angel Esteban Ruiz

**TRIAL COURT**
**COMMERCIAL SECTION**
**BURGOS COURTROOM NO. 1**

**CENTRALIZED CIVIL, ADMINISTRATIVE LITIGATION, AND LABOR**
**CASE PROCESSING OFFICE — BURGOS**
**Phone: 0034947284185**

AVDA. REYES CATÓLICOS, 51 BIS
**Phone:** 947284055
**Email:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Team/User: GC1
Form: M62660 DIOR — Notice of Filing: Communication under Art. 5

**N.I.G.:** 09059 42 1 2026 0003344
**CLC PRIOR INSOLVENCY NOTICE AND COURT APPROVAL 0000310 / 2026**

Originating proceeding:   / **Regarding**
**OTHER INSOLVENCY MATTERS**

PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,
PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,
PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,
PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,   PETITIONER,
PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER
Mr./Ms. GROUP ANTOLIN IRAUSA SA, GROUP ANTOLIN ARAGUSA SA, GROUP ANTOLIN AUTOTRIM SAU, GROUP
ANTOLIN EUROTRIM SAU, GROUP ANTOLIN GLASS SA, GROUP ANTOLIN INGENIERIA SAU, GROUP ANTOLIN
PLASBUR SA, GROUP ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GROUP ANTOLIN LEAMINGTON
LIMITED, GROUP ANTOLIN UK LIMITED, GROUP ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC,
ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GROUP ANTOLIN MISSOURI LLC, GROUP ANTOLIN
KENTUCKY INC, GROUP ANTOLIN MICHIGAN INC, GROUP ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO,
GROUP ANTOLIN SOUTH AFRICA PTY LTD, GROUP ANTOLIN BOHEMIA AS, GROUP ANTOLIN OSTRAVA SRO, GROUP
ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GROUP ANTOLIN BAMBERG GMBH CO
KG, GROUP ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO
SA DE CV, GROUP ANTOLIN SILAO SA DE CV, GROUP ANTOLIN SALTILLO SRL DE CV, GROUP ANTOLIN
TLAXCALA SRL DE CV, GROUP ANTOLIN CUAUTITLAN SRL DE CV, GROUP ANTOLIN LUSITANIA COMPONENTES
AUTOMOVEL UNIPESSOAL LDA, GROUP ANTOLIN BRATISLAVA SRO
Attorney-in-Fact (Court Agent) Mr. MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN
RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL
ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN
RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL
ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN
RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL
ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN
RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL
ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN
RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL
ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ
Attorney: Ms. BLANCA MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Ms. BLANCA
MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Ms. BLANCA MORENO HERRERO, Ms. BLANCA
MORENO HERRERO, Ms. BLANCA MORENO HERRERO, Ms. BLANCA MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ, Ms. BLANCA
MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Ms. BLANCA
MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Ms. BLANCA
MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ,
Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Ms. BLANCA MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ,
Ms. BLANCA MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ, Mr. RODRIGO LOPEZ GONZALEZ, Ms. BLANCA MORENO HERRERO,
Ms. BLANCA MORENO HERRERO, Ms. BLANCA MORENO HERRERO, Ms. BLANCA MORENO HERRERO, Mr. RODRIGO LOPEZ GONZALEZ,
Mr. RODRIGO LOPEZ GONZALEZ

Deposits and Court-Held Funds Account at BANCO SANTANDER.
Case Account No.: 1067 0000 52 0310 26
Payee: COURT OF FIRST INSTANCE OF BURGOS, COMMERCIAL DIVISION, COURTROOM NO. 1 For wire
transfers: ES55 0049 3569 9200 0500 1274. Reference: 1067 0000 52 0310 26





**ADMINISTRACION
DE JUSTICIA**

## <u>CASE MANAGEMENT ORDER</u>

To: Ms. BEATRIZ BRIONES SANTAMARIA, Court Clerk
(Letrado/a de la Administración de Justicia)

In BURGOS, on May 6, 2026.

Upon the filing of a request for the **appointment of a restructuring expert,** and for such appointment to be made in favor of the company **LEXAUDIT CONCURSAL, S.L.P.** by Attorney-in-Fact MIGUEL ÁNGEL ESTEBAN RUIZ, acting in the name and on behalf of **ANTOLÍN IRAUSA, S.A., and its subsidiaries**, domestic and international, let the corresponding case file be opened and entered under **CLC 310/2026** and let the appropriate separate docket be created so that it may be reported to Your Honor for such ruling as may be proper on the request.

**HOW TO CHALLENGE:** This order may be challenged by filing a **motion for reconsideration** within **five days,** counted from the day following service of notice, before the Clerk of the Court (Administration of Justice) who issued it. The motion must state the alleged legal error on which, in the movant's view, the order is based (Arts. 451 and 452 LEC).

To file the motion, a deposit in the amount of **25,00 €** must be paid into the account indicated above.

So ordered and signed. Certified.

**THE COURT CLERK**





The text of this decision may be shared with parties not involved in the proceeding in which it was issued only after any personal data it contains has been removed, and only with full respect for the right to privacy, the rights of individuals requiring special protection, and, where applicable, the guarantee of anonymity for victims or affected persons.

The personal data included in this decision may not be shared or disclosed, nor used for any purpose that violates the law.



-----------------------------------------------------------------------------------------------------------------------------

I, <u>Nicole Fadel</u>, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:　　　　　　　　　　　　　　　　　　　　　　　　Dated: 7/10/2026





**TRIAL COURT**
**COMMERCIAL SECTION**
**COURTROOM NO. 1 — BURGOS**

**CENTRAL CIVIL, CONTENTIOUS-ADMINISTRATIVE, AND LABOR**
**CASE PROCESSING OFFICE — BURGOS**
**Phone: 0034947284185**

Avda. Reyes Católicos, 51 Bis
**Phone:** 947284055
**Email:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Team/User: GC1
Form: S40040 — Case Management Order (Free Text), Art. 206.2(1) LEC

**N.I.G.:** 09059 42 1 2026 0003344
**PCI SPECIAL INCIDENTAL MATTER (RULING) 0000310 / 2026 0001 —**
**APPOINTMENT OF A RESTRUCTURING EXPERT.**
Originating proceeding: CLC PRIOR INSOLVENCY NOTICE AND JUDICIAL APPROVAL 0000310 / 2026
**Regarding OTHER INSOLVENCY-RELATED**
**MATTERS** Mr./Ms.
Court Representative (Attorney-in-Fact), Mr./Ms.

Attorney,
Mr./Ms.
Court Representative (Attorney-in-Fact), Mr./Ms.

Attorney, Mr./Ms.

Deposit and Court Registry Account held at BANCO SANTANDER.
Case Account: 1067 0000 52 0310 26 Beneficiary: COURT OF FIRST INSTANCE OF BURGOS — COMMERCIAL
DIVISION, COURTROOM NO. 1 For transfers: ES55 0049 3569 9200 0500 1274. Reference: 1067 0000
52 0310 26

## CASE MANAGEMENT ORDER

Ms. BEATRIZ BRIONES SANTAMARIA, Court Clerk
(Letrada de la Administración de Justicia)

In BURGOS, on May 6, 2026.

Having opened this incidental file for the appointment of a
restructuring expert, pursuant to Article 672.3 of the TRLC,
the matter is referred to His/Her Honor for the appropriate
ruling on the request submitted by GUPO ANTOLÍN IRAUSA, S.A.,
together with its domestic and international subsidiaries:

1) They request that the **appointment** of the restructuring
expert be made in favor of **LEXAUDIT CONCURSAL, S.L.P.**

2) They request the **confidential** nature of the application and,
where applicable, of the appointment of the restructuring expert.



**HOW TO CHALLENGE:** An appeal for **reconsideration** may be filed
against this order within **five days**, starting the day after
notice is served, before the Court Clerk (Letrado/a de la
Administración de Justicia) who issued it. The filing must
state the legal violation on which the order

Secure Verification Code: E04799402-MI:MUdx-6abt-oS44-gHAj-C You can
verify this document at https://www.administraciondejusticia.gob.es



would, in the appellant's view, have incurred (Arts. 451 and 452 LEC).

To file the appeal, a deposit of **25,00 €** must be paid into the account indicated above.

I so order and sign. Certified.

**THE COURT CLERK**





Sharing the text of this decision with anyone who is not a party to the proceeding in which it was issued may be done only after any personal data it contains has been removed or anonymized, and with full respect for privacy rights, the rights of individuals requiring special protection, and—where applicable—the guarantee of anonymity for victims or affected persons.

The personal data included in this decision may not be shared or disclosed for purposes that violate the law.



------------------------------------------------------------------------------------------------------------------------

I, Nicole Fadel, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:                                                           Dated: 7/10/2026





NOTIFICADO
21 - MAYO - 2026
Miguel Angel Esteban Ruiz

**TRIAL COURT**
**COMMERCIAL SECTION**
**PLAZA NO. 1**
**BURGOS**

Order: 00089 / 2026

**CENTRAL CIVIL, CONTENTIOUS-ADMINISTRATIVE, AND     -**
**LABOR CASE PROCESSING OFFICE (BURGOS)**

Reyes Católicos Ave., 51 Bis
**Phone: 947284055**
**Email:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Team/User: GC1
Form: N37190 Open Order Closing the Proceeding

**N.I.G.:** 09059 42 1 2026 0003344
**PCI Special Incidental Matter (Special Ruling) 0000310 / 2026**
**0001 – Appointment of a Restructuring Expert -**
Originating proceeding: CLC Prior Insolvency Notice and Judicial Confirmation 0000310 / 2026
**Regarding OTHER INSOLVENCY MATTERS**
PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, PETITIONER, Plaintiff, Plaintiff, Plaintiff, Plaintiff, Plaintiff, Plaintiff, Plaintiff, Plaintiff
Mr./Ms. GRUPO ANTOLIN IRAUSA SA, GRUPO ANTOLIN ARAGUSA SA, GRUPO ANTOLIN AUTOTRIM SAU, GRUPO ANTOLIN EUROTRIM SAU, GRUPO ANTOLIN GLASS SA, GRUPO ANTOLIN INGENIERIA SAU, GRUPO ANTOLIN PLASBUR SA, GRUPO ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GRUPO ANTOLIN LEAMINGTON LIMITED, GRUPO ANTOLIN UK LIMITED, GRUPO ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GRUPO ANTOLIN MISSOURI LLC, GRUPO ANTOLIN KENTUCKY INC, GRUPO ANTOLIN MICHIGAN INC, GRUPO ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GRUPO ANTOLIN SOUTH AFRICA PTY LTD, GRUPO ANTOLIN BOHEMIA AS, GRUPO ANTOLIN OSTRAVA SRO, GRUPO ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GRUPO ANTOLIN BAMBERG GMBH CO KG, GRUPO ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GRUPO ANTOLIN SILAO SA DE CV, GRUPO ANTOLIN SALTILLO SRL DE CV, GRUPO ANTOLIN TLAXCALA SRL DE CV, GRUPO ANTOLIN CUAUTITLAN SRL DE CV, GRUPO ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GRUPO ANTOLIN BRATISLAVA SRO
Attorney-in-fact (Court Representative) Mr./Ms. MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ
Counsel: BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO



## <u>ORDER 89/2026</u>

Burgos, May fourteenth, two thousand twenty-six

**FACTS**

Secure Verification Code: E04799402-MI:FYvz-kiAc-zfdn-7GJS-Y You can
verify this document at https://www.administraciondejusticia.gob.es



**SOLE.** By Scheduling Order dated May 6, 2026, it has been ordered that this separate incidental proceeding, requiring a specific ruling, be opened in order to process the request for the appointment of a restructuring expert filed by Attorney-in-Fact Mr. MIGUEL ÁNGEL ESTEBAN RUIZ, on behalf of and representing the company **GRUPO ANTOLÍN-IRAUSA, S.A.U.**, in which it is proposed that the appointment be made in favor of LEXAUDIT CONCURSAL, S.L.P., and that it be treated as confidential.

<strong>LEGAL GROUNDS</strong>

**FIRST. On the eligibility requirements and the regime of conflicts of interest and prohibitions applicable to restructuring experts**

1) <u>Eligibility requirements</u>

These are set out in Article 674 of Royal Legislative Decree 1/2020, dated May 5, approving the consolidated text of the Insolvency Act (T.R.L.C.). It states that "*the expert must be appointed from among natural persons or legal entities, Spanish or foreign, who possess specialized legal, financial, and business knowledge, as well as experience in restructuring matters, or who can demonstrate that they meet the requirements to serve as an insolvency administrator under this law. Where the restructuring sought has particular features—whether due to the sector in which the debtor operates, the size or complexity of the assets or liabilities, or the presence of cross-border elements—those features must be taken into account when appointing the expert.*"



2) <u>Incompatibilities and prohibitions</u>

Article 675 of the TRLC provides in this regard that "*no restructuring experts may be proposed or appointed, and,*



*If appointed, the following individuals may not accept the position:*

*1) Anyone who, within the past two years, has provided professional services related to the restructuring to the debtor or to persons closely connected to the debtor, unless those services were provided as a result of having been appointed as expert in a prior restructuring.*

*2) Anyone who falls under any of the conflict-of-interest or incompatibility situations set out in the account-auditing laws, in relation to the debtor or persons closely connected to the debtor."*

**SECOND. The Status of the Restructuring Expert**

The restructuring expert's status is governed by Articles 679 through 681 of the T.R.L.C., as follows:

1) Expert's duties

Article 679 of the T.R.L.C. provides that "*the expert will assist the debtor and the creditors in negotiations and in drafting the restructuring plan, and will prepare and submit to the court the reports required by this law, as well as any others the court deems necessary or appropriate*".

2) Duties of care, independence, and impartiality

Article 680 of the T.R.L.C. states that "*the expert shall carry out the duties of the appointment with the level of care expected of a professional specialized in restructurings, and with independence and impartiality with respect to both the debtor and the creditors*".

3) Civil liability of the expert

In this regard, Article 681 of the T.R.L.C. provides that:





*"1. The expert shall be liable for any losses and damages caused to the debtor or to the creditors as a result of a breach of the duties of due care, independence, and impartiality.*

*The expert must maintain professional liability insurance—or an equivalent guarantee—proportionate to the nature and scope of the covered risk. Under that policy, the insurer or credit institution agrees, within the agreed limits, to cover the risk that the insured expert becomes obligated to pay compensation for losses and damages caused in the performance of their duties. If the expert is a legal entity, that entity must carry the professional liability insurance or equivalent guarantee.*

*The liability claim will be handled through the procedures of the insolvency incident."*

**THIRD. Mandatory appointment of the restructuring expert and the documentation that must accompany the application**

Article 672.1(1) of the Consolidated Insolvency Act (TRLC) provides that appointing the restructuring expert will proceed—among other situations—only when requested by the debtor. That request must be accompanied by a set of documents, namely:

1) A written statement explaining why the expert meets the requirements set out in insolvency law to serve in the role.
2) The expert's acceptance of the appointment if designated, as well as acceptance of the agreed amount and the schedule for when the fees will accrue.
3) A copy of the current professional liability insurance policy, or an equivalent guarantee, in force to cover





any potential harm the expert might cause while performing the duties inherent to the role.

**FOURTH. Analysis of the Facts Presented; Decision**

In this case, it is understood that the entity whose appointment as restructuring expert is advocated by the applicant meets the legal requirements previously set out. Specifically, the request was filed together with a document identified as No. 6, which lists the members of LEXAUDIT CONCURSAL, S.L.P.—all of whom have extensive professional experience in insolvency matters (in the case of the founding partners, more than thirty years)—as well as the many debt-restructuring transactions in which they have participated over the past five years, providing legal and/or financial advisory services or acting as restructuring experts. From this, it follows that the entity has sufficient and appropriate expertise to properly carry out the tasks associated with restructuring the debt borne by GRUPO ANTOLÍN-IRAUSA, S.A.U. A further document, identified as No. 7, has also been submitted, reflecting acceptance of the potential appointment, the setting of fees, and a statement that it is not subject to any of the grounds for prohibition or incompatibility for holding the position as provided in insolvency legislation. In addition, a certificate issued by the insurer Axa Seguros, S.A. de seguros y reaseguros, designated as document No. 8, confirms that LEXAUDIT CONCURSAL, S.L.P. has in place a professional liability insurance policy that was in force at the time its appointment was proposed (see document No. 9). Accordingly, and pursuant to Article 672.3 of the T.R.L.C., the requested appointment of the restructuring expert should be granted, and it will be given confidential status as expressly requested by the petitioner through an analogous application of the rule





as governed by Article 591 of the T.R.L.C., regarding publication of the order deeming the notice of commencement of negotiations with creditors to have been made, as referenced in Article 585 of the same statute.

Having reviewed the legal provisions cited, along with any others of general and relevant application, it is appropriate to

### ORDERING PROVISIONS

GRANT the request to appoint a restructuring expert submitted by Attorney-in-Fact (Procurator) Mr. MIGUEL ÁNGEL ESTEEBAN RUIZ on behalf of and representing the company **GRUPO ANTOLÍN-IRAUSA, S.A.U.** and, accordingly, appoint for that role the entity LEXAUDIT CONCURSAL, S.L.P., Tax ID (NIF) B65697740, with offices at Alfonso XII Street, No. 4, 2nd Floor, Left, 28014 Madrid, telephone 915-230-223, and email address info@lexaudit.com.

The appointment of the expert and the expert's identity shall remain confidential (Article 591 T.R.L.C.).

**CHALLENGE PROCEDURE:** the appointment as restructuring expert of any person who does not meet the requirements set out in insolvency legislation, is subject to any ground of incompatibility or disqualification from holding the position, or lacks adequate coverage or guarantee, may be challenged at any time by anyone who can show a legitimate interest in the matter, by means of the procedural channel of an insolvency incident (Article 677 T.R.L.C.).



Accordingly, by this Order, it is so declared, ordered, and signed by MS. ANA ISABEL LÓPEZ PÉREZ, Presiding Judge of the Commercial Division of the Burgos Court of First Instance.

**THE PRESIDING JUDGE**                                    **THE CLERK OF THE COURT**



ADMINISTRACION
DE JUSTICIA

The text of this decision may be shared with individuals or entities not involved in the proceeding in which it was issued only after any personal data it contains has been removed, and only with full respect for the right to privacy, the rights of persons requiring special protection, and—where applicable—the guarantee of anonymity for victims or other affected parties.

The personal data included in this decision may not be shared or disclosed for any purpose that violates the law.



--------------------------------------------------------------------------------------------------------------------------------

I, <u>Nicole Fadel</u>, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:                                                      Dated: 7/10/2026

**Special Incidental Proceeding File 310/2026-0001 —    –   Appointment of an Expert in the Restructuring**

| | |
|---|---|
| **Applicants:** | Group Antolín Irausa S.A.U. and others |
| **Attorney-in-Fact:** | Mr. Miguel Ángel Esteban |

| | |
|---|---|
| **Filing:** | Motion to correct a clerical error and, in the alternative, to supplement |

## TO THE COMMERCIAL DIVISION OF THE
## COURT OF FIRST INSTANCE OF BURGOS, COURTROOM NO. 1

**Mr. Miguel Ángel Esteban**, Attorney-in-Fact and Court Representative for Group Antolín-Irausa, S.A.U. ("**Antolín Irausa**"), Group Antolín-Aragusa, S.A.U., Group Antolín-Autotrim, S.A.U., Group Antolín-Eurotrim, S.A.U., Group Antolín-Glass, S.A.U., Group Antolín-Ingeniería, S.A.U., Group Antolín-Plasbur, S.A.U., Group Antolín-RyA, S.A.U., Antolin Interiors UK Limited, Group Antolin Leamington Limited, Group Antolin UK Limited, Group Antolín North America, Inc., Antolín Alabama, LLC, Antolin Interiors USA, Inc., Antolín Shelby, Inc., Group Antolin Missouri, LLC, Group Antolín Kentucky, Inc., Group Antolín Michigan, Inc., Group Antolin Sibiu SRL, Antolin Silesia Sp. z o.o. , Group Antolín South Africa (PTY) Ltd., Group Antolín Bohemia, a.s., Group Antolín Ostrava, s.r.o., Group Antolín Turnov, s.r.o., Antolin Liban, s.r.o, Antolin Deutschland GmbH, Group Antolín Bamberg GmbH & Co. KG, Group Antolin Logistik Deutschland GmbH, Antolin Straubing GmbH, Antolín Interiors México, S.A. de C.V., Group Antolín Silao, S.A. de C.V., Group Antolín Saltillo, S.R.L. de C.V., Group Antolín Tlaxcala, S.R.L. de C.V., Group Antolín Cuautitlán, S.R.L. de C.V., Group Antolín Lusitânia-Componentes Automóvel, Unipessoal, Lda., and Group Antolín Bratislava, s.r.o. (all of them, the "**Applicant Companies**"), as evidenced by the representation duly recorded in the above-referenced proceedings, appear before this Honorable Court and, as may be most proper under the law, **STATE**:

I.    On April 28, 2026, all of the above-mentioned Applicant Companies requested the appointment of **LEXAUDIT CONCURSAL, S.L.P.** ("**LEXAUDIT**," or the "**Expert**") as restructuring expert for all of the Applicant Companies, pursuant to Articles 672 et seq. of Royal Legislative Decree 1/2020, of May 5, approving the consolidated text of the Spanish Insolvency Act ("**TRLC**"). 1

II.    That, on May 21, 2026, this party was served with the Order of this Honorable Court dated May 14, 2026 (the "**Order**"), granting the request to

the appointment of LEXAUDIT, albeit only—and, in our view, due solely to an inadvertent clerical error—with respect to the parent company Antolín Irausa, with no reference to its subsidiaries (the remaining Applicant Companies), as can be seen in the operative part of the Order.

**III.** That, with due respect and strictly for purposes of our defense, considering—as we have stated—that the Order suffers from a mere clerical omission, by means of this filing and pursuant to Articles 214 and 215 of Law 1/2000, of January 7, on Civil Procedure ("**LEC**") and Article 267 of Organic Law 6/1985, of July 1, on the Judiciary ("**LOPJ**"), I hereby request the **RECTIFICATION** and, **IN THE ALTERNATIVE, SUPPLEMENTATION** of the Order, on the basis of the following

## ARGUMENTS

**First. -** **The Order contains a clear clerical omission that may be corrected *pursuant to* Article 214 of the LEC, as the operative section refers only to Antolín Irausa as the company for which LEXAUDIT is appointed as the restructuring expert, without including the remaining Applicant Companies**

1. On April 28, 2026, the Applicant Companies jointly filed a petition requesting the appointment of a restructuring expert. That filing stated that the request was submitted in the name and on behalf of the thirty-six Applicant Companies—Antolín Irausa and all of its subsidiaries (direct and indirect) identified in the heading.

2. The Order grants the petition and appoints LEXAUDIT as the restructuring expert, on a confidential basis *pursuant to* Article 591 of the TRLC. However, its operative section refers only to Antolín Irausa as the entity for which the appointment is made, and contains no ruling whatsoever as to the other Applicant Companies on whose behalf the petition was also filed.

3. The foregoing shows, in our view, that this is simply an inadvertent omission in identifying the Applicant Companies in the operative part of the Order. 2

4. Accordingly, Section 214.1 of the LEC provides that courts may, at any time, correct obvious clerical errors and arithmetic errors contained in their rulings. The requirements of that provision are met here: (i) this is an obvious clerical error, apparent from simply comparing the application with the Order issued; and (ii) it does not change the substance of the ruling, since the ruling grants the application

submitted; and (iii) correcting it does not entail any change to the legal reasoning or to the ruling in the order.

5. In light of the foregoing, pursuant to Article 214.1 of the Spanish Code of Civil Procedure (LEC), this Honorable Court is respectfully requested to correct the Order so as to expressly extend the appointment of LEXAUDIT as restructuring expert to all of the Applicant Companies, also on a confidential basis.

**Second. -** **Alternatively to the First Allegation, the Order would suffer from an omission that must be supplemented, as it contains no express ruling regarding the remaining Applicant Companies other than Antolín Irausa**

6. In the alternative, should the Court find that this is not a case of correcting a clerical error but rather an omission of a ruling, we hereby request that the Order be supplemented pursuant to Article 215 of the LEC.

7. Article 215.2 of the LEC provides that, where a decision has clearly failed to rule on a claim properly raised, a request to supplement the decision may be filed within five days of service of the decision.

8. In our application, we expressly and clearly requested that LEXAUDIT's appointment as restructuring expert be ordered for all Applicant Companies, not only for the parent company Antolín Irausa. However, as noted above, the operative part of the Order refers solely to the Expert's appointment with respect to Antolín Irausa, and contains no express ruling regarding the remaining Applicant Companies.

9. Accordingly, this Honorable Court is respectfully requested to supplement the Order with an express ruling extending the appointment of LEXAUDIT as restructuring expert—also on a confidential basis—to all Applicant Companies, thereby curing the omission identified pursuant to Article 215.2 of the LEC.

In view of the foregoing,

**RESPECTFULLY REQUESTS OF THE COURT** that this filing be deemed submitted, that it be admitted, and that the **CORRECTION** and, in the alternative, **SUPPLEMENTATION** of the Order dated May 14, 2026 be deemed requested, for purposes of extending the appointment of LEXAUDIT CONCURSAL,

S.L.P., acting as an expert in the restructuring of all Applicant Companies, on a confidential basis.

That is the relief I respectfully request in Burgos, on May 22, 2026.

**RODRIGO LOPEZ GONZALEZ** Digitally signed by RODRIGO LÓPEZ GONZALEZ Date: 2026.05.22 10:36:38 +02'00'

_____

Rodrigo López González

ICAM Member No. 77,858

**BLANCA MORENO HERRERO** Digitally signed by BLANCA MORENO HERRERO Date: 2026.05.22 10:38:37 +02'00'

_____

Blanca Moreno Herrero

ICAM Reg. No. 114,390

Digitally signed by ESTEBAN RUIZ MIGUEL ANGEL - 13131884BDN: C=ES, SERIALNUMBER=IDCES-13131884B, G=MIGUEL ANGEL, SN=ESTEBAN RUIZ, CN=ESTEBAN RUIZ MIGUEL ANGEL - 13131884BReason: I am the author of this documentLocation: Date: 2026.05.22 11:27:11+02'00'Foxit PDF Reader Version: 2023.2.0ESTEBAN RUIZ MIGUEL ANGEL - 13131884B

-------------------------------------------------------------------------------------------------------------------------------

I, <u>Nicole Fadel</u>, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:                                                        Dated: 7/10/2026

4





NOTIFICADO
02 - JUNIO - 2026
Miguel Angel Esteban Ruiz

**TRIAL COURT**
**COMMERCIAL SECTION**

**COURTROOM NO. 1 OF BURGOS**

**Centralized Civil, Administrative Litigation, and Labor Case Processing Unit - Burgos**

Avda. Reyes Católicos, 51 BIS
**Phone:** 947284055
**Email:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Team/User: GC1
Form: S40040 Case Management Order (Free Text) Art. 206.2(1) LEC

**N.I.G.:** 09059 42 1 2026 0003344

**PCI SPECIAL INCIDENTAL MATTER (SPECIFIC RULING) 0000310 / 2026 0001**

Originating proceeding: CLC PRIOR INSOLVENCY NOTICE AND JUDICIAL APPROVAL 0000310 / 2026
**Regarding OTHER INSOLVENCY-RELATED MATTERS**

PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF Ms. GROUP ANTOLIN IRAUSA SA, GROUP ANTOLIN ARAGUSA SA, GROUP ANTOLIN AUTOTRIM SAU, GROUP ANTOLIN EUROTRIM SAU, GROUP ANTOLIN GLASS SA, GROUP ANTOLIN INGENIERIA SAU, GROUP ANTOLIN PLASBUR SA, GROUP ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GROUP ANTOLIN LEAMINGTON LIMITED, GROUP ANTOLIN UK LIMITED, GROUP ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GROUP ANTOLIN MISSOURI LLC, GROUP ANTOLIN KENTUCKY INC, GROUP ANTOLIN MICHIGAN INC, GROUP ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GROUP ANTOLIN SOUTH AFRICA PTY LTD, GROUP ANTOLIN BOHEMIA AS, GROUP ANTOLIN OSTRAVA SRO, GROUP ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GROUP ANTOLIN BAMBERG GMBH CO KG, GROUP ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GROUP ANTOLIN SILAO SA DE CV, GROUP ANTOLIN SALTILLO SRL DE CV, GROUP ANTOLIN TLAXCALA SRL DE CV, GROUP ANTOLIN CUAUTITLAN SRL DE CV, GROUP ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GROUP ANTOLIN BRATISLAVA SRO

Attorney-in-fact (Court Representative) Mr. MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ

Attorneys: BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO

Deposits and Court Registry Account at BANCO SANTANDER.
Case Account No.: 1067 0000 52 0310 26
Payee: COURTROOM NO. 1, COMMERCIAL DIVISION, COURT OF FIRST INSTANCE OF BURGOS. For payments by bank transfer: ES55 0049 3569 9200 0500 1274. Reference: 1067 0000 52 0310 26



Secure Verification Code: E04799402-MI:mbdb-hUhn-k2Pd-8Acd-H You can
verify this document at https://www.administraciondejusticia.gob.es



## CASE MANAGEMENT ORDER

Ms./Mr. Clerk of the Court (Letrado/a de la Administración de Justicia), BEATRIZ BRIONES SANTAMARIA

In BURGOS, on May twenty-ninth, two thousand twenty-six.

A filing has been submitted, docketed under No. 42,254, by Attorney-in-Fact MIGUEL ÁNGEL ESTEBAN RUIZ, on behalf of and representing **GROUP ANTOLÍN IRAUSA, S.A.U. and its subsidiaries** (identified in the caption of this insolvency matter), requesting, pursuant to Article 214.3 of the Spanish Code of Civil Procedure, the **correction of an error** of a clerical nature contained in **Order 89/2026**, dated May 14, asserting that the appointment of LEXAUDIT as restructuring expert applies only to GROUP ANTOLÍN IRAUSA and not to its subsidiaries; file it and submit it to Your Honor for any appropriate action.

**RIGHT TO CHALLENGE:** This order may be challenged by filing a **motion for reconsideration** within **five days**, beginning the day after notice is served, before the Court Clerk (Letrado/a de la Administración de Justicia) who issued it. The motion must state the alleged error of law or procedure on which the challenge is based (Arts. 451 and 452 LEC).

To file the motion, a deposit in the amount of **25,00 €** must be paid into the account indicated above.

So ordered and signed. I certify.

**THE COURT CLERK**





Sharing the text of this decision with individuals who are not parties to the proceedings in which it was issued is permitted only after any personal data it contains has been removed, and only with full respect for the right to privacy, the rights of persons requiring special protection, and—where applicable—the guarantee of anonymity for victims or other affected individuals.

The personal data included in this decision may not be transferred or shared for any purpose that violates the law.



-----------------------------------------------------------------------------------------------------------------------------

I, <u>Nicole Fadel</u>, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:                                                                      Dated: 7/10/2026





NOTIFICADO
03 - JUNIO - 2026
Miguel Angel Esteban Ruiz

**TRIAL COURT**
**COMMERCIAL SECTION**
**COURTROOM NO. 1, BURGOS**

**Central Civil, Contentious-Administrative, and Labor Case Processing Service – Burgos**

Reyes Católicos Ave., 51 Bis
**Phone:** 947284055
**Email:** https://sedejudicial.justicia.es/-/presentacion-de-escritos

Team/User: GC1
Form: S40010 Order—Free-Text (Art. 206.1(2) LEC)

**N.I.G.:** 09059 42 1 2026 0003344
**PCI Special Incidental Matter—Specific Ruling 0000310 / 2026 0001**

Underlying proceeding: CLC Prior Notice of Insolvency and Court Approval 0000310 / 2026
**Re: OTHER INSOLVENCY-RELATED MATTERS**
PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF, PLAINTIFF Mr./Ms. GROUP ANTOLIN IRAUSA SA, GROUP ANTOLIN ARAGUSA SA, GROUP ANTOLIN AUTOTRIM SAU, GROUP ANTOLIN EUROTRIM SAU, GROUP ANTOLIN GLASS SA, GROUP ANTOLIN INGENIERIA SAU, GROUP ANTOLIN PLASBUR SA, GROUP ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GROUP ANTOLIN LEAMINGTON LIMITED, GROUP ANTOLIN UK LIMITED, GROUP ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GROUP ANTOLIN MISSOURI LLC, GROUP ANTOLIN KENTUCKY INC, GROUP ANTOLIN MICHIGAN INC, GROUP ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GROUP ANTOLIN SOUTH AFRICA PTY LTD, GROUP ANTOLIN BOHEMIA AS, GROUP ANTOLIN OSTRAVA SRO, GROUP ANTOLIN TURNOV SRO, ANTOLIN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GROUP ANTOLIN BAMBERG GMBH CO KG, GROUP ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GROUP ANTOLIN SILAO SA DE CV, GROUP ANTOLIN SALTILLO SRL DE CV, GROUP ANTOLIN TLAXCALA SRL DE CV, GROUP ANTOLIN CUAUTITLAN SRL DE CV, GROUP ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA, GROUP ANTOLIN BRATISLAVA SRO

Attorney-in-Fact (Court Agent): MIGUEL ANGEL ESTEBAN RUIZ,   MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL  ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ,  MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL  ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL  ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL  ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL  ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL  ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL  ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ, MIGUEL ANGEL ESTEBAN RUIZ
Attorney(s): BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO, BLANCA MORENO HERRERO, RODRIGO LOPEZ GONZALEZ, RODRIGO LOPEZ GONZALEZ, BLANCA MORENO HERRERO



Secure Verification Code: E04799402-MI:r46d-YW4g-259y-ZyT5-K You can
verify this document at https://www.administraciondejusticia.gob.es



## <u>ORDER — CORRECTION ORDER 05/14/2026</u>

In BURGOS, on June 1, two thousand twenty-six.

### <u>BACKGROUND FACTS</u>

**FIRST.-** In this insolvency proceeding, Order 89/2026 was issued dated May 14, appointing LEXAUDIT CONCURSAL, S.L.P., Tax ID No. B65697740, as restructuring expert, at the request of Attorney-in-Fact (Procurador) Mr. MIGUEL ÁNGEL ESTEBAN RUIZ, acting in the name and on behalf of the company GROUP ANTOLÍN-IRAUSA, S.A.U.

**SECOND.-** By a filing submitted on May 22, 2026 by the procedural representative of GROUP ANTOLÍN-IRAUSA, S.A.U. and all subsidiaries listed in the caption's designation of claimants in this order, a correction of a clerical error has been requested, asking that LEXAUDIT CONCURSAL, S.L.P. be appointed restructuring expert not only for the parent company, GROUP ANTOLÍN-IRAUSA, S.A.U., but also for all of its subsidiaries.

### <u>LEGAL GROUNDS</u>

**FIRST.-** Article 214.1 of the Spanish Code of Civil Procedure (LEC) provides that courts may not alter the rulings they issue once signed; however, they may clarify any unclear point and correct any material error they contain.



**Second.-** Article 214.3 of the LEC states that obvious clerical errors and arithmetic mistakes in decisions issued by the Courts and by the Clerks of the Administration of Justice may be corrected at any time.



**THIRD.-** In this matter, it is appropriate to grant the request to correct Order 89/2026, dated May 14, and to appoint LEXAUDIT CONCURSAL, S.L.P. as the restructuring expert for all companies comprising the GROUP ANTOLÍN IRAUSA GROUP, while keeping the appointment confidential.

<u>**DISPOSITIVE SECTION**</u>

**ORDER:**

**Amend Order 89/2026**, dated May 14, and appoint LEXAUDIT CONCURSAL, S.L.P., Tax ID No. B65697740, with offices at Calle Alfonso XII, No. 4, 2nd Floor, Left, ZIP 28014, Madrid, telephone 915230223, and email address <u>info@lexaudit.com</u>, as restructuring expert for the companies GROUP ANTOLÍN IRAUSA SA, GROUP ANTOLÍN ARAGUSA SA, GROUP ANTOLIN AUTOTRIM SAU, GROUP ANTOLIN EUROTRIM SAU, GROUP ANTOLIN GLASS SA, GROUP ANTOLIN INGENIERIA SAU, GROUP ANTOLIN PLASBUR SA, GROUP ANTOLIN RYA SAU, ANTOLIN INTERIORS UK LIMITED, GROUP ANTOLIN LEAMINGTON LIMITED, GROUP ANTOLIN UK LIMITED, GROUP ANTOLIN NORTH AMERICA INC, ANTOLIN ALABAMA LLC, ANTOLIN INTERIORS USA INC, ANTOLIN SHELBY INC, GROUP ANTOLIN MISSOURI LLC, GROUP ANTOLIN KENTUCKY INC, GROUP ANTOLIN MICHIGAN INC, GROUP ANTOLIN SIBIU SRL, ANTOLIN SILESIA SP ZOO, GROUP ANTOLIN SOUTH AFRICA PTY LTD, GROUP ANTOLIN BOHEMIA AS, GROUP ANTOLIN OSTRAVA SRO, GROUP ANTOLIN TURNOV SRO, ANTOLÍN LIBAN SRO, ANTOLIN DEUTSCHLAND GMBH, GROUP ANTOLIN BAMBERG GMBH CO KG, GROUP ANTOLIN LOGISTIK DEUTSCHLAND GMBH, ANTOLIN STRAUBING GMBH, ANTOLIN INTERIORS MEXICO SA DE CV, GROUP ANTOLIN SILAO SA DE CV, GROUP ANTOLIN SALTILLO SRL DE CV, GROUP ANTOLIN TLAXCALA SRL DE CV, GROUP ANTOLIN





CUAUTITLAN SRL DE CV, GROUP ANTOLIN LUSITANIA COMPONENTES AUTOMOVEL UNIPESSOAL LDA and GROUP ANTOLIN BRATISLAVA SRO.

The expert status is maintained, and   CONFIDENTIAL of the  appointment of their identity remains protected.

**APPEAL PROCEDURE:** no appeal may be filed **against this order**, without prejudice to any appeals that may be available, as applicable, against the decision referenced in the request for clarification.

Accordingly, this Order is issued, directed, and signed by MS. ANA ISABEL LÓPEZ PÉREZ, Hon. Magistrate-Judge of Court No. 1 of the Commercial Division of the Burgos Court of First Instance.

**THE MAGISTRATE-JUDGE**          **THE COURT CLERK**

Sharing the text of this ruling with anyone who is not a party to the case in which it was issued may be done only after removing any personal data it contains, and with full respect for the right to privacy, the rights of individuals requiring special protection, and—where applicable—the guarantee of anonymity for victims or affected persons.

Personal data included in this ruling may not be transferred or disclosed for purposes that are contrary to the law.



----------------------------------------------------------------------------------------------------------------------

I, Nicole Fadel, certify that I am fluent in English and Spanish and am therefore qualified to translate from Spanish to English and attest that the above is a true and accurate translation of the original document.

Nicole Fadel
601 Lexington Ave.
New York, NY 10022

Signed:                                                                          Dated: 7/10/2026